John J. Hebert (#010633)
Mark W. Roth (#010708)
Philip R. Rudd (#014026)
**POLSINELLI SHUGHART, P.C.**
Security Title Plaza
3636 N. Central Avenue, Suite 1200
Phoenix, AZ 85012
Phone: (602) 650-2000
Fax: (602) 264-7033
E-mail: jhebert@polsinelli.com
E-mail: mroth@polsinelli.com
E-mail: prudd@polsinelli.com

*Attorneys for the Debtor*

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 Proceedings |
| FULTON HOMES CORPORATION | Case No. 2:09-bk-1298-GBN |
| Debtor. | **THIRD AMENDED DISCLOSURE STATEMENT RELATING TO THIRD AMENDED PLAN OF REORGANIZATION DATED MAY 25, 2010** |

## I.    INTRODUCTION

This document is the "Third Amended Disclosure Statement Relating to Third Amended Plan of Reorganization Dated May 25, 2010" ("Disclosure Statement") of Fulton Homes Corporation ("Debtor"), an Arizona corporation, the Debtor in the above-entitled Chapter 11 bankruptcy proceeding. This Disclosure Statement is submitted by the Debtor pursuant to 11 U.S.C. § 1125.

11 U.S.C. § 1125(b) prohibits the solicitation of acceptances or rejections of a Plan of Reorganization unless such Plan is accompanied by a copy of the Disclosure Statement which has been approved by the Bankruptcy Court.

The purpose of this Disclosure Statement is to provide creditors and interested parties in this bankruptcy proceeding with such information as may reasonably be deemed sufficient to allow creditors and interested parties to make an informed decision regarding the Debtor's "Third Amended Plan of Reorganization Dated May 25, 2010" (the "Plan").

Unless otherwise noted, those portions of the Plan and this Disclosure Statement providing factual information concerning the Debtor, its assets and liabilities, have been prepared from information submitted by the Debtor and its retained professionals. The Debtor and other professionals employed by the Debtor have utilized all relevant, non-privileged information provided by the Debtor in preparing this Disclosure Statement and the Plan.

This Disclosure Statement contains information that may influence your decision to accept or reject the Debtor's proposed Plan. Please read this document with care.

The financial information contained in this Disclosure Statement has not been subjected to an audit by an independent certified public accountant. For that reason, the Debtor is not able to warrant or represent that the information contained in this Disclosure Statement is without any inaccuracy. To the extent practicable, the information has been prepared from the Debtor's financial books and records and great effort has been made to ensure that all such information is fairly represented.

This Disclosure Statement and the Plan will classify all creditors into Classes. The treatment of each Class of creditors will be set forth in this Disclosure Statement and in the Plan. You should carefully examine the treatment of the Class to which your Claim will be assigned.

This Disclosure Statement requires approval by the Bankruptcy Court after notice and a hearing pursuant to 11 U.S.C. §1125(b). Once approved, the Disclosure Statement will be distributed with the Debtor's proposed Plan for voting. Approval of the Disclosure Statement by the Bankruptcy Court does not constitute either certification or approval of the Debtor's Plan by the Bankruptcy Court or that the Disclosure Statement is without any inaccuracy.

The Bankruptcy Court will confirm the Plan if the requirements of §1129 of the Bankruptcy Code are satisfied. The Bankruptcy Court must determine whether the Plan has been accepted by each impaired Class entitled to vote on the Plan. Impaired Classes entitled to vote on the Plan are those Classes of claims whose legal, equitable, or contractual rights are altered, as defined under §1124 of the Bankruptcy Code. An impaired Class of claims is deemed to have accepted the Plan if at least two-thirds (2/3) in amount of those claims who vote and more than one-half (1/2) in number of those claims who vote have accepted the Plan. An impaired Class of interests is deemed to have accepted the Plan if the Plan has been accepted by at least two-thirds (2/3) in amount of the allowed interests who vote on the Plan.

Even if each Class of creditors does not accept the Plan, the Plan can be confirmed under §1129(b) of the Bankruptcy Code, so long as one impaired Class of creditors accepts the Plan. This is referred to as the "cram down" provision of the Bankruptcy Code. The failure of each Class to accept the Plan could very well result in a conversion of this case to Chapter 7 or dismissal of the Chapter 11.

Only the votes of those creditors or interested parties whose ballots are timely received will be counted in determining whether a Class has accepted the Plan.

## II. DEFINITIONS

The definitions set forth in Article I of the Plan apply in this Disclosure Statement except to the extent other definitions are set forth in this Disclosure Statement.

## III. THE DEBTOR, BACKGROUND, AND EVENTS PRECIPITATING THE CHAPTER 11

### A. Background

The Debtor is an Arizona corporation, founded in 1975 and engaged in the business of building and selling single family homes and residential lots in the state of Arizona. The Ira A. Fulton and Mary Lou Fulton Family Trust ("Fulton Family Trust") is the Debtor's sole shareholder. Ira A. Fulton and Mary Lou Fulton are the beneficiaries of the Fulton Family Trust. Through careful management of the company over the succeeding years, Ira Fulton grew the company from one that built less than 100 homes a year to a company that has built in excess of 2,200 homes per year spread across numerous planned communities.

The Debtor is one of the largest residential home builders in the State of Arizona. The numerous planned communities developed by the Debtor during these 30 years are comprised of more than 18,000 homes. The Debtor's assets consist of its real estate holdings related to its real estate developments. Those developments are in Maricopa and Pinal Counties with approximately 2,850 lots in various phases of development, from dirt to completed model homes.

The Debtor has not only supplied jobs and been a vibrant and involved member of the development community in Arizona, it has also been a good corporate citizen as evidenced by, for example, its donation of land to build more than ten new schools. Such donations have amounted to millions of dollars over the years. Additionally, the Debtor and the Fultons have been involved in a host of other charitable and community programs and organizations for the benefit and betterment of

the State of Arizona and the local community such as the Teacher Silver Apple Award, the Free Pool Fence Program, YMCA Swim Lessons for Children, the Phoenix Children's Hospital CPR program for Parents, Stuff the Bus with School Supplies, and Teacher of the Week.

The Debtor's and its affiliates' (collectively, "Fulton") management team operates out of Fulton's home office in Tempe, Arizona. Fulton also has sales and development related facilities located at its numerous communities. In total, Fulton employs approximately 78 people as salaried employees, hourly employees, and sales agents. In addition, Fulton's developments employ hundreds of local workers indirectly or through various subcontractors that supply services to Fulton. Finally, as a builder, Fulton is also responsible for the purchase of tens of millions of dollars in construction and development related supplies each year. In short, Fulton is an essential part of the state's economy.

The sale of the Debtor's residential homes and lots are in the ordinary course of the Debtor's business. As set forth below, the continued sale of homes free and clear of liens and encumbrances has been approved of by the Bankruptcy Court in this case.

Typically, for a variety of practical, financial and tax savings reasons, the Debtor sells its homes to homebuyers through an affiliated entity called Fulton Homes Sales Corporation ("Fulton Sales"). Fulton Sales is not a debtor in bankruptcy. Fulton Sales not only sells the homes to homebuyers, but it also provides a home warranty to homebuyers.

There are no blanket liens on the Debtor's assets or the properties it sells. Rather, the only liens that may exist relate to a specific piece of property, such as mechanics' or materialman's liens. These liens are ultimately dealt with at the closing of the specific piece of property, if not before, and will not affect the ability of Fulton to sell homes and lots.

The Debtor's chief lender is a consortium of banks (the "Banks") for which Bank of America acts as the agent. The loan by the Banks consists of a $250,000,000 unsecured line of credit that has been paid down by over $84,500,000 in principal, together with an additional $16,700,000 in interest and fees, in the year prior to Fulton Homes' bankruptcy filing. The present amount owed on the line of credit is $163,488,654.82. The Debtor has listed the Banks' claim as disputed in the Debtor's Schedules of Assets and Liabilities, as amended. Because this loan is an unsecured loan, the Banks have no liens on the Debtor's assets, and, importantly, have no collateral interest in the lots and homes

that the Debtor develops and sells. Furthermore, the Debtor was current with all of its banks and vendors through the end of 2008.

Prior to the bankruptcy filing, the Debtor was in close consultation with the Banks seeking to find an accommodation whereby the Debtor could more effectively respond to and thrive in the present economic downturn. The Debtor and the Banks were unable to arrive at an agreement on how to manage their relationship in the face of the economic downturn. This inability to arrive at a common understanding precipitated the Debtor's bankruptcy filing.

Despite the differences between Fulton and the Banks, and the decline in sales due to the economic downturn, Fulton has continued to sell homes at an above average rate given the current market climate, increasing its market share from 3% prior to the Petition Date to over 7% as of the date of this Disclosure Statement. Fulton's management team and staff have worked diligently to ensure that Fulton continues to remain a leader in the Maricopa and Pinal County residential marketplace.

As more fully described below, the Debtor has retained experts in a variety of areas to assist it in its reorganization efforts. In addition to bankruptcy and special legal counsel, the Debtor has retained restructuring professionals with significant experience in the residential home sales and development market, and experts in the area of developing plans of reorganization and the feasibility thereof. These experts have generated detailed analyses of Fulton's land holdings that have been and will continue to be updated based upon the most current information available. These experts and the knowledge they bring to the Debtor give Fulton a strategic advantage in the marketplace.

Fulton also took steps long before filing for bankruptcy protection to ensure that it retained only its most valuable core assets. In fact, during 2008, Fulton sold over 4,400 lots in less desirable markets, generating over $55 million in cash proceeds. Fulton was able to accomplish this because its management team anticipated the downturn in the housing market and made a concerted move to shed those assets that would place an unnecessary drain on Fulton's resources. Thus, the Debtor now has a core set of residential real estate related assets that place it in an optimal position to emerge from bankruptcy and benefit from market conditions as they improve. This includes, for example, the ability to obtain necessary permits for lots in the Ironwood Crossings community at a cost that is approximately 10% of what Fulton's competitors will face. Fulton has also redesigned homes in its

communities to respond to the market conditions, thereby satisfying the demands of customers in the current market climate. In short, Fulton continues to streamline and optimize its operations in response to the present downturn, and is doing so in a way that will also allow it to thrive into the future.

In fact, as discussed below, Fulton's post-petition operations have exceeded Fulton's expectations and Fulton has been able to take advantage of a stronger than anticipated market for homes during 2009 and the first quarter of 2010. Indeed, at the time Fulton Homes filed its voluntary petition in late January 2009, the home sales market in the Valley was abysmal and the future did not look promising. In fact, Fulton Homes closed sales on only 13 homes in January 2009, 13 homes in February 2009, and 19 homes in March 2009. In contrast, over the prior eight years, Fulton Homes had closed an average of approximately 76 homes in each January, an average of nearly 87 homes in each February and nearly 102 homes in each March. In sum, the market and outlook was bleak.

Based on this data, Fulton Homes filed its first proposed plan of reorganization on May 27, 2009 (the "Initial Plan"), within Fulton Homes' initial 120 day exclusive period. This Initial Plan provided for a payment to unsecured creditors of $85,000,000.

However, due in large part to Fulton Homes' strategic and forward looking activities prior to the bankruptcy filing, and the quality of its homes, communities and management, sales began to pick up in the Spring and Summer of 2009. This increase in sales activity also likely reflected consumer recognition of certain new tax incentives available to first-time homebuyers. For example, Fulton Homes recorded sales of 85 homes in April, 104 homes in May, 69 homes in June, and 93 homes in July. Additionally, closings also increased during the Spring and Summer, with 23 closings in April, 60 closings in May, 54 closings in June, and 50 closings in July. Consequently, as sales and closings picked up, Fulton Homes recognized that it was prudent to, and that the market would support, an increase in the payment to unsecured creditors. Accordingly, on July 14, 2009, Fulton Homes filed its "First Amended Plan of Reorganization Dated July 14, 2009" ("First Amended Plan") providing for, among other things, a payment to unsecured creditors of $120,000,000—an increase of $35,000,000 to unsecured creditors.

Subsequently, in light of additional market data (including June, July and August (108 sales)

sales and closings), Fulton Homes filed its "Second Amended Plan of Reorganization Dated August 21, 2009" ("Second Amended Plan") on August 21, 2009. The Second Amended Plan increased the amount to be paid to unsecured creditors to $125,000,000—a $5 million increase in the return to unsecured creditors.

Ultimately, nearly five months after filing the Second Amended Plan, Fulton Homes had received ballots regarding the Second Amended Plan and filed its ballot report on December 4, 2009. All creditors who voted on the Second Amended Plan voted in favor of confirmation, except BofA. BofA also filed an objection to confirmation. By agreement of the parties and instructions from the Court, BofA's plan objection was bifurcated between legal objections and factual objections, with separate briefing and oral argument regarding the purely legal objections. Following the briefing regarding the legal objections to the Second Amended Plan, the hearing on the legal objections was held on February 25, 2010, and the Court entered its Order Regarding Plan Confirmation on March 17, 2010 which indicated that the Court did not believe the Second Amended Plan to be confirmable as written.

In the meantime, between the filing of the Second Amended Plan and the entry of the Court's Order Regarding Plan Confirmation, Fulton Homes remained cautious about the future of the market. For example, the first time homebuyer tax incentive was originally set to expire in November 2009 and there was considerable consternation in the home building community in general about the impact of the expiration of the incentive. Indeed, Fulton Homes' home sales began to decline as that deadline approached. Specifically, Fulton Homes had 62 sales in September 2009, 43 in October and only 37 in November 2009. Nevertheless, because of the sales in the preceding months, home closings were relatively robust in the late Summer and Fall of 2009, with 31 closings in August, 38 in September, 64 in October, 106 in November and 81 in December. In any event, despite the grim outlook at the beginning of 2009 and the modest slide in sales at the end of 2009, Fulton Homes ended up closing 548 homes and 4 lots in 2009, resulting in over $130,000,000 in revenues.

In late 2009, the home buyer's tax incentive was expanded and extended to April 30, 2010. However, sales activity in early 2010 was relatively modest, with 23 sales in January, but is beginning to pick up with 35 sales in February, 43 sales in March and 60 sales in April. Closings, meanwhile,

continue at a relatively steady pace, with 34 closings in January, 53 closings in February, 50 closings in March, and 52 closings in April. Thus, despite the anticipated termination of the tax incentive, the prospects for a strong 2010 are good.

Ultimately, while Fulton's initial projections anticipated that Fulton would sell approximately 210 homes in 2009, Fulton was able to sell 548 homes in 2009. In fact, Fulton doubled its share of the Phoenix homebuilding market in 2009, and has increased its national homebuilder ranking from 70th in 2008 to 49th in 2009. These significant sales have allowed Fulton to accumulate over $65,000,000 in cash since the Petition Date, as of May 1, 2010, and to achieve a post-petition profit reflected in Fulton Homes' income statement, before restructuring expenses, of over $8,500,000, through April 30, 2010. Consequently, given the vastly improved market, Fulton's stellar performance over the past year, and the amount of cash that Fulton has accumulated during the pendency of this case, Fulton has now dramatically changed its proposed treatment of unsecured claims in its Third Amended Plan of Reorganization, and now proposes to pay all Allowed General Unsecured Claims (except Ira Fulton's allowed unsecured claim, which will be waived) in full, with interest, during the life of the Plan.

### B. Business Plan and Projections

The Debtor intends to continue operating its business as a developer of residential communities in Maricopa and Pinal counties.

Initially, the Debtor will be focused on the sale of its existing inventory of lots and homes. This inventory includes everything from platted land to completed spec homes as follows:

1. There are 106 completed homes in the Debtor's inventory, with an additional 223 homes under construction (143 of these homes under construction have already been sold) and 27 being used as model homes. These homes are located across 12 Fulton communities;

2. The Debtor also has 693 finished lots ready for homes to be built on them immediately. These lots are located across 12 of Fulton's communities, and an additional 529 lots are currently being developed into finished lots in 4 Fulton communities;

3. Finally, the Debtor has 1,451 platted lots. These lots have received necessary approvals from municipal agencies.

Fulton has also developed new home designs that respond to the current economic climate and

are competitive with existing home sales and foreclosures. These new designs have been approved by the necessary governmental and community bodies, and will, where appropriate, replace or augment designs that were popular prior to the economic downturn. Model homes of the new designs are already completed at various communities, and homes based on these designs are already being successfully sold.

Fulton may pause construction of new homes, in whole or part, at a limited number of communities. This pause is designed to allow the market to recover and prices to rise before construction and sales restart in these communities. The pause will ensure that Fulton's resources are devoted to those communities with the greatest opportunity to generate profits from sales in the short run.

In the present downturn, Fulton cannot ignore the potential for acquiring land at exceptionally advantageous prices so that affordable quality communities can be developed. With this in mind, Fulton will continue to actively explore opportunities to acquire additional land for the development of new communities, or to augment communities that presently exist.

A summary of Fulton's projections for the repayment of its debt pursuant to the terms of this Plan (the "Financial Summary") is attached hereto as Exhibit "A." The Financial Summary consists only of Fulton's projections based upon its anticipated revenues and expenses. The actual amount available for the payment of creditors will be determined from Fulton's actual revenues and expenses. Nevertheless, Fulton's projections demonstrate that Allowed General Unsecured Creditors will be paid in full by the end of 2015.

The Financial Summary attached hereto as Exhibit "A" is a summary of a roughly 60 page Excel spreadsheet (the "Spreadsheet") which incorporates specific and detailed data regarding the continued and future construction and sale of homes in each of the Debtor's communities. The roughly 60 page Spreadsheet addresses the Debtor's and its financial advisor's, Green Street Capital Group, LLC's ("Green Street"), projections of the product type, lot size, anticipated price (for each product type, lot size, etc.), anticipated cost of construction and other factors weighing on the revenues and expenses associated with building and selling the homes in each of Fulton Homes' communities.

The Spreadsheet is updated periodically as the Debtor and Green Street recognize market

changes with respect to, among other things, product types, absorption rates, costs and pricing. The Financial Summary is merely a snapshot of the Debtor's projections as of May 1, 2010 and, together with the Spreadsheet, is subject to change per market conditions. The Debtor has previously shared the Spreadsheet, in a manipulatable form, with the Banks and their advisors, and will make the voluminous data contained in the Spreadsheet available to any parties requesting such information. Because portions of the Spreadsheet, and the data therein, contain proprietary information and data, some portions of the Spreadsheet may be redacted, and/or parties requesting the Spreadsheet data will be required to sign a confidentiality agreement before being provided with the data.

Generally, the revenue assumptions in the Financial Summary are calculated by multiplying the projected monthly absorption by the per home sales price. In order to project a monthly absorption and per home sales price, the Debtor and its financial advisors, Green Street:

- Inspected each of Fulton's communities;

- Analyzed and evaluated Fulton's business strategies for the assets, including anticipated sales prices based upon historical sales prices and Fulton Homes' and Green Street's evaluation and analysis of the current housing market in the Phoenix metropolitan area;

- Analyzed and evaluated each specific product type being built by Fulton Homes within Fulton's various communities;

- Reviewed and analyzed absorption data and information, including foreclosure data, in the areas immediately surrounding Fulton's communities;

- Reviewed and analyzed home sales, listings, pending sales, foreclosures, and anticipated foreclosures in the areas immediately surrounding Fulton's communities;

- Consulted with and interviewed various "market makers," professionals and users within the local real estate market arena regarding, among other things, their respective views and opinions regarding the local residential real estate market and current and anticipated market trends;

- Addressed and considered recent macro-economic factors and data, based on a variety of media and news sources and other resources, that pertain to the local residential real estate market in general, and Fulton Homes' communities specifically; and

- Relied on the collective internal knowledge, experience and expertise of Fulton, Green Street and their respective network of sources and resources for analyzing market conditions, absorption rates and pricing trends.

Finally, in addition to the myriad of educated assumptions regarding, among other things, the product mix, absorption rates, pricing and expense increases set forth in the Spreadsheet, the Financial Summary makes the following assumptions:

(1)     The Debtor and Green Street assume that appreciation will occur at the rate of 0% for 2010, 2.5% for 2011, 3% for 2012 and 2013, and 3.5% for 2014 and 2015;

(2)     The Debtor and Green Street assume that construction costs will increase at the rate of 1% for 2010 and 2% per year through the remaining life of the projections; and

(3)     The Debtor and Green Street assume that Fulton will build and sell houses, and sell improved lots, at a conservative rate of approximately 303 homes and approximately 66 lots per year.[1]

As set forth below, the Debtor's secured creditors will be paid in full within 60 days of the Plan's confirmation and the Debtor's Allowed Unsecured Claims will also be paid in full, with interest at the Plan Rate beginning on the Effective Date of the Plan, no later than December 31, 2015.

### C.     Operations

In order to provide for efficient and productive operations, and to keep the Debtor's business competitive, the Debtor intends to retain the same management team and structure that existed pre-petition. The issues confronted by the Debtor that led to the bankruptcy filing were the product of market changes, not the Debtor's management or its structure. Thus, a change in management structure is not in the best interests of the Debtor or its creditors because the existing structure is appropriate to the needs of the Debtor.

As described above, Fulton's management team anticipated the downturn in the economy and diligently undertook to shed certain assets that were unlikely to be of value in a recession, obtaining above market prices in the process. While no one could have predicted the severity of the downturn, the prescient acts of Fulton's management team have placed the company in a very strong position to

---

[1] Note that the Debtor's projections reflect a bulk sale of approximately 369 lots in 2013, rather than spreading such lot sales out over the life of the projections. Ultimately, the improved lots will be sold in a manner and at a time that the Debtor deems it prudent to do so based on market conditions.

survive the downturn and emerge as a vibrant, leading and profitable homebuilder as the market returns to normal. The management of Fulton has a combined 120 years of experience with Fulton, as well as additional real estate industry experience obtained prior to joining Fulton.

By maintaining its current management and operational structure, the Debtor will avoid the transactional costs associated with significant and unnecessary change. In addition, the institutional knowledge of the management team will be preserved, and the way in which operations are conducted is, inherently, highly efficient and effective. As with any competitive business, if and when Fulton identifies additional efficiencies, it will respond and institute such operational changes as appropriate.

### D. Fulton Sales

In order to take advantage of certain statutory tax benefits, Ira and Mary Lou Fulton created Fulton Homes Sales Corporation ("Fulton Sales") in 1997. Fulton Sales markets and sells the homes that the Debtor builds. Specifically, when a home is sold, it passes through a double escrow as follows:

(a) First, the Debtor sells the home to Fulton Sales, typically for an amount equal to:

(i) the cost to build the home, including hard construction costs as well as overhead costs incurred by the Debtor ("Manufacturing Cost") *plus*

(ii) The Debtor's mark-up or profit ("Manufacturing Return") of approximately 5% of the sales price;

(b) Second, Fulton Sales sells the home to the homebuyer, typically for an amount equal to:

(i) the price Fulton Sales paid to the Debtor (*i.e.*, the Manufacturing Cost plus the Manufacturing Return) ("Manufacturers' Price") *plus*

(ii) costs and expenses, sales commissions, seller closing costs, homebuyer incentives, home owners' association subsidies for communities that are not currently sold out, etc.) (the "Sales Costs") *plus*

(iii)     Fulton Sales' fixed costs, reserves for warranty claims, general and administrative expenses, and profit, if any ("Sales Return") (the Manufacturers' Price plus the Sales Cost plus the Sales Return is referred to herein as the "Final Sales Price").

Upon the sale of the home to the homebuyer, the title company remits the Manufacturers' Price to the Debtor and the remainder to Fulton Sales who uses the difference between the Manufacturers' Price and the Final Sales Price, if any, to pay its Sales Costs and to cover its Sales Return.  Pursuant to Arizona statutes, because of the foregoing corporate structure, the State of Arizona only charges the Debtor for sales tax on the Manufacturing Return portion of the Final Sales Price paid by the homebuyer.  Fulton Sales is not charged sales tax by the State of Arizona on the transaction.  This corporate structure is very beneficial to the Debtor's financial viability and ability to reorganize.

**E.      Express and Implied Warranty, Latent Defect, Customer Service, and Indemnification Obligations**

As homebuilders and home sellers, Fulton Homes and Fulton Sales have various obligations and potential liabilities to homebuyers.

First, because homebuyers buy from Fulton Sales, they have no interaction or agreements with Fulton Homes.  Rather, all communications and agreements with homebuyers are conducted through Fulton Sales.  Specifically, for example, Fulton Sales (rather than Fulton Homes) provides an express two year limited repair/replacement home warranty ("Express Home Warranty") to homebuyers under and pursuant to the Purchase Agreement and Escrow Instructions ("Purchase Agreement") between the homebuyers and Fulton Sales.  Because Fulton Sales is not a debtor in bankruptcy, the automatic stay does not apply to a homebuyers' efforts to enforce an Express Home Warranty.  Furthermore, the Debtor's plan of reorganization and ultimate discharge will not affect Fulton Sales' liabilities under an Express Home Warranty.  Consequently, the Plan contemplates that Fulton Sales will continue to honor valid obligations under such Express Home Warranties.

Second, although Fulton Homes does not interact with homebuyers and does not provide any express warranties to homebuyers, Fulton Homes—as the builder of the homes—is nevertheless potentially subject to certain implied warranty, latent defect and customer service obligations and

liabilities to home buyers under certain statutes and common law. Further, as a matter of sound business practices and a desire to maintain its valuable reputation as a high quality home builder, with impeccable integrity and unmatched concern for buyers of its homes, Fulton makes every effort to ensure that the homes that it builds and sells satisfy their customers' needs and are generally free of workmanship defects. Consequently, the Plan contemplates that Fulton Homes will continue to honor implied warranty, latent defect and customer service obligations to homebuyers with valid claims.

Finally, Fulton Homes also has certain potential indemnification liabilities to it vendors and suppliers. Again, in order to maintain its relationships with these vendors and suppliers, and to continue its rich tradition as a high quality business partner, the Plan contemplates that Fulton will continue to honor legitimate and valid indemnification claims.

### F. Preferences, Fraudulent Conveyances and Other Potential Causes of Action

To the extent that a preference or fraudulent conveyance occurred before the bankruptcy filings, such transfer may be recoverable by the bankruptcy estate for the benefit of the estate under §§ 544, 547, or 548 of the Bankruptcy Code. To date, no complaints have been filed under any of these theories. To the extent any such claims exist, they will be analyzed for their potential value to the estate. These potential claims are specifically preserved for the benefit of the bankruptcy estate. Any recovery that is obtained will be obtained for the benefit of the estate.

The Banks have asserted that a potential cause of action exists against Ira Fulton or the Fulton Family Trust for alleged unjust enrichment stemming from certain tax refunds to which Ira Fulton is or may be entitled relating to prior income taxes paid by Ira Fulton. Fulton Homes has reviewed this alleged cause of action and has determined that it is meritless and will not be pursued.

### G. Conclusion

Fulton was and will continue to be a leader in the Maricopa County and Pinal County residential homebuilding marketplace. Fulton's management team shed non-core assets prior to the filing of the bankruptcy and is currently positioned to benefit from the market as it recovers. The Debtor has no major secured creditors, and, as set forth below and in the plan of reorganization, is

prepared to (i) pay the secured creditors it does have in full, (ii) pay its unsecured creditors in full, with interest, over a reasonable period of time, and (iii) continue as a vital member of the Arizona economy. In short, Fulton is positioned to be even more successful in the future than before the economic downturn, and the plan of reorganization sets forth how it will accomplish that end.

## IV. SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

### A. Administrative Proceedings

The Debtor filed its Petition for Relief under Chapter 11 on January 27, 2009, and a first meeting of creditors was held on March 3, 2009.

### B. Retention of Professionals

The Debtor retained Polsinelli Shugart, P.C. ("PS") to act as its original bankruptcy counsel. The Court signed an Order approving the retention of PS, on January 27, 2009.

On February 3, 2009, the Debtor filed an application to retain the law firm of Lake and Cobb, P.C. ("LC"), as its special counsel. The Court signed an order approving the retention of LC on February 4, 2009. PS and LC continue to represent the Debtor in this bankruptcy case.

On February 5, 2009 the Debtor filed an application to employ Green Street as it Financial Advisor. On March 2, 2009 the Court signed an order approving the retention of Green Street through October 2009. In November 2009, the Debtor filed a motion to extend Green Street's retention through April 2010. The Court entered its order approving this extended retention on December 4, 2009. The Debtor intends to seek a further extension of Green Street's employment beyond April 2010.

On February 5, 2009, the Debtor filed an application to employ Burch and Cracchiolo as special counsel for the Debtor relating to zoning matters. On March 4, 2009, the Court signed an order approving the retention of Burch and Cracchiolo.

On March 13, 2009, the Debtor filed a motion to retain Gaintner Bandler Reed & Peters, P.L.C., as its auditors for ERISA required 401(k) audits. On April 9, 2009 the Court signed an order approving the retention of Gaintner Bandler Reed & Peters, P.L.C.

On March 23, 2009, the Debtor filed a motion to retain Wentworth Webb & Postal, L.L.P. as the Debtor's property tax protest service advisors. On April 30, 2009 the Court signed an order approving the retention of Wentworth Webb & Postal, L.L.P.

On May 15, 2009, the Debtor filed a motion to retain Deloitte Tax, LLP ("Deloitte Tax") to provide tax services to the Debtor, including preparing and filing tax returns for 2008. The Banks objected to the motion to retain Deloitte Tax. Nevertheless, the Court entered its Order authorizing the Debtor's retention of Deloitte Tax on June 25, 2009. On March 25, 2010, the Debtor filed an application to approve certain modified terms of Deloitte Tax's retention and the Court approved this application on April 29, 2010.

On May 29, 2009, the Debtor filed a motion to retain Elliott Pollack ("Pollack") as the Debtor's interest rate, discount rate and plan feasibility advisor. The Court entered its Order authorizing the Debtor's retention of Pollack on June 22, 2009.

On July 23, 2009, the Debtor filed a motion to retain Deloitte & Touche, LLP ("Deloitte Audit") as independent financial auditor to prepare audited financial statements for the Debtor for the year end 2008. The Court entered its Order authorizing the Debtor's retention of Deloitte Audit on August 12, 2009.

### C.  First Day Motions

The Debtor filed several "first day" motions that were all approved by the Court. These motions and the Orders related thereto are available from the Court's docket. In summary these motions included the following:

      1.    A motion to approve the payment of prepetition wages;

      2.    A motion to allow checks issued prepetition on account of debts due and owing prepetition to clear from the Debtor's existing bank accounts, and to allow the bank accounts to remain open for a limited period of time so that those checks could clear; and

      3.    A motion for the maintenance of existing utility service and establishing procedures for any challenges to such continued service or for additional deposits issued by utility companies.

### D.  Appointment of Unsecured Creditors Committee

On February 22, 2009, the United States Trustee's Office filed a statement stating that, despite its efforts to contact unsecured creditors, it was unable to appoint a Committee of Unsecured Creditors.

### E.    Motion to Sell and Construct Homes

On February 3, 2009, the Debtor filed a Motion for Authority to Sell Homes and Residential Lots Free and Clear of Liens pursuant to Section 363 of the Bankruptcy Code. On February 17, 2009, the Bankruptcy Court approved the Debtor's Motion to Sell Homes and Residential Lots Free and Clear of Liens. This Order permits the Debtor to retain all net proceeds from the sale of its homes and residential lots. As discussed below, the Banks filed a motion requesting that the Court amend this order but have not prosecuted that motion.

### F.    Motion to Pay Critical Vendor

On February 19, 2009, the Debtor filed a Motion to pay Mesa Lighting and Fan, Inc., a critical vendor of the Debtor. On April 2, 2009, the Bankruptcy Court entered an order approving this Motion.

### G.    Motion to Terminate Exclusivity

On June 3, 2009, the Banks filed a motion to terminate the Debtor's exclusive period within which to obtain acceptances of its plan of reorganization. The Debtor opposed the motion. On July 2, 2009, the Court entered its Order denying the Banks' motion to terminate the Debtor's exclusivity period.

### H.    Motion to Alter or Amend Ordinary Course Order

On June 24, 2009, the Banks filed a motion requesting that the Court alter or amend the Court's Order authorizing the Debtor to build and sell homes in the ordinary course of its business. The Debtor has opposed the motion. The parties mutually and repeatedly agreed to continue this matter on the Court's calendar as a status hearing. Most recently, the parties agreed to remove the motion from the Court's calendar and make it subject to call by the parties.

### I.    Motion for Stay Relief

On July 13, 2009, Gustavo Barocio Padilla and Gabriel and Giera Silva filed a motion for relief from the automatic stay to allow them to continue prosecuting a tort claim against the Debtor. The Debtor has filed a limited opposition to the motion for stay relief. The Court has entered its order approving an agreement between the movant and the Debtor regarding this motion whereby the movant can continue the prosecution of the action but cannot take any collection actions against

the Debtor.

## J.    Prior Plans and Disclosure Statements

The Debtor filed three prior proposed plans of reorganization.  The most recent proposed plan, the Second Amended Plan of Reorganization Dated August 21, 2009 ("Second Amended Plan"), was filed on August 21, 2009.  The Court approved a disclosure statement regarding the Second Amended Plan, and Fulton Homes solicited votes with respect to the Second Amended Plan.  Ultimately, all classes of claims accepted the Second Amended Plan, except the class of unsecured claims due to the Banks' rejecting ballot.  Only the Banks rejected the Second Amended Plan.  Additionally, the Banks filed a legal objection to the Second Amended Plan.  Following briefing and oral argument by the parties, the Court entered its Order dated March 17, 2010 which found that the Second Amended Plan could not be confirmed as written.  Fulton Homes has filed this Plan in response to the Court's Order and in response to changes in the market conditions between the date the Second Amended Plan was filed and the date of this Plan.

## K.    Motions to Extend Exclusivity

Fulton Homes has repeatedly sought, and obtained (either through Court orders overruling the Banks' objections or by stipulations from the Banks), order extending the Debtor's exclusive period within which to obtain confirmation of a plan of reorganization.  The Debtor's most recent motion to extend its exclusivity period is set for hearing on May 27, 2010 at 2:00 p.m.

## L.    The Injunction

The Banks filed a lawsuit against Fulton Sales and Fulton Homes Warranty Corporation ("Fulton Warranty") in the Maricopa County Superior Court (the "State Court Action") seeking to enforce certain guarantees by those entities in favor of the Banks.  On April 10, 2009, the Debtor filed an adversary complaint and a motion for an injunction against the Banks seeking to enjoin them from prosecuting the State Court Action.  The Banks opposed the request for an injunction.  On July 2, 2009, the Court entered its order granting a limited injunction against the Banks, precluding the Banks from enforcing any judgment it may obtain in the State Court Action until after the confirmation of the Plan.

**M.    The Debtor's Motion for Alternative Dispute Resolution**

The Debtor has filed a "Motion for Referral of Plan Confirmation Disputes to ADR Program" ("Motion for ADR"), requesting that the Court assign the contested plan confirmation issues between Fulton Homes and the Banks for inclusion in the Alternative Dispute Resolution Program established by Local Bankruptcy Rules 9072-1 through 9072-9 (the "ADR Program"). The Court has set a hearing on the Motion for ADR for May 27, 2010 at 2:00 p.m.

**N.    The Banks' Motion for the Appointment of an Examiner**

The Banks have filed a motion for the appointment of an examiner pursuant to § 1104(c) of the Bankruptcy Code. The Debtor does not believe that an examiner is either necessary or appropriate in this case, and intends to respond to the motion to appoint an examiner in due course. No hearing has yet been set on the motion.

**O.    Operating Reports**

The Debtor's monthly operating reports are current and copies can be obtained from the Court's electronic docket.

**V.    DESCRIPTION OF ASSETS AND LIABILITIES OF THE DEBTORS**

**A.    Assets**

The values ascribed to the Debtor's assets below are based on the Debtor's best estimate and other factors such as the purchase price, comparable sales, and tax assessments.

**1.    Real Estate** –  The value of the Debtor's real estate assets is in constant fluctuation given the current market conditions. In fact, as of the Petition Date, the value of the Debtor's assets was less than the amount of the debt. However, the liquidation value of the Debtor's assets has improved during the course of this case. At this time, the Debtor is informed and believes that the value of its real estate assets, as such assets are developed by Fulton during the life of the Plan, will be sufficient to pay all creditors in full.

**2.    Bank Accounts** – Wells Fargo Bank– $56.5 million (as of April 30, 2010).

**3.    Insurance Reserve** –  $2.2 million (as of April 30, 2010).

**4.    Escrowed Land Development Funds for Current Developments** --

$7.3 million ( as of April 30, 2010)

**B.    Liabilities**

The following is an overview of the Debtor's known liabilities.

**1.    Priority Claims**

**a.    Arizona Department of Revenue** – The Debtor was current on taxes owed to the Arizona Department of Revenue ("ADOR") and does not expect ADOR to have a claim.

**2.    Secured Claims**

**a.**    Vertical Construction Mechanic's and Materialman's Lien Claimants on the Cobblestone Subdivision- These are secured creditors who have filed, or have the right to file, a mechanics lien claim on the Cobblestone Subdivision for work on the vertical portions of construction.  The total of these secured claims is $11,541.00.

**b.**    Vertical Construction Mechanic's and Materialman's Lien Claimants on the Coldwater Springs Subdivision- These are secured creditors who filed, or have the right to file, a mechanics lien claim on the Coldwater Springs Subdivision for work on the vertical portions of construction.  The total of these secured claims is $840.00.

**c.**    Vertical Construction Mechanic's and Materialman's Lien Claimants on the Cortina Subdivision- These are secured creditors who have filed, or have the right to file, a mechanics lien claim on the Cortina Subdivision for work on the vertical portions of construction.  The total of these secured claims is $100,929.30.

**d.**    Horizontal Construction Mechanic's and Materialman's Lien Claimants on the Cortina Subdivision- These are secured creditors who have filed, or have the right to file, a mechanics lien claim on the Cortina Subdivision for work on the horizontal portions of construction.  The total of these secured claims is $2,423.57.

**e.**    Vertical Construction Mechanic's and Materialman's Lien Claimants on the Fulton Estates Subdivision- These are secured creditors who have filed, or have the right to file, a mechanics lien claim on the Fulton Estates Subdivision for work on the vertical portions of construction.  The total of these secured claims is $67,138.80.

**f.** Vertical Construction Mechanic's and Materialman's Lien Claimants on the Royal Ranch Subdivision- These are secured creditors who have filed, or have the right to file, a mechanics lien claim on the Royal Ranch Subdivision for work on the vertical portions of construction. The total of these secured claims is $15,762.58.

**g.** Horizontal Construction Mechanic's and Materialman's Lien Claimants on the Royal Ranch Subdivision- These are secured creditors who have filed, or have the right to file, a mechanics lien claim on the Royal Ranch Subdivision for work on the horizontal portions of construction. The total of these secured claims is $3,897.32.

**h.** Vertical Construction Mechanic's and Materialman's Lien Claimants on the Villago Subdivision- These are secured creditors who have filed, or have the right to file, a mechanics lien claim on the Villago Subdivision for work on the vertical portions of construction. The total of these secured claims is $13,772.21.

**i.** Horizontal Construction Mechanic's and Materialman's Lien Claimants on the Villago Subdivision- These are secured creditors who have filed, or have the right to file, a mechanics lien claim on the Villago Subdivision for work on the horizontal portions of construction. The total of these secured claims is $450.00.

**j.** Vertical Construction Mechanic's and Materialman's Lien Claimants on the Freeman Farms Subdivision- These are secured creditors who have filed, or have the right to file, a mechanics lien claim on the Freeman Farms Subdivision for work on the vertical portions of construction. The total of these secured claims is $41,826.56.

**k.** Horizontal Construction Mechanic's and Materialman's Lien Claimants on the Freeman Farms Subdivision- These are secured creditors who have filed, or have the right to file, a mechanics lien claim on the Freeman Farms Subdivision for work on the horizontal portions of construction. The total of these secured claims is $5,513.44.

**l.** Vertical Construction Mechanic's and Materialman's Lien Claimants on the Fulton Ranch Subdivision- These are secured creditors who have filed, or have the right to file, a mechanics lien claim on the Fulton Ranch Subdivision for work on the vertical portions of construction. The total of these secured claims is $202,205.11.

**m.** Horizontal Construction Mechanic's and Materialman's Lien Claimants on the Fulton Ranch Subdivision- These are secured creditors who have filed, or have the right to file, a mechanics lien claim on the Fulton Ranch Subdivision for work on the horizontal portions of construction. The total of these secured claims is $19,218.74.

**n.** Vertical Construction Mechanic's and Materialman's Lien Claimants on the Geneva Estates Subdivision- These are secured creditors who have filed, or have the right to file, a mechanics lien claim on the Geneva Estates Subdivision for work on the vertical portions of construction. The total of these secured claims is $196,077.31.

**o.** Horizontal Construction Mechanic's and Materialman's Lien Claimants on the Geneva Estates Subdivision- These are secured creditors who have filed, or have the right to file, a mechanics lien claim on the Geneva Estates Subdivision for work on the horizontal portions of construction. The total of these secured claims is $721.50.

**p.** Vertical Construction Mechanic's and Materialman's Lien Claimants on the Ironwood Crossing Subdivision- These are secured creditors who have filed, or have the right to file, a mechanics lien claim on the Ironwood Crossing Subdivision for work on the vertical portions of construction. The total of these secured claims is $219,532.32.

**q.** Horizontal Construction Mechanic's and Materialman's Lien Claimants on the Ironwood Crossing Subdivision- These are secured creditors who have filed, or have the right to file, a mechanics lien claim on the Ironwood Crossing Subdivision for work on the horizontal portions of construction. The total of these secured claims is $247,057.09.

**r.** The Debtor anticipates that the Maricopa County Treasurer will have a secured claim in the approximate amount of $895,292.04 for real property taxes.

**s.** The Debtor anticipates that the Pinal County Treasurer will have a secured claim in the approximate amount of $172,999.25 for real property taxes.

### 3. Unsecured Claims

According to the Debtor's Schedules of Assets and Liabilities, the total amount of unsecured claims is $164,697,251.85.

## C.    Administrative Expenses

The Debtor's administrative expenses consist of the fees and costs of attorneys and other professionals necessary to Fulton's operations, bankruptcy case, and plan of reorganization. The fees and costs of these professionals will not be precisely known until the Bankruptcy Case is completed. However, as set forth below, the Debtor's professionals anticipate that either (a) the retainers they presently have will be sufficient to cover the services they have rendered, and will render, in the Bankruptcy Case, or (b) for those professionals that do not have retainers and will be paid by some other manner, their projected anticipated fees and costs for their services will be commensurate with their historical fees and costs incurred by the Debtor.

The Debtor's bankruptcy counsel is PS. PS is currently in possession of a retainer in the amount of $500,000. PS anticipates its fees be approximately $700,000, depending upon future litigation.

The Debtor's zoning counsel is Burch & Cracchiolo ("BC"). BC considers the Debtor an institutional client and does not hold a retainer. BC currently anticipates its fees during the bankruptcy will not exceed $80,000.

The Debtor's special counsel for real estate, corporate matters and commercial litigation is Lake & Cobb ("LC"). LC does not have a retainer. Historically, LC's fees have been approximately $10,000 per month, but as high as $25,000 per month. It is impossible to accurately calculate LC's fees during the pendency of this bankruptcy case.

The Debtor's principal financial advisor is Green Street. Green Street is currently in possession of a retainer in the amount of $630,000.

The Debtor's tax protest services are provided by Wentworth, Webb and Postal ("WWP"). WWP is paid $500 plus between 25% and 35% of any tax savings it realizes for Fulton. Because the vast majority of WWP's compensation is predicated on and paid from its tax protest success the ultimate costs of its services cannot be calculated, but the vast majority will come from funds the Debtor would never have obtained absent WWP's services.

The Debtor's ERISA-required 401k auditor is Gaintner Bandler Reed & Peters, P.L.C., ("GBRP"). GBRP does not have a retainer. GBRP anticipates that its fees will be approximately $25,000.00.

The Debtor anticipates that Deloitte Tax's fees will not exceed $50,000 and Deloitte Audit's fees will not exceed $25,000.

Mr. Pollack holds a retainer in the amount of $10,000. Mr. Pollack's fees are impossible, at this time, to estimate as they will depend in large part on the nature and extent of any objections to confirmation of the Plan.

## VI. PLAN SUMMARY

The following statements concerning the Plan are merely a summary of the Plan and are not complete. The statements are qualified entirely by express reference to the Plan. Creditors are urged to consult with counsel or each other in order to understand the Plan fully. The Plan is complete, inasmuch as it proposes a legally binding agreement by the debtor, and an intelligent judgment cannot be made without reading it in full. With the exception of the Classes 1-A through 1-C (the "Priority Claims"), all the creditors of the Debtor are impaired under the terms of this Plan. The Secured Creditors are impaired because they will be subjected to different treatment than they had originally contracted for with the Debtor. The Unsecured Creditors will be impaired because, although they will be paid in full on their Allowed Unsecured Claims, with interest, such payment will not occur until December 2015. Thus, the Debtor will have numerous classes with the right to vote on its Plan of reorganization, as set forth herein.

## VII. TREATMENT OF CLASSES UNDER THE PLAN

### A. Priority Claims: Class 1

#### 1. Administrative Claims: 1-A

This Class consists of Allowed Priority Claims under 11 U.S.C. §507(a)(1) – administrative claims. Unless they agree to an alternative form of treatment, the Allowed Claims of Class 1-A shall be paid in full, in cash, on or before the Effective Date or as the same are Allowed and ordered to be paid by the Bankruptcy Court. Any Class 1-A Claim not allowed as of the Effective Date shall be paid as soon thereafter as it is allowed by the Court according to the terms of this Class. This Class is not impaired.

#### 2. Wage Claims: 1-B

This Class consists of Allowed Priority Claims under 11 U.S.C. §507(a)(3) – wage claims. As provided in 11 U.S.C. §1129(a)(9)(B), unless they agree to an alternative form of treatment, the

Allowed Priority Claims of Class 1-B shall be paid in full, in cash, on or before the Effective Date. The Debtor does not believe that any claims exist under this class. Any Class 1-B Claim not allowed as of the Effective Date shall be paid as soon thereafter as they are allowed by the Court according to the terms of this Class. This Class is not impaired.

### 3. Tax Claims: 1-C

This Class consists of Allowed Priority Claims under 11 U.S.C. §507(a)(8) – tax Claims which are not otherwise treated as secured claims herein. As provided in 11 U.S.C. §1129(a)(9)(C), unless they agree to an alternative form of treatment, the Allowed Priority Claims of Class 1-C shall be paid in full, in cash, on or before the Effective Date, or, at the Debtor's option, such Allowed Claims shall be paid, on account of such Allowed Claim, deferred cash payments, over a period not exceeding five years after the date of the order for relief in this case, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim. Any Class 1-C Claims not allowed as of the Effective Date shall be paid as soon thereafter as they are allowed by the Court according to the terms of this Class. This Class is not impaired.

### B. Secured Claims: Class 2

As set forth below, all holders of Allowed Secured Claims will be paid in full on their Allowed Secured Claims. The treatment of each Class of secured creditor will depend on the nature of their secured interest and whatever rights they may have by contract or statute with the Debtor.

#### 1. Class 2-A – Allowed Secured Claims of the Vertical Construction Mechanic's Lien Claimants in the Cobblestone Subdivision

This class is comprised of the Allowed Secured Claims of the Vertical Construction Mechanic's lien claimants in the Cobblestone Subdivision. These Claimants will be paid 80% of their Allowed Secured Claims on the earlier of the Effective Date or the date that such claims are allowed, and the balance on the 60th day after the earlier of the Effective Date or the date they are allowed. No interest will be paid on the Allowed Secured Claims of this Class. This Class is impaired.

#### 2. Class 2-B – Allowed Secured Claims of the Vertical Construction Mechanic's Lien Claimants in the Coldwater Springs Subdivision.

This class is comprised of the Allowed Secured Claims of the Vertical Construction

Mechanic's lien claimants in the Coldwater Springs Subdivision. These Claimants will be paid 80% of their Allowed Secured Claims on the earlier of the Effective Date or the date that such claims are allowed, and the balance on the 60th day after the earlier of the Effective Date or the date they are allowed. No interest will be paid on the Allowed Secured Claims of this Class. This Class is impaired.

**3.** Class 2-C – Allowed Secured Claims of the Vertical Construction Mechanic's Lien Claimants in the Cortina Subdivision.

This class is comprised of the Allowed Secured Claims of the Vertical Construction Mechanic's lien claimants in the Cortina Subdivision. These Claimants will be paid 80% of their Allowed Secured Claims on the earlier of the Effective Date or the date that such claims are allowed, and the balance on the 60th day after the earlier of the Effective Date or the date they are allowed. No interest will be paid on the Allowed Secured Claims of this Class. This Class is impaired.

**4.** Class 2-D – Allowed Secured Claims of the Horizontal Construction Mechanic's Lien Claimants in the Cortina Subdivision.

This class is comprised of the Allowed Secured Claims of the Horizontal Construction Mechanic's lien claimants in the Cortina Subdivision. These Claimants will be paid 80% of their Allowed Secured Claims on the earlier of the Effective Date or the date that such claims are allowed, and the balance on the 60th day after the earlier of the Effective Date or the date they are allowed. No interest will be paid on the Allowed Secured Claims of this Class. This Class is impaired.

**5.** Class 2-E – Allowed Secured Claims of the Vertical Construction Mechanic's Lien Claimants in the Fulton Estates Subdivision.

This class is comprised of the Allowed Secured Claims of the Vertical Construction Mechanic's lien claimants in the Fulton Estates Subdivision. These Claimants will be paid 80% of their Allowed Secured Claims on the earlier of the Effective Date or the date that such claims are allowed, and the balance on the 60th day after the earlier of the Effective Date or the date they are allowed. No interest will be paid on the Allowed Secured Claims of this Class. This Class is impaired.

**6.** Class 2-F – Allowed Secured Claims of the Vertical Construction

Mechanic's Lien Claimants in the Royal Ranch Subdivision.

This class is comprised of the Allowed Secured Claims of the Vertical Construction Mechanic's lien claimants in the Royal Ranch Subdivision. These Claimants will be paid 80% of their Allowed Secured Claims on the earlier of the Effective Date or the date that such claims are allowed, and the balance on the 60th day after the earlier of the Effective Date or the date they are allowed. No interest will be paid on the Allowed Secured Claims of this Class. This Class is impaired.

**7.** Class 2-G – Allowed Secured Claims of the Horizontal Construction Mechanic's Lien Claimants in the Royal Ranch Subdivision.

This class is comprised of the Allowed Secured Claims of the Horizontal Construction Mechanic's lien claimants in the Royal Ranch Subdivision. These Claimants will be paid 80% of their Allowed Secured Claims on the earlier of the Effective Date or the date that such claims are allowed, and the balance on the 60th day after the earlier of the Effective Date or the date they are allowed. No interest will be paid on the Allowed Secured Claims of this Class. This Class is impaired.

**8.** Class 2-H – Allowed Secured Claims of the Vertical Construction Mechanic's Lien Claimants in the Villago Subdivision.

This class is comprised of the Allowed Secured Claims of the Vertical Construction Mechanic's lien claimants in the Villago Subdivision. These Claimants will be paid 80% of their Allowed Secured Claims on the earlier of the Effective Date or the date that such claims are allowed, and the balance on the 60th day after the earlier of the Effective Date or the date they are allowed. No interest will be paid on the Allowed Secured Claims of this Class. This Class is impaired.

**9.** Class 2-I – Allowed Secured Claims of the Horizontal Construction Mechanic's Lien Claimants in the Villago Subdivision.

This class is comprised of the Allowed Secured Claims of the Horizontal Construction Mechanic's lien claimants in the Villago Subdivision. These Claimants will be paid 80% of their Allowed Secured Claims on the earlier of the Effective Date or the date that such claims are allowed, and the balance on the 60th day after the earlier of the Effective Date or the date they are allowed. No interest will be paid on the Allowed Secured Claims of this Class. This Class is

impaired.

**10.** Class 2-J – Allowed Secured Claims of the Vertical Construction Mechanic's Lien Claimants in the Freeman Farms Subdivision.

This class is comprised of the Allowed Secured Claims of the Vertical Construction Mechanic's lien claimants in the Freeman Farms Subdivision. These Claimants will be paid 80% of their Allowed Secured Claims on the earlier of the Effective Date or the date that such claims are allowed, and the balance on the 60th day after the earlier of the Effective Date or the date they are allowed. No interest will be paid on the Allowed Secured Claims of this Class. This Class is impaired.

**11.** Class 2-K – Allowed Secured Claims of the Horizontal Construction Mechanic's Lien Claimants in the Freeman Farms Subdivision.

This class is comprised of the Allowed Secured Claims of the Horizontal Construction Mechanic's lien claimants in the Freeman Farms Subdivision. These Claimants will be paid 80% of their Allowed Secured Claims on the earlier of the Effective Date or the date that such claims are allowed, and the balance on the 60th day after the earlier of the Effective Date or the date they are allowed. No interest will be paid on the Allowed Secured Claims of this Class. This Class is impaired.

**12.** Class 2-L – Allowed Secured Claims of the Vertical Construction Mechanic's Lien Claimants in the Fulton Ranch Subdivision.

This class is comprised of the Allowed Secured Claims of the Vertical Construction Mechanic's lien claimants in the Fulton Ranch Subdivision. These Claimants will be paid 80% of their Allowed Secured Claims on the earlier of the Effective Date or the date that such claims are allowed, and the balance on the 60th day after the earlier of the Effective Date or the date they are allowed. No interest will be paid on the Allowed Secured Claims of this Class. This Class is impaired.

**13.** Class 2-M – Allowed Secured Claims of the Horizontal Construction Mechanic's Lien Claimants in the Fulton Ranch Subdivision.

This class is comprised of the Allowed Secured Claims of the Horizontal Construction Mechanic's lien claimants in the Fulton Ranch Subdivision. These Claimants will be paid 80% of their Allowed Secured Claims on the earlier of the Effective Date or the date that such claims are

allowed, and the balance on the 60th day after the earlier of the Effective Date or the date they are allowed. No interest will be paid on the Allowed Secured Claims of this Class. This Class is impaired.

**14.** Class 2-N – Allowed Secured Claims of the Vertical Construction Mechanic's Lien Claimants in the Geneva Estates Subdivision.

This class is comprised of the Allowed Secured Claims of the Vertical Construction Mechanic's lien claimants in the Geneva Estates Subdivision. These Claimants will be paid 80% of their Allowed Secured Claims on the earlier of the Effective Date or the date that such claims are allowed, and the balance on the 60th day after the earlier of the Effective Date or the date they are allowed. No interest will be paid on the Allowed Secured Claims of this Class. This Class is impaired.

**15.** Class 2-O – Allowed Secured Claims of the Horizontal Construction Mechanic's Lien Claimants in the Geneva Estates Subdivision.

This class is comprised of the Allowed Secured Claims of the Horizontal Construction Mechanic's lien claimants in the Geneva Estates Subdivision. These Claimants will be paid 80% of their Allowed Secured Claims on the earlier of the Effective Date or the date that such claims are allowed, and the balance on the 60th day after the earlier of the Effective Date or the date they are allowed. No interest will be paid on the Allowed Secured Claims of this Class. This Class is impaired.

**16.** Class 2-P – Allowed Secured Claims of the Vertical Construction Mechanic's Lien Claimants in the Ironwood Crossing Subdivision.

This class is comprised of the Allowed Secured Claims of the Vertical Construction Mechanic's lien claimants in the Ironwood Crossing Subdivision. These Claimants will be paid 80% of their Allowed Secured Claims on the earlier of the Effective Date or the date that such claims are allowed, and the balance on the 60th day after the earlier of the Effective Date or the date they are allowed. No interest will be paid on the Allowed Secured Claims of this Class. This Class is impaired.

**17.** Class 2-Q – Allowed Secured Claims of the Horizontal Construction Mechanic's Lien Claimants in the Ironwood Crossing Subdivision.

This class is comprised of the Allowed Secured Claims of the Horizontal Construction

Mechanic's lien claimants in the Ironwood Crossing Subdivision. These Claimants will be paid 80% of their Allowed Secured Claims on the earlier of the Effective Date or the date that such claims are allowed, and the balance on the 60th day after the earlier of the Effective Date or the date they are allowed. No interest will be paid on the Allowed Secured Claims of this Class. This Class is impaired.

### 18. Class 2-R – Allowed Secured Claims of Maricopa County

This Class consists of the Allowed Secured Claim of the County of Maricopa, Arizona ("Maricopa County"), that is secured by a Senior Secured Claim in the Debtor's Real Property. Commencing on the Effective Date, this claim will be paid in equal quarterly payments of principal and interest over a term of 1 year. Interest will be charged at the statutory rate plus 2%. The County will retain its existing secured interest in the Real Property until this claim has been satisfied in full. This Class is impaired.

### 19. Class 2-S – Allowed Secured Claims of Pinal County

This Class consists of the Allowed Secured Claim of the County of Pinal, Arizona ("Pinal County") that is secured by a Senior Secured Claim in the Debtor's Real Property. Commencing on the Effective Date, this claim will be paid in equal quarterly payments of principal and interest over a term of 1 year. Interest will be charged at the statutory rate plus 2%. The County will retain its existing secured interest in the Real Property until this claim has been satisfied in full. This Class is impaired.

### C. Unsecured Claims: Class 3

This Class consists of all Allowed General Unsecured Claims.

All Allowed General Unsecured Claims, with the exception of Ira Fulton's unsecured claim which Ira Fulton has agreed to waive upon confirmation of the Plan, will be paid in full, together with interest at the Plan Rate beginning on the Effective Date of the Plan, no later than December 31, 2015, from the proceeds of the sale of Fulton Homes' assets.

Specifically, the Debtor will pay at least $35,000,000 to Allowed Unsecured Creditors, to be distributed *pro rata*, on the Effective Date of the Plan as a principal paydown of the total amount due Allowed Unsecured Creditors in this class. Thereafter, Allowed Unsecured Creditors will be paid their *pro rata* share of a minimum principal payment of at least $15 million per year, on or before the

end of each calendar year, from the proceeds of Fulton's sale of houses and lots. On or before December 31, 2015, the Debtor will pay all remaining amounts of Allowed Secured Claims in full. Additionally, the Debtor will make quarterly distributions of interest, at the Plan Rate, to Allowed Unsecured Claimants, based upon the outstanding amount of their respective Allowed Unsecured Claims.

### D. Interest Holder: Class 4

This Class consists of all Allowed Interests of the Debtor. The Fulton Family Trust is the sole Interest Holder of the Debtor. The Fulton Family Trust will retain its equity position in the Reorganized Debtor post-confirmation. Other than ordinary course compensation paid to Ira Fulton, there shall be no distributions to Interest Holders until the claims of all higher priority classes are paid in full as provided in the Plan.

### VIII. MEANS FOR EXECUTING THE PLAN

The Plan will be implemented by the retention of Fulton's existing management, as set forth herein. This Plan is self funded. Fulton will continue to build and sell homes in Maricopa and Pinal counties within its existing planned communities. Fulton will also continue to satisfy all of its valid express or implied warranty, latent defect, customer service, and indemnification obligations, if any, as (and if) they become non-contingent, liquidated, valid and due, whether such claims arise from houses built and/or sold by Fulton pre-petition, post-petition or post-confirmation. Additionally, Fulton anticipates that it will acquire interests in additional real property to develop new planned communities. Ultimately, Fulton will use the revenues it generates from the sale of homes to pay the Debtor's creditors, to fund ongoing operations, and to purchase additional land as necessary and prudent.

The Debtor's projections, attached to the Disclosure Statement as Exhibit "A," reveal that the proceeds from the sale of Fulton's existing inventory of homes and lots, together with the cash that it has accumulated during the course of the Debtor's Chapter 11 case, will be sufficient to allow the Debtor to (a) maintain an adequate working capital reserve of approximately $19,818,000, (b) pay at least $35,000,000 in cash to Allowed Unsecured Claims on the Effective Date of the Plan, (c) build and sell houses, and sell unimproved lots, at a conservative rate of approximately 303 homes and

approximately 66 lots per year[2], (d) pay the principal amount of all Allowed Unsecured Claims (except Ira Fulton's unsecured claim) in full by the end of 2015, (e) pay interest on the principal amount of all Allowed Unsecured Claims (except Ira Fulton's unsecured claim) at the rate of 6% per annum through the end of 2015, and (f) have sufficient cash and real estate remaining at the end of 2015 to remain a viable business.

## IX. RETAINED CAUSES OF ACTION

The Debtor specifically retains all causes of action. Any retained causes of action include, but are not limited to, all avoidance actions, fraudulent conveyance actions, preference actions, and other claims and causes of action of every kind and nature whatsoever, arising before the Effective Date which have not been resolved or disposed of prior to the Effective Date, whether or not such claims or causes of action are specifically identified in this Disclosure Statement.

Any recovery obtained from retained causes of action shall become an additional asset of the Debtor, unless otherwise ordered by the Court, and shall be available for distribution in accordance with the terms of the Plan.

## X. MANAGEMENT

The Reorganized Debtor will be managed by the same management team that managed the Debtor pre-petition, including Ira Fulton (who, together with his wife, Mary Lou Fulton, are the Debtor's sole directors and the sole beneficiaries of the Debtor's Interest Holder), Doug Fulton (the Debtor's Chief Executive Officer and Vice President), Norm Nicholls (the Debtor's President), and Steve Walters (the Debtor's Treasurer) (collectively, the "Management Team"). Each of the foregoing members of the Management Team will continue to be paid, post-confirmation, as they were paid pre-petition and during the course of the Bankruptcy Case. Specifically, the Management Team's salaries are, and will continue to be, paid by Fulton Homes Sales Corporation, with 42.5% of their respective salaries allocated to the Debtor.

The Debtor's Management Team was not a cause of the Debtor's financial difficulties. The Debtor's difficulties are the result of the present precipitous downturn in the market, a downturn

---

[2] Note that the Debtor's projections reflect a bulk sale of approximately 369 lots in 2013, rather than spreading such lot sales out over the life of the projections. Ultimately, the unimproved lots will be sold in a manner and at a time that the Debtor deems it prudent to do so based on market conditions.

whose depth and severity could not have been predicted. By retaining the current Management Team in place, the Debtor will benefit from the specific knowledge and experience of its Management Team. Thus, a change in management structure is not in the best interests of the Debtor or its creditors because the existing structure is appropriate to the needs of the Debtor.

As described in this Disclosure Statement, the Management Team anticipated the downturn in the economy and diligently undertook to shed those assets that were unlikely to be of value in a recession. While no one could have predicted the severity of the downturn, the prescient acts of Fulton's Management Team have placed the company in a very strong position to survive the downturn, to pay the Debtor's creditors in full, and to emerge as a vibrant, leading and profitable homebuilder as the market returns to normal.

In addition, by maintaining the current management, Fulton will avoid the transactional costs associated with significant, and unnecessary, change in management. Fulton will also be able to preserve the institutional knowledge of the Management Team.

## XI.    DISBURSING AGENT

The Reorganized Debtor shall act as the Disbursing Agent under the Plan.

## XII.    DOCUMENTATION OF PLAN IMPLEMENTATION

In the event any entity which possesses an Allowed Secured Claim or any other lien in any of the Debtor's property for which the Plan requires the execution of any documents to incorporate the terms of the Plan fails to provide a release of its lien or execute the necessary documents to satisfy the requirements of the Plan, the Debtor may record a copy of this Plan or the Confirmation Order with the appropriate governmental agency and such recordation shall constitute the lien release and creation of any necessary new liens to satisfy the terms of the Plan. If the Debtor deems advisable, it may obtain a further Order from the Court that may be recorded in order to implement the terms of the Plan.

## XIII.   LIQUIDATION ANALYSIS

Under the Plan proposed herein, the Debtor proposes to pay all Allowed Secured Claims in full, and all Allowed Unsecured Creditors in full, with interest at the Plan Rate. Consequently, all creditors will necessarily recover as much, if not more, under the Plan than they would receive in a liquidation under Chapter 7 of the Bankruptcy Code, and approval of the Plan is in the best interests of

creftors.

## XIV.  EFFECT OF CONFIRMATION

Except as otherwise provided in the Plan or the Confirmation Order, Confirmation acts as a discharge, effective as of Confirmation, of any and all debts of the Debtor, that arose any time before the entry of the Confirmation Order including, but not limited to, all principal and all interest accrued thereon, pursuant to §1141(d)(1) of the Bankruptcy Code.  The discharge shall be effective as to each Claim, regardless of whether a proof of claim thereon was filed, whether the Claim is an Allowed Claim, or whether the holder thereof votes to accept the Plan.

In addition, any pre-confirmation obligations of the Debtor dealt with in this Plan shall be considered New Obligations of the Debtor, and these New Obligations shall not be considered in default unless and until the Reorganized Debtor defaults on the New Obligations pursuant to the terms of the Plan.  The New Obligations provided for in the Plan shall be in the place of, and completely substitute for, any pre-Confirmation obligations of the Debtor and, once the Plan is confirmed, the only obligations of the Debtor shall be such New Obligations as provided for under the Plan.

Nothing herein is designed to provide for, or shall be deemed or considered to be, or to contemplate or otherwise provide for, a release of any third parties of any claims that creditors of Fulton Homes may have against such third parties, including any guarantors or sureties of Fulton Homes' obligations to such creditors.

## XV.  TAX CONSEQUENCES

Pursuant to §1125(a)(1) of the Bankruptcy Code, the Debtor is to provide a discussion of the potential material tax consequences of the Plan to the Debtor, any successor to the Debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant Class to make an informed judgment about the Plan.  However the Debtor need not include such information about any other possible or proposed plan.  In determining whether the Disclosure Statement provides adequate information, the Court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

The following discussion summarizes certain considerations that may affect the anticipated federal income tax consequences of the Plan's implementation to Creditors, to the Interest Holder,

and to the Debtor. It does not address all federal income tax consequences of the Plan nor does it address the state or local income tax or other state or local tax consequences of the Plan's implementation to Creditors, to the Interest Holder, or to the Debtor.

This description of the federal income tax consequences of implementing the Plan is based on Debtor's interpretation of the applicable provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), the regulations promulgated thereunder, and other relevant authority. Debtor's interpretation, however, is not binding on the IRS or any court. The Debtor has not obtained, nor does it intend to obtain, a private letter ruling from the IRS, nor has the Debtor obtained an opinion of counsel with respect to any of these matters. The discussion below is general in nature and is not directed to the specific tax situation of any particular interested taxpayer. **For these reasons, all Creditors and the Interest Holder should consult with their own tax advisors as to the tax consequences of implementation of the Plan to them under applicable federal, state, and local tax laws.**

### A.     Tax Consequences to the Debtor

In general, pursuant to IRC Section 108, the amount of any debt of a corporation that is partially or totally discharged pursuant to a Title 11 bankruptcy case is excluded from gross income. According to IRC Section 108(b), the amount of debt discharge income ("DDI") that is excluded from gross income must be applied to reduce the tax attributes of the Debtor. The Debtor's tax attributes are reduced in the following order: (1) net operating losses ("NOLs"); (2) general business credits; (3) minimum tax credit; (4) capital loss carryovers; (5) reduction in tax basis of the Debtor's property; (6) passive activity loss and credit carryovers; and (7) foreign tax credit carryovers. Here, because the Debtor is paying all creditors in full, it is not anticipated that the Debtor will have any DDI.

With regard to the Debtor's ongoing qualification as an S corporation, the filing of a bankruptcy petition, on its own without a change in ownership, will not cause the Debtor's Subchapter S election to terminate. However, S corporations are not allowed to have more than one class of stock, and the issuance of a debt instrument by an S corporation sometimes can be reclassified as equity for federal income tax purposes, thereby causing the S corporation to have a

second class of stock and lose its S corporation qualification.

As a part of the Plan, the Debtor will be issuing a debt instrument to its unsecured creditors in the form of a right to receive 100% of their Allowed Claims over time (the "Restructured Debt").

When evaluating whether an instrument will be reclassified as equity, the instrument must satisfy any one of three alternative tests in order to be considered debt for federal tax purposes. Under these three alternative tests, an instrument will be considered debt if: (1) the instrument qualifies as straight debt under the IRC; (2) the instrument is classified as debt for purposes of general federal tax law; or (3) the instrument was not issued to circumvent the S corporation "second class of stock" rules. The Debtor believes that the Restructured Debt satisfies at least one, and likely all three, of these alternative tests. As such, the Debtor does not believe that there is significant risk that the Restructured Debt will cause the Debtor to violate the "second class of stock" prohibition, and therefore there is not at a significant risk of losing the Debtor's S corporation status.

### B.     Tax Consequences to the Interest Holder

As stated above, it is anticipated that the Debtor will not incur any DDI. Therefore, it is not anticipated that the Interest Holder will have any tax consequences by virtue of confirmation of the Plan.

**The Interest Holder is urged to consult with his own tax advisor regarding his particular tax consequences under the Plan.**

### C.     Tax Consequences to the Secured and Unsecured Creditors

Both the Secured Claimants and/or the Unsecured Claimants may be required to report income or entitled to a deduction as a result of implementation of the Plan. The exact tax treatment depends on, among other things, each Claimant's method of accounting, the nature of each Claimant's claim, and whether and to what extent such Claimant has taken a bad debt deduction in prior taxable years with respect to the particular debt owed to it by one of the Debtors. **Each Holder of a secured claim or an unsecured claim is urged to consult with his, her, or its own tax advisor regarding the particular tax consequences of the treatment of his, her, or its claim under the Plan.**

## XVI.  NON-ALLOWANCE OF PENALTIES AND FINES

No allowed claim, whether secured, unsecured, priority, or administrative, shall include any fine, penalty, exemplary or punitive damages, default interest, late charges, or other monetary charge relating to or arising from any default or breach by the Debtor ("Default Charges").  Any such Default Charges shall be deemed disallowed whether or not an objection thereto is filed.  No distribution shall be made under this Plan on account of any Default Charges.

## XVII.  OBJECTIONS TO AND ESTIMATIONS OF CLAIMS

### A.    Objections and Bar Date for Filing Objections

As soon as practicable, but in no event later than 120 days after the Effective Date, objections to Claims shall be filed with the Bankruptcy Court and served upon the Debtor and the holders of each of the Claims to which objections are made pursuant to the Bankruptcy Code and the Bankruptcy Rules.  Objections filed after such date will be barred.

### B.    Settlement of Claims

Settlement of any objection to a Claim not exceeding $10,000 shall be permitted on the eleventh (11th) day after notice of the settlement has been provided to the Debtor, the Creditors, the settling party, and other persons specifically requesting such notice, and if on such date there is no written objection filed, such settlement shall be deemed approved.  In the event of a written objection to the settlement, the settlement must be approved by the Court on notice to the objecting party.

### C.    Estimation of Claims

For purposes of making distributions provided for under the Plan, all Claims objected to shall be estimated by the Disbursing Agent at an amount equal to (i) the amount, if any, determined by the Court pursuant to §502(c) of the Bankruptcy Code as an estimate for distribution purposes; (ii) an amount agreed to between the Debtor and the Claimant; or, (iii) that amount set forth as an estimate in the Plan or Disclosure Statement.  Notwithstanding anything herein to the contrary, no distributions shall be made on account of any Claim until such Claim is an Allowed Claim.

### D.    Unclaimed Funds and Interest

Distribution to Claimants shall be mailed by the Reorganized Debtor to the Claimants at the

address appearing on the master mailing matrix unless the Claimant provides the Reorganized Debtor with an alternative address. For a period of one year from the date that a distribution was to be made by the disbursing agent but has gone uncollected by the Claimant, the disbursing agent shall retain any distributions otherwise distributable hereunder which remain unclaimed or as to which the disbursing agent has not received documents required pursuant to the Plan. Thereafter, the unclaimed funds shall revest in the Reorganized Debtor.

## XVIII. EXECUTORY CONTRACTS

The Debtor rejects all executory contracts and unexpired leases not otherwise assumed herein or assumed by separate order of the Court. Claims arising from the Debtor's rejection of any executory contracts or unexpired leases shall be filed no later than ten (10) days after the earlier of Confirmation or the date the executory contract or unexpired lease is specifically rejected. Any such Claims not timely filed and served shall be disallowed.

## XIX. VOTING PROCEDURE

The Plan divides the claims of creditors and interest-holders into separate classes. All classes of claimants are encouraged to vote; however, only the vote of holders of claims that are impaired by the Plan will have a significant impact on the confirmation process. Generally, this includes creditors who, under the Plan, will receive less than full payment of their claims on the Effective Date of the Plan.

All creditors entitled to vote on the Plan must cast their vote by completing, dating, and signing the ballot which has been mailed to them with this Disclosure Statement. The ballot contains instructions concerning the deadline for submitting the ballot and to what address the ballot should be mailed.

This Disclosure Statement has been approved by the Bankruptcy Court in accordance with §1125 of the Bankruptcy Code, and is provided to each person whose claim or interest has been scheduled by the Debtor, or who has filed a proof of claim or interest with respect to the Debtor or its property, and to each known equity interest holder and other parties-in-interest known to the Debtor. The Disclosure Statement is intended to assist creditors in evaluating the Plan and in determining whether to accept the Plan. In determining acceptance of the Plan, votes of creditors will only be counted if submitted by a creditor whose claim is duly scheduled by the Debtor as undisputed, non-

contingent and liquidated, or who has timely filed with the Court a proof of claim or proof of interest.

The Bankruptcy Court will schedule a hearing to determine whether the requirements for confirmation under the Bankruptcy Code have been met and whether the Plan has been accepted by each impaired class and by the requisite number of creditors in such class. Under §1126 of the Code, an impaired class is deemed to have accepted the Plan upon a favorable vote of at least two-thirds (2/3) in dollar amount and more than one-half (l/2) in number of the allowed claims of class members voting on the Plan. Further, unless there is unanimous acceptance of the Plan by an impaired class, the Court must also determine that class members will receive at least as much as they would if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

Even if each class of creditors does not accept the Plan, the Plan can be confirmed under § 1129(b) of the Code, so long as one impaired class of creditors accepts the Plan. The failure of each class to accept the Plan could very well result in a conversion of this case to a Chapter 7 or dismissal of the Chapter 11, and the secured creditors repossessing their collateral and disposing of it in a commercially reasonable manner with no obligation to unsecured creditors.

## XX.  MODIFICATION OF PLAN

In addition to its modification rights under §1127 of the Bankruptcy Code, the Debtor may amend or modify its Plan at any time prior to Confirmation without leave of the Court. The Debtor or the Reorganized Debtor may propose amendments and/or modifications of its Plan at any time subsequent to Confirmation with leave of the Court and upon notice to Creditors. After Confirmation of the Plan, the Debtor or the Reorganized Debtor may, with approval of the Court, as long as it does not materially or adversely affect the interests of Creditors, remedy any defect or omission or reconcile any inconsistencies of the Plan, or in the Confirmation Order, if any may be necessary to carry out the purposes and intent of their Plan.

## XXI.  CLOSING OF THE CASE

If the Court does not close this case on its own motion, the Reorganized Debtor will move the Court to close this case once the Plan is deemed substantially consummated. Until substantial consummation, the Reorganized Debtor will be responsible for filing pre- and post-confirmation reports required by the United States Trustee and paying the quarterly post-confirmation fees of the United States Trustee, in cash, pursuant to 28 U.S.C. §1930, as amended. Pursuant to 11 U.S.C.

§1129(a)(12), all fees payable under Section 1930 of Title 28, as determined by the Court at the hearing on confirmation of the Plan, will be paid, in cash, on the Effective Date.

## XXII.  RETENTION OF JURISDICTION

The Court will retain jurisdiction until the Plan has been fully consummated for, including but not limited to, the following purposes:

A.      The classification of the Claims of any Creditors and the re-examination of any Claims which have been allowed for the purposes of voting, and for the determination of such objections as may be filed to the Creditor's Claims. The failure by the Debtor to object to or examine any Claim for the purpose of voting shall not be deemed to be a waiver of the Debtor's rights to object to or to re-examine the Claim in whole or in part.

B.      To determine any Claims which are disputed by the Debtor, whether such objections are filed before or after Confirmation, to estimate any Unliquidated or Contingent Claims pursuant to 11 U.S.C. § 502(c)(1) upon request of the Debtor or any holder of a Contingent or Unliquidated Claim, and to make determinations on any objection to such a Claim.

C.      To determine all questions and disputes regarding title to the assets of the estate, and determination of all causes of action, controversies, disputes, or conflicts, whether or not subject to action pending as of the date of Confirmation, between the Debtor and any other party, including but not limited to, any rights of the Debtor to recover assets pursuant to the provisions of the Bankruptcy Code.

D.      The correction of any defect, the curing of any omission or any reconciliation of any inconsistencies in the Plan, or the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan.

E.      The modification of the Plan after Confirmation, pursuant to the Bankruptcy Rules and the Bankruptcy Code.

F.      To enforce and interpret the terms and conditions of the Plan.

G.      To enter orders, including injunctions, necessary to enforce the title, rights, and powers of the Debtor, and to impose such limitations, restrictions, terms, and conditions of such title, right, and power as this Court may deem necessary.

H.    To enter an order concluding and terminating this case.

## XXIII. DISCLAIMER

Court approval of this Disclosure Statement and the accompanying Plan of Reorganization, including exhibits, is not a certification of the accuracy of the contents thereof.  Furthermore, Court approval of these documents does not constitute the Court's opinion as to whether the Plan should be approved or disapproved.

## XXIV. RISKS

The principal risk associated with the plan is the health of the national and international economies as a whole, and the housing market in Maricopa and Pinal counties more specifically.  Expectations are that the present recession will give way to economic growth in the foreseeable future.  As that growth occurs demand for housing will increase, as will housing prices and net sales.

However, if the economy should suffer a substantial further decline in the near to mid term, the result could be a further decline in demand for homes.  However, this risk is mitigated because it would likely mean that the Unsecured Creditors would still be repaid, only over a longer term.  Nonetheless, as with any business, the markets are unpredictable, and although Fulton is confident it can succeed under the Plan, it cannot guaranty success.

## XXV.  PROPONENTS RECOMMENDATION/ALTERNATIVES TO THE PLAN

The Debtor recommends that all creditors entitled to vote for the Plan do so.   The Debtor's Plan proposes to pay all Allowed Secured and Allowed Unsecured Claims in full.  The alternatives to confirmation of the Plan would be either conversion of this case to a case under Chapter 7 of the Bankruptcy Code or a dismissal of the case.

Conversion of the case to Chapter 7 will result in the liquidation of the Debtor's assets, at liquidation prices.  It will also result in the appointment of a Chapter 7 trustee and, most likely, the hiring of an attorney by the trustee.  Expenses incurred in administering the Chapter 7 case would take priority in the right to payment over allowed, administrative expenses incurred in the Chapter 11 case.  Both Chapter 7 and Chapter 11 administrative expenses take priority over the payment of general unsecured claims.  Also, because the Debtor's assets will be subject to liquidation under "fire sale" conditions, it will generate substantially less cash for the payment of creditors than a reorganization under the terms of the Plan.  In other words, conversion would likely decrease the net amount

available to pay currently existing creditors.

Dismissal of this case would likely result in substantial litigation being brought against Fulton by the Banks. The litigation would consume substantial financial resources. It is also likely that the Banks would attempt to perfect liens on the Debtor's real property and other assets, and that, as a result, other Unsecured Creditors would receive nothing. For these reasons, the Debtor urges you to vote to accept the Plan and to return your ballots in time to be counted.

[Signatures on following page]

DATED this 25th day of May, 2010.

POLSINELLI SHUGHART, P.C.

By _____
John J. Hebert
Mark W. Roth
Philip R. Rudd
Security Title Plaza
3636 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
*Attorneys for Debtor*

COPY of the foregoing served via electronic notification (or mailed, if indicated by an "*") on May 25, 2010, to:

Elizabeth C. Amorosi
* Elizabeth.C.Amorosi@usdoj.gov
U. S. TRUSTEE'S OFFICE
230 South 1st Avenue, Suite 204
Phoenix, AZ 85003-1706

Christopher H Bayley *cbayley@swlaw.com
Craig K. Williams *ckwilliams@swlaw.com
Lori A. Lewis *llewis@swlaw.com
SNELL & WILMER
400 E. Van Buren
Phoenix, AZ 85004-2202
*Attorneys for Bank of America N.A. on its own
behalf and as Administrative Agent for
JPMorgan Chase Bank, N.A., Compass Bank,
Guaranty Bank, and Wachovia Bank*

Nancy J. March *nmarch@dmyl.com
DECONCINI MCDONALD YETWIN & LACY, P.C.
2525 E. Broadway Blvd., Suite 200
Tucson, AZ 85716-5300
*Attorneys for Blue Cross Blue Shield of Arizona*

Madeleine C. Wanslee *mwanslee@gustlaw.com
GUST ROSENFELD, P.L.C.
201 East Washington, Suite 800
Phoenix, AZ 85004-2327
*Attorneys for Maricopa County Treasurer*

GE MONEY BANK *claims@recoverycorp.com
c/o Recovery Management Systems Corp.
25 SE 2nd Avenue, Suite 1120
Miami, Florida 33131-1605
Attn: Ramesh Singh

Karen Johnson
* Bankruptcy@pinalcountyaz.gov
PINAL COUNTY TREASURER
P. O. Box 729
Florence, AZ 85232

By: _/s/ Cathie Bernales_____

**FULTON HOMES CORPORATION**
Annual Financial Summary
May 1, 2010 thru 2021


GREEN STREET
CAPITAL GROUP
STRUCTURED FINANCE · ASSET MANAGEMENT

| | Total | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| **SALES & STARTS** | | | | | | | |
| Home Sales | 1,627 | 260 | 317 | 294 | 254 | 252 | 250 |
| Lot Sales | 396 | 3 | 6 | 6 | 369 | 6 | 6 |
| Home Starts | 1,318 | 60 | 247 | 280 | 250 | 252 | 229 |
| | | | | | | | |
| **BEGINNING FHC CASH** | | 50,500,000 | | | | | |
| **BEGINNING FHSC CASH** | | 8,100,000 | | | | | |
| **IRONWOOD CHURCH SITE SALE** | | 650,000 | | | | | |
| **INSURANCE RESERVE** | | (2,100,000) | | | | | |
| **PMT TO ALLOWED SECURED CLAIMS** | | (2,332,000) | | | | | |
| **WORKING CAPITAL DEDUCTION** | | (19,818,000) | | | | | |
|    **INITIAL PRINCIPAL PAYDOWN** | 35,000,000 | | | | | | |
| | | | | | | | |
| **REVENUES** | | | | | | | |
| Sales | 501,658,054 | 78,932,113 | 96,069,016 | 83,925,941 | 91,851,712 | 74,647,423 | 76,231,848 |
|    **TOTAL** | 501,658,054 | 78,932,113 | 96,069,016 | 83,925,941 | 91,851,712 | 74,647,423 | 76,231,848 |
| | | | | | | | |
| **DIRECT COSTS** | | | | | | | |
| Lot Acquisition Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Lot Development Expense | (36,015,705) | (3,259,996) | 0 | (13,013,378) | (12,287,312) | (2,559,960) | (4,895,058) |
| Funds Available to Unsecured Creditors | (164,033,655) | (52,587,835) | (21,615,909) | (19,368,625) | (20,402,011) | (15,187,420) | (34,871,855) |
| Property Taxes | (3,850,000) | (400,000) | (750,000) | (700,000) | (700,000) | (650,000) | (650,000) |
| Home Construction Expense | (196,604,487) | (8,839,411) | (35,426,654) | (40,865,479) | (36,795,646) | (37,832,519) | (36,844,778) |
| WIP Expense | (16,472,431) | (16,472,431) | 0 | 0 | 0 | 0 | 0 |
| Home Closing Costs | (39,347,450) | (6,178,268) | (7,531,759) | (6,577,316) | (7,213,869) | (5,860,012) | (5,986,228) |
|    **TOTAL** | (456,323,729) | (87,737,941) | (65,324,322) | (80,524,798) | (77,398,837) | (62,089,911) | (83,247,919) |
| | | | | | | | |
| **Property Excess/Deficit** | 45,334,326 | (8,805,828) | 30,744,694 | 3,401,143 | 14,452,875 | 12,557,512 | (7,016,071) |
| | | | | | | | |
| **INDIRECT / INTEREST** | | | | | | | |
| Interest Expense to Unsecured Creditors | (23,635,209) | (4,801,516) | (6,057,043) | (4,830,387) | (3,719,006) | (2,552,138) | (1,675,119) |
| Indirect Costs/Overhead | (69,616,661) | (7,616,000) | (12,748,083) | (13,790,722) | (11,914,433) | (11,820,619) | (11,726,804) |
|    **TOTAL INDIRECT / INTEREST** | (93,251,870) | (12,417,516) | (18,805,126) | (18,621,109) | (15,633,439) | (14,372,756) | (13,401,923) |
| | | | | | | | |
| **CASH EXCESS/DEFICIT** | 6,900,456 | 33,594,657 | 11,939,568 | (15,219,966) | (1,180,565) | (1,815,244) | (20,417,995) |
| **CUMMULATIVE** | | 33,594,657 | 45,534,225 | 30,314,259 | 29,133,694 | 27,318,450 | 6,900,456 |

<u>**NOTES:**</u>
*(1) The figures used above represent Revenues and Costs from Fulton Homes Corporation and Fulton Homes Sales Corporation.*
*(2) The figures used above are based on current expectations, estimates, and projections about our industry, our beliefs, and our assumptions. This is not a guarantee of future performance and is subject to risks, uncertainties, and other factors, some of which are beyond our control and difficult to predict, and could cause actual results to differ materially from those expressed or forecasted above.*
*(3) The figures above do not include the development escrow accounts.*