Christopher H. Bayley (#010764)
Lori A. Lewis (#019285)
Evans O'Brien (#026521)
Snell & Wilmer L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2202
Telephone: (602) 382-6000
Facsimile: (602) 382-6070
E-mail: cbayley@swlaw.com
llewis@swlaw.com
eobrien@swlaw.com
Attorneys for Creditor Bank of America N.A., on its own behalf
and as Administrative Agent for JPMorgan Chase Bank, N.A.,
Compass Bank, Wachovia Bank, and Compass Bank as successor
in interest to Guaranty Bank

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In Re:<br><br>FULTON HOMES CORPORATION,<br><br>Debtor. | Proceedings Under Chapter 11<br><br>Case No. 2:09-bk-01298-GBN<br><br>**REPLY IN SUPPORT OF MOTION TO APPOINT AN EXAMINER PURSUANT TO 11 U.S.C. § 1104(c)**<br><br>**Hearing Date:** July 6, 2010<br>**Hearing Time:** 9:30 a.m.<br>**Location:** 230 N. First Ave.<br>7th Floor, Courtroom 702<br>Phoenix, AZ 85003<br><br>**Related DE(s):** 369 and 402 |

Bank of America, N.A., on its own behalf and as Administrative Agent for JPMorgan Chase Bank, N.A., Compass Bank, Wachovia Bank, and Compass Bank as successor in interest to Guaranty Bank ("Bank Group"), by and through undersigned counsel, hereby replies in support of its "Motion to Appoint An Examiner Pursuant to 11 U.S.C. § 1104(c)" ("Motion") [DE #369]. The appointment of an examiner is mandatory in this case because all of the requirements of § 1104(c)(2) have been met, and the scope of investigation and budget proposed

11628348

by the Bank Group are reasonable and appropriate. Accordingly, the Bank Group respectfully requests that the Court enter an Order appointing an examiner in this case.

This Reply is fully supported by the accompanying Memorandum of Points and Authorities and all of the pleadings filed in this case, which are incorporated herein by this reference.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **I. INTRODUCTION**

The Debtor has cited absolutely no controlling or convincing authority to controvert the Bank Group's assertion that appointment of an examiner is mandatory in this case. It is thus clear that under the circumstances of this case, the Court lacks discretion to decline to appoint an examiner. Moreover, while the Bank Group is not required to provide factual support that an investigation is necessary, the Bank Group has nonetheless identified specific areas of concern, and established a basis for examination in each instance. The proposed scope of the examiner's duties is narrowly defined, and the budget, to be borne almost entirely by the Bank Group as the single largest creditor, is limited accordingly.

### **II. LEGAL ANALYSIS**

#### **A. Section 1104(c)(2) is Mandatory**

There is no dispute that the requirements of § 1104(c)(2) are satisfied here. The Bank Group is clearly a party in interest; no plan has been confirmed; no trustee has been appointed; and the Debtor's unsecured debt of $164,000,000 dwarfs the statutory $5,000,000 threshold. Nevertheless, the Debtor argues that, notwithstanding the unambiguous language of the statute, the Court has discretion not to appoint an examiner in this case. The Debtor is mistaken. The appointment of an examiner is mandatory.

As an initial matter, it is worth noting that the Debtor has failed to cite a single decision upholding a trial court's finding that § 1104(c)(2) is discretionary. In fact, "every district court and nearly every bankruptcy court that has confronted the question has [] read the provision to be

11628348

- 2 -

mandatory on its face." *In re Walton*, 398 B.R. 77, 81-82 (N.D. Ga. 2008) (citing *In re Loral Space & Commc'ns, Ltd.*, No. 04-CV-8645-RPP, 2004 WL 2979785 (S.D.N.Y. Dec. 23, 2004); *In re Schepps Food Stores, Inc.*, 148 B.R. 27 (S.D. Tex.1992); *In re Vision Dev. Group of Bro-ward County, LLC*, No. 07-17778-BKC-RBR, 2008 WL 2676827 (Bankr. S.D. Fla. June 30, 2008); *In re Collins & Aikman Corp.*, 368 B.R. 623 (Bankr. E.D. Mich.2007); *In re UAL Corp.*, 307 B.R. 80 (Bankr.N.D.Ill.2004); *In re Mechem Fin. of Ohio, Inc.*, 92 B.R. 760 (Bankr. N.D. Ohio 1988); *In re The Bible Speaks*, 74 B.R. 511 (Bankr. D. Mass.1987); *In re 1243 20th St., Inc.*, 6 B.R. 683 (Bankr. D.D.C.1980); and *In re Lenihan*, 4 B.R. 209 (Bankr. D.R.I.1980)). In addition, the only circuit court to have addressed the issue found that § 1104(c)(2) is mandatory. *In re Revco D.S., Inc.*, 898 F.2d 498 (6th Cir. 1990).

In the face of this overwhelming authority, the Debtor relies exclusively on three bankruptcy court decisions, *In re Spansion*, 426 B.R. 114 (Bankr. D. Del. 2010), *appeal docketed*, No. 10-cv-00369-RBK (D. Del. May 17, 2010), *In re Winston Industries, Inc.*, 35 B.R. 304 (Bankr. N.D. Ohio 1983), and *In re Erickson Retirement Communities, LLC*, 425 B.R. 309 (Bankr. N.D. Tex. 2010). These cases are wholly unpersuasive.

First, *In re Spansion* is currently on appeal in the United States District Court in the District of Delaware. Therefore, it is unclear whether the bankruptcy court's ruling will survive appellate review. Second, *In re Winston Industries, Inc.* was decided in 1983, several years before the Supreme Court made clear that bankruptcy cases should be decided strictly on the basis of the clear language of the Bankruptcy Code. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989). Moreover, since the *Winston Industries* decision, the Court of Appeals for the Sixth Circuit has expressly held that § 1104(c)(2) requires the appointment of an examiner where the $5,000,000 threshold for unsecured debt is met. *In re Revco D.S., Inc.*, 898 F.2d at 501. Therefore, although the decision has not been explicitly overruled, it is doubtful *In re Winston Industries* remains good law today. Finally, as the Debtor appears to concede in the Response, any discussion of the mandatory nature of § 1104(c)(2) in *In re Erickson* is purely dicta since the

11628348

- 3 -

court decided not to appoint an examiner because the movant lacked standing to make the request. In other words, the strongest authority the Debtor has offered to support its suggestion that the appointment of an examiner pursuant to § 1104(c)(2) is discretionary is a Delaware bankruptcy court decision that is currently on appeal.

Not only has the Debtor failed to cite any persuasive authority in support of its position, the court in *In re Walton* expressly rejected the exact arguments advanced by the Debtor in the Response. There, the court began the analysis with the well-established rule of statutory interpretation that "when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms." *In re Walton*, 398 B.R. at 81 (citations and quotations omitted). After finding that the plain language of § 1104(c)(2) appears to require the appointment of an examiner, the court then considered the subsection in light of § 1104 as a whole. *Id.* at 82. The court found that this analysis strengthens the mandatory nature of § 1104(c)(2) because it is directly preceded by § 1104(c)(1), which is discretionary in nature. *Id.* According to the court, "[a] provision for discretionary appointment, where the court is to consider the interests of parties in making its own determination whether an examiner is necessary, followed by a provision that only considers whether a dollar criterion has been satisfied, is conclusive that the second provision is compelling on the court." *Id.* (citations omitted). Finally, the court rejected the appellees' argument that the "as is appropriate" language gives bankruptcy judges discretion to deny the appointment of an examiner under § 1104(c)(2). *Id.* at 83. "As one court confronting an identical argument explained, … '[t]his reasoning is both grammatically and contextually wrong. In the provision, "as is appropriate" modifies "investigation." The statute allows the court to determine the scope, length, and conduct of the investigation, rather than the appointment itself.'" *Id.* (citing *In re Schepps Food Stores, Inc.*, 148 B.R. at 30).

There is no dispute that all of the requirements of § 1104(c)(2) are satisfied here. Accordingly, the Debtor's tortured analysis notwithstanding, the appointment of an examiner is

11628348

- 4 -

mandatory in this case.

**B.  Appointment of an Examiner is in the Best Interest of Creditors and the Estate**

The Debtor claims that the appointment of an examiner is in the best interest of only one creditor, the Bank Group, and therefore appointment under 11 U.S.C. § 1104(c)(1) is not appropriate. The Bank Group has established that an examiner is mandatory in this case because the Debtor's unsecured debt far exceeds the threshold set forth in § 1104(c)(2), and the Court need not rely on § 1104(c)(1) to justify the appointment of an examiner. Nevertheless, the appointment of an examiner is certainly in the best interest of all creditors in this case, not just the Bank Group. The Bank Group's interest in maximizing its recovery is no different than that of any other unsecured creditor. In the *Gliatech* case cited by the Debtor in its Reply, the court found pivotal the fact that all of the creditors would bear the costs of an examination. *In re Gliatech, Inc.*, 305 B.R. 832, 836 (Bankr. N.D. Ohio 2004). The court declined to appoint an examiner, finding that the party requesting the examination should bear the cost of conducting its own investigation. *Id.* Here, the cost of an examiner will be born almost entirely by the Bank Group, as by far the single largest creditor. According to the Debtor's Third Amended Disclosure Statement, the total amount of unsecured claims is $164,697,251.85. The Debtor scheduled the Bank Group's claim in the amount of $163,488,655.00. The Debtor holds 99.3% of all unsecured debt. Assuming that the examiner uses the entire $50,000 budget in conducting its investigation and preparing its report, and assuming that the unsecured creditors as a class would bear the cost of an examiner, $49,650 of the cost would be allocated to the Bank Group, and only $350 to the remaining unsecured creditors. The Bank Group has absolutely no intent to burden other creditors with the cost of an examiner, and will bear the entire cost if necessary.

The Court may ask, if the Bank Group is willing to bear the costs of an examiner, why should it not conduct its own investigation? As the Court has undoubtedly noted, the Debtor and its ownership have continually accused the Bank Group of having a vendetta to destroy the

11628348

Debtor. While nothing could be further from the truth (the Bank Group's economic interest lies in the Debtor's maximization of its assets), the Debtor and its insiders may be more willing to cooperate with an inarguably neutral third party. This is not to say that the Bank Group will not continue to conduct discovery in support of a plan objection, the tax refund issue which the Bank Group has already identified and begun to investigate, or any other issue that may arise. However, in the areas of investigation that the Bank Group has identified, all of which involve the Debtor's interactions with insiders, an examiner may meet with more success than the Bank Group has to this point.

### C. Proposed Scope of Examiner's Duties is Appropriate

In support of its assertion that there is nothing in this case for an examiner to investigate, Fulton merely repeats its mantra that it has proposed a "full payment plan," and therefore nothing else really needs to be done. Creditors are to merely sit back and let the plan be confirmed, relying on the Debtor's assertions regarding the feasibility of the plan and its good faith in proposing the plan. The Bank Group cited several actions of the Debtor throughout the pendency of this case that appear to have been conducted solely in the interest of the Debtor's owner, rather than the bankruptcy estate and the creditor group. The Debtor claims that these actions were all in relation to prior plans of reorganization filed by the Debtor, and are moot now that the Debtor has filed its Third Amended Plan. The withdrawal of the prior plans does not moot the Bank Group's point. Even though the Debtor is no longer attempting to force the objectionable plan provisions upon its creditors, the fact that it even proposed and attempted to do so is an indication of its misplaced interests.

Contrary to the Debtor's claim that the Bank Group does not identify any basis for an investigation of any of the Debtor's activities, the Bank Group has clearly outlined several areas of investigation, and the basis therefore. The legislative history of section 1106(b) demonstrates that Congress intended to grant the courts with broad authority in determining the duties of the examiner. H.R. Rep. No. 95-595, 95th Cong. (1st Sess. 1977) ("The court is authorized to give

11628348

- 6 -

the examiner additional duties as the circumstances warrant."). Despite the Court's ability to fashion an expansive scope of tasks for the examiner to perform, the Bank Group has requested a limited and finite scope of work for any appointed examiner. Clearly, the limited scope requested by the Bank Group is well within the purview of an examiner's role, as set forth by the plain language of section 1106.

Specifically, the Bank Group has asked the Court to direct an examiner to investigate the following "Areas of Investigation":

(1) **Communications Between Management and Ownership:** The Bank Group has requested that an examiner investigate communications between the Debtor and the Fulton Family Trust, as well as the internal communications of the Debtor, during the course of this bankruptcy proceeding to determine whether the Debtor is acting in good faith. The Bank Group outlined in its Motion (and in several previous pleadings in this case), actions of the Debtor that demonstrate that the Debtor's motive in this case is to shift all of the risk of its ongoing operations to the Bank Group, while retaining all of the benefits of ownership for its shareholder, well beyond what it permitted by the Bankruptcy Code. Even with the Third Amended Plan, which the Debtor erroneously alleges is a "full payment plan," the Debtor commits to paying the Bank Group only a small portion of its available cash for several years, with potentially a large balloon payment at the end of the plan period, making the Debtor's large cash reserves fully available to the shareholder without court supervision or penalty. The Bank Group is not impugning the character of the Debtor's management or its ownership, as Fulton alleges. However, in a family business, the allegiance to a patriarch owner may be understandably difficult to overcome. If the Debtor has nothing to hide, nothing will be lost by permitting an impartial third party to review the correspondence between the Debtor's management and its ownership, and internal communications of the Debtor, during the course of this bankruptcy proceeding.

11628348

- 7 -

(2) **Tax Issues:** The Bank Group requests that an examiner investigate the tax advice provided to the Debtor by Deloitte Tax, LLP to ensure that any plan of reorganization that may be proposed by the Debtor, as well as other post-petition actions of the Debtor, have the goal and effect of maximizing the assets of the bankruptcy estate, and are not colored by the tax considerations of the Debtor's equity holder, who is also advised by Deloitte Tax, LLP. Again, given the family nature of the Debtor's business, it may be very difficult for Debtor's management to focus on the interests of the creditors, even if that is at the expense of the equity holder, to whom at least two of the top managers are related. Because the Debtor is a pass-through entity, its profit/loss and its tax characteristics are passed through to its shareholder. Business decisions that have a tax consequence to the shareholder may inversely affect the Debtor's estate. The Bank Group requests that a disinterested third party review the post-petition accounting and tax-related activity in order to provide assurance that the Debtor's duties to its creditors have not been overcome by loyalty to its owner.

(3) **Corporate Opportunities:** Bof A has requested that an examiner investigate the pre- and post-petition activities of the Debtor, the Fulton Family Trust, Ira Fulton, Debtor's management, Fulton Homes Sales Corporation, and other insiders to determine whether corporate opportunities have been usurped. In seeking an injunction against the Bank Group pursuing its guaranty claim against Fulton Homes Sales Corporation, the Debtor has repeatedly argued to the Court that the operations of the Debtor and Fulton Homes Sales Corporation are closely intertwined. However, only the operations of the Debtor are currently subject to the scrutiny of the Court. An examiner should investigate the transactions and communications between the Debtor and Fulton Homes Sales Corporation, as well as other insiders that are not subject to court supervision.

(4) **Fulton Sales Expenses:** The Bank Group has requested that an examiner investigate the Debtor's post-petition transactions with Fulton Homes Sales to determine that expenses and revenue are appropriately allocated between the debtor and non-debtor entities.

The Debtor shares a business address, employees, management, office equipment, accounting systems, and overhead expenses with Fulton Sales. The Debtor's management (which is identical to the management of Fulton Sales), determines how expenses are allocated between the Debtor and Fulton Sales. There is thus an unavoidable conflict of interest between Fulton Sales and the Debtor that may impede the Debtor's ability to preserve estate assets for the benefit of creditors. *See, e.g., In re Cajun Elec. Power Coop., Inc.*, 74 F.3d 599, 600 (5th Cir. 1995) (adopting on rehearing the dissent in 69 F.3d 746, 751 (5th Cir. 1995)) (appointing trustee because of "inherent conflict" caused by utility cooperative's board members also serving in various capacities at the cooperative's member utility companies)[1].

(5) **Other Activies, Including "Restricted Cash" Accounts:** The Bank Group requested that an examiner investigate other activities of the Debtor that the Court may subsequently deem necessary. While not specifically included in the Motion, this category should encompass an investigation of the "Restricted Cash" accounts established by the Debtor post-petition. The Debtor's monthly operating reports reveal that the Debtor has opened escrow accounts that it categorizes as "Restricted Cash" accounts, in the total amount of $9,018,465.01 as of the end of May, 2010. The monthly operating reports do not include an accounting for the funds deposited into/withdrawn from these Restricted Cash Accounts. Rather, the Debtor includes only a summary statement in the monthly operating reports of the total amount of cash that was wired to an escrow account for land development, and the total disbursements made from the account. For example, in April, 2010, the monthly operating report reflects that $1,707,127.00 was wired to First American Title Company for land development work, and that $627,600.21 of disbursements were made from escrow. Further scrutiny of these accounts is warranted.

---

[1] Of course, here, the relief requested is not the appointment of a trustee, but the much less onerous, invasive, and disruptive appointment of an examiner.

11628348

- 9 -

Despite the detail with which the Bank Group has set forth the basis for an examination of these specific areas, the Debtor argues that there is nothing to investigate. Therefore, the Debtor suggests, in the event the Court agrees with the great weight of authority and finds that § 1104(c)(2) is mandatory, it should simply appoint an examiner without any duties. In other words, the Debtor suggests that the Court enforce the letter, but not the spirit, of the law. Of course, the Debtor fails to cite a single published opinion where a court has actually adopted this approach. As a result, the Court should reject the Debtor's suggestion that it appoint an examiner without any duties.

### III. <u>CONCLUSION</u>

The Bank Group respectfully requests that the Court enter an order appointing an examiner in this case for the specific purpose of carrying out the duties of an examiner specifically set forth in 11 U.S.C. § 1106(b) and examining the Areas of Investigation outlined in the Motion and this Reply.

RESPECTFULLY SUBMITTED this 30th day of June, 2010.

Snell & Wilmer L.L.P..

By /s/ LAL – 019285
Christopher H. Bayley
Lori A. Lewis
Evans O'Brien
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2202
Attorneys for Creditor Bank of America N.A., on its own behalf and as Administrative Agent for JPMorgan Chase Bank, N.A., Compass Bank, Wachovia Bank, and Compass Bank as successor in interest to Guaranty Bank

. . .

. . .

. . .

. . .

. . .

11628348

- 10 -

| | |
|---|---|
| COPY of the foregoing mailed or e-mailed this 30th day of June, 2010, to: | |
| Mark W. Roth | mroth@polsinelli.com |
| Philip R. Rudd | prudd@polsinelli.com |
| John J. Hebert | jhebert@polsinelli.com |
| Arturo A. Thompson | athompson@polsinelli.com |
| Polsinelli Shughart PC 3636 N. Central Ave., Ste. 1200 Phoenix, AZ 85012 Attorneys for Fulton Homes Corporation | |
| Elizabeth Amorosi | Elizabeth.C.Amorosi@usdoj.gov |
| Larry Lee Watson | larry.watson@usdoj.gov |
| Office of the U.S. Trustee 230 N. First Ave., Ste. 240 Phoenix, AZ 85003-1706 | |
| Nancy J. March | nmarch@dmyl.com |
| DeConcini McDonald Yetwin & Lacy PC 2525 E. Broadway Blvd., Ste. 200 Tucson, AZ 85716-5300 Attorneys for Blue Cross Blue Shield of Arizona, Inc. | |
| Madeleine Wanslee | mwanslee@gustlaw.com |
| Gust Rosenfeld PLC 201 E. Washington St., Ste. 800 Phoenix, AZ 85004 Attorneys for Maricopa County Treasurer | |
| 20 Largest Unsecured Creditors (list attached) | |

/s/ Mary J. Minnick

11628348

- 11 -

| | | |
|---|---|---|
| 1 | ARIZONA WHOLESALE SUPPLY<br>PO BOX 2979<br>PHOENIX AZ  85062-2979 | |
| 3 | CAVANAGH LAW FIRM<br>1850 N CENTRAL AVE STE 2400<br>PHOENIX AZ  85004-4579 | FENNEMORE CRAIG PC<br>3003 N CENTRAL AVE STE 2600<br>PHOENIX AZ  85012-2913 |
| 5 | FIRST CLASS DELIVERY<br>2515 E THOMAS RD STE 16-734<br>PHOENIX AZ  85016-7959 | GE APPLIANCES<br>GE CONSUMER AND INDUSTRIAL<br>307 N HURSTBOURNE PKWY<br>LOUISVILLE KY  40222 |
| 8 | INFRASTRUCTURE DYNAMICS<br>2020 S MCCLINTOCK DR STE 109<br>TEMPE AZ  85282-2691 | LP RENT-A-FENCE<br>PO BOX 519<br>STANFIELD AZ  85272-0519 |
| 10 | MESA LIGHTING & FAN INC<br>418 E BASELINE RD<br>MESA AZ  85204-6502 | MOBIL MINI<br>PO BOX 79149<br>PHOENIX AZ  85062-9149 |
| 12 | OPTIMUS SURVEY SERVICES<br>4550 E COTTON CENTER BLVD STE 140<br>PHOENIX AZ  85040-4802 | PERKINSON REPROGRAPHICS<br>2330 W BROADWAY RD STE 103<br>MESA AZ  85202-1886 |
| 14 | PRE PAID LEGAL SERVICES<br>PO BOX 2629<br>ADA OK  74821-9984 | PRECISION DRAFTING AND DESIGN<br>3210 N DELAWARE ST<br>CHANDLER AZ  85225-1100 |
| 16 | QWEST<br>PO BOX 29040<br>PHOENIX AZ  85038-9040 | SOS EXTERMINATING<br>1240 W SAN PEDRO ST<br>GILBERT AZ  85233-2405 |
| 18 | SCOTT BLUE REPROGRAPHICS<br>133 W FIRST AVE<br>MESA AZ  85210-1311 | TOWN OF QUEEN CREEK<br>22350 S ELLSWORTH RD<br>QUEEN CREEK AZ  85242-9311 |

11628348