# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

|  |  |
|---|---|
| In re:<br><br>FULTON HOMES CORPORATION<br><br>Debtor. | Chapter 11 Case<br>Case No. 2:09-bk-1298-GBN |

## AMENDED AND SUPPLEMENTED DISCLOSURE STATEMENT CONCERNING THE DEBTOR'S FOURTH AMENDED PLAN OF REORGANIZATION

### IMPORTANT DATES:

Date by which objections to Confirmation of the Plan must be filed and served: _____, 2010

Date by which Ballots must be received: _____, 2010

Evidentiary Hearing on Confirmation of the Plan: _____, 2010

---

Craig D. Hansen, Esq. (AZ Bar No. 007405) chansen@ssd.com
Sean T. Cork, Esq. (AZ Bar No. 022149) scork@ssd.com
Kelly Singer, Esq. (AZ Bar No. 022024) ksinger@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
1 East Washington, Suite 2700
Phoenix, Arizona 85004-2256
(602) 528-4000

and

Philip M. Oliss (OH Bar No. 0066528) poliss@ssd.com
Jessica D. Goldman (OH Bar No. 0077049) jgoldman@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114
(216) 479-8500

Proposed Counsel to Debtors and Debtors-In-Possession

DATED: September __, 2010

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION & SUMMARY .................................................................. 1

    A.   Overview ..................................................................................... 1

    B.   Executive Summary of Modifications from Previous Disclosure
        Statements ................................................................................... 1

    C.   Notice to Holders of Claims and Equity Interests ........................... 3

    D.   Rules of Interpretation ................................................................. 5

    E.   Summary of Treatment of Claims and Equity Interests under the Plan ......... 5

    F.   General Voting Procedures, Ballots, and Voting Deadline .......................... 11

    G.   Acceptance or Rejection of a Plan ................................................ 13

    H.   Evidentiary Confirmation Hearing and Deadline for Objections to
        Confirmation ............................................................................... 13

II.  DEFINITIONS ......................................................................................... 14

III. THE DEBTOR, BACKGROUND, AND EVENTS PRECIPITATING THE
    CHAPTER 11 ......................................................................................... 14

    A.   Background ................................................................................. 14

    B.   Business Plan and Projections ....................................................... 16

    C.   Fulton Sales ............................................................................... 17

    D.   Express and Implied Warranty, Latent Defect, Customer Service, and
        Indemnification Obligations .......................................................... 18

    E.   Preferences, Fraudulent Conveyances and Other Potential Causes of
        Action ........................................................................................ 18

    F.   Conclusion ................................................................................. 19

IV.  SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE ............................... 19

    A.   Administrative Proceedings ........................................................... 19

    B.   Retention of Professionals ............................................................ 19

    C.   First Day Motions ....................................................................... 20

    D.   Appointment of Unsecured Creditors Committee ............................. 20

    E.   Motion to Sell and Construct Homes .............................................. 20

    F.   Motion to Pay Critical Vendor ...................................................... 21

    G.   Motion to Terminate Exclusivity ................................................... 21

    H.   Motion to Alter or Amend Ordinary Course Order ........................... 21

    I.   Motion for Stay Relief .................................................................. 21

    J.   Prior Plans and Disclosure Statements ........................................... 21

    K.   Motions to Extend Exclusivity ...................................................... 22

    L.   The Injunction ............................................................................ 22

    M.   The Debtor's Motion for Alternative Dispute Resolution ................... 22

    N.   The Bank Group's Motion for the Appointment of an Examiner ................ 22

    O.   Retention of Squire Sanders & Odyssey .......................................... 22

    P.   Stipulated Order with the Bank Group Regarding Scheduling Matters ........ 23

    Q.   Operating Reports ....................................................................... 23

V.      DESCRIPTION OF ASSETS AND LIABILITIES OF THE DEBTOR .................... 23

     A.      Assets .................................................................................................. 23
     B.      Liabilities ............................................................................................ 23

VI.      PLAN SUMMARY ........................................................................................... 24

VII.      TREATMENT OF UNCLASSIFIED CLAIMS ............................................... 25

     A.      Unclassified Claims ............................................................................ 25
     B.      Allowed Administrative Claims .......................................................... 25

VIII.      TREATMENT OF CLASSES & EQUITY INTERESTS UNDER THE PLAN ........ 26

     A.      Class 1 – Secured Vendor Claims ...................................................... 27
     B.      Class 2 – Secured Tax Claims ............................................................ 28
     C.      Class 3 – Bank Group Claims ............................................................ 28
     D.      Class 4 – General Unsecured Claims ................................................. 30
     E.      Class 5 – Queen Creek Claims ........................................................... 30
     F.      Class 6 – Unsecured Warranty Claims .............................................. 30
     G.      Class 7 - Fulton Unsecured Claim ..................................................... 30
     H.      Class 8 – Equity Interests ................................................................... 31

IX.      SUMMARY OF THE NEW CREDIT FACILITY TO BE ISSUED
     PURSUANT TO THE PLAN ............................................................................ 32

     A.      Amended and Restated Credit Agreement ......................................... 32
     B.      New Note ............................................................................................. 34

X.      MEANS FOR EXECUTING THE PLAN ........................................................ 34

     A.      Funding of the Plan and Contribution of Assets ............................... 34
     B.      Continued Corporate Existence .......................................................... 36
     C.      Cancellation of Securities, Instruments and Agreements .................. 36
     D.      Effectiveness of New Securities, Instruments, Agreements and
             Documents .......................................................................................... 36
     E.      No Corporate Action Required ........................................................... 37
     F.      Indemnification and Insurance ........................................................... 37
     G.      Operations Pending Effective Date ..................................................... 37
     H.      Payment of Trustee Fees .................................................................... 37

XI.      DISTRIBUTIONS ............................................................................................. 37

     A.      Distributions on Account of Claims Allowed as of the Effective Date ........ 37
     B.      Distribution on Account of Claims Allowed after the Effective Date .......... 37
     C.      Delivery of Distributions .................................................................... 38
     D.      Fractional, De Minimis, Undeliverable, and Unclaimed Distributions ........ 39
     E.      Manner of Payment Pursuant to the Plan .......................................... 40
     F.      Claims Paid or Payable by Third Parties ........................................... 40

XII.      RETAINED CAUSES OF ACTION ................................................................ 41

XIII.    MANAGEMENT ................................................................................ 41
XIV.    EFFECT OF CONFIRMATION ........................................................ 41

      A.    Vesting of Assets ................................................................ 41
      B.    Discharge ............................................................................ 42
      C.    Discharge Injunction ......................................................... 42
      D.    Releases and Related Matters ........................................... 42
      E.    Preservation of Insurance .................................................. 43

XV.    DOCUMENTATION OF PLAN IMPLEMENTATION ..................... 43
XVI.    EXEMPTION FROM TRANSFER TAXES ..................................... 43
XVII.    TAX CONSIDERATIONS ................................................................ 44

      A.    Timing and Order of Transactions .................................... 44
      B.    Tax Reorganization Documents ........................................ 44

XVIII.    LIQUIDATION ANALYSIS ............................................................. 44
XIX.    FEASIBILITY ANALYSIS .............................................................. 46
XX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............ 47

      A.    Tax Consequences to the Debtor ...................................... 48
      B.    Tax Consequences to the Holders of Equity Interests ................... 50
      C.    Tax Consequences to the Creditors who Hold Debt Instruments (other then the Fulton Unsecured Claim) ................. 50
      D.    Tax Consequences to the Creditors who have Performed Services ............. 52
      E.    Tax Consequences to the Creditors who are a State, or Political Subdivision Thereof ................. 53
      F.    Tax Consequences for the Fulton Unsecured Claim ................... 53
      G.    Information Reporting and Backup Withholding ......................... 53

XXI.    IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE ............ 54

      A.    IRS CIRCULAR 230 NOTICE .......................................... 54

XXII.    DETERMINATION OF CLAIMS .................................................... 54

      A.    Objections to Claims .......................................................... 54
      B.    Distributions on Allowance or Disallowance of Disputed Claims ................ 55
      C.    Contingent Claims ............................................................. 55

XXIII.    EXECUTORY CONTRACTS ........................................................... 55

      A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ............ 55
      B.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ............ 55
      C.    Pre-Existing Obligations to the Debtor under Executory Contracts and Unexpired Leases ............ 56

D.    Claims Based on Rejection of Executory Contracts and Unexpired Leases .............................................................................................. 57

E.    Modification of Executory Contracts and Unexpired Leases Containing Equity Ownership Restrictions .................................... 57

F.    Modifications, Amendments, Supplements, Restatements, or Other Agreements ...................................................................................... 57

G.    Reservation of Rights ......................................................................... 57

H.    Nonoccurrence of Effective Date ...................................................... 58

XXIV.    MODIFICATION OF PLAN .................................................................... 58

XXV.    CONDITIONS PRECEDENT .................................................................. 58

A.    Conditions to Confirmation ............................................................... 58

B.    Conditions to the Effective Date ........................................................ 58

C.    Waiver of Conditions ......................................................................... 59

XXVI.    POST-EFFECTIVE DATE FEES; FINAL DECREE .............................. 59

XXVII.    RETENTION OF JURISDICTION .......................................................... 59

XXVIII.    RETENTION AND ENFORCEMENT OF CLAIMS ............................... 60

A.    Retention and Reservation ................................................................. 60

B.    Prosecution ......................................................................................... 60

XXIX.    MISCELLANEOUS PROVISIONS ........................................................ 61

A.    Effecting Documents, Further Transactions, Timing ....................... 61

B.    Binding Effect .................................................................................... 61

C.    Governing Law ................................................................................... 61

D.    Modification and Treatment of Claims ............................................. 61

E.    Setoffs and Recoupment .................................................................... 61

F.    Severability ........................................................................................ 61

G.    Plan Documents ................................................................................. 62

H.    Inconsistency ..................................................................................... 62

I.    Subordination ..................................................................................... 62

J.    Withholding and Reporting Requirements ........................................ 62

K.    IRS Circular 230 Notice .................................................................... 62

L.    Method of Payment; Payments, Filings and Notices Only on Business Days .................................................................................... 62

XXX.    RISKS ...................................................................................................... 63

A.    Homebuilding Industry ...................................................................... 63

B.    Reorganization Factors ...................................................................... 65

XXXI.    RECOMMENDATION AND CONCLUSION ......................................... 66

A.    Hearing On and Objection to Confirmation ..................................... 66

B.    Recommendation ............................................................................... 66

EXHIBITS: 1. Debtor's Fourth Amended Plan of Reorganization

## I.    INTRODUCTION & SUMMARY

### A.    Overview

Fulton Homes Corporation, an Arizona corporation and the debtor in the above-entitled chapter 11 bankruptcy proceeding (the "**Debtor**"), submits this *Amended and Supplemented Disclosure Statement Relating to Fourth Amended Plan of Reorganization* (the "**Disclosure Statement**") [D.E. ___] pursuant to Section 1125 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**") for use in the solicitation of votes on the Debtor's *Fourth Amended Plan of Reorganization* (attached as Exhibit 1 to this Disclosure Statement, the "**Plan**") [D.E. ___] proposed by the Debtor.  The Plan was filed with the United States Bankruptcy Court for the District of Arizona (the "**Court**"), on August 20, 2010.  In addition, the Debtor will file a supplement to the Plan (the "**Plan Supplement**") which will include the Debtor's detailed Liquidation Analysis (defined below) and Feasibility Analysis (defined below, and together with the Liquidation Analysis, the "**Projections**") not later than August 26, 2010. Copies of the Plan Supplement can be obtained upon by: (a) written request to Squire, Sanders & Dempsey L.L.P., Two Renaissance Square, 1 East Washington, Suite 2700, Phoenix, Arizona 85004-2256 (Attn:  Bradley A. Cosman, Esq., bcosman@ssd.com), counsel to the Debtor; or (b) accessing the website for the United States Bankruptcy Court for the District of Arizona (www.azb.uscourts.gov/).

The following introduction and summary is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information and financial statements and notes thereto appearing elsewhere in this Disclosure Statement, the Plan, and Plan Supplement.  This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, the need to seek chapter 11 protection, significant events that have occurred during the chapter 11 case, and the anticipated organization and operations of the Reorganized Debtor.  This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with securities to be issued under the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims and Equity Interests must follow for their votes to be counted.  Certain provisions of the Plan, and thus the descriptions and summaries contained herein, may be the subject of continuing negotiations among the Debtor and various parties, may not have been finally agreed upon, and may be modified.  Such modifications, however, will not have a material effect on the distributions contemplated by the Plan.

The Debtor is a proponent of the Plan within the meaning of Section 1129 of the Bankruptcy Code.  The Plan contains separate Classes and proposes recoveries for holders of Claims against, and Equity Interests, in the Debtor.   After careful review of the Debtor's current business operations, estimated recoveries in a liquidation scenario, and the prospects of ongoing business, the Debtor has concluded that their business and assets have significant value that would not be realized in a liquidation scenario and, as a result, the recovery to the Debtor's Creditors will be maximized by a reorganization of the Debtor as contemplated by the Plan.  Therefore, the Debtor recommends that you vote in favor of the Plan.

### B.    Executive Summary of Modifications from Previous Disclosure Statements

The Debtor previously filed four proposed plans of reorganization.  As part of the Debtor's previous confirmation efforts, the Bankruptcy Court approved the Debtor's *Second Amended Disclosure Statement Concerning the Debtor's Second Amended Plan of Reorganization Dated August 21, 2009* (the "**Second Amended Disclosure Statement**") on October 13, 2009 [D.E. 261].  This Disclosure Statement reflects material additional and enhanced disclosures beyond those contained in the previously approved

Second Amended Disclosure Statement. Furthermore, as summarized in the chart immediately below and discussed in detail in Sections IX and X of this Disclosure Statement, the changes to the treatment of the Bank Group Claims contemplated by the Plan are not adverse and in fact, reflect significant enhanced treatment above the Debtor's most recent previously proposed plan (which itself reflected enhanced treatment of the Bank Group Claims above the Debtor's previously proposed plans).

### Summary of Enhancements to Bank Group Claim Treatment

| Bank Group Treatment | Third Amended Plan | Fourth Amended Plan |
|---|---|---|
| **Collateral** | None | Senior, perfected and valid Liens on all of the Reorganized Debtor's: (i) real property assets, including, without limitation, lots, units, leaseholds and fixtures; (ii) inventory and other goods; (iii) accounts receivable; (iv) Cash and bank accounts of the Borrowers; and (v) all proceeds of any of the foregoing; provided, however, that the Bank Group Collateral will not include any asset that either Borrower acquires after the Effective Date with third-party financing. |
| **Covenants** | None | The Amended and Restated Loan Agreement will include those affirmative, negative and property covenants customarily found in transactions of type contemplated by the Plan, as well as the financial covenants identified in Section IX of this Disclosure Statement. |
| **Contribution of Non-Debtor Equity Interest** | None | Ira A. and Mary Lou Fulton will contribute, pursuant to the Tax Reorganization, to the Reorganized Debtor all of their ownership interest in Fulton Sales, which constitutes 100% of the total outstanding stock of Fulton Sales. |
| **Addition of Non-Debtor Borrowers** | None | Fulton Sales agrees to become a Borrower under the New Credit Facility, and will, in its capacity as Borrower, pledge any unrestricted Cash, including unrestricted Cash generated post-Effective Date from Sales of Units and Non-Units as part of the Bank Group Collateral.. |
| **Conversion of Fulton Unsecured Claim Into Equity** | None | To facilitate the treatment of Allowed Claims under the Plan and the reorganization of the Debtor, Ira A. Fulton will agree, pursuant to the Tax Reorganization, to convert the $25 million Fulton Unsecured Claim into equity in the Reorganized Debtor |

To effectuate these enhancements to the Bank Group and to generate additional liquidity without implementation of a revolving line of credit, the Debtor will secure from its subcontractor creditors in Class 1 — by way of their support for the Plan and otherwise — the following. First, in exchange for the benefits associated with future business from the Debtor, subcontractor related creditors have their Claims paid in full — 60% of the Effective Date and the balance over two to four years — which will in turn, reduce the Reorganized Debtor's immediate cash flow obligations. Second, in similar exchange for the benefits associated with future business from the Debtor, certain subcontractor related creditors will extend favorable trade payment terms to the Debtor. Extension of trade payment terms frees up the Debtor's working capital. Third, the Plan contemplates subordinating any mechanics' liens or similar

liens from subcontractor claimants in order to grant the Bank Group a senior perfected lien on all of the Debtor's real estate assets.

### C. Notice to Holders of Claims and Equity Interests

This Disclosure Statement is being transmitted to certain holders of Claims and Equity Interests for the purpose of soliciting votes on the Plan, and to others for informational purposes. The purpose of this Disclosure Statement is to provide adequate information to enable the holder of a Claim against or Equity Interest in the Debtor to make a reasonably informed decision with respect to the Plan prior to exercising the right to vote on the Plan.

By order entered on _____, 2010, the Bankruptcy Court approved this Disclosure Statement, authorized the Debtor to commence a solicitation of votes with respect to the Plan and set a final hearing for _____, 2010, at which time the Bankruptcy Court will consider confirmation of the Plan [D.E. ___]. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT AND THE OTHER MATERIALS INCLUDED IN THE SOLICITATION PACKAGE ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtor or the Plan other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN SUPPLEMENT IS, BY ITS NATURE, FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL OR FUTURE RESULTS. These estimates, assumptions, projections of future operating results and the like contained in this Disclosure Statement are statements that the Debtor believes constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These statements often include the words "may," "could," "would," "should," "believes," "expects," "anticipates," "estimates," "intends," "plans," "targets," "potentially," "probably," "projects," "outlook," or similar expressions. Such forward-looking statements involve known and unknown risks, uncertainties and other important factors that could cause the actual results, performance or achievements of Reorganized Debtor to differ materially from any future results, performance or achievements expressed or implied by such forward-looking statements. Such risks, uncertainties and other important factors include, among others: general economic and business conditions; the availability, terms and deployment of capital; the availability and terms of construction materials; adverse determinations in any future litigation or regulatory proceedings; and any other factors referenced in this Disclosure Statement or otherwise.

Except with respect to the Liquidation Analysis and the Feasibility Analysis (to be included in the Plan Supplement) (collectively, the "**Projections**"), and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. Neither the Debtor nor Reorganized Debtor intend to update the Projections for the purposes hereof; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections. Further, the Debtor does not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the

delivery of this Disclosure Statement does not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN OF REORGANIZATION OF THE ABOVE-CAPTIONED DEBTOR, AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND PLAN SUPPLEMENT AND IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN WILL GOVERN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF THE DEBTOR AND AFFILIATES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE CHAPTER 11 CASE, AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT SUCH SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

4

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR CHAPTER 11 INTERESTS IN, THE DEBTOR.

### D.  Rules of Interpretation

The following rules for interpretation and construction shall apply to the Disclosure Statement: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference in the Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference in the Disclosure Statement to an existing document, schedule, exhibit, statute, regulation, order, rule of the court, or the like, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented from time to time; (4) any reference to an entity as a holder of a Claim or Equity Interest includes that entity's successors and assigns; (5) unless otherwise specified, all references in the Disclosure Statement to Articles and Exhibits are references to Articles and Exhibits of the Disclosure Statement; (6) the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (7) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Disclosure Statement; (8) unless otherwise set forth in the Disclosure Statement, the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply; (9) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to the Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (10) unless otherwise specified, all references in the Disclosure Statement to monetary figures shall refer to currency of the United States of America.

### E.  Summary of Treatment of Claims and Equity Interests under the Plan

The obligations and distributions made under the Plan are in full and final settlement, release and compromise of any and all Claims against and Equity Interests in the Debtor.

The Plan contains separate classes for holders of Claims against, and Equity Interests in, the Debtor. The table below summarizes the classification and treatment of the principal prepetition Claims and Equity Interests under the Plan. The classification and treatment for all Classes are described in more detail in Article II through IV of the Plan. The table below also sets forth the Debtor's estimates of the amount of Claims that will ultimately become allowed in each Class based upon review by the Debtor of all Claims scheduled by the Debtor, Claims filed by creditors, consideration of the provisions of the Plan that affect the allowance of certain Claims, and a general estimate of the amount by which Allowed Claims may ultimately exceed the amount of the Claims scheduled by the Debtor.

In addition, for certain classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows. Accordingly, for these reasons, no representation can be or is being made with respect to whether the

estimated percentage recoveries set forth in the table below will actually be realized by the holders of Allowed Claims in any particular class.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISK AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR, PLEASE SEE THE PLAN SUMMARY AND RISKS SECTIONS OF THIS DISCLOSURE STATEMENT.

| Class | Class Description | Treatment under plan | Estimated Claim | Estimated Recovery |
|---|---|---|---|---|
| 1 | **Secured Vendor Claims** <br><br> **(Impaired; entitled to vote)** | Each holder of an Allowed Secured Vendor Claim is considered to be in its own separate subclass within Class 1, and each such subclass is deemed to be a separate Class for purposes of the Plan. The treatment accorded to Allowed Secured Vendor Claims under the Plan depends on whether the holder of such Claim votes to accept or reject the Plan. <br><br> 1. Treatment Upon Acceptance of Plan: Each holder of an Allowed Secured Vendor Claim that votes to accept the Plan shall receive, in full and final satisfaction, settlement, release, and discharge of, such Claim, the following treatment: a) a Cash payment on the Effective Date equal to 60% of the Allowed amount of such Secured Vendor Claim; b) Cash payments in an amount equal to the balance of the Allowed Secured Vendor Claim, with such payments to be made over a 2-year period commencing on the Effective Date, and shall be paid interest at a market rate as determined by the Bankruptcy Court; and c) The holder of such Allowed Secured Vendor Claim shall be designated a "Preferred Vendor" entitling such claimholder to bid on all future jobs of the Reorganized Debtor so long as the unsecured note remains unpaid. <br><br> In consideration for the foregoing treatment, and in full and final settlement of any and all claims between the Claim holder and the Debtor, as of the Effective Date the holder of an Allowed Secured Vendor Claim that votes to accept the Plan will: (i) agree to extend normal pre-petition trade and payment terms to the Reorganized Debtor; and (ii) subordinate any and all Liens, security interests and right to receive any Cash held in escrow to the Liens and payments provided to the Bank Group to facilitate the | $1,163,630 | 100% |

| Class | Class Description | Treatment under plan | Estimated Claim | Estimated Recovery |
|---|---|---|---|---|
| | | Debtor's treatment of the Bank Group Claims.<br><br>2. <u>Treatment Upon Rejection of Plan</u>: Each holder of an Allowed Secured Vendor Claim that votes to reject the Plan shall receive, in full and final satisfaction, settlement, release, and discharge of, such Claim, the following treatment: a) a Cash payment on the Effective Date equal to 60% of the Allowed amount of such Secured Vendor Claim; b) Cash payments in an amount equal to the balance of the Allowed Secured Vendor Claim, with such payments to be made over a 4-year period commencing on the Effective Date, and shall be paid interest at a market rate as determined by the Bankruptcy Court; and c) The holder of such Allowed Secured Vendor Claim shall not be designated as a "Preferred Vendor."<br><br>In consideration for the foregoing treatment, and in full and final settlement of any and all claims between the Claim holder and the Debtor, as of the Effective Date the holder of an Allowed Secured Vendor Claim that votes to accept the Plan will: (i) agree to extend normal pre-petition trade and payment terms to the Reorganized Debtor; and (ii) subordinate any and all Liens, security interests and right to receive any Cash held in escrow to the Liens and payments provided to the Bank Group to facilitate the Debtor's treatment of the Bank Group Claims. | | |
| 2 | **Secured Tax Claims**<br><br>**(Impaired; entitled to vote)** | Each holder of an Allowed Secured Tax Claim is considered to be in its own separate subclass within Class 2, and each such subclass is deemed to be a separate Class for purposes of the Plan. The treatment of Allowed Secured Tax Claims will depend upon the nature of the property subject to the Lien of the holder of the Allowed Secured Tax Claim.<br><br>1. <u>Finished Lots</u>: Each holder of an Allowed Secured Tax Claim that are secured by a Lien on finished lots of the Debtor shall receive, in full and final satisfaction, settlement, release, and discharge of, such Claim, the following treatment: a) the Claim holder will retain its Lien on the property until such time as the Claim is | $1,068,292 | 100% |

| Class | Class Description | Treatment under plan | Estimated Claim | Estimated Recovery |
|---|---|---|---|---|
| | | paid in full; and b) the Claim will be paid in full and in Cash, with interest at the statutory rate, on the date that the respective developed lot is sold to a third party.<br><br>2. <u>Unfinished Lots</u>: Each holder of an Allowed Secured Tax Claim that are secured by a Lien on unfinished lots of the Debtor shall receive, in full and final satisfaction, settlement, release, and discharge of, such Claim, the following treatment: a) the Claim holder will retain its Lien on the property until such time as the Claim is paid in full; and b) the Claim will be paid in full and in Cash, with interest at the statutory rate, over a 4-year period following the Effective Date. The Reorganized Debtor will make semi-annual payments on account of such Allowed Secured Tax Claims. | | |
| 3 | **Bank Group Claims**<br><br>**(Impaired; entitled to vote)** | In full settlement, release and discharge of all Bank Group Claims, on the Effective Date or as soon thereafter as practicable, Holders of Allowed Bank Group Claims shall receive the following:<br><br>    1.    Cash Payment: On the Effective Date, the Borrowers will pay the Bank Group Effective Date Cash Payment to the holders of Allowed Bank Group Claims.<br><br>    2.    New Note: On the Effective Date, the Borrowers will issue the New Note to the holders of Allowed Bank Group Claims, and shall execute the Amended and Restated Credit Agreement.<br><br>    3.    Collateral: On the Effective Date, the Borrowers will grant to the holders of Allowed Bank Group Claims senior, perfected and valid Liens on the Bank Group Collateral (subject only to existing Liens securing Allowed Secured Tax Claims), <u>provided</u>, <u>however</u>, that the Liens granted hereunder shall be released by the holders of Allowed Bank Group Claims upon the of the conditions set forth in Section 3.2 of the Amended and Restated Credit Agreement.<br><br>    4.    Interest and Term: The New | $164,667,386 | 100% |

| Class | Class Description | Treatment under plan | Estimated Claim | Estimated Recovery |
|---|---|---|---|---|
| | | Note matures on the sixth anniversary of the Effective Date. The New Note shall bear interest at LIBOR + 4.00%, subject to a LIBOR floor of 2.00%, _provided_, _however_, that if the outstanding principal amount of the New Note on the third anniversary of the Effective Date is equal to or less than $75 million, the interest rate will be reduced to LIBOR + 2.00%, subject to a LIBOR floor of 2.00%.<br><br>5.    Minimum Amortization: The Borrowers will make minimum annual principal payments on the New Note in the amount of $15 million, which will be due and payable on each anniversary of the Effective Date; _provided_, _however_, that on or prior to the third anniversary of the Effective Date, the Borrowers will be required to have made principal payments equal to or greater than $55 million.<br><br>6.    Mandatory Prepayments. From and after the Effective Date, the Borrowers shall make mandatory prepayments pursuant to the Amended and Restated Credit Agreement as follows: (i) in connection with the sale of Bank Group Collateral consisting of a Unit, the Borrowers shall prepay the obligations arising under the Amended and Restated Credit Agreement in an aggregate amount equal to 21% of the Gross Sales Price from the sale of such Unit; and (ii) in connection with the sale of Bank Group Collateral consisting of a Non-Unit, the Borrowers shall apply the Net Cash Proceeds from such sale as follows: (a) first, to fund the Maximum Working Capital Reserve; (b) second, to fund the Maximum Lot Reserve; and (c) third, all remaining Net Cash Proceeds shall be used to prepay the obligations arising under the Amended and Restated Credit Agreement..<br><br>7.    Priority Over Dividends or Equity Interest related Distributions. Pursuant to terms of the Amended and Rested Credit Agreement, the Reorganized Debtor will not make any Equity Interest related Distributions or dividends to holders of the Reorganized Debtor's Equity Interests, other than the customary distributions on account of any tax liability | | |

| Class | Class Description | Treatment under plan | Estimated Claim | Estimated Recovery |
|---|---|---|---|---|
| | | incurred by the holders of the Reorganized Debtor's Equity attributable to the Reorganized Debtor's S corporation status, until the Allowed Bank Group Claims are first satisfied in full | | |
| 4 | **General Unsecured Claims**<br><br>**(Impaired; entitled to vote)** | Holders of Allowed General Unsecured Claims (other than Bank Group Claims, the Queen Creek Claim, and the Fulton Unsecured Claim) will receive, in full and final satisfaction of such claims: a) a Cash payment on the Effective Date equal to 60% of the Allowed amount of such General Unsecured Claim; and b) Cash payments in an amount equal to the balance of the Allowed amount of such Claim (including post-petition interest at the Federal Judgment Rate). Such payments shall be made over a 3-year period commencing on the earlier of the Effective Date or the date such claim becomes allowed, and shall be paid interest at a market rate as determined by the Bankruptcy Court. | $1,217,311 | 100% |
| 5 | **Queen Creek Claims**<br><br>**(Impaired; entitled to vote)** | Holders of Allowed Queen Creek Claims will receive, in full and final satisfaction of such claims, reduced Cash payments in the following amounts: (a) $125,000 in Cash on the Effective Date; (b) $75,000 in Cash on the first anniversary of the Effective Date; and (c) $50,000 in Cash on the second anniversary of the Effective Date. | $250,000 | 100% |
| 6 | **Unsecured Warranty Claims**<br><br>**(Unimpaired; deemed to accept)** | Holders of Allowed Unsecured Warranty Claims will have their Claims paid in full in the ordinary course of business of the Debtor or Reorganized Debtor, as applicable, as and when such Claims become Allowed. | Unknown | 100% |
| 7 | **Fulton Unsecured Claim**<br><br>**(Impaired; entitled to vote)** | Ira A. Fulton, who is the sole holder of the Fulton Unsecured Claim, shall, in full and final satisfaction of the Fulton Unsecured Claim, and to facilitate the treatment of all Claims against the Debtor and reorganization of the Debtor, shall on the Effective Date for purposes of this Plan only, convert the $25 million Fulton Unsecured Claim into additional equity of the Reorganized Debtor, provided, however, that if the Bankruptcy Court determines that the conversion of the Fulton Unsecured Claim into | $25,000,000 | N/A |

| Class | Class Description | Treatment under plan | Estimated Claim | Estimated Recovery |
|---|---|---|---|---|
| | | equity of the Reorganized Debtor constitutes a payment of principal and interest on the Fulton Unsecured Claim, then the Fulton Unsecured Claim shall not be converted into equity of the Reorganized Debtor, and there shall be no payments made on account of the Fulton Unsecured Claim so long as any obligations under the Amended and Restated Credit Agreement remain outstanding.<br><br>Notwithstanding the foregoing, nothing in the Plan or Confirmation Order, including Article 10.4 of the Plan, shall alter or impair the Subordination Agreement. | | |
| 8 | **Equity Interests**<br><br>**(Impaired; entitled to vote)** | The Plan shall not alter or otherwise impair Allowed Equity Interests. The Reorganized Debtor will not make distributions to holders of Allowed Equity Interests until the Borrowers' obligations under the New Loan Documents are first satisfied in full, provided, however, that the Reorganized Debtor will be permitted to make normal and customary distributions to holders of Allowed Equity Interests for the purpose of permitting such holders to pay taxes so long as an event of default has not occurred under the Amended and Restated Credit Agreement.<br><br>Additionally, to facilitate the transactions and treatment of Claims set forth in the Plan, on the Effective Date the holders of Allowed Equity Interests will, as described in Article 6.1 of the Plan: (a) contribute the equity interests in Fulton Sales to the Reorganized Debtor; (b) make Fulton Sales become a Borrower under the Amended and Restated Credit Agreement; and (c) make Fulton Sales pledge its Cash to the holders of Allowed Bank Group Claims as part of the Bank Group Collateral. | N/A | 100% |

F.      **General Voting Procedures, Ballots, and Voting Deadline**

Under the Bankruptcy Code, impaired classes of claims and interests are entitled to vote on a plan of reorganization. A class that is not impaired under a plan is deemed to have accepted the plan and does not vote. A class is "impaired" under the Bankruptcy Code unless the legal, equitable, and contractual rights of the holders of claims or interests in that class are not modified or altered. For purposes of the Plan, holders of Claims in Classes 1, 2, 3, 4, 5, 7 and 8 are "impaired" and are entitled to vote on the Plan.

Class 6 Unsecured Warranty Claims are unimpaired under the Plan and deemed to have accepted the Plan without voting pursuant to Section 1126(f) of the Bankruptcy Code.

1.      Voting of Disputed Claims or Equity Interests

If a claim for which a proof of claim has been timely filed is marked as contingent, unliquidated, or disputed on its face, or the claim for which a proof of claim has been timely filed is listed as contingent, unliquidated, or disputed on the Schedules, either in whole or in part, such claim is temporarily allowed for voting purposes at the lesser amount of: (1) the amount stated in the proof of claim, irrespective of any designation as contingent, unliquidated, or disputed; (2) the amount stated for such claim in the Schedules, irrespective of any designation as contingent, unliquidated, or disputed; or (3) an amount set forth in a stipulation, approved by an order of the Bankruptcy Court, between the holder of such claim and the Debtor.

If a claim has been made subject to a pending estimation motion or otherwise estimated or allowed for voting purposes by order of the Bankruptcy Court prior to the Voting Deadline, such claim is temporarily allowed in the amount proposed to be estimated or so estimated or allowed by the Bankruptcy Court.

If a claim has been made subject to a pending objection by the Debtor or any other party-in-interest under Bankruptcy Code § 502(a) and Bankruptcy Rule 3007, where such objection remains unresolved as of the Voting Deadline, such claim is temporarily disallowed for voting purposes under the Plan.

If a claim is listed in the Schedules as contingent, unliquidated, or disputed and a proof of claim was not timely filed, such claim is temporarily disallowed for voting purposes under the Plan.

2.      Voting Procedure and Instructions

Accompanying this Disclosure Statement are, among other things, copies of (1) the Plan (Exhibit 1 hereto, separately filed in this chapter 11 case); (2) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan; the date, time and place of the evidentiary hearing to consider the confirmation of the Plan and related matters, and the time for filing objections to the confirmation of the Plan (the "**Confirmation Hearing Notice**"); and (3) if you are entitled to vote, one or more Ballots (and return envelopes) to be used by you in voting to accept or to reject the Plan. The Plan Supplement containing additional information will be filed not later than 10 days prior to the Voting Deadline.

After carefully reviewing the Plan, this Disclosure Statement (including the Plan Supplement), and (if you are entitled to vote) the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by checking the appropriate box on the enclosed Ballot. Please complete and sign your original Ballot (copies will not be accepted) and return it in the envelope provided. You must provide all of the information requested by the appropriate Ballot. Failure to do so may result in the disqualification of your vote on such Ballot. Each Ballot has been coded to reflect the class of Claims or Equity Interest it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

**The Bankruptcy Court has set 5:00 p.m. (MST) on [_____], 2010, as the Voting Deadline**. The Deadline is the date for the determination of record holders of Claims and/or Equity Interests entitled to receive a copy of this Disclosure Statement and vote, using appropriate Ballots, to accept or reject the Plan. All Ballots must be actually received by **Squire, Sanders & Dempsey L.L.P., Attn: Karen**

**Graves**, 1 East Washington, Suite 2700, Phoenix, Arizona 85004 by the Voting Deadline, unless the Bankruptcy Court extends such date before such time. Ballots returned by facsimile or email are not valid and will not be counted.

**Ballots received after the Voting Deadline will not be counted. Ballots should <u>not</u> be delivered directly to the Debtor, the Bankruptcy Court, or the Office of the United States Trustee.**

<u>Questions About Voting Procedures</u>

If: (l) you have any questions about (a) the procedure for voting your Claim or Equity Interest, (b) the packet of materials that you have received, or (c) the amount of your Claim; or (2) you wish to obtain an additional copy of the Plan, this Disclosure Statement, the Plan Supplement, or any exhibits to such documents please contact:

> **SQUIRE, SANDERS & DEMPSEY L.L.P.**
> <u>Attention:</u> Karen Graves
> 1 East Washington, Suite 2700
> Phoenix, Arizona 85004
> 602.528.4810

**G.     Acceptance or Rejection of a Plan**

Under the Bankruptcy Code, a voting class of claims is deemed to have accepted a plan if it is accepted by creditors in such class who vote on the plan and who hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class. A voting class of interests is deemed to have accepted a plan if it is accepted by holders of interests who hold at least two-thirds in amount of the interests of such class that have actually voted on the plan.

If the Plan is not accepted by all Impaired Classes, the Plan may still be confirmed by the Bankruptcy Court under Section 1129(b) of the Bankruptcy Code if: (a) the Plan has been accepted by at least one Impaired Class and (b) the Bankruptcy Court determines, among other things, that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each non-accepting Impaired Class (the "**Cramdown Provisions**"). If the Plan is not accepted by all Impaired Classes, the Debtor reserves the right to ask the Bankruptcy Court to confirm the Plan under the Cramdown Provisions.

**H.     Evidentiary Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to Section 1128 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3017(c), the Bankruptcy Court has scheduled an evidentiary hearing to consider confirmation of the Plan to begin on _____, 2010, at __:__ _.m. (Mountain Standard Time) before the Honorable George B. Nielsen, Jr., United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Arizona, 7th Floor, Courtroom 702, 203 N. First Avenue, Phoenix, Arizona 85003. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed with the Clerk of the Bankruptcy Court and served so that they are **ACTUALLY RECEIVED** on or before _____, 2010, at __:00 p.m. (Mountain Standard Time) by: (i) Squire, Sanders & Dempsey L.L.P., 1 E. Washington, Suite 2700, Phoenix, Arizona 85004, Attn: Craig. D. Hansen, Esq. and Sean T.

Cork, Esq., counsel for the Debtor, and (ii) the Office of the United States Trustee for the District of Arizona, 230 North First Avenue, Suite 204, Phoenix, Arizona 85003, Attn: Larry Watson, Esq.

## II.     DEFINITIONS

All capitalized terms not defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

## III.     THE DEBTOR, BACKGROUND, AND EVENTS PRECIPITATING THE CHAPTER 11

### A.     Background

The Debtor is an Arizona corporation, founded in 1975 and engaged in the business of building and selling single family homes and residential lots in the state of Arizona. The Ira A. Fulton and Mary Lou Fulton Family Trust ("**Fulton Family Trust**") is the Debtor's sole shareholder. Ira A. Fulton and Mary Lou Fulton are the beneficiaries of the Fulton Family Trust. Through careful management of the company over the succeeding years, Ira A. Fulton grew the company from one that built less than 100 homes a year to a company that has built in excess of 2,200 homes per year spread across numerous planned communities.

The Debtor is one of the largest residential home builders in Arizona. The numerous planned communities developed by the Debtor during these 30 years are comprised of more than 18,000 homes. The Debtor's assets consist of its real estate holdings related to its real estate developments. Those developments are in Maricopa and Pinal Counties with approximately 2,850 lots in various phases of development, from dirt to completed model homes.

The Debtor has not only supplied jobs and been a vibrant and involved member of the development community in Arizona, it has also been a good corporate citizen as evidenced by, for example, its donation of land to build more than ten new schools. Such donations have amounted to millions of dollars over the years. Additionally, the Debtor and the Fultons have been involved in a host of other charitable and community programs and organizations for the benefit and betterment of the State of Arizona and the local community such as the Teacher Silver Apple Award, the Free Pool Fence Program, YMCA Swim Lessons for Children, the Phoenix Children's Hospital CPR program for Parents, Stuff the Bus with School Supplies, and Teacher of the Week.

The management team for the Debtor and its affiliates (collectively, "**Fulton**") operates out of the Debtor's home office in Tempe, Arizona. Fulton also has sales and development related facilities located at its numerous communities. In total, Fulton employs approximately 78 people as salaried employees, hourly employees, and sales agents. In addition, Fulton employs hundreds of local workers indirectly or through various subcontractors that supply services to Fulton. Finally, as a builder, Fulton is also responsible for the purchase of tens of millions of dollars in construction and development related supplies each year. In short, Fulton is an essential part of the state's economy.

The sale of the Debtor's residential homes and lots are in the ordinary course of the Debtor's business. As set forth below, the continued sale of homes free and clear of liens and encumbrances has been approved of by the Bankruptcy Court in this case.

Typically, for a variety of practical, financial and tax savings reasons, the Debtor sells its homes to homebuyers through an affiliated entity called Fulton Homes Sales Corporation ("**Fulton Sales**"). Fulton Sales is not a debtor in bankruptcy. Fulton Sales not only sells the homes to homebuyers, but it also provides seller's a home warranty to homebuyers.

There are no blanket liens on the Debtor's assets or the properties it sells. Rather, the only liens that may exist relate to a specific piece of property, such as mechanics' or materialman's liens.

The Debtor's chief lender is a consortium of banks (the "**Bank Group**") for which Bank of America acts as the agent. The loan by the Bank Group consists of a $250,000,000 unsecured line of credit that has been paid down by over $84,500,000 in principal, together with an additional $16,700,000 in interest and fees, in the year prior to the Debtor's bankruptcy filing. As of the Petition Date, the amount owed on the line of credit is $164,667,386. The Debtor has listed the Bank Group's claim as disputed in the Debtor's Schedules of Assets and Liabilities, as amended, although the Plan proposes to allow the Bank Group's Claims as General Unsecured Claims. Because this loan is an unsecured loan, the Bank Group has no liens on the Debtor's assets, and, importantly, have no collateral interest in the lots and homes that the Debtor develops and sells. Furthermore, the Debtor was current with all of its banks and vendors through the end of 2008.

Prior to the bankruptcy filing, the Debtor was in close consultation with the Bank Group seeking to find an accommodation whereby the Debtor could more effectively respond to and thrive in the present economic downturn. The Debtor and the Bank Group were unable to arrive at an agreement on how to manage their relationship in the face of the economic downturn. This inability to arrive at a common understanding precipitated the Debtor's bankruptcy filing.

Despite the differences between the Debtor and the Bank Group, and the decline in sales due to the economic downturn, the Debtor has continued to sell homes at an above average rate as compared to its competitors. The Debtor's management team and staff have worked diligently to ensure that The Debtor continues to remain a leader in the Maricopa and Pinal County residential marketplace.

As more fully described below, the Debtor has retained experts in a variety of areas to assist it in its reorganization efforts. In addition to bankruptcy and special legal counsel, the Debtor has retained restructuring professionals with significant experience in the residential home sales and development market, and experts in the area of developing plans of reorganization and the feasibility thereof. These experts have generated detailed analyses of the Debtor's land holdings that have been and will continue to be updated based upon the most current information available. These experts and the knowledge they bring to the Debtor give the Debtor a strategic advantage in the marketplace.

The Debtor also took steps long before filing for bankruptcy protection to ensure that it retained only its most valuable core assets. In fact, during 2008, the Debtor sold over 4,400 lots in less desirable markets, generating over $55 million in cash proceeds. The Debtor was able to accomplish this because its management team anticipated the downturn in the housing market and made a concerted move to shed those assets that would place an unnecessary drain on the Debtor's resources. Thus, the Debtor now has a core set of residential real estate related assets that place it in an optimal position to emerge from bankruptcy and benefit from market conditions as they improve. This includes, for example, the ability to obtain necessary permits for lots in the Ironwood Crossings community at a cost that is approximately 10% of what The Debtor's competitors will face. The Debtor has also redesigned homes in its communities to respond to the market conditions, thereby satisfying the demands of customers in the current market climate. In short, the Debtor continues to streamline and optimize its operations in response to the present downturn, and is doing so in a way that will also allow it to thrive into the future.

The Debtor has previously filed four plans of reorganization in this case. The Debtor filed its first proposed plan of reorganization on May 27, 2009 (the "**Initial Plan**") [D.E. 137]. On July 14, 2009, the Debtor filed its *First Amended Plan of Reorganization Dated July 14, 2009* ("**First Amended Plan**") [D.E. 185]. The Debtor filed its *Second Amended Plan of Reorganization Dated August 21, 2009* ("**Second Amended Plan**") [D.E. 234] on August 21, 2009

Following briefing and oral argument by the parties, the Bankruptcy Court entered its *Order Regarding Confirmation Finding the Second Amended Plan* on March 17, 2010 holding that the Second Amended Plan could not be confirmed as written (the "**Order Regarding Confirmation**"). The Bankruptcy Court indicated several finding the Second Amended Plan was not confirmable including: (1) the fact that the auction procedures set forth in the Second Amended Plan effectively operated as an impressible third party release of Fulton Sales' guarantee obligations; (2) the Second Amended Plan raised artificial impairment issues; and (3) the Second Amended Plan failed to identify post-confirmation management compensation as required; (4) the auction procedures set forth in the Second Amended Plan raised significant and potentially fatal issues regarding absolute priority and new value.

The Debtor filed its *Third Amended Plan of Reorganization Dated May 25, 2010* ("**Third Amended Plan**") [D.E. 388] on May 25, 2010. Since filing the Third Amended Plan, and as discussed below, the Debtor has retained Squire, Sanders & Dempsey L.L.P. ("**Squire Sanders**") as substitute counsel to the Debtor. In addition, the Debtor has retained, subject to the Bankruptcy Court's approval, Odyssey Capital Group, LLC ("**Odyssey**") as its expert witness for purposes of Plan confirmation. Upon the retention of Squire Sanders, the Debtor and its professionals have engaged in renewed good-faith discussions with the Bank Group's professionals in an effort to open lines of communication regarding the potential for a consensual negotiation of the Bank Group's claims under the Plan. To that end, the Debtor and the Bank Group entered into the *Stipulated Order Between Debtor and Bank of America, N.A., as Administrative Agent for the Bank Group, Regarding Scheduling Matters* (the "**Scheduling Stipulation**") [D.E. 437], which extends certain scheduling matters and timelines appropriate to facilitate good faith negotiations and to permit Squire Sanders to respond to the Bank's concerns.

Notwithstanding good-faith negotiations, the Debtor and the Bank Group have not reached a consensual resolution of the Bank Group's claims under the Plan. The Debtor and Bank Group continue to negotiate in good faith; nevertheless, the Debtor needs to proceed toward confirmation and now submits its *Fourth Amended Plan of Reorganization* (the "**Fourth Amended Plan**") [D.E. ___]. The Fourth Amended Plan contemplates material changes and significant enhancements to the treatment of the Allowed Bank Group Claims from the terms of the Debtor's previously proposed plans.

**B.      Business Plan and Projections**

The Debtor intends to continue operating its business as a developer of residential communities in Maricopa and Pinal counties. Initially, the Debtor will be focused on the sale of its existing inventory of lots and homes. This inventory includes everything from platted land to completed spec homes.

The Debtor has also developed new home designs that respond to the current economic climate and are competitive with existing home sales and foreclosures. These new designs have been approved by the necessary governmental and community bodies, and will, where appropriate, replace or augment designs that were popular prior to the economic downturn. Model homes of the new designs are already completed at various communities, and homes based on these designs are already being successfully sold.

The Debtor may pause construction of new homes, in whole or part, at a limited number of communities. This pause is designed to allow the market to recover and prices to rise before construction and sales restart in these communities. The pause will ensure that the Debtor's resources are devoted to those communities with the greatest opportunity to generate profits from sales in the short run.

In the present downturn, the Debtor cannot ignore the potential for acquiring land at exceptionally advantageous prices so that affordable quality communities can be developed. With this in mind, the Debtor will continue to actively explore opportunities to acquire additional land for the development of new communities, or to augment communities that presently exist.

The Feasibility Analysis to be included in the Plan Supplement reflects the repayment of the Debtor's debt pursuant to the terms of the Plan. The Feasibility Analysis consists of the Debtor's projections based upon its anticipated revenues and expenses. The actual amount available for the payment of creditors will be determined from the Debtor's actual revenues and expenses. Nevertheless, the Feasibility Analysis demonstrates that Allowed General Unsecured Creditors will be paid in full under the Plan. The key revenue, expense, and other assumptions used in the Feasibility Analysis are discussed in detail in the Plan Supplement.

The liquidation value range and the Debtor's total enterprise value both reflect sufficient value to pay all Creditors in full and provide recovery to holders of the Debtor's Equity Interests.

### C.    Fulton Sales

Fulton Homes Sales Corporation ("**Fulton Sales**") was created in 1997 to provide certain statutory tax benefits to the Debtor. Fulton Sales markets and sells the homes that the Debtor builds. Specifically, when a home is sold, it passes through a double escrow as follows:

1.    First, the Debtor sells the home to Fulton Sales, typically for an amount equal to:

    (a)    the cost to build the home, including hard construction costs as well as overhead costs incurred by the Debtor ("**Manufacturing Cost**") *plus*

    (b)    The Debtor's mark-up or profit ("**Manufacturing Return**") of approximately 5% of the sales price;

2.    Second, Fulton Sales sells the home to the homebuyer, typically for an amount equal to:

    (a)    the price Fulton Sales paid to the Debtor (*i.e.*, the Manufacturing Cost plus the Manufacturing Return) ("**Manufacturers' Price**") *plus*

    (b)    costs and expenses, sales commissions, seller closing costs, homebuyer incentives, home owners' association subsidies for communities that are not currently sold out, etc.) (the "**Sales Costs**") *plus*

    (c)    Fulton Sales' fixed costs, reserves for warranty claims, general and administrative expenses, and profit, if any ("Sales Return") (the Manufacturers' Price plus the Sales Cost plus the Sales Return is referred to herein as the "**Final Sales Price**").

Upon the sale of the home to the homebuyer, the title company remits the Manufacturers' Price to the Debtor and the remainder to Fulton Sales who uses the difference between the Manufacturers' Price and the Final Sales Price, if any, to pay its Sales Costs and to cover its Sales Return. Pursuant to Arizona statutes, because of the foregoing corporate structure, the State of Arizona only charges the Debtor for sales tax on the Manufacturing Return portion of the Final Sales Price paid by the homebuyer. Fulton Sales is not charged sales tax by the State of Arizona on the transaction. This corporate structure is very beneficial to the Debtor's financial viability and ability to reorganize.

### D. Express and Implied Warranty, Latent Defect, Customer Service, and Indemnification Obligations

As homebuilders and home sellers, the Debtor and Fulton Sales have various obligations and potential liabilities to homebuyers.

First, because homebuyers buy from Fulton Sales, they have no interaction or agreements with the Debtor. Rather, all communications and agreements with homebuyers are conducted through Fulton Sales. Specifically, for example, Fulton Sales (rather than the Debtor) provides an express two year limited repair/replacement home warranty ("**Express Home Warranty**") to homebuyers under and pursuant to the Purchase Agreement and Escrow Instructions ("**Purchase Agreement**") between the homebuyers and Fulton Sales.

Because Fulton Sales is not a debtor in bankruptcy, the automatic stay does not apply to a homebuyers' efforts to enforce an Express Home Warranty. The Debtor's Plan and ultimate discharge will not affect Fulton Sales' liabilities under an Express Home Warranty as Fulton Sales will continue to honor valid obligations under such Express Home Warranties in the ordinary course.

In contrast, a liquidation of the Debtor would lead to the liquidation of Futon Sales for two reasons. First, as discussed above, Fulton Sales primary source of revenue is derived from marketing and selling the homes that the Debtor builds. If the Debtor ceases building homes, Fulton Sales will not have sufficient revenues to operate as a going concern. Second, if the Debtor were to liquidate, Fulton Sales may be unable to satisfy significant warranty claims likely to arise from such a liquidation. A liquidation of Fulton Sales is therefore likely to: (a) significantly increase the amount of claims against the Debtor arising from the assertion of warranty claims against the Debtor and Fulton Sales due to such liquidation; and/or (b) decrease the amount of assets available from Fulton Sales to satisfy the Claims of creditors of the Debtor.

Second, although the Debtor does not interact with homebuyers and does not provide any express warranties to homebuyers, the Debtor—as the builder of the homes—is nevertheless potentially subject to certain implied warranty, latent defect and customer service obligations and liabilities to home buyers under certain statutes and common law. Further, as a matter of sound business practices and a desire to maintain its valuable reputation as a high quality home builder, with impeccable integrity and unmatched concern for buyers of its homes, the Debtor makes every effort to ensure that the homes that it builds and sells satisfy their customers' needs and are generally free of workmanship defects.

Finally, the Debtor also has certain potential indemnification liabilities to it vendors and suppliers. Again, in order to maintain its relationships with these vendors and suppliers, and to continue its rich tradition as a high quality business partner, the Plan contemplates that the Debtor will continue to honor legitimate and valid indemnification claims.

### E. Preferences, Fraudulent Conveyances and Other Potential Causes of Action

To the extent that a preference or fraudulent conveyance occurred before the Petition Date, such transfer may be recoverable by the Estate for the benefit of the Estate under §§ 544, 547, or 548 of the Bankruptcy Code. To date, no complaints have been filed under any of these theories. To the extent any such claims exist, they will be analyzed for their potential value to the Estate. These potential claims are specifically preserved for the benefit of the Estate.

The Bank Group has asserted that a potential cause of action exists against Ira A. Fulton or the Fulton Family Trust for alleged unjust enrichment stemming from certain tax refunds to which Ira A.

Fulton or the Fulton Family Trust is or may be entitled relating to prior income taxes paid by Ira A. Fulton or the Fulton Family Trust. To the extent any such cause of action exists, it belongs to the Estate. The Bank Group has not made any demand on the Debtor to pursue any such cause of action. Nevertheless, the Debtor and Squire Sanders are investigating the alleged factual and legal bases raised by the Bank Group regarding such potential cause of action and intend to file a report to detail the results of that investigation. .

### F.    Conclusion

The Debtor was and will continue to be a leader in the Maricopa County and Pinal County residential homebuilding marketplace. The Debtor's management team shed non-core assets prior to the filing of the bankruptcy and is currently positioned to benefit from the market as it recovers. The Debtor has no major secured creditors, and, as set forth below and in the plan of reorganization, is prepared to (i) pay the secured creditors it does have in full, (ii) pay its unsecured creditors in full, with interest, over a reasonable period of time, and (iii) continue as a vital member of the Arizona economy.

## IV.    SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

### A.    Administrative Proceedings

The Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code on January 27, 2009, and a first meeting of creditors was held on March 3, 2009.

### B.    Retention of Professionals

The Debtor originally retained Polsinelli Shugart, P.C. ("**PS**") to act as its bankruptcy counsel. The Bankruptcy Court signed an Order approving the retention of PS on January 27, 2009. On July 22, 2010, the Debtor retained Squire Sanders as substitute bankruptcy counsel. The Bankruptcy Court signed an Interim Order approving the retention of Squire Sanders on July 26, 2010 [D.E. 433]. On July 30, 2010, PS filed a Motion to Withdrawal as attorney for the Debtor [D.E. 441]. On August 11, 2010, the Bankruptcy Court signed an order authorizing the withdrawal of PS as counsel for the Debtor [D.E. 449].

On February 3, 2009, the Debtor filed an application to retain the law firm of Lake and Cobb, P.C. as its special counsel. The Bankruptcy Court signed an order approving the retention of LC on February 4, 2009 [D.E. 45].

On February 5, 2009 the Debtor filed an application to employ Green Street as it Financial Advisor [D.E. 47]. On March 2, 2009 the Bankruptcy Court signed an order approving the retention of Green Street through October 2009 [D.E. 88]. In November 2009, the Debtor filed a motion to extend Green Street's retention through April 2010. The Bankruptcy Court entered its order approving this extended retention on December 3, 2009 [D.E. 300].

On February 5, 2009, the Debtor filed an application to employ Burch and Cracchiolo as special counsel for the Debtor relating to zoning matters [D.E. 52]. On March 4, 2009, the Bankruptcy Court signed an order approving the retention of Burch and Cracchiolo [D.E. 94].

On March 13, 2009, the Debtor filed a motion to retain Gaintner Bandler Reed & Peters, P.L.C., as its auditors for ERISA required 401(k) audits [D.E. 99]. On April 8, 2009 the Bankruptcy Court signed an order approving the retention of Gaintner Bandler Reed & Peters, P.L.C. [D.E. 124].

On March 23, 2009, the Debtor filed a motion to retain Wentworth Webb & Postal, L.L.P. as the Debtor's property tax protest service advisors [D.E. 102]. On April 30, 2009 the Bankruptcy Court signed an order approving the retention of Wentworth Webb & Postal, L.L.P. [D.E. 131].

On May 15, 2009, the Debtor filed a motion to retain Deloitte Tax, LLP ("**Deloitte Tax**") to provide tax services to the Debtor, including preparing and filing tax returns for 2008 [D.E. 132]. The Bank Group objected to the motion to retain Deloitte Tax. Nevertheless, the Bankruptcy Court entered its Order authorizing the Debtor's retention of Deloitte Tax on June 25, 2009 [D.E. 174]. On March 25, 2010, the Debtor filed an application to approve certain modified terms of Deloitte Tax's retention and the Bankruptcy Court approved this application on April 29, 2010 [D.E. 357].

On May 29, 2009, the Debtor filed a motion to retain Elliott Pollack ("Pollack") as the Debtor's original interest rate, discount rate and plan feasibility advisor [D.E. 138]. The Bankruptcy Court entered its Order authorizing the Debtor's retention of Pollack on June 22, 2009 [D.E. 168].

On July 23, 2009, the Debtor filed a motion to retain Deloitte & Touche, LLP ("**Deloitte Audit**") as independent financial auditor to prepare audited financial statements for the Debtor for the year end 2008 [D.E. 195]. The Bankruptcy Court entered its Order authorizing the Debtor's retention of Deloitte Audit on August 12, 2009 [D.E. 229].

## C. First Day Motions

The Debtor filed several "first day" motions that were all approved by the Bankruptcy Court. These motions and the Orders related thereto are available from the Bankruptcy Court's docket. In summary these motions included the following:

> 1. A motion to approve the payment of prepetition wages;
>
> 2. A motion to allow checks issued prepetition on account of debts due and owing prepetition to clear from the Debtor's existing bank accounts, and to allow the bank accounts to remain open for a limited period of time so that those checks could clear; and
>
> 3. A motion for the maintenance of existing utility service and establishing procedures for any challenges to such continued service or for additional deposits issued by utility companies.

## D. Appointment of Unsecured Creditors Committee

On February 25, 2009, the United States Trustee's Office filed a statement stating that, despite its efforts to contact unsecured creditors, it was unable to appoint a Committee of Unsecured Creditors [D.E. 81].

## E. Motion to Sell and Construct Homes

On February 3, 2009, the Debtor filed a *Motion to Construct and Sell Residential Homes and Sell Residential Lots Free and Clear of Liens in the Ordinary Course of Debtor's Business Pursuant to Section 363 of the Bankruptcy Code* [D.E. 34]. On February 17, 2009, the Bankruptcy Court approved the Debtor's Motion to Sell Homes and Residential Lots Free and Clear of Liens [D.E. 74]. This Order permits the Debtor to retain all net proceeds from the sale of its homes and residential lots. As discussed below, the Bank Group filed a motion requesting that the Bankruptcy Court amend this order but have not prosecuted that motion.

### F.     Motion to Pay Critical Vendor

On April 2, 2009, the Bankruptcy Court entered an order approving payment of Mesa Lighting and Fan, Inc. as a critical vendor of the Debtor [D.E. 118].

### G.     Motion to Terminate Exclusivity

On July 2, 2009, the Bankruptcy Court entered its Order denying the Bank Group's motion to terminate the Debtor's exclusivity period [D.E. 176].

### H.     Motion to Alter or Amend Ordinary Course Order

On June 24, 2009, the Bank Group filed a motion requesting that the Bankruptcy Court alter or amend the Bankruptcy Court's Order authorizing the Debtor to build and sell homes in the ordinary course of its business [D.E. 169]. The Debtor has opposed the motion. The parties mutually and repeatedly agreed to continue this matter on the Bankruptcy Court's calendar as a status hearing. Most recently, the parties agreed to remove the motion from the Bankruptcy Court's calendar and make it subject to call by the parties.

### I.     Motion for Stay Relief

On July 13, 2009, Gustavo Barocio Padilla and Gabriel and Giera Silva filed a motion for relief from the automatic stay to allow them to continue prosecuting a tort claim against the Debtor [D.E. 182]. The Debtor has filed a limited opposition to the motion for stay relief [D.E. 201]. The Bankruptcy Court has entered its order approving an agreement between the movant and the Debtor regarding this motion whereby the movant can continue the prosecution of the action but cannot take any collection actions against the Debtor [D.E. 242].

### J.     Prior Plans and Disclosure Statements

As discussed above, the Debtor previously filed four proposed plans of reorganization. The Bankruptcy Court approved the Second Amended Disclosure Statement on October 14, 2009, and Fulton Homes solicited votes with respect to the Second Amended Plan. Ultimately, all classes of claims accepted the Second Amended Plan, except the class of unsecured claims due to the Bank Group's rejecting ballot. Additionally, the Bank Group filed a legal objection to the Second Amended Plan. Following briefing and oral argument by the parties, the Bankruptcy Court entered its *Order Regarding Confirmation Finding the Second Amended Plan* holding that the Second Amended Plan could not be confirmed as written (the "**Order Regarding Confirmation**").

The Debtor subsequently filed its Third Amended Plan on May 25, 2010 in response to the Order Regarding Confirmation and on account of changes in the market conditions between the date of the Second Amended Plan and the Third Amended Plan. The Bank Group objected that the Third Amended Plan did not automatically satisfy the best interest of creditors test, and thus, a proper liquidation analysis was required but missing from the corresponding disclosure statement. In response, the Debtor has subsequently provided the Bank Group a revised liquidation analysis. After renewing good-faith negotiations with the Bank Group to reach a consensual resolution regarding treatment of their claims, the Debtor now submits its Fourth Amended Plan and this Disclosure Statement.

As detailed in Section I of this Disclosure Statement, this Disclosure Statement reflects material additional and enhanced disclosures beyond those contained in the previously approved Second Amended Disclosure Statement. Furthermore, as set forth in the Section I of this Disclosure Statement, the changes

to the treatment of the Bank Group Claims contemplated by the Plan are not adverse, and in fact, reflect enhanced treatment above the Debtor's previously proposed plans.

### K.      Motions to Extend Exclusivity

The Debtor has repeatedly sought, and obtained (either through Bankruptcy Court orders overruling the Bank Group's objections or by stipulations from the Bank Group), orders extending the Debtor's exclusive period within which to solicit confirmation of a plan of reorganization. The Debtor's exclusive period to obtain acceptances of the Plan expires on August 29, 2010. Pursuant to the Scheduling Stipulation, the Bank Group shall not file a plan of reorganization, or support or participate in any plan of reorganization filed by any entity other than the Debtor, until September 27, 2010.

### L.      The Injunction

The Bank Group filed a lawsuit against Fulton Sales and Fulton Homes Warranty Corporation ("**Fulton Warranty**") in the Maricopa County Superior Court (the "**State Court Action**") seeking to enforce certain guarantees by those entities in favor of the Bank Group. On April 10, 2009, the Debtor filed an adversary complaint and a motion for an injunction against the Bank Group seeking to enjoin them from prosecuting the State Court Action. The Bank Group opposed the request for an injunction. On July 2, 2009, the Bankruptcy Court entered its order granting a limited injunction against the Bank Group, precluding the Bank Group from enforcing any judgment it may obtain in the State Court Action until after the confirmation of the Plan [Adv. Pro. 09-00379; D.E. 29].

### M.      The Debtor's Motion for Alternative Dispute Resolution

On May 27, 2010, the Bankruptcy Court denied [*see* D.E. 395] the Debtor's *Motion for Referral of Plan Confirmation Disputes to ADR Program* ("**Motion for ADR**") [D.E. 353] which requested that the Bankruptcy Court assign the contested plan confirmation issues between the Debtor and the Bank Group for inclusion in the Alternative Dispute Resolution Program established by Local Bankruptcy Rules 9072-1 through 9072-9 (the "**ADR Program**").

### N.      The Bank Group's Motion for the Appointment of an Examiner

The Bank Group has filed a motion for the appointment of an examiner pursuant to § 1104(c) of the Bankruptcy Code (the "**Examiner Motion**") [D.E. 369]. The Debtor has objected to appointment of an examiner as unnecessary [D.E. 402]. The Bankruptcy Court has scheduled a continued hearing on the Examiner Motion for August 26, 2010 at 9:30 a.m.

In response to the Examiner Motion, and pursuant to the *Stipulated Order Between Bank of America, N.A., as Administrative Agent for the Bank Group, Regarding Scheduling Matters*, the Debtor has provided the Bank Group with non-privileged documents responsive to the Bank Group's request for production of documents relating to the Examiner Motion. Furthermore, in connection therewith, the Debtor has made its management available to the Bank Group for interviews and questions.

### O.      Retention of Squire Sanders & Odyssey

On July 22, 2010, the Debtor has retained Squire Sanders as substitute bankruptcy counsel to the Debtor [D.E. 430]. The Bankruptcy Court signed an Interim Order approving the retention of Squire Sanders on July 26, 2010 [D.E. 433]. In addition, the Debtor has retained, subject to the Bankruptcy Court's approval, Odyssey as its expert witness for purposes of Plan confirmation.

### P. Stipulated Order with the Bank Group Regarding Scheduling Matters

Upon the retention of Squire Sanders, the Debtor and its professionals have engaged in renewed good-faith discussions with the Bank Group's professionals in an effort to open lines of communication regarding the potential for a consensual negotiation of the Bank Group's claims under the Plan. To that end, the Debtor and the Bank Group entered into the *Stipulated Order Between Bank of America, N.A., as Administrative Agent for the Bank Group, Regarding Scheduling Matters* (the "**Scheduling Stipulation**") [D.E. 437], which extends certain scheduling matters and timelines appropriate to facilitate good faith negotiations and to permit Squire Sanders to respond to the Bank's concerns.

### Q. Operating Reports

The Debtor's monthly operating reports are current and copies can be obtained from the Bankruptcy Court's electronic docket.

## V. DESCRIPTION OF ASSETS AND LIABILITIES OF THE DEBTOR

### A. Assets

The value of the Debtor's real estate assets is in constant fluctuation given the current market conditions. As of the Petition Date, the value of the Debtor's assets was less than the amount of the debt. However, the value of the Debtor's assets has improved during the course of this case; and as set forth in the Feasibility Analysis to be included in the Plan Supplement, at this time, the value of the Debtor's assets, as such assets are developed by the Debtor during the life of the Plan, will be sufficient to pay all creditors in full.

In addition to its real estate assets, the Debtor has significant other assets including available cash as of the Effective Date of $80 million, insurance reserves and escrowed land development funds for current developments.

Furthermore, as discussed in Sections IX and X, below, the Plan contemplates that on or before the Effective Date, Ira A. and Mary Lou Fulton will, pursuant to the Tax Reorganization, contribute to the Reorganized Debtor all of their ownership interest in the non-debtor Fulton Sales, which constitutes 100% of the total outstanding stock of Fulton Sales. Pursuant to the Plan, Fulton Sales, which is a non-debtor entity, will also agree to become a Borrower under the New Credit Facility, and will, in its capacity as Borrower, pledge any unrestricted Cash, including unrestricted Cash generated post-Effective Date from Sales of Units and Non-Units as part of the Bank Group Collateral. These asset values further support the Debtor's Feasibility Analysis.

### B. Liabilities

The following is an overview of the Debtor's known liabilities.

#### 1. Priority Claims

Certain Claims will be entitled to priority under Sections 507(a)(1), (3), and (8) of the Bankruptcy Code as administrative claims, wage claims, or tax claims.

#### 2. Secured Claims

First, there are a number of Creditors holding Secured Vendor Claims arising from the provision of goods and services to the Debtor before the Petition Date, that are: (a) secured by a Lien on property of the Estate, including a mechanic's lien or similar lien; or (b) entitled to administrative priority under Section 503(b)(9) of the Bankruptcy Code. Secured Vendor Claims include Claims arising form vertical or horizontal construction at the Cobblestone, Coldwater Springs, Cortina, Fulton Estates, Royal Ranch, Villago, Freeman Farms, Fulton Ranch, Geneva Estates, and Ironwood Crossing subdivisions.

Second, there are a number of Secured Tax Claims held by a governmental unit or associated political subdivision, including property taxes and accrued and unpaid interest under applicable law from the Petition Date, that is secured by a Lien on property of the Estate by operation of applicable law including every Claim for unpaid real, personal property, or *ad valorem* taxes. Secured Tax Claims include the claims of Maricopa and Pinal Counties.

### 3. General Unsecured Claims

Any Claim against the Debtor that is unsecured and not subject of any Lien or priority or administrative status under the Bankruptcy Code, provided that a General Unsecured Claim shall not include: (a) a Secured Claim; (b) an Administrative Claim; (c) a Secured Vendor Claim; (d) a Secured Tax Claim; (e) a Priority Claim; (f) the Bank Group Claims; (g) the Queen Creek Claim; and (h) the Fulton Unsecured Claim.

### 4. Bank Group Claims

All general unsecured claims of the Bank Group arising under the Pre-Petition Credit Agreement, which will be Allowed in the amount of: (i) $163,488,654.82 in unpaid principal and pre-petition interest; (ii) accrued and unpaid interest from the Petition Date through and including the Effective Date at the Federal Judgment Rate; (iii) reasonable and actual fees and expenses of the restructuring professionals of the Bank Group in an amount determined by the Bankruptcy Court or otherwise agreed to by the Debtor and the Bank Group; and (iv) reasonable and actual fees payable to the Administrative Agent under the Pre-Petition Credit Agreement, to the extent such fees are Allowed by the Bankruptcy Court.

### 5. Queen Creek Claims

The general unsecured Claim of Queen Creek arising under an agreement of the Debtor to fund money to Queen Creek for construction of a public library.

## VI. **PLAN SUMMARY**

Chapter 11 of the Bankruptcy Code is the principal reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself and its creditors and equity holders. Confirmation of a plan of reorganization is the principal objective of a chapter 11 case.

In general, a chapter 11 plan of reorganization (a) divides claims and interests into separate classes, (b) specifies the property that each class is to receive under the plan, and (c) contains other provisions necessary to the reorganization of the debtor. A chapter 11 plan may specify that certain classes of claims or interests are either to be paid in full upon the effective date of the plan, reinstated, or their legal, equitable and contractual rights are to remain unchanged by the reorganization effectuated by the plan. Such classes are referred to under the Bankruptcy Code as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from

the holders of claims or interest in such classes. A chapter 11 plan also may specify that certain classes will not receive any distribution of property. Such classes are deemed to reject the plan.

All other classes of claims and interests contain "impaired" claims and interests entitled to vote on the plan. As a condition to confirmation, the Bankruptcy Code generally requires that each impaired class of claims or interests votes to accept a plan. Acceptances must be received (a) from the holders of claims constituting at least two-thirds in dollar amount and more than one-half in number of the allowed claims in each impaired class of claims that have voted to accept or reject the plan, and (b) from the holders of at least two-thirds in amount of the allowed interests in each impaired class of interest that have voted to accept or reject the plan. If any class or classes of claims or interests entitled to vote with respect to the plan rejects the plan, upon request of the plan proponents, the bankruptcy court may nevertheless confirm the plan if certain minimum treatment standards are met with respect to such class or classes.

Chapter 11 of the Bankruptcy Code does not require each holder of a claim or interest to vote in favor of a plan of reorganization in order for the bankruptcy court to confirm the plan. However, the bankruptcy court must find that the plan of reorganization meets a number of statutory tests (other than the voting requirements described in this section) before it may confirm, or approve, the plan of reorganization. Many of these tests are designed to protect the interest of holders of claims or interest that do not vote to accept the plan of reorganization but who will nonetheless be bound by the plan's provisions if it is confirmed by the bankruptcy court.

The following statements concerning the Plan are merely a summary of the Plan and are not complete. The statements are qualified entirely by express reference to the Plan. Creditors and Equity Interest holders are urged to consult with counsel or each other in order to understand the Plan fully. The Plan is complete, inasmuch as it proposes a legally binding agreement by the Debtor, and an intelligent judgment cannot be made without reading it in full. With the exception of the Class 6, all other Classes of the Debtor are impaired under the terms of the Plan. Therefore, Classes 1, 2, 3, 4, 5, 7 and 8 are impaired and entitled to vote.

## VII.    TREATMENT OF UNCLASSIFIED CLAIMS

### A.    Unclassified Claims

As provided in Bankruptcy Code § 1123(a)(1), Administrative Claims, Priority Tax Claims and Other Priority Claims are not classified for purposes of voting on, or receiving distributions under, the Plan. holders of Administrative Claims and Priority Tax Claims are not entitled to vote on the Plan but, rather, are treated separately in accordance with Article II of the Plan and under Bankruptcy Code § 1129(a)(9)(A).

### B.    Allowed Administrative Claims

1.    Generally.

Each Allowed Administrative Claim (other than a Preserved Ordinary Course Administrative Claim or Professional Claim) shall be paid in full in Cash (or otherwise satisfied in accordance with its terms) on the latest of: (a) the Effective Date, or as soon after that date as practicable; (b) any date the Bankruptcy Court may fix, or as soon after that date as practicable; (c) 30 days after the Claim is Allowed; and (d) any date on which the holder of the Claim and the Reorganized Debtor agrees.

2.    Requests for Payment.

All requests for payment of an Administrative Claim (other than a Preserved Ordinary Course Administrative Claim or Professional Claim) must be served on the Reorganized Debtor and filed with the Bankruptcy Court no later than the Administrative Claims Bar Date. Any holder of an Administrative Claim (other than a Preserved Ordinary Course Administrative Claim or Professional Claim) that fails to file and serve its request by the Administrative Claims Bar Date shall be forever barred from asserting its Administrative Claim against the Debtor or the Reorganized Debtor.

    3.  Preserved Ordinary Course Administrative Claims.

Each Allowed Preserved Ordinary Course Administrative Claim shall be paid in full in Cash at the Reorganized Debtor's election either: (a) in accordance with the terms and conditions under which the Claim arose; or (b) on such date on which the holder of the Claim and the Reorganized Debtor agrees. Payments shall be made without further action by the holder of the Preserved Ordinary Course Administrative Claim.

    4.  Allowed Priority Tax Claims

Any Allowed Priority Tax Claim shall be paid in full in Cash on the later of the Effective Date (or as soon after that date as practicable) and 30 days after the Claim is Allowed, but the Debtor or the Reorganized Debtor may elect to pay any Allowed Priority Tax Claim through regular installment payments in Cash of a total value, as of the Effective Date, equal to the Allowed amount of the Claim, over a period ending not later than five years after the Petition Date, and in a manner not less favorable than the most favored General Unsecured Claim provided for by the Plan.  If the Debtor or the Reorganized Debtor so elects, the installment payments shall be made in equal quarterly installments of principal plus simple interest on the unpaid portion of the Allowed Priority Tax Claim accruing from the Effective Date at the rate of six percent per year. The first payment shall be made on the latest of: (a) the Effective Date, or as soon after that date as practicable; (b) 30 days after the Claim is Allowed, or as soon after than date as practicable; and (c) another date on which the holder of the Claim and the Debtor or the Reorganized Debtor agrees. The Reorganized Debtor retains the right to prepay any Allowed Priority Tax Claim, or any remaining balance of such a Claim, in full or in part, at any time on or after the Effective Date without premium or penalty.

    5.  Allowed Other Priority Claims

Any Allowed Other Priority Claim shall be paid in full in Cash either: (a) on the later of the Effective Date (or as soon after that date as practicable) and 30 days after the Claim is Allowed; or (c) on such date on which the holder of the Allowed Other Priority Claim and the Reorganized Debtor agrees.

    6.  Professional Claims

Each Allowed Professional Claim shall be paid in full in Cash: (a) no later than three days after the Professional Claim is Allowed; (b) on any other terms the holder of an Allowed Professional Claim and the Debtor or the Reorganized Debtor may agree; or (c) in accordance with the terms of any applicable administrative procedures order entered by the Bankruptcy Court.  Each Person seeking an award by the Bankruptcy Court of Professional Fees must file with the Bankruptcy Court and serve on the Reorganized Debtor its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date within 60 days after the Effective Date.

## VIII.  <u>TREATMENT OF CLASSES & EQUITY INTERESTS UNDER THE PLAN</u>

Pursuant to Section 1122 of the Bankruptcy Code, set forth below is a designation of classes of

Claims against and Equity Interests in the Debtor. All Claims and Equity Interests, except Administrative Claims, Priority Tax Claims, Other Priority Claims and any other unclassified Claims are placed in the Classes as set forth below. In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Other Priority Claims have not been classified, and the respective treatments of such unclassified Claims are set forth in Article II of the Plan.

The treatment of Claims and Equity Interests as provided in Article IV of the Plan represents a compromise and full and final settlement, pursuant to Section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, of the various Claims and Equity Interests of parties in interest in the Chapter 11 Case..

### A. Class 1 – Secured Vendor Claims

1. Impairment and Voting. Class 1 is Impaired by the Plan. All holders of Allowed Secured Vendor Claims in Class 1 are entitled to vote and shall be solicited to vote on the Plan.

2. Treatment. Each holder of an Allowed Secured Vendor Claim is considered to be in its own separate subclass within Class 1, and each such subclass is deemed to be a separate Class for purposes of the Plan. The treatment accorded to Allowed Secured Vendor Claims under the Plan depends on whether the holder of such Claim votes to accept or reject the Plan.

(a) Treatment Upon Acceptance of Plan: Each holder of an Allowed Secured Vendor Claim that votes to accept the Plan shall receive, in full and final satisfaction, settlement, release, and discharge of, such Claim, the following treatment: a) a Cash payment on the Effective Date equal to 60% of the Allowed amount of such Secured Vendor Claim; b) Cash payments in an amount equal to the balance of the Allowed Secured Vendor Claim, with such payments to be made over a 2-year period commencing on the Effective Date, and shall be paid interest at a market rate as determined by the Bankruptcy Court; and c) The holder of such Allowed Secured Vendor Claim shall be designated a "Preferred Vendor" entitling such claimholder to bid on all future jobs of the Reorganized Debtor so long as the unsecured note remains unpaid.

In consideration for the foregoing treatment, and in full and final settlement of any and all claims between the Claim holder and the Debtor, as of the Effective Date the holder of an Allowed Secured Vendor Claim that votes to accept the Plan will: (i) agree to extend normal pre-petition trade and payment terms to the Reorganized Debtor; and (ii) subordinate any and all Liens, security interests and right to receive any Cash held in escrow to the Liens and payments provided to the Bank Group to facilitate the Debtor's treatment of the Bank Group Claims.

(b) Treatment Upon Rejection of Plan: Each holder of an Allowed Secured Vendor Claim that votes to reject the Plan shall receive, in full and final satisfaction, settlement, release, and discharge of, such Claim, the following treatment: a) a Cash payment on the Effective Date equal to 60% of the Allowed amount of such Secured Vendor Claim; b) Cash payments in an amount equal to the balance of the Allowed Secured Vendor Claim, with such payments to be made over a 4-year period

commencing on the Effective Date, and shall be paid interest at a market rate as determined by the Bankruptcy Court; and c) The holder of such Allowed Secured Vendor Claim shall not be designated as a "Preferred Vendor."

In consideration for the foregoing treatment, and in full and final settlement of any and all claims between the Claim holder and the Debtor, as of the Effective Date the holder of an Allowed Secured Vendor Claim that votes to accept the Plan will: (i) agree to extend normal pre-petition trade and payment terms to the Reorganized Debtor; and (ii) subordinate any and all Liens, security interests and right to receive any Cash held in escrow to the Liens and payments provided to the Bank Group to facilitate the Debtor's treatment of the Bank Group Claims

**B.    Class 2 – Secured Tax Claims**

1.    Impairment and Voting.  Class 2 is Impaired by the Plan.  All holders of Allowed Secured Tax Claims in Class 2 are entitled to vote and shall be solicited to vote on the Plan.

2.    Treatment.  Each holder of an Allowed Secured Tax Claim is considered to be in its own separate subclass within Class 2, and each such subclass is deemed to be a separate Class for purposes of the Plan.  The treatment of Allowed Secured Tax Claims will depend upon the nature of the property subject to the Lien of the holder of the Allowed Secured Tax Claim.

(a)    <u>Finished Lots</u>:  Each holder of an Allowed Secured Tax Claim that are secured by a Lien on finished lots of the Debtor shall receive, in full and final satisfaction, settlement, release, and discharge of, such Claim, the following treatment: a) the Claim holder will retain its Lien on the property until such time as the Claim is paid in full; and b) the Claim will be paid in full and in Cash, with interest at the statutory rate, on the date that the respective developed lot is sold to a third party.

(b)    <u>Unfinished Lots</u>:  Each holder of an Allowed Secured Tax Claim that are secured by a Lien on unfinished lots of the Debtor shall receive, in full and final satisfaction, settlement, release, and discharge of, such Claim, the following treatment: a) the Claim holder will retain its Lien on the property until such time as the Claim is paid in full; and b) the Claim will be paid in full and in Cash, with interest at the statutory rate, over a 4-year period following the Effective Date.  The Reorganized Debtor will make semi-annual payments on account of such Allowed Secured Tax Claims.

**C.    Class 3 – Bank Group Claims**

1.    Impairment and Voting. Class 3 is Impaired by the Plan.  All holders of Allowed Bank Group Claims in Class 3 are entitled to vote and shall be solicited to vote on the Plan.

2.    Treatment.  In full settlement, release and discharge of all Bank Group Claims, on the Effective Date or as soon thereafter as practicable, holders of Allowed Bank Group Claims shall receive the following:

(a)   Cash Payment:  On the Effective Date, the Borrowers will pay the Bank Group Effective Date Cash Payment[1] to the holders of Allowed Bank Group Claims.

(b)   New Note:  On the Effective Date, the Borrowers will issue the New Note to the holders of Allowed Bank Group Claims, and shall execute the Amended and Restated Credit Agreement.

(c)   Collateral:  On the Effective Date, the Borrowers will grant to the holders of Allowed Bank Group Claims senior, perfected and valid Liens on the Bank Group Collateral (subject only to existing Liens securing Allowed Secured Tax Claims), provided, however, that the Liens granted hereunder shall be released by the holders of Allowed Bank Group Claims upon satisfaction of the conditions set forth in Section 3.2 of the Amended and Restated Credit Agreement.

(d)   Interest and Term:  The New Note matures on the sixth anniversary of the Effective Date.  The New Note shall bear interest at LIBOR + 4.00%, subject to a LIBOR floor of 2.00%, provided, however, that if the outstanding principal amount of the New Note on the third anniversary of the Effective Date is equal to or less than $75 million, the interest rate will be reduced to LIBOR + 2.00%, subject to a LIBOR floor of 2.00%.

(e)   Minimum Amortization:  The Borrowers will make minimum annual principal payments  on the New Note in the amount of $15 million, which will be due and payable on each anniversary of the Effective Date; provided, however, that on or prior to the third anniversary of the Effective Date, the Borrowers will be required to have made principal payments equal to or greater than $55 million.

(f)   Mandatory Prepayments:   From and after the Effective Date, the Borrowers shall make mandatory prepayments pursuant to the Amended and Restated Credit Agreement as follows: (i) in connection with the sale of Bank Group Collateral consisting of a Unit, the Borrowers shall prepay the obligations arising under the Amended and Restated Credit Agreement in an aggregate amount equal to 21% of the Gross Sales Price from the sale of such Unit; and (ii) in connection with the sale of Bank Group Collateral consisting of a Non-Unit, the Borrowers shall apply the Net Cash Proceeds from such sale as follows: (a) first, to fund the Maximum Working Capital Reserve; (b) second, to fund the Maximum Lot Reserve; and (c) third, all remaining Net Cash Proceeds shall be used to prepay the obligations arising under the Amended and Restated Credit Agreement.

---

[1]      As defined in the Plan, the Bank Group Effective Date Cash Payment is "[A] payment to be made on the Effective Date by the Borrowers to the Bank Group, which shall equal the difference between: (i) the Cash of the Borrowers as of the Effective Date, less (ii) the sum of (a) the Maximum Reserves, (b) the amount of estimated and Allowed Administrative Claims, and (c) the payment of Allowed or estimated Secured Tax Claims, Secured Vendor Claims, the Queen Creek Claim, and General Unsecured Claims that are required to be paid on the Effective Date or subject to a reasonable reserve if such Claims are Disputed as the Effective Date, provided, however, that the Bank Group Effective Date Cash Payment shall not be less than $30 million or greater than $35 million."

(g)  Priority Over Dividends or Equity Interest Distributions.  Pursuant to terms of the Amended and Rested Credit Agreement, the Reorganized Debtor will not make any Equity Interest Distributions or dividends to holders of the Reorganized Debtor's Equity Interests, other than the customary distributions on account of any tax liability incurred by the holders of the Reorganized Debtor's Equity attributable to the Reorganized Debtor's S corporation status, until the Allowed Bank Group Claims are first satisfied in full.

### D.  Class 4 – General Unsecured Claims

1.  Impairment and Voting.  Class 4 is Impaired by the Plan.  All holders of Allowed General Unsecured Claims in Class 4 are entitled to vote and shall be solicited to vote on the Plan.

2.  Treatment.  Holders of Allowed General Unsecured Claims (other than Bank Group Claims, the Queen Creek Claim, and the Fulton Unsecured Claim) will receive, in full and final satisfaction of such claims: a) a Cash payment on the Effective Date equal to 60% of the Allowed amount of such General Unsecured Claim; and b) Cash payments in an amount equal to the balance of the Allowed amount of such Claim (including post-petition interest at the Federal Judgment Rate).  Such payments shall be made over a 3-year period commencing on the earlier of the Effective Date or the date such claim becomes allowed, and shall be paid interest at a market rate as determined by the Bankruptcy Court.

### E.  Class 5 – Queen Creek Claims

1.  Impairment and Voting.  Class 5 is Impaired by the Plan.  All holders of Allowed Queen Creek Claims in Class 5 are entitled to vote and shall be solicited to vote on the Plan.

2.  Treatment.  Holders of Allowed Queen Creek Claims will receive, in full and final satisfaction of such claims, reduced Cash payments in the following amounts: (a) $125,000 in Cash on the Effective Date; (b) $75,000 in Cash on the first anniversary of the Effective Date; and (c) $50,000 in Cash on the second anniversary of the Effective Date.

### F.  Class 6 – Unsecured Warranty Claims

1.  Impairment and Voting.  Class 6 is Unimpaired by the Plan.  All holders of Allowed Equity Interests in Class 6 are deemed to have accepted the Plan and shall not be entitled to vote on the Plan.

2.  Treatment.  Holders of Allowed Unsecured Warranty Claims will have their Claims paid in full in the ordinary course of business of the Debtor or Reorganized Debtor, as applicable, as and when such Claims become Allowed.

### G.  Class 7 - Fulton Unsecured Claim

1.  Impairment and Voting.  Class 7 is Impaired by the Plan.  Holders of Allowed Fulton Unsecured Claim in Class 7 are entitled to vote and shall be solicited to vote on the Plan.

2.  Treatment.  Ira A. Fulton, who is the sole holder of the Fulton Unsecured Claim, shall, in full and final satisfaction of the Fulton Unsecured Claim, and to facilitate the treatment of all Claims against the Debtor and reorganization of the Debtor, shall on the Effective Date for purposes of

this Plan only, convert the $25 million Fulton Unsecured Claim into additional equity of the Reorganized Debtor, provided, however, that if the Bankruptcy Court determines that the conversion of the Fulton Unsecured Claim into equity of the Reorganized Debtor constitutes a payment of principal and interest on the Fulton Unsecured Claim, then the Fulton Unsecured Claim shall not be converted into equity of the Reorganized Debtor, and there shall be no payments made on account of the Fulton Unsecured Claim so long as any obligations under the Amended and Restated Credit Agreement remain outstanding.

Notwithstanding the foregoing, nothing in the Plan or Confirmation Order, including Article 10.4 of the Plan, shall alter or impair the Subordination Agreement.

The Fulton Unsecured Claim is subject to that certain Second Amended and Restated Subordination Agreement, dated as of February 24, 2003, given by Ira A. Fulton, in his individual capacity, as Creditor, for the benefit of Bank of America, N.A., individually and as agent for the Bank Group, as amended, restated, supplemented or otherwise modified from time to time (the "Subordination Agreement"). The Subordination Agreement provides that any and all claims of Ira A. Fulton, in his individual capacity, as creditor, against the Debtor are subject and subordinate to the Claims of the Bank Group against the Debtor. Additionally, pursuant to the Subordination Agreement, Ira Fulton has agreed not to collect or receive "payment of the principal or interest of any claim or claims" he has against the Debtor. The proposed treatment of the Fulton Unsecured Claim under the Plan does not provide for the payment of principal or interest to Ira A. Fulton on account of the Fulton Unsecured Claim. Rather, the Plan provides that, on the Effective Date, the Fulton Unsecured Claim will be converted into an equity interest in the Reorganized Debtor. If, however, the Bankruptcy Court determines that the conversion of the Fulton Unsecured Claim to an equity interest in the Reorganized Debtor constitutes a "payment" of the principal or interest of the Fulton Unsecured Claim that is subject to the provisions of the Subordination Agreement, the Contribution Agreement will provide that the Fulton Unsecured Claim will not be converted into equity on the Effective Date, but will remain outstanding and will continue to be subject to the terms and conditions of the Subordination Agreement until such time as the Bank Group Claims have been satisfied in full.

The Subordination Agreement also appoints the Administrative Agent as its attorney in fact to file claims and accept or reject any plan of reorganization on behalf of Ira A. Fulton with respect to the Fulton Unsecured Claim. The Bank Group has stated that it may seek to submit a ballot accepting or rejecting the Plan on behalf of the Fulton Unsecured Claim. If the Bankruptcy Court determines that the Subordination Agreement allows the Administrative Agent to vote the Fulton Unsecured Claim, the Administrative Agent will be entitled to submit a ballot to accept or reject the Plan on account of the Fulton Unsecured Claim.

**H.    Class 8 – Equity Interests**

1.    Impairment and Voting. Class 8 is Impaired by the Plan. All holders of Allowed Equity Interests in Class 8 are entitled to vote and shall be solicited to vote on the Plan.

2.    Treatment. The Reorganized Debtor will not make distributions to holders of Allowed Equity Interests until the Borrowers' obligations under the New Loan Documents are first satisfied in full, provided, however, that the Reorganized Debtor will be permitted to make normal and customary distributions to holders of Allowed Equity Interests for the purpose of permitting such holders to pay taxes so long as an event of default has not occurred under the Amended and Restated Credit Agreement.

Notwithstanding the fact that the Debtor is solvent and Equity Interest holders are thereby entitled to a recover, the Equity Interest holders have agreed to facilitate the transactions and treatment of Claims

set forth in the Plan by offering to do the following.  First, on the Effective Date the holders of Allowed Equity Interests will, as described in Article 6.1 of the Plan, contribute 100% of the equity interests in Fulton Sales to the Reorganized Debtor.  Second, on the Effective Date, the Reorganized Debtor will cause Fulton Sales to become a Borrower under the Amended and Restated Credit Agreement.  Third, the Debtor will cause Fulton Sales pledge its Cash to the holders of Allowed Bank Group Claims as part of the Bank Group Collateral.

## IX.    SUMMARY OF THE NEW CREDIT FACILITY TO BE ISSUED PURSUANT TO THE PLAN

On the Effective Date, the Pre-Petition Credit Agreement will be reduced and replaced with a new senior credit facility (the "**New Credit Facility**").  Pursuant to the New Credit Facility, the Debtor will execute the "**New Loan Documents**," including the "**Amended and Restated Credit Agreement**" and the "**New Note**."  The borrowers under the New Loan Documents will be the Debtor and Fulton Sales (together, the "**Borrowers**").

Copies of the New Loan Documents will be included as an Exhibit to the Plan Supplement. Meanwhile, material terms of the New Loan Documents are summarized below.

### A.    Amended and Restated Credit Agreement

#### 1.    Amount

The beginning principal balance of the Amended and Restated Credit Agreement will be the sum of: (a) the Allowed Bank Group Claims as of the Effective Date; and (b) the Bank Group Effective Date Cash Payment (defined below).

#### 2.    Bank Group Effective Date Cash Payment

The Borrowers will pay to the Bank Group the "**Bank Group Effective Date Cash Payment**," which shall equal the difference between: (i) the Cash of the Borrowers as of the Effective Date, less (ii) the sum of (a) the Maximum Reserves, (b) the amount of estimated and Allowed Administrative Claims, and (c) the payment of Allowed or estimated Secured Tax Claims, Secured Vendor Claims, the Queen Creek Claim, and General Unsecured Claims that are required to be paid on the Effective Date  or subject to a reasonable reserve if such Claims are Disputed as the Effective Date, provided, however, that the Bank Group Effective Date Cash Payment shall not be less than $30 million or greater than $35 million.

#### 3.    Interest

The Amended and Restated Credit Agreement shall bear interest at LIBOR + 4.00%, subject to a LIBOR floor of 2.00%, provided, however, that if the outstanding principal amount of the Amended and Restated Credit Agreement on the third anniversary of the Effective Date is equal to or less than $75 million, the interest rate will be reduced to LIBOR + 2.00%, subject to a LIBOR floor of 2.00%.

#### 4.    Minimum Amortization & Prepayments

First, the Borrowers will make minimum annual principal payments on the New Note in the amount of $15 million, which will be due and payable on each anniversary of the Effective Date; provided, however, that on or prior to the third anniversary of the Effective Date, the Borrowers will be required to have made principal payments equal to or greater than $55 million.

The New Note may be prepaid at any time in whole or in part without premium or penalty. Any optional prepayment will be applied to the principal outstanding on the New Note and credited against the annual minimum amortization payments discussed immediately above.

5.      Mandatory Prepayments

From and after the Effective Date, the Borrowers shall make mandatory prepayments pursuant to the Amended and Restated Credit Agreement as follows: (i) in connection with the sale of Bank Group Collateral consisting of a Unit, the Borrowers shall prepay the obligations arising under the Amended and Restated Credit Agreement in an aggregate amount equal to 21% of the Gross Sales Price from the sale of such Unit; and (ii) in connection with the sale of Bank Group Collateral consisting of a Non-Unit, the Borrowers shall apply the Net Cash Proceeds from such sale as follows: (a) first, to fund the Maximum Working Capital Reserve; (b) second, to fund the Maximum Lot Reserve; and (c) third, all remaining Net Cash Proceeds shall be used to prepay the obligations arising under the Amended and Restated Credit Agreement.

6.      Priority Over Dividends or Equity Interest Distributions

Pursuant to terms of the Amended and Rested Credit Agreement, the Reorganized Debtor will not make any Equity Interest Distributions or dividends to holders of the Reorganized Debtor's Equity Interests, other than the customary distributions on account of any tax liability incurred by the holders of the Reorganized Debtor's Equity attributable to the Reorganized Debtor's S corporation status, until the Allowed Bank Group Claims are first satisfied in full.

7.      Collateral

On the Effective Date, the Borrowers will grant to the holders of Allowed Bank Group Claims senior, perfected and valid Liens on the Bank Group Collateral (subject only to existing Liens securing Allowed Secured Tax Claims), provided, however, that the Liens granted hereunder shall be released by the holders of Allowed Bank Group Claims upon satisfaction of the conditions set forth in Section 3.2 of the Amended and Restated Credit Agreement.

8.      Covenants

The Amended and Restated Loan Agreement will include those affirmative, negative and property covenants customarily found in transactions of this type and the following financial covenants:

(a)     Neither the Borrowers nor their affiliates will permit the ratio of EBITDA to Interest Incurred (each as defined in the existing credit facility), for any period consisting of the preceding 4 fiscal quarters, to be less than 1.50 to 1.00;

(b)     Borrowers will not permit the Total Lots Owned to exceed ten (10) times the total number of Units sold in the immediately preceding four (4) quarter period. Borrower will be in default if Total Lots Owned exceed this limit for 3 consecutive quarters; and

(c)     Borrowers will not permit the total number of Spec Units to exceed 60% of the total home closings for the immediately preceding four (4) quarter period. Borrower will be in default if total Spec Units exceed this limit for 3 consecutive quarters.

9.      Distributions for Payment on Income Taxes

From and after the Effective Date, and so long as no Event of Default (as defined below) has occurred and is continuing, the Borrowers may, in Borrowers' discretion, and with no legal obligation to do so, make cash distributions to their stockholders at such times and in such amounts as necessary for paying the Estimated Taxes allocated to such stockholder.  The cash distributions for Estimated Tax payments are the only distributions to stockholders that are permitted so long as the Borrower's obligations under the Amended and Restated Credit Agreement remain outstanding, and no such distributions are permitted if an Event of Default (as defined below) has occurred and is continuing.

"Estimated Taxes" means the estimated state and federal income taxes attributable to allocations to the Borrowers' shareholders for the taxable year of tax items from the Borrowers, (i) assuming the maximum effective, combined (federal, state and local) income tax rate for such shareholder, (ii) taking into account the effect of cumulative losses, deductions and carry-overs of the Borrowers, which occur in taxable years occurring during or after the taxable year in which the execution of the Amended and Restated Credit Agreement occurs, and (iii) reducing the tax rate used to take into consideration the different rates applicable to capital gains.

"Event of Default" shall have the meaning assigned to it in the Amended and Restated Credit Agreement.
.

**B.      New Note**

Pursuant to the Amended and Restated Credit Agreement, the Borrowers will issue the "**New Note**" to the Bank Group.  The New Note will be a term note in the face amount (the "**New Note Face Amount**") of the sum of: (a) the Allowed Bank Group Claims as of the Effective Date; and (b) the Bank Group Effective Date Cash Payment (defined below).  The New Note matures on the sixth anniversary of the Effective Date.  The New Note shall bear interest at LIBOR + 4.00%, subject to a LIBOR floor of 2.00%, provided, however, that if the outstanding principal amount of the New Note on the third anniversary of the Effective Date is equal to or less than $75 million, the interest rate will be reduced to LIBOR + 2.00%, subject to a LIBOR floor of 2.00%.

## X.      MEANS FOR EXECUTING THE PLAN

**A.      Funding of the Plan and Contribution of Assets**

The Reorganized Debtor shall fund Distributions under the Plan with Cash on hand, the sale of existing assets in the ordinary course of business, the New Credit Facility, the agreement of Fulton Sales to become a Borrower under the New Credit Facility, the conversion of the Fulton Unsecured Claim into equity in the Reorganized Debtor, and the creation of new Liens and security interests in assets of the Reorganized Debtor and Fulton Sales to secure the obligations of the Borrowers under the New Credit Facility.  In addition, the holders of the outstanding equity of Fulton Sales will effectuate the Trust Contribution pursuant to the Tax Reorganization Plan.

1.      New Credit Facility

On the Effective Date, the Borrowers will execute the New Loan Documents.  Pursuant to the New Loan Documents, the Borrowers will issue the New Note to the holders of Allowed Bank Group

Claims on the Effective Date. The New Note shall be a term note in the face amount of the New Note Face Amount. The New Note matures on the sixth anniversary of the Effective Date. The New Note shall bear interest at LIBOR + 4.00%, subject to a LIBOR floor of 2.00%, provided, however, that if the outstanding principal amount of the New Note on the third anniversary of the Effective Date is equal to or less than $75 million, the interest rate will be reduced to LIBOR + 2.00%, subject to a LIBOR floor of 2.00%.

2.      Contribution of Fulton Sales Equity Interests

On or before the Effective Date, Ira A. and Mary Lou Fulton will make the Trust Contribution to the Fulton Family Trust. Subsequently, the Fulton Family Trust will make the Fulton Sales Stock Contribution to the Debtor. The timing and implementation of the making of the Trust Contribution and the Fulton Sales Stock Contribution will occur in the manner and order specified in Article 6.10 of the Plan.

3.      Fulton Sales Becomes Borrower Under New Credit Facility

On the Effective Date, in full and final settlement and satisfaction of the treatment of Claims and releases granted under the Plan, Fulton Sales agrees to become a Borrower under the New Credit Facility, and will, in its capacity as Borrower, pledge any unrestricted Cash, including unrestricted Cash generated post-Effective Date from Sales of Units and Non-Units as part of the Bank Group Collateral.

4.      Conversion of Fulton Unsecured Claim Into Equity

On the Effective Date, in full and final settlement and satisfaction of the treatment of the Fulton Unsecured Claim, and to facilitate the treatment of Allowed Claims under the Plan and the reorganization of the Debtor, Ira A. Fulton shall, for purposes of the Plan only, agree to convert the $25 million Fulton Unsecured Claim into equity in the Reorganized Debtor.

5.      Plan Contribution Agreement

Ira A. Fulton and the Reorganized Debtor will execute the Plan Contribution Agreement to evidence their consent to implement certain provisions of the Plan, including, without limitation: (a) Fulton Sales becoming a co-Borrower under the Amended and Restated Credit Agreement; (b) Fulton Sales pledging its unrestricted Cash to the holders of Allowed Bank Group Claims; (c) the conversion of the Fulton Unsecured Claim into equity of the Reorganized Debtor; (d) the making of the Fulton Sales Contribution; and (e) any other actions required to be taken by holders of Allowed Equity Interests pursuant to Article 4.7 of the Plan. A copy of the Plan Contribution Agreement will be included as an Exhibit to the Plan Supplement.

6.      Bank Group Collateral

On the Effective Date, in full and final settlement and satisfaction of the treatment of Claims and releases granted under the Plan, the obligations of the Borrowers under the New Credit Facility shall be secured by senior, perfected and valid Liens on the Bank Group Collateral (subject only to existing Liens securing Allowed Secured Tax Claims), provided, however, that the Liens granted hereunder shall be released by the holders of Allowed Bank Group Claims upon satisfaction of the conditions set forth in Section 3.2 of the Amended and Restated Credit Agreement.

7.      Additional Liquidity

To generate additional liquidity without implementation of a revolving line of credit, the Debtor will secure from its subcontractor creditors in Class 1, by way of their support for the Plan and otherwise, the following. First, in exchange for the benefits associated with future business from the Debtor, subcontractor related creditors will have their Claims paid in full — 60% of the Effective Date and the balance over two to four years — which will in turn, reduce the Reorganized Debtor's immediate cash flow obligations. Second, in similar exchange for the benefits associated with future business from the Debtor, certain subcontractor related creditors will extend favorable trade payment terms to the Debtor. Extension of trade payment terms frees up the Debtor's working capital. Third, the Plan contemplates subordinating any mechanics' liens or similar liens from subcontractor claimants in order to grant the Bank Group a senior perfected lien on all of the Debtor's real estate assets.

### B. Continued Corporate Existence

1. The Debtor. From and after the Effective Date, the Debtor will continue to exist, with all the powers of a corporation under applicable law in the jurisdiction in which the Debtor is incorporated and pursuant to its articles of incorporation and bylaws in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws are amended by the Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

2. Amended and Restated Organizational Documents. As of the Effective Date and without any further action by the stockholders or directors of the Debtor or the Reorganized Debtor, the Reorganized Debtor's certificate of incorporation will be amended and restated substantially in the forms of the Amended and Restated Articles of Organization. The Amended and Restated Organizational Documents will also prohibit (to the extent required by Bankruptcy Code § 1123(a) and (b)) the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtor may amend the Amended and Restated Organizational Documents as permitted by applicable law.

3. Non-Debtors. There are certain Affiliates of the Debtor that are not debtors in the Chapter 11 Case. The continued existence, operation and ownership of such Non-Debtor Affiliates is a material component of the Debtor's business, and, as set forth in Article 11.1 of the Plan, all of the Debtor's equity interests and other property interests in such Non-Debtor Affiliates shall revest in the Reorganized Debtor or its successor on the Effective Date.

### C. Cancellation of Securities, Instruments and Agreements

On the Effective Date, except to the extent provided otherwise in the Plan, all securities, and all agreements, instruments, and other documents evidencing or governing any Claims against the Debtor, will be automatically deemed terminated, canceled, and extinguished with respect to the Debtor and the Chapter 11 Case (all without further action by any Person), and all obligations of the Debtor and its Estate under such instruments and agreements will be deemed fully and finally waived, released, canceled, extinguished, and discharged.

### D. Effectiveness of New Securities, Instruments, Agreements and Documents.

On the Effective Date, all securities, instruments, agreements, and documents issued, entered into, delivered, or filed under the Plan, including, without limitation, the New Loan Documents, the Plan Documents, and any security, instrument, agreement or document entered into, delivered, or filed in connection with any of the foregoing, will be deemed to become effective, binding, and enforceable in accordance with its respective terms and conditions.

### E. No Corporate Action Required.

As of the Effective Date: (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements related to or contemplated by the Plan; and (b) the other matters provided for under, or in furtherance of, the Plan involving corporate action required of the Debtor, will be deemed to have occurred and become effective as provided in the Plan, and will be deemed authorized and approved in all respects without further order of the Bankruptcy Court or any further action by the stockholders or directors of the Debtor.

### F. Indemnification and Insurance

The Reorganized Debtor will assume any pre-Petition Date indemnification obligations to any current or former directors and officers employed with the Debtor as of the Effective Date.

### G. Operations Pending Effective Date

Until the Effective Date, the Debtor will continue to operate its business, subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules.

### H. Payment of Trustee Fees

The Debtor shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) within ten (10) days of the entry of the order of confirmation for pre-confirmation periods and simultaneously provide to the United States Trustee an appropriate affidavit indicating the case disbursements for the relevant period. The Reorganized Debtor shall further pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) based upon all disbursements of the Reorganized Debtor for post-confirmation periods within the time periods set forth in 28 U.S.C. § 1930(a)(6), until the earlier of the closing of these cases by the issuance of a Final Decree by the Bankruptcy Court, or upon the entry of an Order by this Bankruptcy Court dismissing this case or converting this case to another chapter under the Bankruptcy Code, and the parties responsible for paying the post-confirmation United States Trustee fees shall provide to the United States Trustee upon the payment of each post-confirmation payment an appropriate affidavit indicating all the cash disbursements for the relevant period

## XI. DISTRIBUTIONS

### A. Distributions on Account of Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, initial Distributions under the Plan on account of Claims Allowed on or before the Effective Date shall be made on the Distribution Date; provided, however, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case or assumed by the Debtor prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims, unless otherwise agreed, shall be paid in accordance with Article II.4 of the Plan.

### B. Distribution on Account of Claims Allowed after the Effective Date

1. Payments and Distributions on Disputed Claims

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, Distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the Distribution Date that is at least thirty days after the Disputed Claim becomes an Allowed Claim; provided, however, that (a) Disputed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case or assumed by the Debtor on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business or industry practice, and (b) Disputed Priority Tax Claims become Allowed Priority Tax Claims after the Effective Date, unless otherwise agreed, shall be paid in accordance with Article II.4 of the Plan.

2.    Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and all Claims of such holder have been Allowed. In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtor shall in its sole discretion establish appropriate reserves for potential payment of such Claims. All Distributions made pursuant to the Plan on account of an Allowed Claim shall be made together with any dividends, payments, or other Distributions made on account of, as well as any obligation arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates Distributions were previously made to holders of Allowed Claims included in the applicable Class.

3.    Limits on Distributions

**Notwithstanding anything in the applicable holder's Proof of Claim or otherwise to the contrary, the holder of a Claim shall not be entitled to receive or recover a Distribution under the Plan on account of a Claim in excess of the amount: (a) stated in the holder's Proof of Claim, if any, as of the Distribution Record Date, plus interest thereon to the extent provided for by the Plan; (b) if the Claim is denominated as contingent or unliquidated as of the Distribution Record Date, the amount that the Debtor elects to reserve on account of such Claim and set forth in the Plan Supplement, or such other amount as may be estimated by the Bankruptcy Court prior to the Confirmation Hearing; or (c) if a Claim has been estimated, the amount reserved to satisfy such Claim after such estimation.**

C.    **Delivery of Distributions**

1.    Record Date for Distributions. On the Distribution Record Date, the Claims Register shall be closed and the Distribution Agent shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, if a Claim or Equity Interest is transferred twenty or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to transfer by the transferor.

2.    Distribution Agent. The Distribution Agent shall make all distributions required under the Plan to the holders of Allowed Claims.

3. Delivery of Distributions. Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Distribution Agent: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the signatory set forth on any of the Proofs of Claim Filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is Filed or if the Debtor has been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim; (d) at the addresses reflected on the Schedules if no Proof of Claim has been Filed and the Distribution Agent has not received a written notice of a change of address; or (e) on any counsel that has appeared in the Chapter 11 Case on the holder's behalf. Distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of distributions in the manner set forth in the Plan. The Debtor, the Reorganized Debtor, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan, except for gross negligence or intentional misconduct.

4. Compliance Matters. In connection with the Plan, to the extent applicable, the Reorganized Debtor and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Distributions pursuant to the Plan shall be subject to such tax withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtor and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such tax withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate to comply with such withholding and reporting requirements.

**D.      Fractional, De Minimis, Undeliverable, and Unclaimed Distributions**

1. Fractional Distributions. Notwithstanding any other provision of the Plan to the contrary, payments of fractions of dollars shall not be made and shall be deemed to be zero, and the Reorganized Debtor and the Distribution Agent shall not be required to make distributions or payments of fractions of dollars. Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment by the Reorganized Debtor or Distribution Agent shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

2. De Minimis Distributions. The Reorganized Debtor and Distribution Agent shall not have any obligation to make a Distribution on account of an Allowed Claim if (1) the amount to be distributed to the holder of an Allowed Claim on the particular Distribution date does not constitute a final Distribution to such holder and is or has an economic value of less than $50 or (2) the aggregate amount of all Distributions authorized to be made on that Distribution date have an economic value less than $20,000, unless such Distribution is a final Distribution.

3. Undeliverable Distributions. If any Distribution to a holder of an Allowed Claim is returned to the Reorganized Debtor or the Distribution Agent as undeliverable, no further Distributions shall be made to such holder unless and until the Reorganized Debtor or Distribution Agent is notified in writing of such holder's then-current address, at which time all currently due missed Distributions shall be made to such holder on the next Distribution date. Undeliverable Distributions shall remain in the possession of the Reorganized Debtor until such time as a Distribution becomes deliverable, or such Distribution shall be reallocated to the holders of other Claims in the same Class on a pro rata basis,

(defined as the quotient of each Allowed Claim in such Class and all Allowed Claims in that Class), and shall not be supplemented with any interest, dividends, or other accruals of any kin.

4.      Reversion.  Any Distribution under the Plan that is an Unclaimed Distribution for a period of six months after the Distribution date on which such Distribution is initially attempted shall be deemed unclaimed property under Section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall be reallocated to other holders of Claims in the same Class as the Claim on account of which such Unclaimed Distribution was made, pro rata (defined as the quotient of each Allowed Claim in such Class and all Allowed Claims in that Class).  Upon such reallocation, the Claim of any holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.

## E.      Manner of Payment Pursuant to the Plan

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Reorganized Debtor by check or by wire transfer.  Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within ninety days after issuance, but may be reissued upon written request of the recipient until the Distribution is reallocated to the holders of other Claims in the same Class.

## F.      Claims Paid or Payable by Third Parties

1.      Claims Paid by Third Parties.  The Debtor or Reorganized Debtor, as applicable, shall reduce in full a Claim on the Claims Register, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtor or the Reorganized Debtor.  Further, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtor or the Reorganized Debtor on account of such Claim, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties.  No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtor's insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtor's insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Debtor or Reorganized Debtor without a Claims objection having to be Filed and without any further notice, other than notice to the holder of such Claim of such expungement, or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies.  Distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything

contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## XII.    RETAINED CAUSES OF ACTION

The Debtor specifically retains all causes of action. Any retained causes of action include, but are not limited to, all avoidance actions, fraudulent conveyance actions, preference actions, and other claims and causes of action of every kind and nature whatsoever, arising before the Effective Date which have not been resolved or disposed of prior to the Effective Date, whether or not such claims or causes of action are specifically identified in this Disclosure Statement.

## XIII.   MANAGEMENT

Ira A. Fulton will serve as Chairman of the Board of Directors of the Reorganized Debtor.

The Reorganized Debtor will be managed by the same management team that managed the Debtor prepetition, including: Doug Fulton (the Debtor's Chief Executive Officer and Executive Vice President), Norm Nicholls (the Debtor's President and Chief Operating Officer), and Steve Walters (the Debtor's Chief Financial Officer and Treasurer) (collectively, the "**Management Team**"). Information regarding post-confirmation compensation for the Chairman of the Board of Directors Each and the Management Team will be included as part of the Plan Supplement.

Despite the decline in sales due to the economic downturn, Fulton has continued to sell homes at an above average rate given the current market climate, increasing its market share from 3% prior to the Petition Date to over 7% recently. In addition to increasing the Debtor's share of the Phoenix homebuilding market in 2009, Fulton and its Management Team similarly increased the Debtor's national homebuilder ranking from 70th in 2008 to 49th in 2009. Such results are demonstrative of the Management Team's ability to steer homebuilding operations during these difficult economic conditions.

By retaining the current Management Team in place, the Debtor will benefit from the specific knowledge and experience of its Management Team. Thus, a change in management structure is not in the best interests of the Debtor or its creditors because the existing structure is appropriate to the needs of the Debtor.

As described in this Disclosure Statement, the Management Team anticipated the downturn in the economy and diligently undertook to shed those assets that were unlikely to be of value in a recession. While no one could have predicted the severity of the downturn, the prescient acts of the Management Team have placed the company in a very strong position to survive the downturn, to pay the Debtor's creditors in full, and to emerge as a vibrant, leading and profitable homebuilder as the market returns to normal.

In addition, by maintaining the current management, the Debtor will avoid the transactional costs associated with significant, and unnecessary, change in management. The Debtor will also be able to preserve the institutional knowledge of the Management Team.

## XIV.   EFFECT OF CONFIRMATION

### A.    Vesting of Assets

Except as provided in the Plan, the Confirmation Order, or the Plan Documents, all property of the Estate shall vest in the Reorganized Debtor on the Effective Date free and clear of all Liens and

Claims of all kinds existing before the Effective Date, provided, however, that all assets of the Reorganized Debtor shall be subject to the senior, perfected Liens granted to the holders of Allowed Bank Group Claims, with such Liens being senior to any and all other Liens, Claims and interests, including any Liens or Claims of creditors asserting mechanics liens or similar operational liens, other than Liens securing Allowed Secured Tax Claims. Real property which vests in the Reorganized Debtor shall remain subject to any easements, rights-of-way, zoning, covenants, conditions and restrictions and other similar land-use restrictions in existence as of the Effective Date. From and after the Effective Date, the Reorganized Debtor may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, including the employment of, and payment to, Professionals except as otherwise provided in the Plan, or the Confirmation Order.

B.   **Discharge**

Except as provided in the Plan or the Confirmation Order, the rights granted under the Plan and the treatment of Claims and Equity Interests under the Plan are in exchange for and in complete satisfaction, discharge, and release of, all Claims including any interest accrued on General Unsecured Claims from the Petition Date and termination of all Equity Interests. Except as provided in the Plan or the Confirmation Order, confirmation of the Plan discharges which the Debtor and the Reorganized Debtor from all Claims or other debts that arose before the Confirmation Date, and all debts of the kind specified in Bankruptcy Code §§ 502(g), 502(h) or 502(i), whether or not: (i) a proof of claim based on such debt is filed or deemed filed under Bankruptcy Code § 501; (ii) a Claim based on such debt is Allowed under Bankruptcy Code § 502; or (iii) the holder of a Claim based on such debt has accepted the Plan. Without limiting the foregoing, the discharge granted under the Plan is granted to the fullest extent allowed under Bankruptcy Code §§ 1141(a), 1141(b), 1141(c), and 1141(d)(1).

C.   **Discharge Injunction**

*Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, all entities that have held, currently hold, or may hold a Claim or other debt or liability that is unclassified by the Plan or that is classified by the Plan or is subject to a distribution under the Plan, or an Interest or other right of an equity security holder that is treated under the Plan, are permanently enjoined from taking any of the following actions on account of any such Claims, debts, liabilities, or Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against the Debtor and the Reorganized Debtor; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, or their respective property; (c) creating, perfecting, or enforcing any Lien or encumbrance against the Debtor, the Reorganized Debtor, or their respective property; (d) asserting a right of setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtor, the Reorganized Debtor, or their respective property; and (e) commencing or continuing any action, in any manner, in any place, that does not comply with or is inconsistent with the provisions of the Plan or the Bankruptcy Code. Nothing in this  Plan is to be construed or is to have the effect of extinguishing, prohibiting, or otherwise limiting, the right of any holder of a Claim to assert a right to setoff or recoupment arising in connection with that Claim as part of the resolution and treatment of that Claim under the Plan.*

D.   **Releases and Related Matters**

1.      Releases by the Debtor**.**  Pursuant to Section 1123(b)(3) of the Bankruptcy Code, effective as of the Effective Date, the Debtor, in its individual capacity for and on behalf of its Estate, shall be deemed to forever release, waive, and discharge all Released Parties from all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever, whether

liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to (i) the Debtor, (ii) the Chapter 11 Case and the conduct thereof, and (iii) the Plan. The Reorganized Debtor shall be bound, to the same extent the Debtor is bound, by all of the releases set forth in Article 11.4 of the Plan.

2.    Injunction

***Confirmation of the Plan shall act as an injunction against any Person commencing or continuing against the Reorganized Debtor, including any subsidiary or Affiliate of the Reorganized Debtor that as part of the Plan has agreed to become a Borrower under the New Credit Facility, or any of its assets, any action, employment of process, or act to collect, offset, or recover any Claim or cause of action such Person may possess against the Debtor.***

E.    **Preservation of Insurance**

The discharge and release from Claims as provided in the Plan, except as necessary to be consistent with the Plan, do not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtor or any other Person

## XV.    DOCUMENTATION OF PLAN IMPLEMENTATION

In the event any entity which possesses an Allowed Secured Claim or any other lien in any of the Debtor's property for which the Plan requires the execution of any documents to incorporate the terms of the Plan fails to provide a release of its lien or execute the necessary documents to satisfy the requirements of the Plan, the Debtor may record a copy of the Plan or the Confirmation Order with the appropriate governmental agency and such recordation shall constitute the lien release and creation of any necessary new liens to satisfy the terms of the Plan. If the Debtor deems advisable, it may obtain a further Order from the Bankruptcy Court that may be recorded in order to implement the terms of the Plan.

## XVI.    EXEMPTION FROM TRANSFER TAXES

In accordance with Bankruptcy Code § 1146: (a) the issuance, distribution, transfer and exchange of the New Note; (b) the execution and filing of any deed of trust, security agreement or other document or instrument necessary to create, attach, perfect or record any Lien, mortgage, deed of trust or security interest granted under the Plan; (c) the issuance, distribution, transfer, and exchange of assets or property of the Reorganized Debtor, including, without limitation, all real property owned by the Debtor; (d) the execution, assignment, modification, or recording of any lease or sublease; and (e) the execution, delivery, or recording of a deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, the Confirmation Order, or any transaction contemplated above, or any transactions arising out of, contemplated by, or in any way related to, the foregoing are not subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, or real estate transfer tax, or other similar tax or governmental assessment and the appropriate state or local government officials or agents are directed to forego the collection of any such tax or assessment and to accept for filing or recordation any of the foregoing instruments or other documents without the payment of any such tax or assessment.

## XVII. TAX CONSIDERATIONS

### A. Timing and Order of Transactions

In order to implement the Tax Reorganization, the following actions will be deemed to occur on or before the Effective Date in the following order: (a) first, Ira A. and Mary Lou Fulton will make the Trust Contribution to the Fulton Family Trust; (b) second, Fulton Sales will pay the Fulton Sales Reimbursement Payment to the Debtor; (c) third, the Fulton Family Trust will make the Fulton Sales Stock Contribution to the Debtor; and (d) fourth, the Debtor or Reorganized Debtor, as applicable, will make the Q-Sub Election with respect to Fulton Sales.

### B. Tax Reorganization Documents

In order to implement the Tax Reorganization, the Debtor, the Reorganized Debtor, Fulton Sales, and their respective directors and shareholders, are authorized and directed to execute the following documents: (a) the Tax Reorganization Plan; (b) those director and/or shareholder consents necessary to effectuate the Tax Reorganization, Trust Contribution, Fulton Sales Stock Contribution and the Q-Sub Election; and (c) those instruments, agreements, documents and certificates as may be necessary to effectuate the Tax Reorganization, including, without limitation, unanimous consents of necessary shareholders and directors and IRS Form 8869, Qualified Subchapter S Election.

## XVIII. LIQUIDATION ANALYSIS

*The Debtor's detailed Liquidation Analysis will be included as an Exhibit to the Plan Supplement. The following is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information and financial statements and notes thereto appearing in the Plan Supplement. The final Liquidation Analysis provided in the Plan Supplement may change or differ from the following general overview. In the event of any conflict between the Liquidation Analysis provided in the Plan Supplement and this general overview, the Liquidation Analysis provided in the Plan Supplement will govern.*

Often called the "best interests" test of creditors, section 1129(a)(7) of the Bankruptcy Code requires that the bankruptcy court find, as a condition to confirmation of a plan of reorganization, that each holder of a Claim or Equity interest in each impaired class either: (i) has voted to accept the Plan; or (ii) will receive or retain under the Plan property of a value that, as of the Effective Date, is not less than the amount the such Person would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. To make these findings, a Bankruptcy Court will typically: (1) estimate the cash proceeds (the "Liquidation Proceeds") that a Chapter 7 Trustee would generate if the Debtor's Chapter 11 case was converted to a Chapter 7 case on the Effective date and the assets of the Debtor's Estate were liquidated; (2) determine the distribution (the "**Liquidation Distribution**") that each non-accepting holder of a Claim or interest would receive from the Liquidation Proceeds under the priority scheme dictated in Chapter 7; and (3) compare each holder's Liquidation Distribution to the distribution under the Plan ("Plan Distribution") that such holder receive if the Plan were confirmed and consummated.

It is assumed that the liquidation would occur under the direction of a Chapter 7 trustee. It is further assumed that the Liquidation Proceeds would be distributed in accordance with section 726 of the Bankruptcy Code. Under any liquidation scenario there can be unanticipated events that may materially impact disbursements. These events can include, but are not limited to, macro economic conditions, changes in the value of the assets that are being liquidated and changes in consumer preferences.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7), the Debtor's management together with its professionals prepared the Liquidation Analysis.

The Liquidation Analysis presents both "High" and "Low" estimates of Liquidation Proceeds representing a range of management's assumptions related to the sale of the assets, the costs incurred during liquidation and the proceeds realized.

In a Chapter 7 liquidation, certain distinctive factors would limit the recovery from the sale of the Debtor's assets. The Debtor's assets consist of cash, models and spec homes, work in progress ("WIP"), finished lots and platted and engineered lots. In a liquidation, the Debtor would likely have to discount prices to sell houses that are completed or currently under construction due to factors such as, but not limited to, market perception regarding the value of the Fulton brand name and the perceived quality and value currently associated with that name, the Debtor's inability to offer home warranties, the sale of homes in partially completed developments, concerns regarding maintenance of common areas, and potentially low sales values for partially-completed homes. As a result, the sale of such assets would most likely generate insufficient proceeds to repay the creditors in full. Current market conditions would seem to indicate that significant price reductions would be required in order to sell the inventory. In addition, it is assumed that in Liquidation, the Chapter 11 Trustee would need to spend some amount of the Debtor's cash to finish construction of WIP, including payments to contractors and employees of the debtor necessary to convert the WIP into salable product. Estimates of wind-down expenses to be incurred after the assumed Effective Date include expenses related to the sales of homes and land and expenses of the Chapter 7 Trustee and the Trustee's professionals. Any administrative claims included in the wind down expenses are assumed to be paid during the wind down period. It is assumed that the Chapter 7 Trustee would retain professionals to expedite the liquidation and that the Chapter 7 Trustee fees are paid in accordance with the limits established by section 326 of the Bankruptcy Code.

The Debtor controls interest in several non-filing operating subsidiaries. In Chapter 7 liquidation, it is assumed that funding would not be available to meet future operating requirements for such subsidiaries. It is further assumed that since these subsidiaries derive a great deal of their business from the operations of the Debtor, the Chapter 7 liquidation of the Debtor will result in the subsidiaries no longer having viable operations or market value.

*The Liquidation Analysis includes the value of cash and other assets of Fulton Sales, an affiliate of the Debtor that has guaranteed the Debtor's debt to the Bank Group. The Liquidation Analysis assumes that a liquidation of the Debtor would require the liquidation of Fulton Sales as well, and that such action would: (a) significantly increase the amount of claims against the Debtor arising from the assertion of warranty claims against the Debtor and Fulton Sales due to such liquidation; and/or (b) decrease the amount of assets available from Fulton Sales to satisfy the Claims of creditors of the Debtor.*

*Inversely, a liquidation of Fulton Sales would similarly lead to a liquidation of this Debtor as a liquidation of Fulton Sales would: (a) significantly increase the amount of claims against this Debtor arising from the assertion of express and/or implied warranty claims against the Debtor on account of the elimination of Fulton Sales as a viable avenue of recovery; and/or (b) decrease the amount of assets available from Fulton Sales to satisfy the Claims of creditors of this Debtor.*

THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTOR WAS, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND THE ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE CONTAINED WITHIN THE LIQUIDATION ANALYSIS. THE LIQUIDATION ANALYSIS IS SUBJECT TO ECONOMIC, COMPETITIVE AND OPERATIONAL

UNCERTAINTIES THAT MAY BE BEYOND THE CONTROL OF THE DEBTOR OR A CHAPTER 7 TRUSTEE. NEITHER THE LIQUIDATION ANALYSIS NOR THE FINANCIAL PROJECTIONS HAVE BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH THE STANDARDS OF THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.

<u>Application of the Best Interests Test to the Liquidation Analysis</u>

The Liquidation Analysis will be attached as an Exhibit to the Plan Supplement. The Debtor believes that any liquidation analysis is speculative. For example, the Liquidation Analysis necessarily contains an estimate of the amount of Claims that will ultimately become Allowed Claims. In preparing the Liquidation Analysis , the Debtor will project the amount of Allowed Claims based upon a review of their scheduled and filed proofs of claim. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtor projected a range for the amount of Allowed Claims with the low end of the range the lowest reasonable amount of Claims and the high end of the range the highest reasonable amount of the Claims, thus allowing assessment of the most likely range of chapter 7 liquidation dividends to the holders of the Allowed Claims. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims and Allowed Interests under the Plan.

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Debtor believes that, taking into account the Liquidation Analysis, the Plan will meet the "best interests" test of Bankruptcy Code § 1129(a)(7). The Debtors believe that each member of each Class will receive at least as much under the Plan as it would in a liquidation in a hypothetical chapter 7 case. Creditors and Equity Interest holders will receive a better recovery through the distributions contemplated by the Plan because maintaining the Debtor as a going concern under the Plan rather than a forced liquidation will allow the realization of more value for the Debtor's assets for the benefit of Equity Interest holders, not just Creditors.

## XIX.   <u>FEASIBILITY ANALYSIS</u>

*The Debtor's detailed Feasibility Analysis will be included as an Exhibit to the Plan Supplement. The following is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information and financial statements and notes thereto appearing in the Plan Supplement. The final Feasibility Analysis provided in the Plan Supplement may change or differ from the following general overview. In the event of any conflict between the Feasibility Analysis provided in the Plan Supplement and this general overview, the Feasibility Analysis provided in the Plan Supplement will govern.*

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor. This requirement is imposed by Bankruptcy Code § 1129(a)(11) and is referred to as the "feasibility" requirement. The Debtors believe that they will be able to perform timely all obligations described in the Plan and, therefore, that the Plan is feasible.

To demonstrate the feasibility of the Plan, the Debtors will attach a feasibility analysis and financial projections as an Exhibit to the Plan Supplement (the "**Feasibility Analysis**"). The Feasibility Analysis demonstrates that the Reorganized Debtor will have sufficient Cash on hand as of the Effective Date to make, on the Effective Date, all payments to Creditors owing on the Effective Date, and sufficient

Cash on hand to satisfy all remaining obligations under the Plan to all Creditors in all Classes. Accordingly, the Debtor believes that the Plan satisfies the feasibility requirement of Bankruptcy Code § 1129(a)(11). The Debtor cautions that no representations can be made as to the accuracy of the Feasibility Analysis and projections contained in the Plan Supplement or as to the Reorganized Debtor's ability to achieve the projected results. Certain of the assumptions on which the Feasibility Analysis is based are subject to uncertainties outside the Debtor's control. Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the Feasibility Analysis was prepared may be different from those assumed or may be unanticipated, and may adversely affect the Debtor's financial results. Therefore, the actual results can be expected to vary from the Feasibility Analysis and the variations may be material and adverse.

The Feasibility Analysis was not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants, the practices recognized to be in accordance with generally accepted accounting principles, or the rules and regulations of the Securities and Exchange Commission regarding projections. Furthermore, the Feasibility Analysis was not audited by the Debtor's independent accountants. Although presented with numerical specificity, the Feasibility Analysis is based on a variety of assumptions, some of which in the past have not been achieved and which may not be realized in the future, and are subject to significant business, economic and competitive uncertainties and contingencies, and many of which are beyond the Debtors' control. Consequently, the Feasibility Analysis should not be regarded as a representation or warranty by the Debtor or any other Person, that projections will be realized. Actual results may vary materially from those presented.

## XX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A summary description of certain United States federal income tax consequences (hereinafter, "**Tax Consequences**") of the Plan follows. This description is for informational purposes only and, owing to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various Tax Consequences of the Plan discussed below. This disclosure describes only the principal Tax Consequences of the Plan to the Debtor and to holders of Claims and Equity Interests. No opinion of counsel has been sought or obtained with respect to any Tax Consequences of the Plan. No rulings or determinations of the Internal Revenue Service ("**IRS**") or any other tax authorities have been sought or obtained with respect to any Tax Consequences of the Plan, and the discussion below is not binding on the IRS or other authorities. No representations are being made to the Debtor or any holder of a Claim or Equity Interest regarding the particular Tax Consequences of the confirmation and consummation of the Plan. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed here.

The following discussion of the Tax Consequences is based on the Internal Revenue Code of 1986, as amended (the "**Code**"), Treasury Regulations, judicial authorities, published positions of the IRS and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the Tax Consequences of the Plan to special classes of taxpayers (*e.g.*, insurance companies, tax-exempt organizations, persons that are, or hold their Claims through, pass-through entities, persons whose functional currency is not the United States dollar, foreign persons, dealers in securities or foreign currency, employees of the Debtor, persons who received their Claims by exercising an employee stock option or otherwise as compensation, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction). Furthermore, the following discussion does not address United States federal taxes other than income taxes.

The following discussion assumes that the Debtor validly elected S corporation status within the meaning of Code Sections 1361 and 1362 (the "**S Status**"), and its shareholders have consented to such election, effective as of the date the Debtor was originally organized and that neither the Debtor nor its shareholders, or any other agents thereof, have taken or permitted any action that resulted in a termination of the Debtor's S Status through the Effective Date. If the Debtor's S Status has not been maintained from the date it was originally organized through the Effective Date, the discussion below would be irrelevant as the Debtor would be taxed as a corporation, as opposed to an S corporation, for United States federal income tax purposes (hereinafter "**Tax Purposes**").

Holders of Claims and Equity Interests are strongly urged to consult their own tax advisor regarding the United States federal, state, local, and foreign tax consequences of the transactions described in this Disclosure Statement and in the Plan.

### A. Tax Consequences to the Debtor

The Debtor has been treated as an S corporation for Tax Purposes. Generally speaking, an S corporation is not a taxable entity and does not incur any federal income tax liability. Rather any gains, losses or other items of income, deductions or credit (hereinafter "**Tax Items**") realized by the Debtor are passed through to the holders of Equity Interests. The fact that the Debtor has filed a Chapter 11 proceeding does not change this tax result. No new taxable entity is created when an S corporation files bankruptcy. Thus, any gain or loss recognized by the Debtor in connection with the transactions contemplated by the Plan will be passed through to the holders of Equity Interests. The Debtor will continue to file information returns for Tax Purposes and will allocate to each shareholder his, her or its respective share of Tax Items.

### 1. Cancellation of Indebtedness ("COD") Income

Under the Plan, the Debtor's outstanding indebtedness will be satisfied in exchange for Cash payments and the execution of the New Credit Facility pursuant to which the New Note will be issued (hereinafter, the execution of the New Credit Facility and the issuance of the New Note will be collectively referred to as the "**Debtor's New Debt**"). It is anticipated that the Cash payments and the issue price of the Debtor's New Debt will be equal to the amount of the Debtor's outstanding indebtedness. In such an event, the Debtor will not realize any COD income. However, the Debtor will realize COD income to the extent the Cash payments and the issue price of the Debtor's New Debt are less than the particular Claim being satisfied in exchange therefor.

Article VI of the Plan contemplates that the Fulton Unsecured Claim will be converted into equity in the Reorganized Debtor. It is expected that the confirmation order and any documents necessary to implement the Plan will provide that Ira Fulton will assign the Fulton Unsecured Claim to the Fulton Family Trust and that the Fulton Family Trust will be the holder of the Fulton Unsecured Claim at the Effective Date when the conversion occurs. It is anticipated that the "meaningless gesture" doctrine as described in Rev. Rul. 64-155, 1964 C.B. 138, applies to the conversion of the Fulton Unsecured Claim given the Service, in TAM 9830002, applied the "meaningless gesture" doctrine when it had the opportunity under similar circumstances, and there is no reason to believe the Service would not take a similar position with respect to the conversion of the Fulton Unsecured Claim. As a result, assuming the "meaningless gesture" doctrine applies, the conversion of the Fulton Unsecured Claim would be viewed as a contribution of capital under Code Section 108(e)(6), and the Debtor will not realize any COD income, except and to the extent, at the Effective Date, the adjusted tax basis of the Fulton Unsecured Claim is less than the face amount of the Fulton Unsecured Claim.

Lastly, the Debtor satisfied all accrued interest on the Fulton Unsecured Claim on the Petition Date and the holder of the Fulton Unsecured Claim stopped accruing interest as of such date. Thus, arguably, no accrued but unpaid interest is cancelled in connection with the conversion of the Fulton Unsecured Claim into equity in the Reorganized Debtor. However, in the event interest on the Fulton Unsecured Claim has accrued on the Effective Date, the accrued but unpaid interest will likely not result in COD income under Code Section 108(e)(2) as the payment of such interest would have ultimately given rise to a deduction. However, it is possible that the IRS may take a different view with respect to such an interest payment. In such a case, COD income would be recognized by the Debtor.

In the event the Debtor does realize COD income as described above, Code Section 108(a)(1)(A) permits the Debtor to exclude from gross income any COD income resulting from debt discharged pursuant to the Plan. However, pursuant to Code Section 108(b), the amount of COD income excluded from the Debtor's gross income must be applied to reduce other tax attributes of the Debtor in the following order: (1) net operating losses; (2) general business credits; (3) minimum tax credit; (4) capital loss carryovers; (5) reduction of the Debtor's tax basis in its property; (6) passive activity loss and credit carryovers; and (7) foreign tax credit carryovers. The Debtor's most likely attribute to be reduced in this instance is the Debtor's tax basis in its property.

2.      Second Class of Stock

Generally speaking, the Debtor's filing of the bankruptcy proceeding will not affect its election to be taxed as an S corporation for Tax Purposes. However, S corporations are not allowed to have more than one class of stock, and debt instruments or other arrangements can at times be reclassified as a second class of stock. If either the Debtor's New Debt or future Cash payments being made under the Plan are treated as a second class of stock, the Debtor's S Status would terminate and it would be taxed as a corporation following the Effective Date. A debt instrument or other arrangement will not be classified as a second class of stock if it is (1) "straight debt" for Tax Purposes; or (2) treated as debt for Tax Purposes, unless it is issued or entered into with the principal purpose of circumventing the S corporation "second class of stock" rules. It is anticipated that neither the Debtor's New Debt nor the future Cash payments to be made under the Plan will be treated as a second class of stock.

3.      Fulton Sales Stock Contribution

On or prior to the Effective Date, Ira and Mary Lou Fulton will contribute all of the stock of Fulton Sales to the Fulton Family Trust (the "**Trust Contribution**"). On the Effective Date, Fulton Sales will make the Fulton Sales Reimbursement Payment to the Reorganized Debtor. Further, on the Effective Date, but after the Trust Contribution and the Fulton Sales Reimbursement Payment, the Fulton Family Trust will, in turn, contribute all of the stock of Fulton Sales to the Reorganized Debtor (the "**Fulton Sales Stock Contribution**"). Subsequent to the Effective Date, pursuant to a contractual plan of reorganization (the "**Tax Plan**"), Reorganized Debtor will make an election to treat Fulton Sales as a qualified subchapter S subsidiary (the "**Q-Sub Election**"), effective as of the Fulton Sales Stock Contribution.

It is anticipated that the implementation of the Tax Plan (i.e., the Fulton Sales Stock Contribution and the Q-Sub Election), when viewed together, will qualify as a tax-free reorganization under both Code Section 368(a)(1)(D) and Code Section 368(a)(1)(G) (the "**Tax Reorganization**"). However, when a reorganization qualifies under both Code Section 368(a)(1)(D) and Code Section 368(a)(1)(G), Code Section 368(a)(3)(C) treats such reorganization as a tax-free reorganization under Code Section 368(a)(1)(G), other than for purposes of Code Section 357(c)(1). Code Section 357(c)(1) provides that the transferor is required to recognize gain if the sum of the amount of liabilities assumed exceeds the total of the adjusted basis of the property transferred. Code Section 357(c)(1)(B) limits the application of

the gain recognition rule to exchanges to which Code Section 351 applies or to divisive reorganizations under Code Section 368(a)(1)(D). Because the Tax Plan also qualifies as an acquisitive reorganization under Code Section 368(a)(1)(D), and such reorganization is not a divisive reorganization under Code Section 368(a)(1)(D), the gain recognition rule under Code Section 357(c)(1) is inapplicable.

Accordingly, the Tax Reorganization will qualify as a tax-free reorganization under Code Section 368(a)(1)(G) and neither the Debtor nor Fulton Sales, or their respective shareholders should recognize gain or loss due to the implementation of the Tax Plan. Fulton Sales, due to the Q-Sub Election, will be a disregarded entity and all of its assets and liabilities will be treated as the Debtor's.

**B.      Tax Consequences to the Holders of Equity Interests**

As discussed above in the section titled "Tax Consequences to the Debtor", because of the Debtor's S Status, any Tax Items recognized by the Debtor in connection with the transactions contemplated by the Plan will be passed through to the holders of the Equity Interests.

See the discussion in section A.1, above, regarding the effects of the Debtor recognizing COD income in connection with the Plan.

See the discussion in section A.3, above, regarding the effects of the Tax Reorganization. Subsequent to the Q-Sub Election, Fulton Sales' Tax Items will be treated as the Debtor's and, thus, will ultimately be passed through to the holders of the Equity Interests.

**The holders of the Equity Interests are strongly urged to consult their own tax advisor (including their own estate and gift tax advisor) regarding the Tax Consequences of the transactions described in this Disclosure Statement and in the Plan.**

**C.      Tax Consequences to the Creditors who Hold Debt Instruments (other then the Fulton Unsecured Claim)**

The following discusses certain Tax Consequences of the transactions contemplated by the Plan to Creditors that are "United States holders," as defined below, who hold debt instruments. The Tax Consequences of the transactions contemplated by the Plan to Creditors (including the character, timing and amount of income, gain or loss recognized) will depend on, among other things: (1) whether the Claim and the consideration received in respect of it are "securities" for Tax Purposes; (2) the manner in which a Creditor acquired a Claim; (3) the length of time the Claim has been held; (4) whether the Claim was acquired at a discount; (5) whether the Creditor has taken a bad debt deduction with respect to the Claim (or any portion of it) in the current tax year or any prior tax year; (6) whether the Creditor has previously included in its taxable income accrued but unpaid interest with respect to the Claim; and (7) whether the Claim is an installment obligation for Tax Purposes. Creditors, therefore, should consult their own tax advisors regarding the particular Tax Consequences to them of the transactions contemplated by the Plan.

For purposes of the following discussion, a "United States holder" is a Creditor that is: (1) a citizen or individual resident of the United States; (2) a partnership, limited liability company, or corporation created or organized in the United States or under the laws of the United States, a political subdivision of the United States, or a State of the United States; (3) an estate whose income is subject to United States federal income taxation regardless of its source; or (4) a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust, or (ii) the trust was in existence on August 20, 1996, and properly elected to be treated as a United States person.

1. Characterization of the Creditors' Claims

   (a)     Class 1 and 4.

Under the Plan, Creditors in Class 1 and 4 will receive Cash payments in exchange for the full and final satisfaction of their Claims. Under such circumstances, a Creditor in Class 1 or 4 whose Claim constitutes a debt instrument will generally recognize gain or loss in an amount equal to the amount of the Cash payments received and the Creditor's adjusted tax basis in such Claim. See Section C.2, below, for discussion regarding the character of the Creditor's gain or loss.

   (b)     Class 3

Under the Plan, Creditors in Class 3 will receive the Bank Group Effective Date Cash Payment and the Debtor's New Debt (as such term is defined in Section A.1, above) in exchange for the full and final satisfaction of their Claims. As a result, a Creditor will be treated as having exchanged its Claim for the Bank Group Effective Date Cash Payment and the Debtor's New Debt. Under such circumstances, a Creditor will generally recognize gain or loss in an amount equal to the difference between the Creditor's amount realized (generally, the collective amount of the Bank Group Effective Date Cash Payment and the issue price of the Debtor's New Debt) and the Creditor's adjusted tax basis in such Claim. The Creditor's initial tax basis in the Debtor's New Debt will generally be equal to the issue price of the Debtor's New Debt. See Section C.2, below, for discussion regarding the character of the Creditor's gain or loss.

2. Character of the Creditors' Gain or Loss

The character of a Creditor's gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors which vary depending on a Creditor's particular circumstances. Such factors include the nature of such Claim as held by the Creditor, whether such Claim constitutes a capital asset in the hands of the Creditor, whether such Claim was purchased at a discount, whether any amount received in respect of such Claim constitutes accrued interest, whether interest will be imputed to the payment arrangements of Class 1 and 4 Creditor's whose Claims constitute a debt instrument, and whether and to what extent the Creditor has previously claimed a bad debt deduction with respect to such Claim. A Creditor who recognizes a loss on a transaction conducted under the Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year.

3. Accrued Interest

A Creditor who has not previously included accrued interest into taxable income will be required to recognize ordinary income equal to the portion of either (i) a Cash payment; or (ii) the issue price of the Debtor's New Debt, as applicable, that is allocable to accrued interest, regardless of whether that Creditor realizes an overall gain or loss as a result of the exchange of its existing Claims. A Creditor who has included such accrued interest into taxable income generally may take an ordinary deduction to the extent that such Claim is not fully satisfied under the Plan (after allocating between principal and accrued interest), even if the underlying Claim is held as a capital asset. It is not clear the extent to which a portion of either (i) a Cash payment; or (ii) the issue price of the Debtor's New Debt, as applicable, will be properly allocable to accrued interest.

**Creditors are advised to consult their own tax advisors to determine the extent any portion of either (i) a Cash payment; or (ii) the issue price of the Debtor's New Debt, as applicable, is allocable to accrued interest.**

4.            Adequately Stated Interest

Generally, it is anticipated that the Debtor's New Debt will have an interest rate that is equal to or in excess of the IRS provided applicable federal rate (hereinafter, the "AFR"). However, if the interest rate of the Debtor's New Debt becomes lower than the AFR (which could result from a subsequent increase in the AFR), a Creditor will be treated as receiving additional interest equal to the amount of "foregone interest." For this purpose, "foregone interest" would be equal to the difference between the amount of interest the Creditor would have received if the interest rate of the Debtor's New Debt was equal to the AFR, and the amount of interest payable on the Debtor's New Debt.

5.            Market Discount

In general, a debt obligation, other than one with a fixed maturity of one year or less, that is acquired by a holder in the secondary market (or, in certain circumstances, on original issuance) is a "market discount bond" as to that holder if the obligation's stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the holder's adjusted tax basis in the debt obligation immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount. To the extent that a Creditor has not previously included market discount in its taxable income, gain recognized by a Creditor on the disposition of a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the Creditor's period of ownership. A holder of a market discount bond that is required to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to deduct such interest, in whole or in part, on the disposition of such bond. In addition, any partial principal payment received by a Creditor that is attributable to a market discount bond will generally be treated as ordinary interest income to the extent such payment does not exceed the market discount accrued on such bond during the Creditor's period of ownership.

6.            Original Issue Discount

The original issue discount ("OID") rules provide an extremely detailed and complex method for determining and taxing the interest components of debt instruments, including any Claims treated as debt instruments and the Debtor's New Debt. A holder of a debt instrument containing OID must include a portion of the OID in gross income in each taxable year in which the holder holds the debt instrument, regardless of whether any cash payments are received. OID is defined as the difference between the issue price and the stated redemption price at maturity of a debt instrument. As the OID rules are extremely complex, it is not certain how they will apply to the transactions contemplated by the Plan. Accordingly, each Creditor must consult its own tax advisor.

7.            Other Claimholders

If a Creditor reaches an agreement with the Chapter 11 Trustee or the Debtor to have its Claim satisfied, settled, released, exchanged, or otherwise discharged in a manner other than as described in the Plan, that Creditor should consult with its own tax advisors regarding the Tax Consequences of that satisfaction, settlement, release, exchange, or discharge.

**D.        Tax Consequences to the Creditors who have Performed Services**

The following discusses certain Tax Consequences of the transactions contemplated by the Plan to Creditors in Class 1 and 4 who performed services under a contractual arrangement with the Debtor (the "Service Creditors"). The Tax Consequences of the transactions contemplated by the Plan to the

Service Creditors (including the character, timing and amount of income, gain or loss recognized) will depend on, among other things: (1) whether the Service Creditors' Claim constitutes the right to receive income; (2) whether the Service Creditors' Claim constitutes a property right; and (3) whether the Service Creditors' Claim constitutes a debt instrument.

If the Service Creditors' Claim constitutes the right to receive income, the timing of the Tax Items recognized by such Service Creditors will depend on, among other things, the Service Creditors' method of accounting (including whether the Claim results from a "long-term contract" as such term is defined by Code Section 460(f)). If the Service Creditors' Claim constitutes a property right, such Service Creditors would generally recognize gain or loss in an amount equal to the amount of the Cash payments received and the Service Creditors' adjusted tax basis in such Claim. Lastly, the Tax Consequences of the Service Creditors whose Claims constitute a debt instrument are discussed in Section C, above.

**The Service Creditors are strongly urged to consult their own tax advisor regarding the Tax Consequences of the transactions described in this Disclosure Statement and in the Plan.**

### E. Tax Consequences to the Creditors who are a State, or Political Subdivision Thereof

Under the Plan, Creditors in Class 2 and 5 will receive Cash payments in exchange for the full and final satisfaction of their Claims. Generally speaking, under Code Section 115, income from the exercise of an essential governmental function is excluded from the gross income of any state, or political subdivision thereof. Accordingly, it is anticipated that Creditors in Class 2 and 5 will not be subject to United States federal income tax upon the receipt of a Cash payment under the Plan.

### F. Tax Consequences for the Fulton Unsecured Claim

As explained above, on the Effective Date, the Fulton Family Trust will convert the Fulton Unsecured Claim into equity in the Reorganized Debtor. Assuming the "meaningless gesture" doctrine as described in Rev. Rul. 64-155, 1964 C.B. 138, applies, such a conversion of the Fulton Unsecured Claim would be treated as a tax-deferred contribution of capital under Code Section 351.

Lastly, the Debtor satisfied all accrued interest on the Fulton Unsecured Claim on the Petition Date. As a result, it is anticipated that neither Ira and Mary Lou Fulton nor the Fulton Family Trust would recognize accrued interest into taxable income upon the conversion of the Fulton Unsecured Claim. However, in the event interest on the Fulton Unsecured Claim has accrued on the Effective Date, either Ira and Mary Lou Fulton or the Fulton Family Trust, as applicable, may be required to include the accrued but unpaid interest into taxable income. Further, it is unclear whether the deemed payment of the accrued interest would have to be capitalized. Thus, it is unclear whether the Reorganized Debtor would be able to currently deduct the deemed payment of interest. See Section C.3, above, for additional discussion of accrued interest.

**The holders of the Fulton Unsecured Claim are strongly urged to consult their own tax advisors (including their own estate and gift tax advisor) regarding the Tax Consequences of converting the Fulton Unsecured Claim into equity in the Reorganized Debtor.**

### G. Information Reporting and Backup Withholding

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. These reportable payments do not include those that give rise to gain or loss on the exchange of a Claim. Moreover, such reportable

payments are subject to backup withholding under certain circumstances. A United States holder may be subject to backup withholding at rate of 28 percent with respect to certain distributions or payments of accrued interest, market discount, or similar items pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a United States person, the taxpayer identification number is correct, and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Payments that give rise to gain or loss on the exchange of a Claim are not subject to backup withholding.

Backup withholding is not an additional tax. Amounts subject to backup withholding are credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess backup withholding by filing an appropriate claim for refund with the IRS.

## XXI. IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON THE PARTICULAR CIRCUMSTANCES OF THE DEBTOR, EACH HOLDER OF AN EQUITY INTEREST AND THE CREDITORS. ACCORDINGLY, ANYONE AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.**

### A. IRS CIRCULAR 230 NOTICE

**TO COMPLY WITH UNITED STATES TREASURY REGULATIONS, BE ADVISED THAT ANY UNITED STATES FEDERAL TAX ADVICE INCLUDED IN THIS COMMUNICATION (AND IT IS NOT INTENDED THAT ANY SUCH ADVICE BE GIVEN IN THIS DISCLOSURE STATEMENT) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, TO AVOID ANY UNITED STATES FEDERAL TAX PENALTIES OR TO PROMOTE, MARKET, OR RECOMMEND TO ANOTHER PARTY ANY TRANSACTION OR MATTER.**

## XXII. DETERMINATION OF CLAIMS

### A. Objections to Claims

Notwithstanding the occurrence of the Effective Date, and except as to any Claim that has been Allowed before the Effective Date, the Reorganized Debtor may object to the allowance of any Claim against the Debtor or seek estimation of any Claim on any grounds permitted by the Bankruptcy Code. All objections to Claims filed by the Debtor or Reorganized Debtor must be brought by filing the appropriate pleading in the Bankruptcy Court before the first Business Day that is 180 days after the Effective Date, but the Bankruptcy Court may approve a later date on the Reorganized Debtor's motion filed (but not necessarily heard) before the first Business Day that is 180 days after the Effective Date.

### B. Distributions on Allowance or Disallowance of Disputed Claims

No distributions shall be made to any holder of a Claim unless and until the Claim becomes an Allowed Claim. If a Claim is not an Allowed Claim as of the Effective Date, distributions on account of that Claim shall commence only when the Claim becomes an Allowed Claim after the Effective Date or as otherwise specifically provided in the Plan. If a Disputed Claim becomes an Allowed Claim, the Reorganized Debtors shall make a distribution in accordance with the terms of the Plan applicable to Claims of the Class in which that Claim resides.

### C. Contingent Claims

Until a Contingent Claim becomes an Allowed Claim or is Disallowed, the Claim shall be treated as a Disputed Claim for all purposes under the Plan. The holder of a Contingent Claim shall be entitled to a distribution under the Plan only when the Contingent Claim becomes an Allowed Claim. Any Contingent Claim for reimbursement or contribution held by a Person that may be liable with a Debtor on a Claim of a Creditor is Disallowed as of the Effective Date if: (a) that Creditor's Claim is Disallowed; (b) the Claim for reimbursement or contribution is contingent as of the Effective Date; or (c) that Person asserts a right of subrogation to the rights of the Creditor under Bankruptcy Code § 509.

## XXIII. EXECUTORY CONTRACTS

The executory contracts and unexpired leases between the Debtor and any Person are dealt with as follows:

### A. Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, the Debtor's executory contracts or unexpired leases listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" in the Plan Supplement or not assumed or rejected pursuant to a Bankruptcy Court order prior to the Effective Date shall be deemed rejected pursuant to Sections 365 and 1123 of the Bankruptcy Code, except for those executory contracts or unexpired leases: (1) listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement; (2) that are the subject of a motion to assume or reject pending on the Effective Date (in which case the such assumption or rejection and the effective date thereof shall remain subject to a Bankruptcy Court order); (3) that are subject to a motion to reject with a requested effective date of rejection after the Effective Date; or (4) that are otherwise expressly assumed or rejected pursuant to the Plan. Entry of the Confirmation Order shall constitute a Final Order approving the assumption or rejection of such executory contracts or unexpired leases as set forth in the Plan, all pursuant to Sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of such executory contracts and unexpired leases in the Plan are effective as of the Effective Date. Each such executory contract and unexpired lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party prior to the Effective Date shall revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the Reorganized Debtor reserves the right to alter, amend, modify, or supplement the schedules of executory contracts or unexpired leases identified in the Plan Supplement at any time through and including fifteen days after the Effective Date.

### B. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

1.      Designation of Cure Amount. With respect to the Debtor's executory contracts or unexpired leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Debtor shall have designated a proposed Cure Amount, and the assumption of such executory contract or

unexpired lease may be conditioned upon the disposition of all issues with respect to Cure in a manner satisfactory to the Debtor or the Reorganized Debtor. Any provision or terms of the Debtor's executory contracts or unexpired leases to be assumed pursuant to the Plan that are or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure.

2.  Disagreement with Cure Amount. Except with respect to executory contracts and unexpired leases for which the Debtor and the applicable counterparties have stipulated in writing to payment of a Cure Amount, all requests for payment of Cure that differ from the amounts proposed by the Debtor must be Filed with the Bankruptcy Court and served on the Debtor on or before the Cure Bar Date. Any request for a Cure Payment that is not timely Filed shall be disallowed automatically and forever barred from assertion and shall not be enforceable against the Reorganized Debtor, without the need for any objection by the Reorganized or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtor of the amounts listed on the Debtor's proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided, however, that nothing shall prevent the Reorganized Debtor from paying any Cure Amount despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtor also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

3.  Resolution of Cure Amount. If the Reorganized Debtor objects to any requested Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Cure Amount and any related issues. If there is a dispute regarding such Cure Amount, the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" within the meaning of Section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Reorganized Debtor and the counterparty to the executory contract or unexpired lease. Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption of any executory contract or unexpired lease will be deemed to have consented to such assumption. The Reorganized Debtor reserves the right either to reject or nullify the assumption of any executory contract or unexpired lease no later than thirty days after a Final Order determining the Cure Amount or any request for adequate assurance of future performance required to assume such executory contract or unexpired lease or any other matter relating to assumption.

4.  Claims Related to Cure. Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption. Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice, other than notice to the other party to such contract or lease of such disallowance and expungement, or action, order, or approval of the Bankruptcy Court.

C.  **Pre-Existing Obligations to the Debtor under Executory Contracts and Unexpired Leases**

Rejection of any executory contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtor under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtor expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to

provide, warranties or continued maintenance obligations on goods previously purchased by the Debtor or the Reorganized Debtor, as applicable, from counterparties to rejected or repudiated executory contracts.

### D. Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Debtor's executory contracts and unexpired leases pursuant to the Plan or otherwise must be Filed with the Bankruptcy Court and served on the Debtor or Reorganized Debtor, as applicable, no later than thirty days after the later of the Effective Date or the date of any notice of rejection. Any Proofs of Claim arising from the rejection of the Debtor's executory contracts or unexpired leases that are not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against the Reorganized Debtor without the need for any objection by the Reorganized Debtor or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtor's executory contracts and unexpired leases shall be classified as Rejection Damages Claims and shall be treated in accordance with Article 4.4 of the Plan.

### E. Modification of Executory Contracts and Unexpired Leases Containing Equity Ownership Restrictions

All executory contracts and unexpired leases to be assumed under the Plan pursuant to Section 365 and 1123 of the Bankruptcy Code shall be deemed so assumed, without giving effect to any provisions contained in such executory contracts or unexpired leases restricting the change in control or ownership interest composition of any or all of the Debtor, and upon the Effective Date (1) any such restrictions shall be deemed of no further force and effect and (2) any breaches that may arise thereunder as a result of Confirmation or Consummation shall be deemed waived by the applicable non-Debtor counterparty.

### F. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and all executory contracts and unexpired leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### G. Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtor that any such contract or lease is in fact an executory contract or unexpired lease or that the Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired lease at the time

of assumption or rejection, the Debtor shall have thirty days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### H.      Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to Section 365(d)(4) of the Bankruptcy Code

## XXIV.  MODIFICATION OF PLAN

In addition to its modification rights under §1127 of the Bankruptcy Code, the Debtor may amend or modify its Plan at any time prior to Confirmation without leave of the Bankruptcy Court.  The Debtor or the Reorganized Debtor may propose amendments and/or modifications of its Plan at any time subsequent to Confirmation with leave of the Bankruptcy Court and upon notice to Creditors.  After Confirmation of the Plan, the Debtor or the Reorganized Debtor may, with approval of the Bankruptcy Court, as long as it does not materially or adversely affect the interests of Creditors, remedy any defect or omission or reconcile any inconsistencies of the Plan, or in the Confirmation Order, if any may be necessary to carry out the purposes and intent of the Plan.

## XXV.   CONDITIONS PRECEDENT

### A.      Conditions to Confirmation

The following are conditions precedent to confirmation of the Plan that must be satisfied or waived in accordance with Article 12.3 of the Plan:

(a)      The Bankruptcy Court shall have approved by Final Order a Disclosure Statement with respect to the Plan in form and substance acceptable to the Debtor in its sole and absolute discretion.

(b)      The Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance acceptable to the Debtor.

(c)      The New Loan Documents shall be in form and substance acceptable to the Debtor..

### B.      Conditions to the Effective Date.

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with Article 12.3 of the Plan:

(a)      The Bankruptcy Court shall have entered one or more orders (which includes the Confirmation Order) authorizing the assumption and rejection of unexpired leases and executory contracts by the Debtor as contemplated by Article VIII of the Plan.

(b)      The Confirmation Order shall be a Final Order, the Confirmation Date shall have occurred, and no request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

(c)      Each Exhibit, document or agreement to be executed in connection with the Plan shall be in form and substance reasonably acceptable to the Debtor.

### C. Waiver of Conditions

The Debtor or the Reorganized Debtor, as applicable, may waive any condition to confirmation or the Effective Date, in whole or in part, at any time, without any notice to parties-in-interest and without further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan, provided, however, that the conditions to consummation set forth in Article 12.1(a) and 12.1(b), and the condition to the Effective Date set forth in Article 12.2(a) of the Plan, may not be waived by the Debtor.

## XXVI. POST-EFFECTIVE DATE FEES; FINAL DECREE

The Reorganized Debtor shall be responsible for paying any post-Effective Date fees under 28 U.S.C. § 1930(a)(6) and filing post-confirmation reports until the Bankruptcy Court enters a final decree, which shall be as soon as practicable after distributions under the Plan have commenced. Notice of application for a final decree need be given only to those holders of Claims and Equity Interests and other parties that, after the Effective Date, specifically request such notice.

## XXVII. RETENTION OF JURISDICTION

Pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and the Plan, including, among others, the following matters:

(a) to hear and determine motions for (i) the assumption or rejection or (ii) the assumption and assignment of executory contracts or unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid;

(b) to adjudicate any and all adversary proceedings, applications and contested matters that may be commenced or maintained pursuant to the Chapter 11 Case or the Plan, proceedings to adjudicate the allowance of Disputed Claims and all controversies and issues arising from or relating to any of the foregoing;

(c) to ensure that distributions to Allowed Claimholders are accomplished as provided herein;

(d) to hear and determine any and all objections to the allowance or estimation of Claims filed, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to allow or disallow any Claim, in whole or in part;

(e) to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified and/or vacated;

(f) to issue orders in aid of execution, implementation, or consummation of the Plan;

(g) to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(h)　　to hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under the Plan or under Sections 330, 331, 503(b), 1103 and 1l29(a)(4) of the Bankruptcy Code;

(i)　　to determine requests for the payment of Claims entitled to priority under Section 507(a)(l) of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

(j)　　to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order including disputes arising under agreements, documents or instruments executed in connection with the Plan;

(k)　　to hear and determine all suits or adversary proceedings to recover assets of the Debtor and property of the Estate, wherever located;

(l)　　to hear and determine matters concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code;

(m)　　to hear any other matter not inconsistent with the Bankruptcy Code;

(n)　　to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

(o)　　to enter a final decree closing the Chapter 11 Case; and

(p)　　to enforce all orders previously entered by the Bankruptcy Court.

(q)　　to enter an order concluding and terminating this case.

## XXVIII.　　__RETENTION AND ENFORCEMENT OF CLAIMS__

### A.　　Retention and Reservation

In accordance with Bankruptcy Code § 1123(b)(3), all Preserved Litigation Claims are retained and reserved for each of the Reorganized Debtor, which are designated as the Estate's representative under Bankruptcy Code § 1123(b)(3)(B) for purposes of the Preserved Litigation Claims.

### B.　　Prosecution

The Reorganized Debtor shall have the authority to prosecute, defend, compromise, settle, and otherwise deal with any Preserved Litigation Claims, and the Reorganized Debtor shall do so in its capacity as a representative of the Estate in accordance with Bankruptcy Code § 1123(b)(3)(B). The Reorganized Debtor shall pay the fees and costs associated with litigating the Preserved Litigation Claims in the ordinary course of business. The Reorganized Debtor shall have sole discretion to determine in its business judgment which Preserved Litigation Claims to pursue, which to settle, and the terms and conditions of those settlements.

## XXIX.  MISCELLANEOUS PROVISIONS

### A.  Effecting Documents, Further Transactions, Timing

The Debtor, the Reorganized Debtor, the Administrative Agent, the Bank Group, and all other parties to the Plan Documents are authorized and directed as of the Effective Date, and without further order of the Bankruptcy Court, to execute, deliver, file, or record all Plan Documents and other contracts, instruments, releases, and other agreements or documents, and to take all actions necessary or appropriate to effect and further evidence the terms of the Plan. All transactions required to occur on the Effective Date under the terms of the Plan are deemed to have occurred simultaneously.

### B.  Binding Effect.

The Plan is binding on, and inures to the benefit of, the Debtor and the holders of all Claims and Equity Interests, and their respective successors and assigns.

### C.  Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable or as provided in any document entered into in connection with the Plan, the rights, duties and obligations of the Debtor and any other Person arising under the Plan are governed by, and construed and enforced in accordance with, the internal laws of the State of Arizona, without giving effect to Arizona's choice of law provisions.

### D.  Modification and Treatment of Claims.

The Reorganized Debtor reserves the right to modify the treatment of any Allowed Claim in any manner adverse only to the holder of that Claim at any time after the Effective Date on that holder's prior written consent.

### E.  Setoffs and Recoupment

The Debtor and the Reorganized Debtor may, but are not required to, set off or recoup against any Claim or Equity Interest and the payments or other distributions to be made under the Plan in respect of such Claim, Claims of any nature that arose before the Petition Date that the Debtor may have against the holder of such Claim or Equity Interest to the extent such Claims may be set off or recouped under applicable law, but neither the failure to do so nor the fact of any Claim or Equity Interest under the Plan becoming Allowed constitutes a waiver or release by the Debtor or the Reorganized Debtor of any such claim that they may have against such holder.

### F.  Severability.

If the Bankruptcy Court finds the Plan or any provision of the Plan to be invalid, illegal or unenforceable, or if the Bankruptcy Court cannot confirm the Plan under Bankruptcy Code § 1129, the Bankruptcy Court, at the request of the Debtor or the Reorganized Debtor, may retain the power to alter and interpret the Plan or any such provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the provision held to be invalid or unenforceable, and such provision shall then become applicable as altered or interpreted. The Confirmation Order constitutes a judicial determination and provides that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable.

G.      **Plan Documents.**

Notwithstanding anything to the contrary contained in the Plan, including any reference in the Plan to documents in the forms annexed to the Plan as exhibits, the Debtor may revise any Plan Document (a) by filing such revised Plan Document with the Bankruptcy Court more than ten days before the deadline for voting on the Plan, or (b) with the written consent of all parties in interest that are entitled to vote on the Plan and are materially and adversely affected by such revision.

H.      **Inconsistency.**

If any inconsistency between the Plan and the Disclosure Statement exists, the provisions of the Plan govern. If any inconsistency between the Plan and any Plan Document exists, the provisions of the Plan Document govern.

I.      **Subordination**

The distributions under the Plan take into account the relative priority of each Claim in connection with any contractual subordination provisions relating to such Claim. Accordingly, distributions under the Plan are not and may not be subject to levy, garnishment, attachment, or other legal process by any holder of a Claim or Equity Interest purporting to be entitled to the benefits of such contractual subordination, and all such holders are deemed to have waived all contractual subordination rights they otherwise may have had.

J.      **Withholding and Reporting Requirements**

In connection with the Plan and all instruments issued in connection with the Plan, the Debtor or the Reorganized Debtor, as the case may be, must comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions under the Plan remain subject to any such withholding and reporting requirements. The Debtor and the Reorganized Debtor, as the case may be, may take all actions necessary to comply with such withholding and reporting requirements. Notwithstanding any other provision of the Plan, each holder of an Allowed Claim or Allowed Equity Interest that has received a distribution under the Plan has sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding, and other tax obligation on account of such distribution.

K.      **IRS Circular 230 Notice.**

Any U.S. federal tax descriptions or advice included in the Plan is not intended or written to be used, and cannot be used, to avoid any U.S. federal tax penalties, or to promote, market or recommend to another party any transaction or matter.

L.      **Method of Payment; Payments, Filings and Notices Only on Business Days.**

Payments of Cash under the Plan must be made by check drawn on a domestic bank or by wire transfer from a domestic bank. Whenever any payment, distribution, filing, delivery, or notice to be made under the Plan is due on a day other than a Business Day, such payment, distribution, filing, delivery, or notice may instead be made, without interest or penalty, on the immediately following Business Day.

## XXX.  RISKS

The restructuring of the Debtor involves a degree of risk, and this Disclosure Statement and the Plan and certain of their Exhibits contain forward-looking statements that involve risks and uncertainty. The Reorganized Debtor's actual results could differ materially from those anticipated in such forward-looking statements as a result of a variety of factors, including those set forth in the following risk factors and elsewhere in this Disclosure Statement.  Holders of Claims should consider carefully the following factors, in addition to the other information contained in this Disclosure Statement, before submitting a vote to accept or reject the Plan.

### A.  Homebuilding Industry

Economic Conditions

The residential homebuilding industry is sensitive to changes in economic conditions and other factors, such as the level of employment, consumer confidence, consumer income, availability of financing, and interest rate levels.  While the Debtor believes that Reorganized Debtor will be successful given the terms of the Plan, adverse changes in any of these conditions generally, or in the markets where Reorganized Debtor operates, could decrease demand and pricing for new homes in these areas or result in customer cancellations of pending contracts, which could adversely affect the projections that were used to create the Plan and could result in a decrease in revenues and earnings and would adversely affect the financial condition of Reorganized Debtor.

Moreover, the homebuilding industry has recently been impacted by lack of consumer confidence, decreased housing affordability, rising unemployment, a significant increase in the number of foreclosed homes, and large supplies of resale and new home inventories which resulted in an industry-wide softening of demand for new homes.  As a result of these factors, many homebuilders have experienced significant decreases in our revenues and profitability and incurred substantial impairments of land and certain other assets.  While it is impossible to predict the duration or the severity of the current market conditions, the Debtor believes that the Reorganized Debtor will be able to meet its obligations under the Plan.

Mortgage Industry

Housing demand is adversely affected by the lack of availability of mortgage financing and increases in interest rates.  Increased cancellations could increase the available homes inventory supply, which may reduce prices and reduce the availability of future financing for homebuyers.  Most homebuyers finance their home purchases through third-party lenders providing mortgage financing.  If mortgage interest rates increase and, consequently, the ability of prospective buyers to finance home purchases is adversely affected, home sales, gross margins and cash flow may also be adversely affected and the impact may be material.

Homebuilding activities depend, in part, upon the availability and costs of mortgage financing for buyers of homes owned by potential customers, as those customers (move-up buyers) often must sell their residences before they purchase new homes.  Mortgage lenders have recently become subject to more intense underwriting standards by the regulatory authorities which oversee them as a consequence of the sub-prime mortgage market failures, among other reasons.  More stringent underwriting standards could have a material adverse effect on the homebuilding business if certain buyers are unable to obtain mortgage financing.  Additionally, the recent lack of liquidity in both the national and global financial markets further intensified the limited availability of financing for mortgage lenders, even for those who

are not impacted by the stricter underwriting standards. A prolonged tightening of the financial markets would also negatively impact the homebuilding business.

<u>Land Acquisition</u>

The homebuilding industry is highly competitive for suitable land. The availability of finished and partially finished developed lots and undeveloped land for purchase that meet the assumptions used for the Plan depends on a number of factors outside the control of the Reorganized Debtor, including land availability in general, competition with other homebuilders and land buyers for desirable property, inflation in land prices, zoning, allowable housing density, and other regulatory requirements. Should suitable lots or land become less available, the number of homes the Reorganized Debtor may be able to build and sell could be reduced, and the cost of land could be increased, perhaps substantially, which could adversely impact operations.

The Reorganized Debtor's long-term ability to build homes depends on its ability to acquire land suitable for residential building at reasonable prices in locations where it wants to build. As competition for suitable land increases, and as available land is developed, the cost of acquiring suitable remaining land could rise, and the availability of suitable land at acceptable prices may decline. Any land shortages or any decrease in the supply of suitable land at reasonable prices could limit the Reorganized Debtor's ability to develop new communities or result in increased land costs, which could adversely impact Reorganized Debtor's revenues, earnings, and margins.

<u>Labor and Materials</u>

The homebuilding industry is highly competitive for skilled labor and materials. Increased costs or shortages of skilled labor and/or lumber, framing, concrete, steel, and other building materials could cause increases in construction costs and construction delays that cannot be passed on to those customers who have already entered into sale contracts as those sales contracts generally fix the price of the home at the time the contract is signed, which may be well in advance of the construction of the home. Sustained increases in construction costs may, over time, erode margins, and pricing competition for materials and labor that may not be passed on to homebuyers.

The Reorganized Debtor will depend on the continued availability of and satisfactory performance by these subcontractors for the design and construction of its homes. There can be no assurance that there will be sufficient availability of and satisfactory performance by these unaffiliated third-party subcontractors. In addition, inadequate subcontractor resources could have a material adverse affect on the Reorganized Debtor's business.

<u>Warranty and Liability Claims</u>

Homebuilders are subject to home warranty and construction defect claims arising in the ordinary course of business. Homebuilders record warranty and other reserves for the homes they sell based on historical experience in the respective markets based on the qualitative risks associated with the types of homes built. The Reorganized Debtor will have, and require the majority of its subcontractors to have, general liability, property, errors and omissions, workers compensation, and other business insurance. These insurance policies protect against a portion of the risk of loss from claims, subject to deductibles, and other coverage limits. Because of the uncertainties inherent to these matters, however, the Reorganized Debtor cannot provide assurance that such insurance coverage and reserves will be adequate to address all warranty and construction defect claims in the future. Contractual indemnities can be difficult to enforce and some types of claims may not be covered by insurance or may exceed applicable coverage limits. Additionally, the coverage offered by and the availability of general liability insurance

for construction defects are currently limited and costly. There can be no assurance that coverage will not be further restricted and become more costly.

**B.      Reorganization Factors**

Financial Considerations

As with any plan of reorganization or other financial transaction, there are certain risk factors that must be considered. All risk factors cannot be anticipated, some events will develop in ways that were not foreseen, and many or all of the assumptions that have been used in connection with this Disclosure Statement and the Plan will not be realized exactly as assumed. Some or all of such variations may be material. While efforts have been made to be reasonable in this regard, there can be no assurance that subsequent events will bear out the analyses set forth in this Disclosure Statement. Holders of Claims and Equity Interests should be aware of some of the principal risks associated with the contemplated reorganization:

•        There is a risk that one or more of the required conditions or obligations under the Plan or the Plan Documents will not occur, be satisfied or waived, as the case may be, resulting in the inability to confirm the Plan.

•        The total amount of all Claims filed in the Chapter 11 Cases may materially exceed the estimated amounts of Allowed Claims assumed in the development of the Plan, in the valuation estimates provided above. The actual amount of all Allowed Claims in any Class may differ significantly from the estimates provided in this Disclosure Statement. Accordingly, the amount and timing of the distributions that will ultimately be received by any particular holder of an Allowed Claim in any Class may be materially and adversely affected if the estimates are exceeded as to any Class.

•        A number of other uncertainties may adversely affect the Reorganized Debtor's future operations including, without limitation, economic recession, lumber prices, increased competition, adverse regulatory agency actions, acts of God, or similar circumstances. Many of these factors will be substantially beyond the Reorganized Debtor's control, and a change in any factor or combination of factors could have a material adverse effect on the Reorganized Debtor's financial condition, cash flows, and results of operations.

•        There can be no assurance that the Reorganized Debtor will be able to continue to generate sufficient funds to meet its obligations and necessary capital expenditures. Although Reorganized Debtor's financial projections assume that Reorganized Debtor will generate sufficient funds to meet its working capital needs for the foreseeable future on a stand-alone basis, its ability to gain access to additional capital, if needed, cannot be assured, particularly in view of possible competitive factors and industry conditions.

Risk of Non-Confirmation of the Plan

Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications of the Plan will not be required for confirmation, that such negotiations would not adversely affect the holders of Allowed Claims and Equity Interests, or that such modifications would not necessitate the re-solicitation of votes.

# XXXI. RECOMMENDATION AND CONCLUSION

### A.       Hearing On and Objection to Confirmation

The evidentiary hearing on confirmation of the Plan has been scheduled for _____, 2010 at __:00 _.m. (MST).  The hearing may be adjourned from time to time by announcing the adjournment in open court, all without further notice to parties in interest, and the Plan may be modified by the Debtor under Bankruptcy Code § 1127 before, during, or as a result of that hearing, without further notice to parties in interest..

The time by which any objections to confirmation of the Plan must be filed with the Bankruptcy Court and received by the parties listed in the Confirmation Hearing Notice has been set for _____, 2010 at __:00 _.m. (MST).

### B.       Recommendation

The Plan provides for full distributions to creditors of the Debtor, and maximizes the value of the Debtor for distribution to creditors and holders of equity interests.  The Debtor believes that any alternative to confirmation of the Plan, such as a continuation in Chapter 11, attempts by another party in interest to file a plan, or liquidation, could result in significant delays, litigation, and costs.

**FOR THESE REASONS, THE DEBTOR URGES YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN.**

DATED this __ day of September, 2010.

**SQUIRE, SANDERS & DEMPSEY L.L.P.**

By: */s/ Sean T. Cork*_____
     Craig D. Hansen, Esq.
     Sean T. Cork, Esq.
     Kelly Singer, Esq.
     1 East Washington, Suite 2700
     Phoenix, Arizona  85004-4498

     *Counsel  to Debtor and Debtor-in-Possession*