Snell & Wilmer
——— L.L.P. ———
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| In Re: | Proceedings Under Chapter 11 |
|---|---|
| FULTON HOMES CORPORATION, | Case No.  2:09-bk-1298-GBN |
| Debtor. | |

**CREDITORS' DISCLOSURE STATEMENT CONCERNING THE
CREDITORS' PLAN OF REORGANIZATION DATED SEPTEMBER 28, 2010**

**SNELL & WILMER** L.L.P.
One Arizona Center
400 E.  Van Buren
Phoenix, AZ  85004-2202
Telephone:      (602) 382-6000
Facsimile:      (602) 382-6070
Attorneys:      Donald L.  Gaffney (#005717) dgaffney@swlaw.com
                Lori A.  Lewis (#019285) llewis@swlaw.com

Attorneys for Creditor Bank of
America, N.A., on its own and as
administrative agent for JPMorgan
Chase Bank, N.A.; Compass Bank,
on its own and as successor-in-
interest to Guaranty Bank; and Wells
Fargo, as successor-in-interest to
Wachovia Bank

Dated:  September 28, 2010

Phoenix, Arizona

12015364

**TABLE OF CONTENTS**

**Page**

I.        INTRODUCTION ................................................................................................ 1

    A.      Overview ..................................................................................................... 1

    B.      Notice of Holders of Claims and Equity Interests ................................. 2

    C.      Rules of Interpretation.............................................................................. 4

    D.      Summary of Treatment of Claims and Equity Interests under the Plan................. 5

    E.      General Voting Procedures, Ballots, and Voting Deadline.................... 11

    F.      Acceptance or Rejection of a Plan ......................................................... 13

    G.      Evidentiary Confirmation Hearing and Deadline for Objections to Confirmation .......................................................................................... 13

II.       DEFINITIONS .................................................................................................. 14

III.     THE DEBTOR, BACKGROUND, AND EVENTS PRECIPITATING THE CHAPTER 11 .................................................................................................. 14

    A.      Background .............................................................................................. 14

    B.      Business Plan and Projections................................................................ 16

    C.      Fulton Sales............................................................................................. 17

    D.      Express and Implied Warranty, Latent Defect, Customer Service, and Indemnification Obligations .................................................................. 17

    E.      Preferences, Fraudulent Conveyances, and Other Potential Causes of Action....................................................................................................... 18

    F.      Conclusion .............................................................................................. 18

IV.     SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE ............................. 18

    A.      Administrative Proceedings ................................................................... 18

    B.      Retention of Professionals...................................................................... 18

    C.      First Day Motions .................................................................................. 19

    D.      Appointment of Unsecured Creditors Committee ............................... 20

    E.      Motion to Sell and Construct Homes .................................................... 20

    F.      Motion to Pay Critical Vendor .............................................................. 20

    G.      Motion to Terminate Exclusivity .......................................................... 20

    H.      Motion to Alter or Amend Ordinary Course Order ............................ 20

    I.      Motion for Stay Relief ........................................................................... 20

    J.      Prior Plans and Disclosure Statements................................................. 20

    K.      Motions to Extend Exclusivity .............................................................. 21

    L.      Limited Injunction of Bank Group Guaranty Suit .............................. 21

Snell & Wilmer
— L.L.P. —
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

i

M. Bank Group's Summary Judgment Against Fulton Sales ..................................... 21

N. The Debtor's Motion for Alternative Dispute Resolution ................................... 22

O. The Bank Group's Motion for the Appointment of an Examiner ....................... 22

P. Retention of Squire Sanders & Odyssey .......................................................... 22

Q. Stipulated Order with the Bank Group Regarding Scheduling Matters ............... 22

R. Operating Reports ............................................................................................ 22

V. DESCRIPTION OF ASSETS AND LIABILITIES OF THE DEBTOR .................... 22

A. Assets .............................................................................................................. 22

B. Liabilities ........................................................................................................ 23

VI. PLAN SUMMARY ................................................................................................. 24

VII. TREATMENT OF UNCLASSIFIED CLAIMS ........................................................ 25

A. Unclassified Claims ......................................................................................... 25

B. Allowed Administrative Claims ....................................................................... 25

VIII. TREATMENT OF CLASSES & EQUITY INTERESTS UNDER THE PLAN ......... 26

A. Class 1 – Secured Vendor Claims .................................................................... 27

B. Class 2 – Secured Tax Claims .......................................................................... 27

C. Class 3 – Bank Group Claims .......................................................................... 27

D. Class 4 – General Unsecured Claims ............................................................... 29

E. Class 5 – Queen Creek Claims ......................................................................... 29

F. Class 6 – Unsecured Warranty Claims ............................................................. 29

G. Class 7 – Fulton Unsecured Claim ................................................................... 30

H. Class 8 – Equity Interests ................................................................................ 30

IX. SUMMARY OF THE NEW CREDIT FACILITY TO BE ISSUED
PURSUANT TO THE PLAN ................................................................................... 30

X. MEANS FOR EXECUTING THE PLAN ................................................................ 31

A. Sources of Consideration for Plan Distributions .............................................. 31

B. New Credit Facility .......................................................................................... 31

C. Fulton Sales Becomes Borrower Under New Credit Facility or Alternative ....... 31

D. Bank Group Collateral ..................................................................................... 31

E. Continued Corporate Existence ....................................................................... 32

F. Cancellation of Securities, Instruments, and Agreements ................................. 32

G. Effectiveness of New Securities, Instruments, Agreements, and Documents ...... 32

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

ii

H.    No Corporate Action Required .................................................................. 33

I.    Officers and Directors ........................................................................... 33

J.    Operations Pending Effective Date......................................................... 33

K.    Exemption from Transfer Taxes ............................................................. 33

L.    Payment of Trustee Fees ........................................................................ 34

XI.    DISTRIBUTIONS ............................................................................... 34

A.    Distributions on Account of Claims Allowed as of the Effective Date ................ 34

B.    Distribution on Account of Claims Allowed after the Effective Date ................ 34

C.    Delivery of Distributions ....................................................................... 35

D.    Fractional, De Minimis, Undeliverable, and Unclaimed Distributions ............... 36

E.    Manner of Payment Pursuant to the Plan .............................................. 37

F.    Claims Paid or Payable by Third Parties .............................................. 37

XII.    RETAINED CAUSES OF ACTION .................................................. 38

XIII.    MANAGEMENT.................................................................................. 38

XIV.    EFFECT OF CONFIRMATION ....................................................... 38

A.    Vesting of Assets ................................................................................... 38

B.    Discharge .............................................................................................. 39

C.    Discharge Injunction ............................................................................. 39

D.    Injunction .............................................................................................. 39

E.    Preservation of Insurance ...................................................................... 40

XV.    DOCUMENTATION OF PLAN IMPLEMENTATION ................... 40

XVI.    EXEMPTION FROM TRANSFER TAXES ..................................... 40

XVII.    LIQUIDATION ANALYSIS............................................................... 40

XVIII.    FEASIBILITY ANALYSIS ................................................................ 40

XIX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............ 41

A.    Tax Consequences to the Debtor............................................................ 42

B.    Tax Consequences to the Holders of Equity Interests ........................... 44

C.    Tax Consequences to the Creditors who Hold Debt Instruments ......................... 44

D.    Tax Consequences to the Creditors who have Performed Services..................... 47

E.    Tax Consequences to the Creditors who are a State or Political Subdivision Thereof .................................................................................................. 47

F.    Information Reporting and Backup Withholding ................................... 47

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

iii

XX.    IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE ............... 48

    A.    IRS CIRCULAR 230 NOTICE ............................................................ 48

XXI.    DETERMINATION OF CLAIMS ........................................................ 48

    A.    Objections to Claims .............................................................................. 48

    B.    Distributions on Allowance or Disallowance of Disputed Claims ....................... 48

    C.    Contingent Claims ............................................................................... 49

XXII.    EXECUTORY CONTRACTS ............................................................. 49

    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ........... 49

    B.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ........ 49

    C.    Pre-Existing Obligations to the Debtor under Executory Contracts and
       Unexpired Leases ................................................................................. 50

    D.    Claims Based on Rejection of Executory Contracts and Unexpired Leases .......... 51

    E.    Modification of Executory Contracts and Unexpired Leases Containing
       Equity Ownership Restrictions ................................................................ 51

    F.    Modifications, Amendments, Supplements, Restatements, or Other
       Agreements ........................................................................................ 51

    G.    Reservation of Rights ........................................................................... 51

    H.    Nonoccurrence of Effective Date ............................................................. 52

XXIII.    MODIFICATION OF PLAN .............................................................. 52

XXIV.    CONDITIONS PRECEDENT ............................................................ 52

    A.    Conditions to Confirmation .................................................................... 52

    B.    Conditions to the Effective Date ............................................................. 52

    C.    Waiver of Conditions ............................................................................ 53

XXV.    POST-EFFECTIVE DATE FEES; FINAL DECREE ............................... 53

XXVI.    RETENTION OF JURISDICTION ..................................................... 53

XXVII.    RETENTION AND ENFORCEMENT OF CLAIMS ............................... 54

    A.    Retention and Reservation ..................................................................... 54

    B.    Prosecution ........................................................................................ 54

XXVIII.    MISCELLANEOUS PROVISIONS .................................................... 55

    A.    Effecting Documents, Further Transactions, and Timing .............................. 55

    B.    Binding Effect .................................................................................... 55

    C.    Governing Law ................................................................................... 55

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

ix

D.  Modification and Treatment of Claims ............................................................... 55

E.  Setoffs and Recoupment ........................................................................................ 55

F.  Severability ............................................................................................................ 55

G.  Plan Documents ..................................................................................................... 56

H.  Inconsistency .......................................................................................................... 56

I.  Withholding and Reporting Requirements ........................................................... 56

J.  IRS Circular 230 Notice ........................................................................................ 56

K.  Method of Payment; Payments, Filings and Notices Only on Business Days...... 56

XXIX.  RISKS ............................................................................................................................ 56

A.  Homebuilding Industry .......................................................................................... 57

B.  Reorganization Factors .......................................................................................... 59

XXX.  RECOMMENDATION AND CONCLUSION ............................................................. 60

A.  Hearing On and Objection to Confirmation.......................................................... 60

B.  Recommendation .................................................................................................... 60

Snell & Wilmer
— L.L.P. —
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

# I. INTRODUCTION

## A. Overview

Bank of America, N.A., on its own and as Administrative Agent for the following banks: JPMorgan Chase Bank, N.A.; Compass Bank, on its own and as successor-in-interest to Guaranty Bank; and Wells Fargo, as successor-in-interest to Wachovia Bank (collectively, the "**Bank Group**"), the largest general unsecured creditor respectfully submits this *Disclosure Statement Relating to the Creditor Plan of Reorganization* (the "**Disclosure Statement**") for Fulton Homes Corporation, an Arizona corporation and the debtor in the above-captioned Chapter 11 case (the "**Debtor**"), pursuant to Section 1125 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**") for use in the solicitation of votes on the Bank Group's Plan of Reorganization (attached as <u>Exhibit 1</u> to this Disclosure Statement, the "**Plan**") [D.E. _____] proposed by the Bank Group. The Plan was filed with the United States Bankruptcy Court for the District of Arizona (the "**Court**") on September 28, 2010.

The following introduction and summary is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan. This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, significant events that have occurred during the Chapter 11 case, and the anticipated organization and operations of the Reorganized Debtor. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with securities to be issued under the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims and Equity Interests must follow for their votes to be counted. Certain provisions of the Plan, and thus the descriptions and summaries contained herein, may be the subject of continuing negotiations among the Bank Group, the Debtor, and other various parties, may not have been finally agreed upon, and may be modified. Such modifications, however, will not have a material effect on the distributions contemplated by the Plan.

The Bank Group is the Plan Proponent within the meaning of Section 1129 of the Bankruptcy Code. The Plan contains separate Classes and proposes recoveries for holders of Claims against, and Equity Interests in, the Debtor. After careful review of the Debtor's current business operations and its solvency, estimated recoveries in a liquidation scenario, and the prospects of ongoing business, the Bank Group has concluded that the Debtor's business and assets have significant value that would not be realized in a liquidation scenario and, as a result, the recovery to the Debtor's Creditors will be maximized by a reorganization of the Debtor as contemplated by the Plan. Therefore, the Bank Group recommends that you vote in favor of the Plan.

The Debtor has also filed and submitted to creditors a proposed plan of reorganization, which is currently in its fourth incarnation (*see Debtor's Fourth Amended Plan of Reorganization filed September 15, 2010* [D.E. 504] (the "**Debtor's Fourth Amended Plan**") and *Debtor's Fourth Amended and Supplemented Disclosure Statement Concerning the Debtor's Fourth Amended Plan of Reorganizatio*n, filed September 15, 2010 [D.E. 506] (the "**Debtor's Fourth Amended Disclosure Statement**"). The Bank Group's Plan is submitted as an alternative to the Debtor's Fourth Amended Plan and contains several advantages over the Debtor's Fourth Amended Plan, including, but not limited to:

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

- The Bank Group's Plan pays creditors in full, which includes principal, interest, default interest, and attorneys' fees and costs, whereas the Debtor's Plan only pays creditors principal and limited interest;

- The Bank Group's Plan pays all unsecured creditors other than the Bank Group the entire amount of their Allowed Claim on the Effective date, whereas the Debtor's Plan pays unsecured creditors over an extended period of time;

- The Bank Group's Plan pays creditors over a shorter period of time, three years, than the Debtor's Plan which stretches payment out over six years; and,

- Under the Bank Group's Plan, the Debtor can continue its current operations without any request to displace existing management and will be better positioned with its current land holdings to deal with the lingering economic downturn while remaining viable and financially positioned to expand in the coming years as the economy recovers.

- All current equity holders are left in place.

B.    **Notice of Holders of Claims and Equity Interests**

This Disclosure Statement is being transmitted to certain holders of Claims and Equity Interests for the purpose of soliciting votes on the Plan, and to others for informational purposes. The purpose of this Disclosure Statement is to provide adequate information to enable the holder of a Claim against or Equity Interest in the Debtor to make a reasonably informed decision with respect to the Plan prior to exercising the right to vote on the Plan.

By order entered on _____, 2010, the Bankruptcy Court approved this Disclosure Statement, authorized the Bank Group to commence a solicitation of votes with respect to the Plan and set a final hearing for _____, 2010, at which time the Bankruptcy Court will consider confirmation of the Plan [D.E. ___]. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT AND THE OTHER MATERIALS INCLUDED IN THE SOLICITATION PACKAGE ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  No solicitation of votes may be made except after distribution of this Disclosure Statement.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN IS, BY ITS NATURE, FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL OR FUTURE RESULTS.   These estimates, assumptions, projections of future operating results and the like contained in this Disclosure Statement are statements that a plan proponent may believe constitutes "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  These statements often include the words "may," "could," "would," "should," "believes," "expects," "anticipates," "estimates," "intends," "plans," "targets," "potentially," "probably," "projects," "outlook," or similar expressions.  Such forward-looking statements involve known and unknown risks, uncertainties

Snell & Wilmer

——— L.L.P. ———

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer

—— L.L.P. ——

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1
2
3
4

and other important factors that could cause the actual results, performance or achievements of Reorganized Debtor to differ materially from any future results, performance or achievements expressed or implied by such forward-looking statements. Such risks, uncertainties and other important factors include, among others: general economic and business conditions; the availability, terms and deployment of capital; the availability and terms of construction materials; adverse determinations in any future litigation or regulatory proceedings; and any other factors referenced in this Disclosure Statement or otherwise.

5
6
7
8
9
10

Except with respect to the Liquidation Analysis and the Feasibility Analysis (collectively, the "**Projections**"), and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. The Bank Group does not intend to update the Projections for the purposes hereof; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections. Further, the Bank Group does not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement does not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

11
12

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

13
14
15
16
17

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE CREDITORS' PLAN OF REORGANIZATION OF THE ABOVE-CAPTIONED DEBTOR'S ESTATE, AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

18
19
20
21
22
23

ALL CREDITORS AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE DISCLOSURE STATEMENT AND IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN WILL GOVERN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

24
25
26

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE

12015364

3

COMMISSION (THE "**SEC**"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF THE DEBTOR AND AFFILIATES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE CHAPTER 11 CASE, AND CERTAIN FINANCIAL INFORMATION.  ALTHOUGH THE BANK GROUP BELIEVES THAT SUCH SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS, IN GENERAL, BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT OR THE DEBTOR AS PART OF THE DEBTOR'S FOURTH AMEDED DISCLOSURE STATEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE BANK GROUP DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR CHAPTER 11 INTERESTS IN, THE DEBTOR.

C.     **Rules of Interpretation**

The following rules for interpretation and construction shall apply to the Disclosure Statement: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference in the Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference in the Disclosure Statement to an existing document, schedule, exhibit, statute, regulation, order, rule of the court, or the like, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented from time to time; (4) any reference to an entity as a holder of a Claim or Equity Interest includes that entity's successors and assigns; (5) unless otherwise specified, all references in the Disclosure Statement to Articles and Exhibits are references to Articles and Exhibits of the Disclosure Statement; (6) the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (7) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Disclosure

Snell & Wilmer
——— L.L.P. ———
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Statement; (8) unless otherwise set forth in the Disclosure Statement, the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply; (9) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to the Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (10) unless otherwise specified, all references in the Disclosure Statement to monetary figures shall refer to currency of the United States of America.

D.     **Summary of Treatment of Claims and Equity Interests under the Plan**

The obligations and distributions made under the Plan are in full and final settlement, release and compromise of any and all Claims against and Equity Interests in the Debtor.

The Plan contains separate classes for holders of Claims against, and Equity Interests in, the Debtor.   The table below summarizes the classification and treatment of the principal prepetition Claims and Equity Interests under the Plan.  The classification and treatment for all Classes are described in more detail in Article II through IV of the Plan.  The table below also sets forth estimates of the amount of Claims that will ultimately become allowed in each Class based upon review by the Bank Group of all Claims scheduled by the Debtor, Claims filed by Creditors, consideration of the provisions of the Plan that affect the allowance of certain Claims, and a general estimate of the amount by which Allowed Claims may ultimately exceed the amount of the Claims scheduled by the Debtor.

In addition, for certain classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows.  Accordingly, for these reasons, no representation can be or is being made with respect to whether the estimated percentage recoveries set forth in the table below will actually be realized by the holders of Allowed Claims in any particular class.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISK AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR, PLEASE SEE THE PLAN SUMMARY AND RISKS SECTIONS OF THIS DISCLOSURE STATEMENT.

| Class | Class Description | Treatment Under Plan | Estimated Claim | Estimated Recovery |
|---|---|---|---|---|
| 1 | **Secured Vendor Claims** <br><br> **(Unimpaired; not entitled to vote)** | Class 1 is Unimpaired by the Plan.   Holders of Allowed Secured Vendor Claims in Class 1 are not entitled to vote and shall not be solicited to vote on the Plan. <br><br> Each holder of an Allowed Secured Vendor Claim is considered to be in its own separate subclass within Class 1, and each such subclass is deemed to be a separate Class for purposes of the Plan. Each holder of an Allowed Secured Vendor Claim shall | $1,163,630 | 100% |

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

5

| Class | Class Description | Treatment Under Plan | Estimated Claim | Estimated Recovery |
|---|---|---|---|---|
| | | receive, in full and final satisfaction, settlement, release, and discharge of, such Claim, a Cash payment on the Effective Date equal to 100% of the Allowed amount of such Secured Vendor Claim | | |
| 2 | **Secured Tax Claims**<br><br>**(Impaired; entitled to vote)** | Class 2 is Impaired by the Plan. Holders of Allowed Secured Tax Claims in Class 2 are entitled to vote and shall be solicited to vote on the Plan.<br><br>Each holder of an Allowed Secured Tax Claim is considered to be in its own separate subclass within Class 2, and each such subclass is deemed to be a separate Class for purposes of the Plan. The treatment of Allowed Secured Tax Claims will depend upon the nature of the property subject to the Lien of the holder of the Allowed Secured Tax Claim.<br><br>1. <u>Finished Lots</u>: Each holder of an Allowed Secured Tax Claim that is secured by a Lien on finished lots of the Debtor shall receive, in full and final satisfaction, settlement, release, and discharge of, such Claim, the following treatment: a) the Claim holder will retain its Lien on the property until such time as the Claim is paid in full; and b) the Claim will be paid in full and in Cash, with interest at the statutory rate, on the date that the respective developed lot is sold to a third party.<br><br>2. <u>Unfinished Lots</u>: Each holder of an Allowed Secured Tax Claim that is secured by a Lien on unfinished lots of the Debtor shall receive, in full and final satisfaction, settlement, release, and discharge of, such Claim, the following treatment: a) the Claim holder will retain its Lien on the property until such time as the Claim is paid in full; and b) the Claim will be paid in full and in Cash, with interest at the statutory | $1,068,292 | 100% |

12015364

| Class | Class Description | Treatment Under Plan | Estimated Claim | Estimated Recovery |
|---|---|---|---|---|
| | | rate, over a 4-year period following the Effective Date. The Reorganized Debtor will make semiannual payments on account of such Allowed Secured Tax Claims. | | |
| 3 | **Bank Group Claims** **(Impaired; entitled to vote)** | Class 3 is Impaired by the Plan. All holders of Allowed Bank Group Claims in Class 3 are entitled to vote and shall be solicited to vote on the Plan. In full settlement, release and discharge of all Bank Group Claims, on the Effective Date or as soon thereafter as practicable, Holders of Allowed Bank Group Claims shall receive the following: 1. Cash Payment: On the Effective Date, the Borrowers will pay the Bank Group Effective Date Cash Payment to the holders of Allowed Bank Group Claims. 2. New Note: On the Effective Date, the Borrowers will issue the New Note to the holders of Allowed Bank Group Claims, and shall execute the Amended and Restated Credit Agreement.[1] The Amended and Restated Credit Agreement provides for: a. A maximum lot ratio, b. Maximum speculative units, c. No additional indebtedness or | $163,488,654 principal, plus approx. $18mm in interest at the non-default rate through 1/1/2011 (or approx. $28mm in interest at the default rate through 1/1/2011) plus fees and costs estimated at $2.5 mm[2] | 100% |

---

[1] The Amended and Restated Credit Agreement and New Note are attached as Exhibits 2 and 3, respectively.

[2] This amount does not represent the entire amount of the Bank Group Claim due and owing under the Pre-Petition Credit Agreement and is only being used herein for the limited purpose of calculating the Bank Group Claim under this proposed Plan in the event of its confirmation. The Bank Group expressly reserves the right to any and all amounts due and owing under the Pre-Petition Credit Agreement including, without limitation, default interest, charges, advances, fees, and attorneys' fees and costs.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

7

| Class | Class Description | Treatment Under Plan | Estimated Claim | Estimated Recovery |
|---|---|---|---|---|
| | | contingent liabilities, | | |
| | | d. Maintenance of all of the Reorganized Debtor's bank accounts at Bank of America, N.A., and | | |
| | | e. Evidence of Liability, Workman's Comp and Course of Construction insurance on all collateral with acceptable levels of coverage and underwritten by a credit-rated insurance company acceptable to the Bank Group. | | |
| | | 3. Collateral: On the Effective Date, the Borrowers will grant to the holders of Allowed Bank Group Claims senior, perfected and valid Liens on the Bank Group Collateral (subject only to existing Liens securing Allowed Secured Tax Claims), provided, however, that the Liens granted hereunder shall be released by the holders of Allowed Bank Group Claims upon the satisfaction of the conditions set forth in the Amended and Restated Credit Agreement. | | |
| | | 4. Interest and Term: The New Note matures on the third anniversary of the Effective Date. The New Note shall bear interest at (i) Prime + 3.75 % during the first year following the Effective Date, Prime + 4.75 % during the second year following the Effective Date, and Prime + 5.75 % during the third year following the Effective Date, subject to an interest rate floor of 7 %, or (ii) whatever rate the Bankruptcy Court approves as appropriate. | | |
| | | 5. Minimum Amortization: The Borrowers will make minimum semi-annual principal payments on the New Note in the amount of $ 10 million, which will be due and payable beginning six months after the first anniversary of the Effective Date, and every six months | | |

12015364

Snell & Wilmer
—— L.L.P. ——
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

| Class | Class Description | Treatment Under Plan | Estimated Claim | Estimated Recovery |
|---|---|---|---|---|
| | | thereafter.<br><br>6. <u>Mandatory Prepayments</u>: From and after the Effective Date, the Borrowers shall make mandatory prepayments pursuant to the Amended and Restated Credit Agreement as follows: (i) in connection with the sale of Bank Group Collateral consisting of a Unit, the Borrowers shall prepay the obligations arising under the Amended and Restated Credit Agreement in an aggregate amount equal to 25 % of the Gross Sales Price from the sale of such Unit; and (ii) in connection with the sale of Bank Group Collateral consisting of a Non-Unit, the Borrowers shall apply the Net Cash Proceeds from such sale as follows: (a) first, to fund the Minimum Working Capital Reserve, if necessary, and (b) second, all remaining Net Cash Proceeds shall be used to prepay the obligations arising under the Amended and Restated Credit Agreement. | | |
| 4 | **General Unsecured Claims**<br><br>**(Unimpaired; not entitled to vote)** | Class 4 is Unimpaired by the Plan. Holders of Allowed General Unsecured Claims in Class 4 are not entitled to vote and shall not be solicited to vote on the Plan.<br><br>Holders of Allowed General Unsecured Claims (other than Bank Group Claims, the Queen Creek Claim, and the Fulton Unsecured Claim) will receive, in full and final satisfaction of such claims a Cash payment on the Effective Date equal to 100% of the Allowed amount of such General Unsecured Claim. | $1,217,311 | 100% |
| 5 | **Queen Creek Claims** | Class 5 is Impaired by the Plan. All Holders of Allowed Queen Creek | $250,000 | 100% |

12015364

**Snell & Wilmer**
——— L.L.P. ———
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer

—— L.L.P. ——

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

| Class | Class Description | Treatment Under Plan | Estimated Claim | Estimated Recovery |
|---|---|---|---|---|
| | **(Impaired; entitled to vote)** | Claims in Class 5 are entitled to vote and shall be solicited to vote on the Plan.[3]<br><br>The Queen Creek Claims shall be Allowed in the amount of $250,000. Holders of Allowed Queen Creek Claims will receive, in full and final satisfaction of such claims, a Cash payment on the Effective Date equal to 100% of the Allowed amount of such Queen Creek Claim. | | |
| 6 | **Unsecured Warranty Claims**<br><br>**(Unimpaired; deemed to accept)** | Class 6 is Unimpaired by the Plan. All holders of Allowed Equity Interests in Class 6 are deemed to have accepted the Plan and shall not be entitled to vote on the Plan.<br><br>Holders of Allowed Unsecured Warranty Claims will have their Claims paid in full in the ordinary course of business of the Debtor or Reorganized Debtor, as applicable, as and when such Claims become Allowed. | Unknown | 100% |
| 7 | **Fulton Unsecured Claim**<br><br>**(Impaired; entitled to vote)** | Class 7 is Impaired by the Plan. All holders of Allowed Fulton Unsecured Claims in Class 7 are entitled to vote and shall be solicited to vote on the Plan.<br><br>The Fulton Unsecured Claim is subordinate to the Bank Group Claims pursuant to the Subordination Agreement. There shall be no payments made on account of the Fulton Unsecured Claim so long as any obligations under the New Loan Documents remain outstanding.<br><br>Nothing in the Plan or | $25,000,000 | N/A |

---

[3] In the Event that the Debtor and Queen Creek reach a settlement of the Queen Creek Claims and such settlement is submitted to and approved by the Bankruptcy Court, the Queen Creek Claims may be Unimpaired by the Plan and Queen Creek may not be entitled to vote, and may not be solicited to vote on the Plan.

12015364

| Class | Class Description | Treatment Under Plan | Estimated Claim | Estimated Recovery |
|---|---|---|---|---|
| | | Confirmation Order shall alter or impair the Subordination Agreement. | | |
| 8 | **Equity Interests** **(Impaired; entitled to vote)** | Class 8 is Impaired by the Plan. All holders of Allowed Equity Interests in Class 8 are entitled to vote and shall be solicited to vote on the Plan.<br><br>The Reorganized Debtor will not make distributions to holders of Allowed Equity Interests, including any distributions to holders of Allowed Equity Interests for the purpose of permitting such holders to pay taxes, until the Borrowers' obligations under the New Loan Documents are first satisfied in full.<br><br>Additionally, to facilitate the transactions and treatment of Claims set forth in the Plan, on the Effective Date the holders of Allowed Equity Interests will, as described in Article 6.1 of the Plan: (a) make Fulton Sales become a Borrower under the Amended and Restated Credit Agreement; and (b) make Fulton Sales pledge its assets to the holders of Allowed Bank Group Claims as part of the Bank Group Collateral. | N/A | 100% |

E.    **General Voting Procedures, Ballots, and Voting Deadline**

Under the Bankruptcy Code, impaired classes of claims and interests are entitled to vote on a plan of reorganization. A class that is not impaired under a plan is deemed to have accepted the plan and does not vote. A class is "impaired" under the Bankruptcy Code unless the legal, equitable, and contractual rights of the holders of claims or interests in that class are not modified or altered. For purposes of the Plan, holders of Claims in Classes 2, 3, 5, 7, and 8 are "impaired" and are entitled to vote on the Plan. Class 1 Secured Vendor Claims; Class 4 General Unsecured Claims; and Class 6 Unsecured Warranty Claims are unimpaired under the Plan and deemed to have accepted the Plan without voting pursuant to Section 1126(f) of the Bankruptcy Code.

1.    **Voting of Disputed Claims or Equity Interests**

If a claim for which a proof of claim has been timely filed is marked as contingent, unliquidated, or disputed on its face, or the claim for which a proof of claim has been timely filed is listed as contingent, unliquidated, or disputed on the Debtor's Schedules, either in whole or in part, such claim is temporarily allowed for voting purposes at the lesser amount of: (1) the

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    amount stated in the proof of claim, irrespective of any designation as contingent, unliquidated, or
2    disputed; (2) the amount stated for such claim in the Debtor's Schedules, irrespective of any
designation as contingent, unliquidated, or disputed; (3) an amount set forth in a stipulation,
3    approved by an order of the Bankruptcy Court, between the holder of such claim and the Debtor;
or (4) with respect to the Bank Group Claim, the amount stated in the proposed Plan.

4        If a claim has been made subject to a pending estimation motion or otherwise estimated or
5    allowed for voting purposes by order of the Bankruptcy Court prior to the Voting Deadline, such
claim is temporarily allowed in the amount proposed to be estimated or so estimated or allowed
6    by the Bankruptcy Court.

7        If a claim has been made subject to a pending objection by the Debtor or any other party-
in-interest under Section 502(a) of Bankruptcy Code and Bankruptcy Rule 3007, where such
8    objection remains unresolved as of the Voting Deadline, such claim is temporarily disallowed for
voting purposes under the Plan.

9        If a claim is listed in the Schedules as contingent, unliquidated, or disputed and a proof of
10    claim was not timely filed, such claim is temporarily disallowed for voting purposes under the
Plan.

11                2.     **Voting Procedure and Instructions**

12        Accompanying this Disclosure Statement are, among other things, copies of (1) the Plan
(Exhibit 1 hereto, separately filed in this chapter 11 case); (2) the notice of, among other things,
13    the time for submitting Ballots to accept or reject the Plan; the date, time and place of the
evidentiary hearing to consider the confirmation of the Plan and related matters, and the time for
14    filing objections to the confirmation of the Plan (the "**Confirmation Hearing Notice**"); and (3) if
you are entitled to vote, one or more Ballots (and return envelopes) to be used by you in voting to
15    accept or to reject the Plan.

16        After carefully reviewing the Plan, this Disclosure Statement (including the Plan
Supplement), and (if you are entitled to vote) the detailed instructions accompanying your Ballot,
17    please indicate your acceptance or rejection of the Plan by checking the appropriate box on the
enclosed Ballot. Please complete and sign your original Ballot (copies will not be accepted) and
18    return it in the envelope provided. You must provide all of the information requested by the
appropriate Ballot. Failure to do so may result in the disqualification of your vote on such Ballot.
19    Each Ballot has been coded to reflect the class of Claims or Equity Interest it represents.
Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots
20    sent to you with this Disclosure Statement.

21        **The Bankruptcy Court has set 5:00 p.m. (MST) on [   ], 2010, as the Voting
Deadline.** The Deadline is the date for the determination of record holders of Claims and/or
22    Equity Interests entitled to receive a copy of this Disclosure Statement and vote, using appropriate
Ballots, to accept or reject the Plan. All Ballots must be actually received by **Snell & Wilmer
23    L.L.P. One Arizona Center 400 East Van Buren, Phoenix, Arizona 85004** by the Voting
Deadline, unless the Bankruptcy Court extends such date before such time. Ballots returned by
24    facsimile or email are not valid and will not be counted.

25        **Ballots received after the Voting Deadline will not be counted. Ballots should not be
delivered directly to the Debtor, the Debtor's counsel, the Bankruptcy Court, or the Office
26    of the United States Trustee.**

12015364

**Questions About Voting Procedures**

If: (l) you have any questions about (a) the procedure for voting your Claim or Equity Interest, (b) the packet of materials that you have received, or (c) the amount of your Claim; or (2) you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any attachments or exhibits to such documents please contact:

**Snell & Wilmer L.L.P.**
<u>Attention</u>: A. Evans O'Brien
One Arizona Center
400 East Van Buren
Phoenix, Arizona 85004
(602) 382-6200

F.       **Acceptance or Rejection of a Plan**

Under the Bankruptcy Code, a voting class of claims is deemed to have accepted a plan if it is accepted by creditors in such class who vote on the plan and who hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class.  A voting class of interests is deemed to have accepted a plan if it is accepted by holders of interests who hold at least two-thirds in amount of the interests of such class that have actually voted on the plan.

If the Plan is not accepted by all Impaired Classes, the Plan may still be confirmed by the Bankruptcy Court under Section 1129(b) of the Bankruptcy Code if: (a) the Plan has been accepted by at least one Impaired Class and (b) the Bankruptcy Court determines, among other things, that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each non-accepting Impaired Class (the "**Cramdown Provisions**").  If the Plan is not accepted by all Impaired Classes, the Plan Proponent reserves the right to ask the Bankruptcy Court to confirm the Plan under the Cramdown Provisions.

G.       **Evidentiary Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to Section 1128 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3017(c), the Bankruptcy Court has scheduled an evidentiary hearing to consider confirmation of the Plan to begin on _____, 2010, at __:__ _.m. (Mountain Standard Time) before the Honorable George B.  Nielsen, Jr., United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Arizona, 7th Floor, Courtroom 702, 203 N. First Avenue, Phoenix, Arizona 85003.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed with the Clerk of the Bankruptcy Court and served so that they are **<u>ACTUALLY RECEIVED</u>** on or before _____, 2010, at __:00 p.m. (Mountain Standard Time) by: (i) Snell & Wilmer L.L.P., One Arizona Center 400 East Van Buren, Phoenix, Arizona 85004, Attn: Donald L. Gaffney and Lori Lewis, counsel for the Bank Group, and (ii) the Office of the United States Trustee for the District of Arizona, 230 North First Avenue, Suite 204, Phoenix, Arizona 85003, Attn: Larry Watson, Esq.

Snell & Wilmer
——— L.L.P. ———
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

## II. <u>DEFINITIONS</u>

All capitalized terms not defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

## III. <u>THE DEBTOR, BACKGROUND, AND EVENTS PRECIPITATING THE CHAPTER 11</u>

**The information contained in this section of the Disclosure Statement is derived exclusively from: (a) information compiled by the Debtor from records maintained in the ordinary course of the Debtor's business or from information received by the Bank Group from the Debtor, (b) information in the Debtor's Schedules and Fourth Amended Disclosure Statement, (c) public disclosures made by or about the Debtor, (d) from other third party sources; (e) the Debtor's Fourth Amended Disclosure Statement and Debtor's Fourth Amended Plan. Every effort has been made to be as accurate as possible in the preparation of this section of the Disclosure Statement; however, because the Bank Group is not privy to the books and records of the Debtor, there can be no assurances that the information contained herein is complete and fully accurate.**

### A. Background

According to Fulton, the Debtor is an Arizona subchapter S corporation, founded in 1975 and engaged in the business of building and selling single family homes and residential lots in the state of Arizona. The Ira A. Fulton and Mary Lou Fulton Family Trust ("**Fulton Family Trust**") is the Debtor's sole shareholder. Ira A. Fulton and Mary Lou Fulton are the beneficiaries of the Fulton Family Trust. According to the Debtor, prior to filing bankruptcy, Ira A. Fulton grew the company from one that built less than 100 homes a year to a company that has built in excess of 2,200 homes per year spread across numerous planned communities.

Before it filed for Chapter 11 protection, the Debtor claims to have been one of the largest residential home builders in Arizona. The Debtor's assets consist of its real estate holdings related to its real estate developments. Those developments are in Maricopa and Pinal Counties with approximately 2,850 lots in various phases of development, from dirt to completed model homes.

The management team for the Debtor and its affiliates (collectively, "**Fulton**") operates out of the Debtor's home office in Tempe, Arizona. Fulton also has sales and development related facilities located at its numerous communities. In total, Fulton employs approximately 78 people as salaried employees, hourly employees, and sales agents.

The Debtor provides that the sale of the Debtor's residential homes and lots are in the ordinary course of the Debtor's business. As set forth below, the continued sale of homes free and clear of liens and encumbrances has been approved of by the Bankruptcy Court in this case.

Typically, for a variety reasons the Debtor sells its homes to homebuyers through an affiliated entity called Fulton Homes Sales Corporation ("**Fulton Sales**"). Fulton Sales is not currently a debtor in bankruptcy. Fulton Sales also provides seller's a home warranty to homebuyers.

12015364

14

Snell & Wilmer
— L.L.P. —
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    At this time, there are no blanket liens on the Debtor's assets or the properties it sells.
2  Rather, the only liens that might arguable exist according to the Debtor that relate to a specific
   piece of property, such as mechanics' or materialman's liens.

3    The Debtor's chief lender is the Bank Group for which Bank of America, N.A. acts as the
4  Administrative Agent. As of the Petition Date, the principal amount owed to the Bank Group on
   the line of credit was no less than $ 163,488,654.82. The Debtor has previously listed the Bank
5  Group's claim as disputed in the Debtor's Schedules of Assets and Liabilities, as amended.
   However, on September 20, 2010, the Bank Group obtained a judgment against Fulton Sales
6  pursuant to certain guaranty obligations for the entire amount owed by Fulton Homes and which
   adjudicated the Bank Group's Claim, including interest after the Petition Date. Until the
7  beginning of 2009, the Debtor was current with all of its banks and vendors.

8    The Debtor began experiencing financial difficulties in 2008 and 2009. Prior to the
   bankruptcy filing, the Debtor contacted the Bank Group seeking to modify its debt obligations.
9  The Debtor and the Bank Group were unable to arrive at an agreement on how to manage their
   relationship in the face of the economic downturn. The Debtor has stated that the failure to reach
10 an agreement with the Bank Group was one of the reasons it decided file this bankruptcy.

11   Despite the differences between the Debtor and the Bank Group, and the decline in sales
   due to the economic downturn, the Debtor has continued to sell homes.

12   As more fully described below, the Debtor has retained various professionals and experts
13 in a variety of areas to assist it in its reorganization efforts. In addition to bankruptcy and special
   legal counsel, the Debtor has retained restructuring professionals with experience in the
14 residential home sales and development market, and experts in the area of developing plans of
   reorganization and the feasibility thereof.

15   According to the Debtor's own statements, during 2008 the Debtor sold over 4,400 lots in
16 less desirable markets, generating over $55 million in cash proceeds. The Debtor also believes
   that its redesigned homes respond to current market conditions, thereby satisfying the demands of
17 customers in the current market climate. In short, the Debtor believes that it has realized the need
   to continue to streamline and optimize its operations in response to the present downturn, and is
18 doing so in a way that will also allow it to operate into the future.

19   The Debtor has previously filed four plans of reorganization in this case. The Debtor filed
   its first proposed plan of reorganization on May 27, 2009 (the "**Initial Plan**") [D.E. 137]. On
20 July 14, 2009, the Debtor filed its *First Amended Plan of Reorganization Dated July 14, 2009*
   ("**First Amended Plan**") [D.E. 185]. The Debtor filed its *Second Amended Plan of
21 Reorganization Dated August 21, 2009* ("**Second Amended Plan**") [D.E. 234] on August 21,
   2009.

22   Following briefing and oral argument by the parties, the Bankruptcy Court entered its
23 *Order Regarding Confirmation Finding the Second Amended Plan* on March 17, 2010 holding
   that the Second Amended Plan could not be confirmed as written (the "**Order Regarding
24 Confirmation**"). The Bankruptcy Court denied confirmation of the Second Amended Plan for
   several reasons, including: (1) the fact that the auction procedures set forth in the Second
25 Amended Plan effectively operated as an impressible third party release of Fulton Sales'
   guarantee obligations; (2) the Second Amended Plan raised artificial impairment issues; (3) the
26 Second Amended Plan failed to identify post-confirmation management compensation as

12015364

required; and (4) the auction procedures set forth in the Second Amended Plan raised significant and potentially fatal issues regarding absolute priority and new value.

The Debtor filed its *Third Amended Plan of Reorganization Dated May 25, 2010* ("**Third Amended Plan**") [D.E. 388] on May 25, 2010. Since filing the Third Amended Plan, and as discussed below, the Debtor has retained Squire, Sanders & Dempsey L.L.P. ("**Squire Sanders**") as substitute counsel to the Debtor. In addition, the Debtor has retained, subject to the Bankruptcy Court's approval, Odyssey Capital Group, LLC ("**Odyssey**") as its expert witness for purposes of Plan confirmation. Upon the retention of Squire Sanders, the Debtor has reengaged in discussions with the Bank Group's professions in an effort to reach a compromise. To that end, the Debtor and the Bank Group entered into the *Stipulated Order Between Debtor and Bank of America, N.A., as Administrative Agent for the Bank Group, Regarding Scheduling Matters* (the "**Scheduling Stipulation**") [D.E. 437], which extends certain scheduling matters and timelines appropriate to facilitate negotiations and to permit Squire Sanders analyze the Debtor's business, the deficiencies with the previously filed plans, and to respond to the Bank's concerns.

The Debtor in August 2010 proposed its Fourth Amended Plan of Reorganization.

Notwithstanding good-faith negotiations, the Debtor and the Bank Group have not reached a consensual resolution of the Bank Group's claims under the Plan. Accordingly, as it appears that the Debtor is unable to present a confirmable plan to its creditors the Bank Group finds it necessary to submit its Plan. The Bank Group's Plan contemplates significant enhancements to the treatment of the all Creditors' claims from the terms of the Debtor's Fourth Amended Plan.

## B.     Business Plan and Projections

The Reorganized Debtor will continue to operate its business as a developer of residential communities in Maricopa and Pinal counties. Initially, the Reorganized Debtor will be focused on the sale of its existing inventory of lots and homes. This inventory includes everything from platted land to completed spec homes.

The Debtor claims to have developed new home designs that respond to the current economic climate and are competitive with existing home sales and foreclosures. The Debtor states that these new designs have been approved by the necessary governmental and community bodies, and will, where appropriate, replace or augment designs that were popular prior to the economic downturn. According to the Debtor, the model homes of the new designs are already completed at various communities, and homes based on these designs are already being successfully sold.

The Feasibility Analysis is attached as Exhibit 9 and reflects the repayment of the Reorganized Debtor's debt pursuant to the terms of the Plan. The Feasibility Analysis is premised upon the Debtor's projections, which, in turn, are based upon its anticipated revenues and expenses. The actual amount available for the payment of creditors will be determined from the Reorganized Debtor's actual revenues and expenses. Nevertheless, the Feasibility Analysis demonstrates that all Creditors will be paid in full under the Bank Group's Plan. The key revenue, expense, and other assumptions used in the Feasibility Analysis are discussed in detail in the Plan.

Snell & Wilmer
—— L.L.P. ——
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

C.    **Fulton Sales**

According to the Debtor, Fulton Sales was created in 1997 to provide certain statutory tax benefits to the Debtor. Fulton Sales markets and sells the homes that the Debtor builds. The Debtor has represented that when a home is sold it passes through a double escrow as follows:

1.    First, the Debtor sells the home to Fulton Sales, typically for an amount equal to:

(a)    the cost to build the home, including hard construction costs as well as overhead costs incurred by the Debtor ("**Manufacturing Cost**") *plus*

(b)    The Debtor's mark-up or profit ("**Manufacturing Return**") of approximately 5% of the sales price;

2.    Second, Fulton Sales sells the home to the homebuyer, typically for an amount equal to:

(a)    the price Fulton Sales paid to the Debtor (*i.e.*, the Manufacturing Cost plus the Manufacturing Return) ("**Manufacturers' Price**") *plus*

(b)    costs and expenses, sales commissions, seller closing costs, homebuyer incentives, home owners' association subsidies for communities that are not currently sold out, etc.) (the "**Sales Costs**") *plus*

(c)    Fulton Sales' fixed costs, reserves for warranty claims, general and administrative expenses, and profit, if any ("Sales Return") (the Manufacturers' Price plus the Sales Cost plus the Sales Return is referred to herein as the "**Final Sales Price**").

According to the Debtor, upon the sale of the home to the homebuyer, the title company remits the Manufacturers' Price to the Debtor and the remainder to Fulton Sales who uses the difference between the Manufacturers' Price and the Final Sales Price, if any, to pay its Sales Costs and to cover its Sales Return. The Debtor has stated that pursuant to Arizona statutes, because of the foregoing corporate structure, the State of Arizona only charges the Debtor for sales tax on the Manufacturing Return portion of the Final Sales Price paid by the homebuyer. The Debtor claims that Fulton Sales is not charged sales tax by the State of Arizona on the transaction.

D.    **Express and Implied Warranty, Latent Defect, Customer Service, and Indemnification Obligations**

According to the Debtor, as homebuilders and home sellers, the Debtor and Fulton Sales have certain obligations and potential liabilities to homebuyers. Because Fulton Sales is not a debtor in bankruptcy at this time, the automatic stay does not apply to a homebuyers' efforts to enforce any warranty claims. The Debtor's Plan and ultimate discharge will not affect Fulton Sales' liabilities under any warranty as it is believed that Fulton Sales will continue to honor valid obligations under such warranties in the ordinary course.

12015364

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

E. **Preferences, Fraudulent Conveyances, and Other Potential Causes of Action**

To the extent that a preference or fraudulent conveyance occurred before the Petition Date, such transfer may be recoverable by the Estate for the benefit of the Estate under Section 544, 547, or 548 of the Bankruptcy Code. To date, no complaints have been filed under any of these theories. To the extent any such claims exist, they will be analyzed for their potential value to the Estate. These potential claims are specifically preserved for the benefit of the Estate.

The Bank Group has asserted that a potential cause of action exists against Ira A. Fulton or the Fulton Family Trust for alleged unjust enrichment stemming from certain tax refunds to which Ira A. Fulton or the Fulton Family Trust is or may be entitled relating to prior income taxes paid by Ira A. Fulton or the Fulton Family Trust. To the extent any such cause of action exists, it belongs to the Estate. The Bank Group has not yet made any demand on the Debtor to pursue any such cause of action. At this time, neither the Bank Group nor the Debtor are pursuing a claim for unjust enrichment against Ira A. Fulton.

F. **Conclusion**

Pursuant to the Creditors' Plan, the Reorganized Debtor would (a) continue to be a leader in the Maricopa County and Pinal County residential homebuilding marketplace; (b) pay all Creditors in full including all interest, late charges, and attorneys' fees and costs; (c) pay Creditors quicker than under the Debtor's plan; (d) allow the Debtor to adjust without laying off employees or management and reposition itself in this difficult economic market so that when the economy improves the Reorganized Debtor will be able to be financially successful.

IV. <u>**SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE**</u>

A. **Administrative Proceedings**

The Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code on January 27, 2009 (the "**Petition Date**"), and a first meeting of creditors was held on March 3, 2009.

B. **Retention of Professionals**

The Debtor originally retained Polsinelli Shugart, P.C. ("**PS**") to act as its bankruptcy counsel. The Bankruptcy Court signed an Order approving the retention of PS on January 27, 2009. On July 22, 2010, the Debtor retained Squire Sanders as substitute bankruptcy counsel. The Bankruptcy Court signed an Interim Order approving the retention of Squire Sanders on July 26, 2010 [D.E. 433]. On July 30, 2010, PS filed a Motion to Withdrawal as attorney for the Debtor [D.E. 441]. On August 11, 2010, the Bankruptcy Court signed an order authorizing the withdrawal of PS as counsel for the Debtor [D.E. 449].

On February 3, 2009, the Debtor filed an application to retain the law firm of Lake and Cobb, P.C. as its special counsel. The Bankruptcy Court signed an order approving the retention of LC on February 4, 2009 [D.E. 45].

On February 5, 2009 the Debtor filed an application to employ Green Street as it Financial Advisor [D.E. 47]. On March 2, 2009 the Bankruptcy Court signed an order approving the retention of Green Street through October 2009 [D.E. 88]. In November 2009, the Debtor filed a

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer
—— L.L.P. ——
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1   motion to extend Green Street's retention through April 2010. The Bankruptcy Court entered its
    order approving this extended retention on December 3, 2009 [D.E. 300].

2

3           On February 5, 2009, the Debtor filed an application to employ Burch and Cracchiolo as
    special counsel for the Debtor relating to zoning matters [D.E. 52]. On March 4, 2009, the
4   Bankruptcy Court signed an order approving the retention of Burch and Cracchiolo [D.E. 94].

5           On March 13, 2009, the Debtor filed a motion to retain Gaintner Bandler Reed & Peters,
    P.L.C., as its auditors for ERISA required 401(k) audits [D.E. 99]. On April 8, 2009 the
6   Bankruptcy Court signed an order approving the retention of Gaintner Bandler Reed & Peters,
    P.L.C. [D.E. 124].

7           On March 23, 2009, the Debtor filed a motion to retain Wentworth Webb & Postal, L.L.P.
    as the Debtor's property tax protest service advisors [D.E. 102]. On April 30, 2009 the
8   Bankruptcy Court signed an order approving the retention of Wentworth Webb & Postal, L.L.P.
    [D.E. 131].

9

10          On May 15, 2009, the Debtor filed a motion to retain Deloitte Tax, LLP ("**Deloitte Tax**")
    to provide tax services to the Debtor, including preparing and filing tax returns for 2008 [D.E.
11  132]. Despite objections from the Bank Group, the Bankruptcy Court entered its Order
    authorizing the Debtor's retention of Deloitte Tax on June 25, 2009 [D.E. 174]. On March 25,
12  2010, the Debtor filed an application to approve certain modified terms of Deloitte Tax's
    retention and the Bankruptcy Court approved this application on April 29, 2010 [D.E. 357].

13          On May 29, 2009, the Debtor filed a motion to retain Elliott Pollack ("**Pollack**") as the
    Debtor's original interest rate, discount rate and plan feasibility advisor [D.E. 138]. The
14  Bankruptcy Court entered its Order authorizing the Debtor's retention of Pollack on June 22,
    2009 [D.E. 168].

15

16          On July 23, 2009, the Debtor filed a motion to retain Deloitte & Touche, LLP ("**Deloitte
    Audit**") as independent financial auditor to prepare audited financial statements for the Debtor for
17  the year end 2008 [D.E. 195]. The Bankruptcy Court entered its Order authorizing the Debtor's
    retention of Deloitte Audit on August 12, 2009 [D.E. 229].

18      C.      **First Day Motions**

19          The Debtor filed several "first day" motions that were approved by the Bankruptcy Court.
    These motions and the orders related thereto are available from the Bankruptcy Court's docket.
20  In summary these motions included the following:

21              1.      A motion to approve the payment of prepetition wages;

22              2.      A motion to allow checks issued prepetition on account of debts due and
    owing prepetition to clear from the Debtor's existing bank accounts, and to allow the bank
23  accounts to remain open for a limited period of time so that those checks could clear; and

24              3.      A motion for the maintenance of existing utility service and establishing
    procedures for any challenges to such continued service or for additional deposits issued by utility
25  companies.

26

12015364

D.     **Appointment of Unsecured Creditors Committee**

On February 25, 2009, the United States Trustee's Office filed a statement stating that, despite its efforts to contact unsecured creditors, it was unable to appoint a Committee of Unsecured Creditors [D.E. 81].

E.     **Motion to Sell and Construct Homes**

On February 3, 2009, the Debtor filed a *Motion to Construct and Sell Residential Homes and Sell Residential Lots Free and Clear of Liens in the Ordinary Course of Debtor's Business Pursuant to Section 363 of the Bankruptcy Code* [D.E. 34].  On February 17, 2009, the Bankruptcy Court approved the Debtor's Motion to Sell Homes and Residential Lots Free and Clear of Liens [D.E. 74].  The Order permits the Debtor to retain all net proceeds from the sale of its homes and residential lots.  As discussed below, the Bank Group filed a motion requesting that the Bankruptcy Court amend this order but has not prosecuted that motion at this time.

F.     **Motion to Pay Critical Vendor**

On April 2, 2009, the Bankruptcy Court entered an order approving payment of Mesa Lighting and Fan, Inc. as a critical vendor of the Debtor [D.E. 118].

G.     **Motion to Terminate Exclusivity**

On July 2, 2009, the Bankruptcy Court entered its Order allowing the Debtor's exclusivity period to be extended over objection from the Bank Group [D.E. 176].

H.     **Motion to Alter or Amend Ordinary Course Order**

On June 24, 2009, the Bank Group filed a motion requesting that the Bankruptcy Court alter or amend the Bankruptcy Court's Order authorizing the Debtor to build and sell homes in the ordinary course of its business [D.E. 169].  The Debtor has opposed the motion.  The parties mutually and repeatedly agreed to continue this matter on the Bankruptcy Court's calendar as a status hearing.  Most recently, the parties agreed to remove the motion from the Bankruptcy Court's calendar and make it subject to call by the parties.

I.     **Motion for Stay Relief**

On July 13, 2009, Gustavo Barocio Padilla and Gabriel and Giera Silva filed a motion for relief from the automatic stay to allow them to continue prosecuting a tort claim against the Debtor [D.E. 182].  The Debtor has filed a limited opposition to the motion for stay relief [D.E. 201].  The Bankruptcy Court has entered its order approving an agreement between the movant and the Debtor regarding this motion whereby the movant can continue the prosecution of the action but cannot take any collection actions against the Debtor [D.E. 242].

J.     **Prior Plans and Disclosure Statements**

As discussed above, the Debtor previously filed four proposed plans of reorganization. The Bankruptcy Court approved the Second Amended Disclosure Statement on October 14, 2009, and Fulton Homes solicited votes with respect to the Second Amended Plan.  The Bank Group submitted a ballot rejecting the Second Amended Plan and filed a legal objection to the Second Amended Plan.  Following briefing and oral argument by the parties, the Bankruptcy Court

Snell & Wilmer
—— L.L.P. ——
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

entered its *Order Regarding Confirmation Finding the Second Amended Plan* holding that the Second Amended Plan could not be confirmed as written (the "**Order Regarding Confirmation**").

The Debtor filed its Third Amended Plan on May 25, 2010 in response to the Order Regarding Confirmation and on account of changes in the market conditions between the date of the Second Amended Plan and the Third Amended Plan. The Bank Group objected that the Third Amended Plan did not automatically satisfy the best interest of creditors test, and thus, a proper liquidation analysis was required but missing from the corresponding disclosure statement. In response, the Debtor has subsequently provided the Bank Group a revised liquidation analysis.

As set forth in the Section I of this Disclosure Statement, the differences between the Bank Group's Plan and the Debtor's Fourth Amended Plan are substantial and the Bank Group's Plan provides for a greater payout to all creditors in less time. As such, the Bank Group's Plan is superior to anything submitted by the Debtor.

K.     **Motions to Extend Exclusivity**

The Debtor has received several extensions to its exclusivity period. The Debtor's exclusive period to obtain acceptances of the Plan expired on August 29, 2010. Pursuant to the Scheduling Stipulation, the Bank Group agreed to not file a plan of reorganization, or support or participate in any plan of reorganization filed by any entity other than the Debtor, until September 27, 2010.

L.     **Limited Injunction of Bank Group Guaranty Suit**

The Bank Group filed a lawsuit against Fulton Sales and Fulton Homes Warranty Corporation ("**Fulton Warranty**") in the Maricopa County Superior Court (the "**State Court Action**") seeking to enforce certain guarantees by those entities in favor of the Bank Group. On April 10, 2009, the Debtor filed an adversary complaint and a motion for an injunction against the Bank Group seeking to enjoin them from prosecuting the State Court Action. The Bank Group opposed the request for an injunction.

On July 2, 2009, the Bankruptcy Court entered its order granting a limited injunction against the Bank Group, precluding the Bank Group from enforcing any judgment it may obtain in the State Court Action until after the confirmation of the Plan [Adv. Pro. 09-00379; D.E. 29].

M.     **Bank Group's Summary Judgment Against Fulton Sales**

On September 20, 2010, the Bank Group was awarded summary judgment against Fulton Sales in the State Court Action (the "**Summary Judgment Order**"). Pursuant to the Summary Judgment Order, Fulton Sales is liable for all amounts owed by Fulton Homes under the Pre-Petition Credit Agreement including default interest and attorneys' fees and costs. The approximate amount of the judgment that will be entered in favor of the Bank Group against Fulton Sales in the State Court Action is $191,000,000. The Bank Group is currently stayed from enforcing its judgment against Fulton Sales by the terms of the limited injunction, but will seeking to have the injunction entirely terminated.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

N.     **The Debtor's Motion for Alternative Dispute Resolution**

On May 27, 2010, the Bankruptcy Court denied [see D.E. 395] the Debtor's *Motion for Referral of Plan Confirmation Disputes to ADR Program* ("**Motion for ADR**") [D.E. 353] which requested that the Bankruptcy Court assign the contested plan confirmation issues between the Debtor and the Bank Group for inclusion in the Alternative Dispute Resolution Program established by Local Bankruptcy Rules 9072-1 through 9072-9 (the "**ADR Program**").

O.     **The Bank Group's Motion for the Appointment of an Examiner**

The Bank Group has filed a motion for the appointment of an examiner pursuant to Section 1104(c) of the Bankruptcy Code (the "**Examiner Motion**") [D.E. 369]. The Debtor has objected to appointment of an examiner [D.E. 402]. In response to the Examiner Motion, and pursuant to the *Stipulated Order Between Bank of America, N.A., as Administrative Agent for the Bank Group, Regarding Scheduling Matters*, the Debtor has provided the Bank Group with non-privileged documents responsive to the Bank Group's request for production of documents relating to the Examiner Motion. Furthermore, in connection therewith, the Debtor has made its management available to the Bank Group for interviews and questions.

P.     **Retention of Squire Sanders & Odyssey**

On July 22, 2010, the Debtor has retained Squire Sanders as substitute bankruptcy counsel to the Debtor [D.E. 430]. The Bankruptcy Court signed an interim order approving the retention of Squire Sanders on July 26, 2010 [D.E. 433]. In addition, the Debtor has retained, subject to the Bankruptcy Court's approval, Odyssey as its potential expert witness for purposes of Plan confirmation.

Q.     **Stipulated Order with the Bank Group Regarding Scheduling Matters**

Upon the retention of Squire Sanders, the Debtor has re-engaged in discussions with the Bank Group and its professionals in an effort to reach a compromise. To that end, the Debtor and the Bank Group entered into the Scheduling Stipulation, which extends certain scheduling matters and timelines appropriate to facilitate negotiations and to permit Squire Sanders analyze the Debtor's business, the deficiencies with the previously filed plans, and to respond to the Bank's concerns.

R.     **Operating Reports**

The Debtor's monthly operating reports are current and copies can be obtained from the Bankruptcy Court's electronic docket.

## V.     DESCRIPTION OF ASSETS AND LIABILITIES OF THE DEBTOR

A.     **Assets**

The value of the Debtor's real estate assets is in constant fluctuation given the current market conditions. As of the Petition Date, the value of the Debtor's assets was believed by the Debtor to be less than the amount of the debt. However, the Debtor now believes that the value of the Debtor's assets has improved during the course of this case; and as set forth in the Feasibility Analysis to be included in the Disclosure Statement exhibits, at this time, the value of

12015364

the Debtor's assets, as such assets are developed by the Debtor during the life of the Plan, will be sufficient to pay all creditors in full. Accordingly, the Debtor has stated that it is solvent.

In addition to its real estate assets, the Debtor has stated that it has significant other assets including available cash as of the Effective Date of $80 million, insurance reserves, and escrowed land development funds for current developments.

## B.    Liabilities

The following is an overview of the Debtor's known liabilities.

### 1.    Priority Claims

Certain Claims will be entitled to priority under Sections 507(a)(1), (3), and (8) of the Bankruptcy Code as administrative claims, wage claims, or tax claims.

### 2.    Secured Claims

First, there are a number of Creditors holding Secured Vendor Claims arising from the provision of goods and services to the Debtor before the Petition Date, that are: (a) secured by a Lien on property of the Estate, including a mechanic's lien or similar lien; or (b) entitled to administrative priority under Section 503(b)(9) of the Bankruptcy Code. Secured Vendor Claims include Claims arising form vertical or horizontal construction at the Cobblestone, Coldwater Springs, Cortina, Fulton Estates, Royal Ranch, Villago, Freeman Farms, Fulton Ranch, Geneva Estates, and Ironwood Crossing subdivisions.

Second, there are a number of Secured Tax Claims held by a governmental unit or associated political subdivision, including property taxes and accrued and unpaid interest under applicable law from the Petition Date, that is secured by a Lien on property of the Estate by operation of applicable law including every Claim for unpaid real, personal property, or ad valorem taxes. Secured Tax Claims include the claims of Maricopa and Pinal Counties.

### 3.    General Unsecured Claims

Any Claim against the Debtor that is unsecured and not subject of any Lien or priority or administrative status under the Bankruptcy Code, provided that a General Unsecured Claim shall not include: (a) a Secured Claim; (b) an Administrative Claim; (c) a Secured Vendor Claim; (d) a Secured Tax Claim; (e) a Priority Claim; (f) the Bank Group Claims; (g) the Queen Creek Claim; and (h) the Fulton Unsecured Claim.

### 4.    Bank Group Claims

All general unsecured Claims of the Bank Group arising under the Pre-Petition Credit Agreement, which will be Allowed[4] in the amount of: (i) $163,488,654.82 in unpaid principal and pre-petition interest; (ii) accrued and unpaid interest from the Petition Date through and including the Effective Date at the Note Rate; (iii) reasonable and actual fees and expenses of the restructuring professionals of the Bank Group in an amount determined by the Bankruptcy Court

---

[4] The Bank Group agrees to the Allowed amount of its Claims for purposes of the Creditor Plan only, and not for any other purpose.

Snell & Wilmer
——— L.L.P. ———
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

or otherwise agreed to by the Debtor and the Bank Group; and (iv) reasonable and actual fees payable to the Administrative Agent or otherwise under the Pre-Petition Credit Agreement, to the extent such fees are Allowed by the Bankruptcy Court; provided, however, that in the event of a default by the Reorganized Debtor under this Plan, the general unsecured Claims of the Bank Group shall be Allowed as of the Effective Date in the amount of: (i) $163,488,654.82 in unpaid principal and pre-petition interest; (ii) accrued and unpaid interest from the Petition Date through and including the Effective Date at the Default Note Rate; (iii) reasonable and actual fees and expenses of the restructuring professionals of the Bank Group in an amount determined by the Bankruptcy Court or otherwise agreed to by the Debtor and the Bank Group; and (iv) reasonable and actual fees payable to the Administrative Agent or otherwise under the Pre-Petition Credit Agreement, to the extent such fees are Allowed by the Bankruptcy Court.

### 5. **Queen Creek Claims**

The general unsecured Claim of Queen Creek arising under an agreement of the Debtor to fund money to Queen Creek for construction of a public library.

## VI. **PLAN SUMMARY**

Chapter 11 of the Bankruptcy Code is the principal reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself and its creditors and equity holders. Although not always obtainable, confirmation of a plan of reorganization is the principal objective of a Chapter 11 case.

In general, a Chapter 11 plan of reorganization (a) divides claims and interests into separate classes, (b) specifies the property that each class is to receive under the plan, and (c) contains other provisions necessary to the reorganization of the debtor. A Chapter 11 plan may specify that certain classes of claims or interests are either to be paid in full upon the effective date of the plan, reinstated, or their legal, equitable, and contractual rights are to remain unchanged by the reorganization effectuated by the plan. Such classes are referred to under the Bankruptcy Code as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from the holders of claims or interest in such classes. A Chapter 11 plan also may specify that certain classes will not receive any distribution of property. Such classes are deemed to reject the plan.

All other classes of claims and interests contain "impaired" claims and interests entitled to vote on the plan. As a condition to confirmation, the Bankruptcy Code generally requires that each impaired class of claims or interests votes to accept a plan. Acceptances must be received (a) from the holders of claims constituting at least two-thirds in dollar amount and more than one-half in number of the allowed claims in each impaired class of claims that have voted to accept or reject the plan, and (b) from the holders of at least two-thirds in amount of the allowed interests in each impaired class of interest that have voted to accept or reject the plan. If any class or classes of claims or interests entitled to vote with respect to the plan rejects the plan, upon request of the Plan Proponent, the bankruptcy court may nevertheless confirm the plan if certain minimum treatment standards are met with respect to such class or classes.

Chapter 11 of the Bankruptcy Code does not require each holder of a claim or interest to vote in favor of a plan of reorganization in order for the bankruptcy court to confirm the plan. The bankruptcy court, however, must find that the plan of reorganization meets a number of statutory tests (other than the voting requirements described in this section) before it may confirm, or approve, the plan of reorganization. Many of these tests are designed to protect the

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

interest of holders of claims or interest that do not vote to accept the plan of reorganization but who will nonetheless be bound by the plan's provisions if it is confirmed by the bankruptcy court.

The following statements concerning the Plan are merely a summary of the Plan and are not complete. The statements are qualified entirely by express reference to the Plan. Creditors and Equity Interest holders are urged to consult with counsel or each other in order to understand the Plan fully. The Plan is complete, inasmuch as it proposes a legally binding agreement by the Plan Proponent, and an intelligent judgment cannot be made without reading it in full. Classes 1, 4, and 6, are unimpaired under the terms of the Plan and not entitled to vote thereon. Classes 2, 3, 5, 7 and 8 are impaired and entitled to vote.

## VII.  TREATMENT OF UNCLASSIFIED CLAIMS

### A.  Unclassified Claims

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Other Priority Claims are not classified for purposes of voting on, or receiving distributions under, the Plan. Holders of Administrative Claims and Priority Tax Claims are not entitled to vote on the Plan but, rather, are treated separately in accordance with Article II of the Plan and under Section 1129(a)(9)(A) of the Bankruptcy Code.

### B.  Allowed Administrative Claims

#### 1.  Generally

Each Allowed Administrative Claim (other than a Preserved Ordinary Course Administrative Claim or Professional Claim) shall be paid in full in Cash (or otherwise satisfied in accordance with its terms) on the latest of: (a) the Effective Date, or as soon after that date as practicable; (b) any date the Bankruptcy Court may fix, or as soon after that date as practicable; (c) 30 days after the Claim is Allowed; and (d) any date on which the holder of the Claim and the Reorganized Debtor agrees.

#### 2.  Requests for Payment

All requests for payment of an Administrative Claim (other than a Preserved Ordinary Course Administrative Claim or Professional Claim) must be served on the Reorganized Debtor and the Administrative Agent and filed with the Bankruptcy Court no later than the Administrative Claims Bar Date. Any holder of an Administrative Claim (other than a Preserved Ordinary Course Administrative Claim or Professional Claim) that fails to file and serve its request by the Administrative Claims Bar Date shall be forever barred from asserting its Administrative Claim against the Debtor or the Reorganized Debtor.

#### 3.  Preserved Ordinary Course Administrative Claims

Each Allowed Preserved Ordinary Course Administrative Claim shall be paid in full in Cash at the Reorganized Debtor's election either: (a) in accordance with the terms and conditions under which the Claim arose; or (b) on such date on which the holder of the Claim and the Reorganized Debtor agrees. Payments shall be made without further action by the holder of the Preserved Ordinary Course Administrative Claim.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

25

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

4.     **Allowed Priority Tax Claims**

Any Allowed Priority Tax Claim shall be paid in full in Cash on the later of the Effective Date (or as soon after that date as practicable) and 30 days after the Claim is Allowed, but the Debtor or the Reorganized Debtor may elect to pay any Allowed Priority Tax Claim through regular installment payments in Cash of a total value, as of the Effective Date, equal to the Allowed amount of the Claim, over a period ending not later than five years after the Petition Date, and in a manner not less favorable than the most favored General Unsecured Claim provided for by the Plan.  If the Debtor or the Reorganized Debtor so elects, the installment payments shall be made in equal quarterly installments of principal plus simple interest on the unpaid portion of the Allowed Priority Tax Claim accruing from the Effective Date at the rate of six percent per year.  The first payment shall be made on the latest of: (a) the Effective Date, or as soon after that date as practicable; (b) 30 days after the Claim is Allowed, or as soon after than date as practicable; and (c) another date on which the holder of the Claim and the Debtor or the Reorganized Debtor agrees.  The Reorganized Debtor retains the right to prepay any Allowed Priority Tax Claim, or any remaining balance of such a Claim, in full or in part, at any time on or after the Effective Date without premium or penalty.

5.     **Allowed Other Priority Claims**

Any Allowed Other Priority Claim shall be paid in full in Cash either: (a) on the later of the Effective Date (or as soon after that date as practicable) and 30 days after the Claim is Allowed; or (c) on such date on which the holder of the Allowed Other Priority Claim and the Reorganized Debtor agrees.

6.     **Professional Claims**

Each Allowed Professional Claim shall be paid in full in Cash: (a) no later than three days after the Professional Claim is Allowed; (b) on any other terms the holder of an Allowed Professional Claim and the Plan Proponent may agree; or (c) in accordance with the terms of any applicable administrative procedures order entered by the Bankruptcy Court.  Each Person seeking an award by the Bankruptcy Court of Professional Fees must file with the Bankruptcy Court and serve on the Reorganized Debtor its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date within 60 days after the Effective Date.

## VIII.   <u>TREATMENT OF CLASSES & EQUITY INTERESTS UNDER THE PLAN</u>

Pursuant to Section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Equity Interests in the Debtor.  All Claims and Equity Interests, except Administrative Claims, Priority Tax Claims, Other Priority Claims and any other unclassified Claims are placed in the Classes as set forth below.  In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Other Priority Claims have not been classified, and the respective treatments of such unclassified Claims are set forth in Article II of the Plan.

The treatment of Claims and Equity Interests as provided in Article IV of the Plan represents a compromise and full and final settlement, pursuant to Section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, of the various Claims and Equity Interests of parties in interest in the Chapter 11 Case.

12015364

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1  A.    **Class 1 – Secured Vendor Claims**

2          1.    **Impairment and Voting**.  Class 1 is Unimpaired by the Plan.  Holders of
Allowed Secured Vendor Claims in Class 1 are not entitled to vote and shall not be solicited to
3  vote on the Plan.

4          2.    **Treatment**.    Each holder of an Allowed Secured Vendor Claim is
considered to be in its own separate subclass within Class 1, and each such subclass is deemed to
5  be a separate Class for purposes of the Plan.  Each holder of an Allowed Secured Vendor Claim
shall receive, in full and final satisfaction, settlement, release, and discharge of, such Claim, a
6  Cash payment on the Effective Date equal to 100% of the Allowed amount of such Secured
Vendor Claim

7  B.    **Class 2 – Secured Tax Claims**

8          1.    **Impairment and Voting**.  Class 2 is Impaired by the Plan.  All holders of
Allowed Secured Tax Claims in Class 2 are entitled to vote and shall be solicited to vote on the
9  Plan.

10          2.    **Treatment**.  Each holder of an Allowed Secured Tax Claim is considered
to be in its own separate subclass within Class 2, and each such subclass is deemed to be a
11  separate Class for purposes of the Plan.  The treatment of Allowed Secured Tax Claims will
depend upon the nature of the property subject to the Lien of the holder of the Allowed Secured
12  Tax Claim.

13                (a)    Finished Lots: Each holder of an Allowed Secured Tax Claim that
are secured by a Lien on finished lots of the Debtor shall receive, in
14                       full and final satisfaction, settlement, release, and discharge of, such
Claim, the following treatment: a) the Claim holder will retain its
15                       Lien on the property until such time as the Claim is paid in full; and
b) the Claim will be paid in full and in Cash, with interest at the
16                       statutory rate, on the date that the respective developed lot is sold to
17                       a third party.

18                (b)    Unfinished Lots: Each holder of an Allowed Secured Tax Claim
that are secured by a Lien on unfinished lots of the Debtor shall
19                       receive, in full and final satisfaction, settlement, release, and
discharge of, such Claim, the following treatment: a) the Claim
20                       holder will retain its Lien on the property until such time as the
Claim is paid in full; and b) the Claim will be paid in full and in
21                       Cash, with interest at the statutory rate, over a 4- year period
following the Effective Date.  The Reorganized Debtor will make
22                       semi-annual payments on account of such Allowed Secured Tax
Claims.

23  C.    **Class 3 – Bank Group Claims**

24          1.    **Impairment and Voting**.  Class 3 is Impaired by the Plan.  All holders of
25  Allowed Bank Group Claims in Class 3 are entitled to vote and shall be solicited to vote on the
Plan.

26

12015364

Snell & Wilmer

——— L.L.P. ———

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

2.    **Treatment**.  In full settlement, release and discharge of all Bank Group Claims, on the Effective Date or as soon thereafter as practicable, Holders of Allowed Bank Group Claims shall receive the following:

(a)    Cash Payment:  On the Effective Date, the Borrowers will pay the Bank Group Effective Date Cash Payment to the holders of Allowed Bank Group Claims.

(b)    New Note:  On the Effective Date, the Borrowers will issue the New Note to the holders of Allowed Bank Group Claims, and shall execute the Amended and Restated Credit Agreement.    The Amended and Restated Credit Agreement provides for:

(1)    A maximum lot ratio,

(2)    Maximum speculative units,

(3)    No additional indebtedness or contingent liabilities,

(4)    Maintenance of all of the Reorganized Debtor's bank accounts at Bank of America, N.A., and

(5)    Evidence of Liability, Workman's Comp and Course of Construction insurance on all collateral with acceptable levels of coverage and underwritten by a credit-rated insurance company acceptable to the Bank Group.

(c)    Collateral:  On the Effective Date, the Borrowers will grant to the holders of Allowed Bank Group Claims senior, perfected and valid Liens on the Bank Group Collateral (subject only to existing Liens securing Allowed Secured Tax Claims), provided, however, that the Liens granted hereunder shall be released by the holders of Allowed Bank Group Claims upon the satisfaction of the conditions set forth in Section _____ of the Amended and Restated Credit Agreement.

(d)    Interest and Term:  The New Note matures on the third anniversary of the Effective Date.   The New Note shall bear interest at  (i) Prime + 3.75 % during the first year following the Effective Date, Prime + 4.75 % during the second year following the Effective Date, and Prime + 5.75 % during the third year following the Effective Date, subject to an interest rate floor of 7 %, or (ii) whatever rate the Bankruptcy Court approves as appropriate.

(e)    Minimum Amortization:  The Borrowers will make minimum semi-annual principal payments on the New Note in the amount of $ 10 million, which will be due and payable beginning six months after the first anniversary of the Effective Date, and every six months thereafter.

12015364

28

(f) <u>Mandatory Prepayments</u>: From and after the Effective Date, the Borrowers shall make mandatory prepayments pursuant to the Amended and Restated Credit Agreement as follows: (i) in connection with the sale of Bank Group Collateral consisting of a Unit, the Borrowers shall prepay the obligations arising under the Amended and Restated Credit Agreement in an aggregate amount equal to 25 % of the Gross Sales Price from the sale of such Unit; and (ii) in connection with the sale of Bank Group Collateral consisting of a Non-Unit, the Borrowers shall apply the Net Cash Proceeds from such sale as follows: (a) first, to fund the Minimum Working Capital Reserve, if necessary, and (b) second, all remaining Net Cash Proceeds shall be used to prepay the obligations arising under the Amended and Restated Credit Agreement.

D. **Class 4 – General Unsecured Claims**

1. **Impairment and Voting**. Class 4 is Unimpaired by the Plan. Holders of Allowed General Unsecured Claims in Class 4 are not entitled to vote and shall not be solicited to vote on the Plan.

2. **Treatment**. Holders of Allowed General Unsecured Claims (other than Bank Group Claims, the Queen Creek Claim, and the Fulton Unsecured Claim) will receive, in full and final satisfaction of such claims a Cash payment on the Effective Date equal to 100% of the Allowed amount of such General Unsecured Claim.

E. **Class 5 – Queen Creek Claims**

1. **Impairment and Voting**. Class 5 is Impaired by the Plan. All Holders of Allowed Queen Creek Claims in Class 5 are entitled to vote and shall be solicited to vote on the Plan.

2. **Treatment**. The Queen Creek Claims shall be Allowed in the amount of $250,000. Holders of Allowed Queen Creek Claims will receive, in full and final satisfaction of such claims, a Cash payment on the Effective Date equal to 100% of the Allowed amount of such Queen Creek Claim.

In the Event that the Debtor and Queen Creek reach a settlement of the Queen Creek Claims and such settlement is submitted to and approved by the Bankruptcy Court, the Queen Creek Claims will be Unimpaired by the Plan and Queen Creek would not be entitled to vote and would not be solicited to vote on the Plan.

F. **Class 6 – Unsecured Warranty Claims**

1. **Impairment and Voting**. Class 6 is Unimpaired by the Plan. All holders of Allowed Equity Interests in Class 6 are deemed to have accepted the Plan and shall not be entitled to vote on the Plan.

2. **Treatment.** Holders of Allowed Unsecured Warranty Claims will have their Claims paid in full in the ordinary course of business of the Debtor or Reorganized Debtor, as applicable, as and when such Claims become Allowed.

12015364

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

G.   **Class 7 – Fulton Unsecured Claim**

1.   **Impairment and Voting**.  Class 7 is Impaired by the Plan.  All holders of Allowed Fulton Unsecured Claims in Class 7 are entitled to vote and shall be solicited to vote on the Plan.

2.   **Treatment**.   The Fulton Unsecured Claim is subordinate to the Bank Group Claims pursuant to the Subordination Agreement.   There shall be no payments made on account of the Fulton Unsecured Claim so long as any obligations under the New Loan Documents remain outstanding.  Following the payment of the Bank Group Claim, the Fulton Unsecured Claim shall be paid as the Reorganized Debtor determines; provided, however, cash over and above all necessary and appropriate company operations and reserves are met until the Fulton Unsecured Note is paid in full.

Nothing in the Plan or Confirmation Order, including Article 10.4 of the Plan, shall alter or impair the Subordination Agreement.

H.   **Class 8 – Equity Interests**

1.   **Impairment and Voting**.  Class 8 is Impaired by the Plan.  All holders of Allowed Equity Interests in Class 8 are entitled to vote and shall be solicited to vote on the Plan.

2.   **Treatment**.   The Reorganized Debtor will not make distributions to holders of Allowed Equity Interests, including any distributions to holders of Allowed Equity Interests for the purpose of permitting such holders to personal pay taxes, until the Borrowers' obligations under the New Loan Documents are first satisfied in full.

Additionally, to facilitate the transactions and treatment of Claims set forth in the Plan, on the Effective Date the holders of Allowed Equity Interests will, as described in Article 6.1 of the Plan: (a) make Fulton Sales become a Borrower under the Amended and Restated Credit Agreement; and (b) make Fulton Sales pledge its assets to the holders of Allowed Bank Group Claims as part of the Bank Group Collateral.

## IX.   SUMMARY OF THE NEW CREDIT FACILITY TO BE ISSUED PURSUANT TO THE PLAN

The Reorganized Debtor shall fund Distributions under the Plan with Cash on hand, the sale of existing assets in the ordinary course of business, the New Credit Facility, the agreement of Fulton Sales to become a Borrower under the New Credit Facility, the conversion of the Fulton Unsecured Claim into equity in the Reorganized Debtor, and the creation of new Liens and security interests in assets of the Reorganized Debtor and the assets of Fulton Sales to secure the obligations of the Borrowers under the New Credit Facility.

A.   **New Credit Facility.**  On the Effective Date, the Borrowers will execute the New Loan Documents.  Pursuant to the New Loan Documents, the Borrowers will issue the New Note to the holders of Allowed Bank Group Claims on the Effective Date.

B.   **Fulton Sales Becomes Borrower Under New Credit Facility or Alternative.** On the Effective Date, in full and final settlement and satisfaction of the treatment of Claims and releases granted under the Plan, Fulton Sales agrees to become a Borrower under the New Credit Facility, and will, in its capacity as Borrower, pledge all of its assets, including unrestricted Cash

12015364

generated post-Effective Date from Sales of Units and Non-Units, as part of the Bank Group Collateral. In the event that Fulton Sales management or equity holders decline to be part of the New Credit Facility, then the Bank Group will proceed with execution and collection of the assets of Fulton Sales and the Fulton Sales assets will be applied to pay down the New Credit Facility.

      **C.**    **Bank Group Collateral.** On the Effective Date, in full and final settlement and satisfaction of the treatment of Claims and releases granted under the Plan, the obligations of the Borrowers under the New Credit Facility shall be secured by senior, perfected and valid Liens on the Bank Group Collateral (subject only to existing Liens securing Allowed Secured Tax Claims), provided, however, that the Liens granted hereunder shall be released by the holders of Allowed Bank Group Claims upon the satisfaction of the conditions set forth in Section _____ of the Amended and Restated Credit Agreement.

## X.    MEANS FOR EXECUTING THE PLAN

### A.    Sources of Consideration for Plan Distributions

      The Reorganized Debtor would fund Distributions under the Plan with Cash on hand, the sale of existing assets in the ordinary course of business, the New Credit Facility, the agreement of Fulton Sales to become a Borrower under the New Credit Facility or the application of the assets therefrom by execution and collection, the conversion of the Fulton Unsecured Claim into equity in the Reorganized Debtor, and the creation of new Liens and security interests in assets of the Reorganized Debtor and Fulton Sales to secure the obligations of the Borrowers under the New Credit Facility. This funding may include borrowing or equity investments following the third year of the Plan.

### B.    New Credit Facility

      On the Effective Date, the Borrowers will execute the New Loan Documents. Pursuant to the New Loan Documents, the Borrowers will issue the New Note to the holders of Allowed Bank Group Claims on the Effective Date.

### C.    Fulton Sales Becomes Borrower Under New Credit Facility or Alternative

      On the Effective Date, in full and final settlement and satisfaction of the treatment of Claims and releases granted under the Plan, Fulton Sales agrees to become a Borrower under the New Credit Facility, and will, in its capacity as Borrower, pledge all of its assets, including unrestricted Cash generated post-Effective Date from Sales of Units and Non-Units, as part of the Bank Group Collateral. In the event that Fulton Sales management or equity holders decline to be part of the New Credit Facility, then the Bank Group will proceed with execution and collection of the assets of Fulton Sales and the Fulton Sales assets will be applied to pay down the New Credit Facility.

### D.    Bank Group Collateral

      On the Effective Date, in full and final settlement and satisfaction of the treatment of Claims and releases granted under the Plan, the obligations of the Borrowers under the New Credit Facility shall be secured by senior, perfected and valid Liens on the Bank Group Collateral (subject only to existing Liens securing Allowed Secured Tax Claims), provided, however, that the Liens granted hereunder shall be released by the holders of Allowed Bank Group Claims upon

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

the satisfaction of the conditions set forth in Section _____ of the Amended and Restated Credit Agreement.

E.  **Continued Corporate Existence**

1.  **The Debtor**.  From and after the Effective Date, the Debtor will continue to exist, with all the powers of a corporation under applicable law in the jurisdiction in which each the Debtor is incorporated and pursuant to its articles of incorporation and bylaws in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws are amended by the Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

2.  **Amended and Restated Organizational Documents**.  As of the Effective Date and without any further action by the stockholders or directors of the Debtor or the Reorganized Debtor, the Reorganized Debtors' certificate of incorporation will be amended and restated substantially in the form of the Amended and Restated Articles of Organization.[5]  The Amended and Restated Organizational Documents will also prohibit (to the extent required by Sections 1123(a) and (b) of the Bankruptcy Code) the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtor may amend the Amended and Restated Organizational Documents as permitted by applicable law.

3.  **Non-Debtors**.   There are certain Affiliates of the Debtor that are not Debtors in the Chapter 11 Case.  The continued existence, operation and ownership of such Non-Debtor Affiliates is a material component of the Debtor's business, and, as set forth in Article 10.1 of the Plan, all of the Debtor's equity interests and other property interests in such Non-Debtor Affiliates shall revest in the Reorganized Debtor on the Effective Date.

F.  **Cancellation of Securities, Instruments, and Agreements**

On the Effective Date, except to the extent provided otherwise in the Plan, all securities, and all agreements, instruments, and other documents evidencing or governing any Claims against the Debtor, will be automatically deemed terminated, canceled, and extinguished with respect to the Debtor and the Chapter 11 Case (all without further action by any Person), and all obligations of the Debtor and its Estate under such instruments and agreements will be deemed fully and finally waived, released, canceled, extinguished, and discharged.

G.  **Effectiveness of New Securities, Instruments, Agreements, and Documents**

On the Effective Date, all securities, instruments, agreements, and documents issued, entered into, delivered, or filed under the Plan, including, without limitation, the New Note, the Amended and Restated Credit Agreement, the Plan Documents, and any security, instrument, agreement or document entered into, delivered, or filed in connection with any of the foregoing, will be deemed to become effective, binding, and enforceable in accordance with its respective terms and conditions.

---

[5] The Amended and Restated Articles of Organization are attached as Exhibit 4.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

### H. No Corporate Action Required

As of the Effective Date: (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements related to or contemplated by the Plan; and (b) the other matters provided for under, or in furtherance of, the Plan involving corporate action required of the Debtor, will be deemed to have occurred and become effective as provided in the Plan, and will be deemed authorized and approved in all respects without further order of the Bankruptcy Court or any further action by the stockholders or directors of the Debtor.

### I. Officers and Directors

1. **Board of Directors**. The board of directors of the Reorganized Debtor as of the Effective Date shall consist of Ira and Mary Lou Fulton, and an independent director to be named by the Plan Proponent [name of independent director will be inserted prior to solicitation of the Plan]. Ira A. Fulton will serve on the board of directors of the Reorganized Debtor. The Schedule of Compensation of Officers and Directors of the Reorganized Debtor is attached as Exhibit 11.

2. **Officers**. The officers of the Reorganized Debtor as of the Effective Date may consist of Douglas S. Fulton, who would continue as Chief Executive Officer and Executive Vice President, Norman Lee Nicholls, who would continue as President and Chief Operating Officer, and Steve W. Walters, who would continue as Chief Financial Officer and Treasurer. In the event that any office or key employees declines to continue with the Reorganized Company post-Effective Date, their positions would be filled by a determination of the board of the Reorganized Debtor.

3. **Indemnification and Insurance**. The Reorganized Debtor will assume any pre-Petition Date indemnification obligations to any current or former directors and officers employed with the Debtor as of the Effective Date.

### J. Operations Pending Effective Date

Until the Effective Date, the Debtor will continue to operate its business, subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules.

### K. Exemption from Transfer Taxes

In accordance with Section 1146 of the Bankruptcy Code: (a) the issuance, distribution, transfer and exchange of the New Note; (b) the execution and filing of any deed of trust, security agreement or other document or instrument necessary to create, attach, perfect or record any Lien, mortgage, deed of trust or security interest granted under the Plan; (c) the issuance, distribution, transfer, and exchange of assets or property of the Reorganized Debtor, including, without limitation, all real property owned by the Debtor; (d) the execution, assignment, modification, or recording of any lease or sublease; and (e) the execution, delivery, or recording of a deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, the Confirmation Order, or any transaction contemplated above, or any transactions arising out of, contemplated by, or in any way related to, the foregoing are not subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, or real estate transfer tax, or other similar tax or governmental assessment and the appropriate state or local government officials or agents are directed to forego the collection of any such tax or assessment and to accept for filing

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

or recordation any of the foregoing instruments or other documents without the payment of any such tax or assessment.

### L.    Payment of Trustee Fees

The Debtor shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) within 10 days of the entry of the order of confirmation for pre-confirmation periods and simultaneously provide to the United States Trustee an appropriate affidavit indicating the case disbursements for the relevant period. The Reorganized Debtor shall further pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) based upon all disbursements of the Reorganized Debtor for post-confirmation periods within the time periods set forth in 28 U.S.C. § 1930(a)(6), until the earlier of the closing of these cases by the issuance of a Final Decree by the Court, or upon the entry of an Order by this Court dismissing this case or converting this case to another chapter under the Bankruptcy Code, and the parties responsible for paying the post-confirmation United States Trustee fees shall provide to the United States Trustee upon the payment of each post-confirmation payment an appropriate affidavit indicating all the cash disbursements for the relevant period.

## XI.    DISTRIBUTIONS

### A.    Distributions on Account of Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, initial Distributions under the Plan on account of Claims Allowed on or before the Effective Date shall be made on the Distribution Record Date; provided, however, that (1) Preserved Ordinary Course Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case or assumed by the Debtor prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims, unless otherwise agreed, shall be paid in accordance with Article II.4 of the Plan.

### B.    Distribution on Account of Claims Allowed after the Effective Date

1.    **Payments and Distributions on Disputed Claims**. Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, Distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the Distribution Date that is at least thirty days after the Disputed Claim becomes an Allowed Claim; provided, however, that (a) Disputed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case or assumed by the Debtor on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business or industry practice, and (b) Disputed Priority Tax Claims become Allowed Priority Tax Claims after the Effective Date, unless otherwise agreed, shall be paid in accordance with Article II.4 of the Plan.

2.    **Special Rules for Distributions to Holders of Disputed Claims**. Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a

Snell & Wilmer
—— L.L.P. ——
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and all Claims of such Holder have been Allowed. In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtor shall in its sole discretion establish appropriate reserves for potential payment of such Claims. All Distributions made pursuant to the Plan on account of an Allowed Claim shall be made together with any dividends, payments, or other Distributions made on account of, as well as any obligation arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates Distributions were previously made to Holders of Allowed Claims included in the applicable Class.

3. **Reserve of Funds for Payment of Disputed Claims**. On the Effective Date, after calculating Distributions to Holders of Allowed Claims and potential Distributions to Holders of Disputed Claims under the Plan, the Reorganized Debtor shall retain and set aside in a reserve fund an amount in cash sufficient to make all payments and Distributions which may be subsequently required for payment to Holders of Disputed Claims. As Disputed Claims are Allowed, the Reorganized Debtor shall distribute, in accordance with the terms of the Plan, Cash to Holders of Allowed Claims, and the reserve fund shall be adjusted. The Reorganized Debtor may (but is not required to) request estimation for any Disputed Claim that is contingent or unliquidated.

4. **Limits on Distributions**. Notwithstanding anything in the applicable holder's Proof of Claim or otherwise to the contrary, the Holder of a Claim shall not be entitled to receive or recover a Distribution under the Plan on account of a Claim in excess of the amount: (a) stated in the holder's Proof of Claim, if any, as of the Distribution Record Date, plus interest thereon to the extent provided for by the Plan; (b) if the Claim is denominated as contingent or unliquidated as of the Distribution Record Date, the amount that the Debtor elects to reserve on account of such Claim, or such other amount as may be estimated by the Bankruptcy Court prior to the Confirmation Hearing; or (c) if a Claim has been estimated, the amount reserved to satisfy such Claim after such estimation.

C. **Delivery of Distributions**

1. **Record Date for Distributions**. On the Distribution Record Date, the Claims Register shall be closed and the Distribution Agent shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, if a Claim or Equity Interest is transferred twenty or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to transfer by the transferor.

2. **Distribution Agent**. The Distribution Agent shall make all distributions required under the Plan to the holders of Allowed Claims.

3. **Delivery of Distributions**. Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Distribution Agent: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the signatory set forth on any of the Proofs of Claim filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is filed or if the Debtor has been notified in writing of a change of address); (c)

Snell & Wilmer
——— L.L.P. ———
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim; (d) at the addresses reflected on the Schedules if no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address; or (e) on any counsel that has appeared in the Chapter 11 Case on the holder's behalf. Distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of distributions in the manner set forth in the Plan. The Debtor, the Reorganized Debtor, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan, except for gross negligence or intentional misconduct.

4. **Compliance Matters**. In connection with the Plan, to the extent applicable, the Reorganized Debtor and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Distributions pursuant to the Plan shall be subject to such tax withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtor and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such tax withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate to comply with such withholding and reporting requirements.

D. **Fractional, De Minimis, Undeliverable, and Unclaimed Distributions**

1. **Fractional Distributions**. Notwithstanding any other provision of the Plan to the contrary, payments of fractions of dollars shall not be made and shall be deemed to be zero, and the Reorganized Debtor and the Distribution Agent shall not be required to make distributions or payments of fractions of dollars. Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment by the Reorganized Debtor or Distribution Agent shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

2. **De Minimis Distributions**. The Reorganized Debtor and Distribution Agent shall not have any obligation to make a Distribution on account of an Allowed Claim if (1) the amount to be distributed to the Holder of an Allowed Claim on the particular Periodic Distribution Date does not constitute a final Distribution to such Holder and is or has an economic value of less than $50 or (2) the aggregate amount of all Distributions authorized to be made on that Periodic Distribution Date have an economic value less than $20,000, unless such Distribution is a final Distribution.

3. **Undeliverable Distributions**. If any Distribution to a Holder of an Allowed Claim is returned to the Reorganized Debtor or the Distribution Agent as undeliverable, no further Distributions shall be made to such Holder unless and until the Reorganized Debtor or Distribution Agent is notified in writing of such Holder's then-current address, at which time all currently due missed Distributions shall be made to such Holder on the next Periodic Distribution Date. Undeliverable Distributions shall remain in the possession of the Reorganized Debtor until such time as a Distribution becomes deliverable, or such Distribution shall be reallocated to the Holders of other Claims in the same Class on a pro rata basis, (defined as the quotient of each Allowed Claim in such Class and all Allowed Claims in that Class), and shall not be supplemented with any interest, dividends, or other accruals of any kind.

Snell & Wilmer
— L.L.P. —
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

4.     **Reversion**.  Any Distribution under the Plan that is an Unclaimed Distribution for a period of six months after the Periodic Distribution Date on which such Distribution is initially attempted shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall be reallocated to other Holders of Claims in the same Class as the Claim on account of which such Unclaimed Distribution was made, pro rata (defined as the quotient of each Allowed Claim in such Class and all Allowed Claims in that Class).  Upon such reallocation, the Claim of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.

E.     **Manner of Payment Pursuant to the Plan**.  Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Reorganized Debtor by check or by wire transfer.  Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within ninety days after issuance, but may be reissued upon written request of the recipient until the Distribution is reallocated to the Holders of other Claims in the same Class.

F.     **Claims Paid or Payable by Third Parties**

1.     **Claims Paid by Third Parties**.  The Debtor or Reorganized Debtor, as applicable, shall reduce in full a Claim on the Claims Register, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtor or the Reorganized Debtor.  Further, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtor or the Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.     **Claims Payable by Third Parties**.  No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtor's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtor's insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Debtor or Reorganized Debtor without a Claims objection having to be filed and without any further notice, other than notice to the Holder of such Claim of such expungement, or action, order, or approval of the Bankruptcy Court.

3.     **Applicability of Insurance Policies**.  Distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

12015364

Snell & Wilmer
—— L.L.P. ——
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

## XII.   RETAINED CAUSES OF ACTION

The Reorganized Debtor specifically retains all causes of action. Any retained causes of action include, but are not limited to, all avoidance actions, fraudulent conveyance actions, preference actions, unjust enrichment or other restitution actions, and other claims and causes of action of every kind and nature whatsoever, arising before the Effective Date which have not been resolved or disposed of prior to the Effective Date, whether or not such claims or causes of action are specifically identified in this Disclosure Statement.

## XIII.   MANAGEMENT

Ira A. Fulton would continue to serve on the board of directors of the Reorganized Debtor. Ira A. Fulton will be compensated as a member of the three person board of directors, whose fees are set in the amount of $50,000, plus reimbursement of all reasonable related expenses.

The Reorganized Debtor would be managed by the same management team that managed the Debtor pre-petition, including: Doug Fulton (the Debtor's Chief Executive Officer and Executive Vice President), Norm Nicholls (the Debtor's President and Chief Operating Officer), and Steve Walters (the Debtor's Chief Financial Officer and Treasurer) (collectively, the "**Management Team**"). Information regarding post-confirmation compensation for the board of directors and the Management Team is included on Exhibit 11.

Fulton claims that it has continued to sell homes at an above average rate given the current market climate, increasing its market share from 3% prior to the Petition Date to over 7% recently. Fulton also claims that in addition to increasing the Debtor's share of the Phoenix homebuilding market in 2009, Fulton and its Management Team similarly increased the Debtor's national homebuilder ranking from 70th in 2008 to 49th in 2009.

By retaining the current Management Team in place, the Fulton claims that the Reorganized Debtor benefit from the specific knowledge and experience of its Management Team. Thus, Fulton believes that a change in management structure is not in the best interests of the Debtor or its creditors because the existing structure is appropriate to the needs of the Debtor. In addition, by maintaining the current management, Fulton claims that the Reorganized Debtor will avoid the transactional costs associated change in management. The Reorganized Debtor hopes to preserve the institutional knowledge of the Management Team.

The Bank Group does not have any confirmation that any member the Management Team will remain with the Reorganized Debtor, but does not require that any member of the Management Team will leave the Reorganized Debtor before or after the Effective Date. In the event that any member of the Management Team elects to pursue new opportunities, the Bank Group is confident that it will be able to hire qualified professionals, especially given the number of available homebuilding professionals affected by the current recession.

## XIV.   EFFECT OF CONFIRMATION

### A.   Vesting of Assets

Except as provided in the Plan, the Confirmation Order, or the Plan Documents, all property of the Estate shall vest in the Reorganized Debtor on the Effective Date free and clear of all Liens and Claims of all kinds existing before the Effective Date; provided, however, that all assets of the Reorganized Debtor shall be subject to the senior, perfected Liens granted to the

12015364

38

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1   holders of Allowed Bank Group Claims, with such Liens being senior to any and all other Liens,
2   Claims, and interests, including any Liens or Claims of creditors asserting mechanic's liens or
    similar operational liens, other than Liens securing Allowed Secured Tax Claims. Real property
3   which vests in the Reorganized Debtor shall remain subject to any easements, rights-of-way,
    zoning, covenants, conditions, restrictions, and other similar land-use restrictions in existence as
4   of the Effective Date. From and after the Effective Date, the Reorganized Debtor may use,
    acquire, and dispose of property free of any restrictions of the Bankruptcy Code, including the
5   employment of, and payment to, Professionals except as otherwise provided in the Plan, or the
    Confirmation Order.

6       B.      **Discharge**

7           Except as provided in the Plan or the Confirmation Order, the rights granted under the
8   Plan and the treatment of Claims and Equity Interests under the Plan are in exchange for and in
    complete satisfaction, discharge, and release of, all Claims including any interest accrued on
9   General Unsecured Claims from the Petition Date and termination of all Equity Interests. Except
    as provided in the Plan or the Confirmation Order, confirmation of the Plan discharges the Debtor
10  and the Reorganized Debtor from all Claims or other debts that arose before the Confirmation
    Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy
11  Code, whether or not: (i) a proof of claim based on such debt is filed or deemed filed under
    Section 501 of the Bankruptcy Code; (ii) a Claim based on such debt is Allowed under
12  Section 502 of the Bankruptcy Code; or (iii) the holder of a Claim based on such debt has
    accepted the Plan. Without limiting the foregoing, the discharge granted under the Plan is granted
13  to the fullest extent allowed under Sections 1141(a), 1141(b), 1141(c), and 1141(d)(1) of the
    Bankruptcy Code.

14      C.      **Discharge Injunction**

15          *Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date,*
16  *all entities that have held, currently hold, or may hold a Claim or other debt or liability that is*
    *unclassified by the Plan or that is classified by the Plan or is subject to a distribution under the*
17  *Plan, or an interest or other right of an Equity Interest holder that is treated under the Plan,*
    *are permanently enjoined from taking any of the following actions on account of any such*
18  *Claims, debts, liabilities, or Interests or rights: (a) commencing or continuing in any manner*
    *any action or other proceeding against the Debtor and the Reorganized Debtor; (b) enforcing,*
19  *attaching, collecting, or recovering in any manner any judgment, award, decree, or order*
    *against the Debtor, the Reorganized Debtor, or their respective property; (c) creating,*
20  *perfecting, or enforcing any Lien or encumbrance against the Debtor, the Reorganized Debtor,*
    *or their respective property; (d) asserting a right of setoff, subrogation, or recoupment of any*
21  *kind against any debt, liability, or obligation due to the Debtor, the Reorganized Debtor, or*
    *their respective property; and (e) commencing or continuing any action, in any manner, in any*
22  *place, that does not comply with or is inconsistent with the provisions of the Plan or the*
    *Bankruptcy Code. Nothing in the Plan is to be construed or is to have the effect of*
23  *extinguishing, prohibiting, or otherwise limiting, the right of any holder of a Claim to assert a*
    *right to setoff or recoupment arising in connection with that Claim as part of the resolution*
    *and treatment of that Claim under the Plan.*

24      D.      **Injunction**

25          *Confirmation of the Plan shall act as an injunction against any Person commencing or*
26  *continuing against the Reorganized Debtor, or any of its assets, any action, employment of*

12015364

39

*process, or act to collect, offset, or recover any Claim or cause of action such Person may possess against the Debtor.*

### E.      **Preservation of Insurance**

The discharge and release from Claims as provided in the Plan, except as necessary to be consistent with the Plan, do not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtor or any other Person

## XV.   DOCUMENTATION OF PLAN IMPLEMENTATION

In the event any entity which possesses an Allowed Secured Claim or any other Lien in any of the Debtor's property for which the Plan requires the execution of any documents to incorporate the terms of the Plan fails to provide a release of its Lien or execute the necessary documents to satisfy the requirements of the Plan, the Debtor may record a copy of the Plan or the Confirmation Order with the appropriate governmental agency or office and such recordation shall constitute the lien release and creation of any necessary new liens to satisfy the terms of the Plan. If the Debtor deems advisable, it may obtain a further Order from the Bankruptcy Court that may be recorded in order to implement the terms of the Plan.

## XVI.   EXEMPTION FROM TRANSFER TAXES

In accordance with Section 1146 of the Bankruptcy Code: (a) the issuance, distribution, transfer, and exchange of the New Note; (b) the execution and filing of any deed of trust, security agreement, or other document or instrument necessary to create, attach, perfect, or record any Lien, mortgage, deed of trust, or security interest granted under the Plan; (c) the issuance, distribution, transfer, and exchange of assets or property of the Reorganized Debtor, including, without limitation, all real property owned by the Debtor; (d) the execution, assignment, modification, or recording of any lease or sublease; and (e) the execution, delivery, or recording of a deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, the Confirmation Order, or any transaction contemplated above, or any transactions arising out of, contemplated by, or in any way related to, the foregoing are not subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, or real estate transfer tax, or other similar tax or governmental assessment and the appropriate state or local government officials or agents are directed to forego the collection of any such tax or assessment and to accept for filing or recordation any of the foregoing instruments or other documents without the payment of any such tax or assessment.

## XVII.   LIQUIDATION ANALYSIS

The Debtor submitted a Liquidation Analysis as Exhibit G to the Plan Supplement [D.E. 466]. The Debtor has represented that its Liquidation Analysis is a true and correct representation of the a hypothetical liquidation of the Debtor. Without endorsement of its contents, the Bank Group incorporates by reference the Debtor's Liquidation Analysis for purposes of disclosure. The Liquidation Analysis is attached as Exhibit 8.

## XVIII. FEASIBILITY ANALYSIS

*The Bank Group's detailed Feasibility Analysis is attached as Exhibit 9. The following is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto*

Snell & Wilmer
——— L.L.P. ———
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

Snell & Wilmer
—— L.L.P. ——
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

*appearing in the Plan. The final Feasibility Analysis provided in the Plan may change or differ from the following general overview. In the event of any conflict between the Feasibility Analysis provided in the Plan and this general overview, the Feasibility Analysis provided in the Plan will govern.*

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor. This requirement is imposed by Section 1129(a)(11) of the Bankruptcy Code and is referred to as the "feasibility" requirement. The Bank Group believes that they will be able to perform timely all obligations described in the Plan and, therefore, that the Plan is feasible.

To demonstrate the feasibility of the Plan, the Debtors will attach a feasibility analysis and financial projections as Exhibit 9 (the "**Feasibility Analysis**"). The Feasibility Analysis demonstrates that the Reorganized Debtor will have sufficient Cash on hand as of the Effective Date to make, on the Effective Date, all payments to Creditors owing on the Effective Date, and sufficient Cash on hand to satisfy all remaining obligations under the Plan to all Creditors in all Classes. Accordingly, the Bank Group believes that the Plan satisfies the feasibility requirement of Section 1129(a)(11) of the Bankruptcy Code. The Bank Group cautions that no representations can be made as to the accuracy of the Feasibility Analysis and projections contained in the Plan or as to the Reorganized Debtor's ability to achieve the projected results. Certain of the assumptions on which the Feasibility Analysis is based are subject to uncertainties outside the Debtor's control. Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the Feasibility Analysis was prepared may be different from those assumed or may be unanticipated, and may adversely affect the Debtor's financial results. Therefore, the actual results can be expected to vary from the Feasibility Analysis and the variations may be material and adverse.

The Feasibility Analysis was not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants, the practices recognized to be in accordance with generally accepted accounting principles, or the rules and regulations of the SEC regarding projections. Furthermore, the Feasibility Analysis was not audited by the Debtor's or the Bank Group's independent accountants. Although presented with numerical specificity, the Feasibility Analysis is based on a variety of assumptions, some of which in the past have not been achieved and which may not be realized in the future, and are subject to significant business, economic, and competitive uncertainties and contingencies, and many of which are beyond the Debtors' control. Consequently, the Feasibility Analysis should not be regarded as a representation or warranty by the Debtor, the Bank Group, or any other Person, that projections will be realized. Actual results may vary materially from those presented.

## XIX. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A summary description of certain United States federal income tax consequences (hereinafter, "**Tax Consequences**") of the Plan follows. This description is for informational purposes only and, owing to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various Tax Consequences of the Plan discussed below. This disclosure describes only the principal Tax Consequences of the Plan to the Debtor and to holders of Claims and Equity Interests. No opinion of counsel has been sought or obtained with respect to any Tax Consequences of the Plan. No rulings or determinations of the Internal Revenue Service ("**IRS**") or any other tax authorities have been sought or obtained with respect to any Tax Consequences of the Plan, and the discussion below is not binding on the IRS or other authorities. No representations are being made to the Debtor, the

12015364

Snell & Wilmer
—— L.L.P. ——
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Bank Group, or any holder of a Claim or Equity Interest regarding the particular Tax Consequences of the confirmation and consummation of the Plan. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed here.

The following discussion of the Tax Consequences is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), Treasury Regulations, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the Tax Consequences of the Plan to special classes of taxpayers (e.g., insurance companies, tax-exempt organizations, Persons that are, or hold their Claims through, pass-through entities, Persons whose functional currency is not the United States dollar, foreign persons, dealers in securities or foreign currency, employees of the Debtor, Persons who received their Claims by exercising an employee stock option or otherwise as compensation, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction). Furthermore, the following discussion does not address United States federal taxes other than income taxes.

The following discussion assumes that the Debtor validly elected subchapter S corporation status within the meaning of Sections 1361 and 1362 of the Tax Code (the "**S Status**"), and its shareholders have consented to such election, effective as of the date the Debtor was originally organized and that neither the Debtor nor its shareholders, or any other agents thereof, have taken or permitted any action that resulted in a termination of the Debtor's S Status through the Effective Date. If the Debtor's S Status has not been maintained from the date it was originally organized through the Effective Date, the discussion below would be irrelevant as the Debtor would be taxed as a corporation, as opposed to an S corporation, for United States federal income tax purposes (hereinafter, "**Tax Purposes**").

Holders of Claims and Equity Interests are strongly urged to consult their own tax advisor regarding the United States federal, state, local, and foreign tax consequences of the transactions described in this Disclosure Statement and in the Plan.

A.      **Tax Consequences to the Debtor**

The Debtor has been treated as an subchapter S corporation for Tax Purposes. Generally speaking, a subchapter S corporation is not a taxable entity and does not incur any federal income tax liability. Rather any gains, losses, or other items of income, deductions, or credit (hereinafter "**Tax Items**") realized by the Debtor are passed through to the holders of Equity Interests. The fact that the Debtor has filed a Chapter 11 proceeding does not change this tax result. No new taxable entity is created when a subchapter S corporation files bankruptcy. Thus, any gain or loss recognized by the Debtor in connection with the transactions contemplated by the Plan will be passed through to the holders of Equity Interests. The Debtor will continue to file information returns for Tax Purposes and will allocate to each shareholder his, her, or its respective share of Tax Items.

12015364

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1         1.     **Cancellation of Indebtedness ("COD") Income**

Under the Plan, the Debtor's outstanding indebtedness will be satisfied in exchange for Cash payments and the execution of the New Credit Facility pursuant to which the New Note will be issued (hereinafter, the execution of the New Credit Facility and the issuance of the New Note will be collectively referred to as the "**Debtor's New Debt**"). It is anticipated that the Cash payments and the issue price of the Debtor's New Debt will be equal to the amount of the Debtor's outstanding indebtedness. In such an event, the Debtor will not realize any COD income. The Debtor, however, will realize COD income to the extent the Cash payments and the issue price of the Debtor's New Debt are less than the particular Claim being satisfied in exchange therefor.

In the event the Debtor does realize COD income as described above, Section 108(a)(1)(A) of the Tax Code should permit the Debtor to exclude from gross income any COD income resulting from debt discharged pursuant to the Plan. Pursuant to Section 108(b) of the Tax Code, however, the amount of COD income excluded from the Debtor's gross income must be applied to reduce other tax attributes of the Debtor in the following order: (1) net operating losses; (2) general business credits; (3) minimum tax credit; (4) capital loss carryovers; (5) reduction of the Debtor's tax basis in its property; (6) passive activity loss and credit carryovers; and (7) foreign tax credit carryovers. The Debtor's most likely attribute to be reduced in this instance is the Debtor's tax basis in its property.

     2.     **Second Class of Stock**

Generally speaking, the Debtor's filing of the bankruptcy proceeding will not affect its election to be taxed as a subchapter S corporation for Tax Purposes. Subchapter S corporations, however, are not allowed to have more than one class of stock, and debt instruments or other arrangements can at times be reclassified as a second class of stock. If either the Debtor's New Debt or future Cash payments being made under the Plan are treated as a second class of stock, the Debtor's S Status would terminate and it would be taxed as a C-corporation following the Effective Date. A debt instrument or other arrangement will not be classified as a second class of stock if it is (1) "straight debt" for Tax Purposes; (2) treated as debt for Tax Purposes; or (3) issued or entered into with the principal purpose of circumventing the S corporation "second class of stock" rules. It is anticipated that neither the Debtor's New Debt nor the future Cash payments to be made under the Plan will be treated as a second class of stock.

     3.     **Fulton Sales Stock Contribution**

On or prior to the Effective Date, Ira and Mary Lou Fulton may contribute all of the stock of Fulton Sales to the Fulton Family Trust (the "**Trust Contribution**"). On the Effective Date, Fulton Sales will make the Fulton Sales Reimbursement Payment to the Reorganized Debtor. Further, on the Effective Date, but after the Trust Contribution and the Fulton Sales Reimbursement Payment, the Fulton Family Trust will, in turn, contribute all of the stock of Fulton Sales to the Reorganized Debtor (the "**Fulton Sales Stock Contribution**"). Subsequent to the Effective Date, pursuant to a contractual plan of reorganization (the "**Tax Plan**"), Reorganized Debtor will make an election to treat Fulton Sales as a qualified subchapter S subsidiary (the "**Q-Sub Election**"), effective as of the Fulton Sales Stock Contribution.

It is anticipated that the implementation of the Tax Plan (i.e., the Fulton Sales Stock Contribution and the Q-Sub Election), when viewed together, will be a tax-free reorganization under Code Section 368(a)(1)(D) and (G) (the "**Tax Reorganization**"). Under such

12015364

43

circumstances, the Tax Plan, as per Code Section 368(a)(3)(C), will be treated as a tax-free reorganization under Code Section 368(a)(1)(G). As a result of the Tax Reorganization, neither the Debtor nor Fulton Sales, or their respective shareholders, will recognize gain or loss as a result of the Tax Reorganization. Subsequent to the Tax Reorganization, Fulton Sales, due to the Q-Sub Election, will be a disregarded entity and all of its assets and liabilities will be treated as the Debtor's. If the above-described contribution of the equity of Fulton Sales is declined by the equity holder, then the assets of Fulton Sales would be applied to the New Credit Facility through collection.

## B.    Tax Consequences to the Holders of Equity Interests

As discussed above in the section titled "Tax Consequences to the Debtor", because of the Debtor's S Status, any Tax Items recognized by the Debtor in connection with the transactions contemplated by the Plan will be passed through to the holders of the Equity Interests.

See the discussion in Section A.1 above, regarding the effects of the Debtor recognizing COD income in connection with the Plan.

See the discussion in Section A.3 above, regarding the effects of the Tax Reorganization. Subsequent to the Q-Sub Election, Fulton Sales' Tax Items will be treated as the Debtor's and, thus, will ultimately be passed through to the holders of the Equity Interests.

**The holders of the Equity Interests are strongly urged to consult their own tax advisor (including their own estate and gift tax advisor) regarding the Tax Consequences of the transactions described in this Disclosure Statement and in the Plan.**

## C.    Tax Consequences to the Creditors who Hold Debt Instruments

The following discusses certain Tax Consequences of the transactions contemplated by the Plan to Creditors that are "United States holders," as defined below, who hold debt instruments. The Tax Consequences of the transactions contemplated by the Plan to Creditors (including the character, timing and amount of income, gain or loss recognized) will depend on, among other things: (1) whether the Claim and the consideration received in respect of it are "securities" for Tax Purposes; (2) the manner in which a Creditor acquired a Claim; (3) the length of time the Claim has been held; (4) whether the Claim was acquired at a discount; (5) whether the Creditor has taken a bad debt deduction with respect to the Claim (or any portion of it) in the current tax year or any prior tax year; (6) whether the Creditor has previously included in its taxable income accrued but unpaid interest with respect to the Claim; and (7) whether the Claim is an installment obligation for Tax Purposes. Creditors, therefore, should consult their own tax advisors regarding the particular Tax Consequences to them of the transactions contemplated by the Plan.

For purposes of the following discussion, a "United States holder" is a Creditor that is: (1) a citizen or individual resident of the United States; (2) a partnership, limited liability company, or corporation created or organized in the United States or under the laws of the United States, a political subdivision of the United States, or a State of the United States; (3) an estate whose income is subject to United States federal income taxation regardless of its source; or (4) a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust, or (ii) the trust was in existence on August 20, 1996, and properly elected to be treated as a United States person.

12015364

Snell & Wilmer
——— L.L.P. ———
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1

## 1.   Characterization of the Creditors' Claims

2

(a)   <u>Class 1 and 4</u>.  Under the Plan, Creditors in Class 1 and 4 will
3   receive Cash payments in exchange for the full and final satisfaction of their Claims.  Under such
circumstances, a Creditor in Class 1 or 4 whose Claim constitutes a debt instrument will generally
4   recognize gain or loss in an amount equal to the amount of the Cash payments received and the
Creditor's adjusted tax basis in such Claim.  See Section C.2, below, for discussion regarding the
5   character of the Creditor's gain or loss.

6

(b)   <u>Class 3</u>.  Under the Plan, Creditors in Class 3 will receive the Bank
Group Effective Date Cash Payment and the Debtor's New Debt (as such term is defined in
7   Section A.1, above) in exchange for the full and final satisfaction of their Claims.  As a result, a
Creditor will be treated as having exchanged its Claim for the Bank Group Effective Date Cash
8   Payment and the Debtor's New Debt.  Under such circumstances, a Creditor will generally
recognize gain or loss in an amount equal to the difference between the Creditor's amount
9   realized (generally, the collective amount of the Bank Group Effective Date Cash Payment and
the issue price of the Debtor's New Debt) and the Creditor's adjusted tax basis in such Claim.
10  The Creditor's initial tax basis in the Debtor's New Debt will generally be equal to the issue price
of the Debtor's New Debt.  See Section C.2, below, for discussion regarding the character of the
11  Creditor's gain or loss.

12

## 2.   Character of the Creditors' Gain or Loss

13

The character of a Creditor's gain or loss as capital gain or loss or as ordinary income or
14  loss will be determined by a number of factors which vary depending on a Creditor's particular
circumstances.  Such factors include the nature of such Claim as held by the Creditor, whether
15  such Claim constitutes a capital asset in the hands of the Creditor, whether such Claim was
purchased at a discount, whether any amount received in respect of such Claim constitutes
16  accrued interest, whether interest will be imputed to the payment arrangements of Class 1 and 4
Creditor's whose Claims constitute a debt instrument, and whether and to what extent the
17  Creditor has previously claimed a bad debt deduction with respect to such Claim.  A Creditor who
recognizes a loss on a transaction conducted under the Plan may be entitled to a bad debt
deduction, either in the taxable year of the Effective Date or a prior taxable year.

18

## 3.   Accrued Interest

19

A Creditor who has not previously included accrued interest into taxable income will be
20  required to recognize ordinary income equal to the portion of either (i) a Cash payment; or (ii) the
issue price of the Debtor's New Debt, as applicable, that is allocable to accrued interest,
21  regardless of whether that Creditor realizes an overall gain or loss as a result of the exchange of
its existing Claims.  A Creditor who has included such accrued interest into taxable income
22  generally may take an ordinary deduction to the extent that such Claim is not fully satisfied under
the Plan (after allocating between principal and accrued interest), even if the underlying Claim is
23  held as a capital asset.  It is not clear the extent to which a portion of either (i) a Cash payment; or
(ii) the issue price of the Debtor's New Debt, as applicable, will be properly allocable to accrued
interest.

24

25

**Creditors are advised to consult their own tax advisors to determine the extent any
portion of either (i) a Cash payment; or (ii) the issue price of the Debtor's New Debt, if
applicable, is allocable to accrued interest.**

26

12015364

45

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

## 4. Adequately Stated Interest

Generally, it is anticipated that the Debtor's New Debt will have an interest rate that is equal to or in excess of the IRS provided applicable federal rate (hereinafter, the "**AFR**"). However, if the interest rate of the Debtor's New Debt becomes lower than the AFR (which could result from a subsequent increase in the AFR), a Creditor will be treated as receiving additional interest equal to the amount of "foregone interest." For this purpose, "foregone interest" would be equal to the difference between the amount of interest the Creditor would have received if the interest rate of the Debtor's New Debt was equal to the AFR, and the amount of interest payable on the Debtor's New Debt.

## 5. Market Discount

In general, a debt obligation, other than one with a fixed maturity of one year or less, that is acquired by a holder in the secondary market (or, in certain circumstances, on original issuance) is a "market discount bond" as to that holder if the obligation's stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the holder's adjusted tax basis in the debt obligation immediately after its acquisition. A debt obligation, however, will not be a "market discount bond" if such excess is less than a statutory de minimis amount. To the extent that a Creditor has not previously included market discount in its taxable income, gain recognized by a Creditor on the disposition of a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the Creditor's period of ownership. A holder of a market discount bond that is required to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to deduct such interest, in whole or in part, on the disposition of such bond. In addition, any partial principal payment received by a Creditor that is attributable to a market discount bond will generally be treated as ordinary interest income to the extent such payment does not exceed the market discount accrued on such bond during the Creditor's period of ownership.

## 6. Original Issue Discount

The original issue discount ("**OID**") rules provide an extremely detailed and complex method for determining and taxing the interest components of debt instruments, including any Claims treated as debt instruments and the Debtor's New Debt. A holder of a debt instrument containing OID must include a portion of the OID in gross income in each taxable year in which the holder holds the debt instrument, regardless of whether any cash payments are received. OID is defined as the difference between the issue price and the stated redemption price at maturity of a debt instrument. As the OID rules are extremely complex, it is not certain how they will apply to the transactions contemplated by the Plan. Accordingly, each Creditor must consult its own tax advisor.

## 7. Other Claimholders

If a Creditor reaches an agreement with the Debtor's Estate to have its Claim satisfied, settled, released, exchanged, or otherwise discharged in a manner other than as described in the Plan, such Creditor should consult with its own tax advisors regarding the Tax Consequences of that satisfaction, settlement, release, exchange, or discharge.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

46

Snell & Wilmer
─── L.L.P. ───
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

D.    **Tax Consequences to the Creditors who have Performed Services**

The following discusses certain Tax Consequences of the transactions contemplated by the Plan to Creditors in Class 1 and 4 who performed services under a contractual arrangement with the Debtor (the "**Service Creditors**"). The Tax Consequences of the transactions contemplated by the Plan to the Service Creditors (including the character, timing and amount of income, gain or loss recognized) will depend on, among other things: (1) whether the Service Creditors' Claim constitutes the right to receive income; (2) whether the Service Creditors' Claim constitutes a property right; and (3) whether the Service Creditors' Claim constitutes a debt instrument.

If the Service Creditors' Claim constitutes the right to receive income, the timing of the Tax Items recognized by such Service Creditors will depend on, among other things, the Service Creditors' method of accounting (including whether the Claim results from a "long-term contract" as such term is defined by Section 460(f) of the Tax Code). If the Service Creditors' Claim constitutes a property right, such Service Creditors would generally recognize gain or loss in an amount equal to the amount of the Cash payments received and the Service Creditors' adjusted tax basis in such Claim. Lastly, the Tax Consequences of the Service Creditors whose Claims constitute a debt instrument are discussed in Section C, above.

**The Service Creditors are strongly urged to consult their own tax advisor regarding the Tax Consequences of the transactions described in this Disclosure Statement and in the Plan.**

E.    **Tax Consequences to the Creditors who are a State or Political Subdivision Thereof**

Under the Plan, Creditors in Class 2 and 5 will receive Cash payments in exchange for the full and final satisfaction of their Claims. Generally speaking, under Section 115 of the Tax Code, income from the exercise of an essential governmental function is excluded from the gross income of any state or political subdivision thereof. Accordingly, it is anticipated that Creditors in Class 2 and 5 will not be subject to United States federal income tax upon the receipt of a Cash payment under the Plan.

F.    **Information Reporting and Backup Withholding**

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. These reportable payments do not include those that give rise to gain or loss on the exchange of a Claim. Moreover, such reportable payments are subject to backup withholding under certain circumstances. A United States holder may be subject to backup withholding at rate of 28% with respect to certain distributions or payments of accrued interest, market discount, or similar items pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a United States person, the taxpayer identification number is correct, and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Payments that give rise to gain or loss on the exchange of a Claim are not subject to backup withholding.

12015364

Backup withholding is not an additional tax. Amounts subject to backup withholding are credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess backup withholding by filing an appropriate claim for refund with the IRS.

## XX. IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON THE PARTICULAR CIRCUMSTANCES OF THE DEBTOR, EACH HOLDER OF AN EQUITY INTEREST, AND THE CREDITORS. ACCORDINGLY, ANYONE AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.**

### A. IRS CIRCULAR 230 NOTICE

**TO COMPLY WITH UNITED STATES TREASURY REGULATIONS, BE ADVISED THAT ANY UNITED STATES FEDERAL TAX ADVICE INCLUDED IN THIS COMMUNICATION (AND IT IS NOT INTENDED THAT ANY SUCH ADVICE BE GIVEN IN THIS DISCLOSURE STATEMENT) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, TO AVOID ANY UNITED STATES FEDERAL TAX PENALTIES OR TO PROMOTE, MARKET, OR RECOMMEND TO ANOTHER PARTY ANY TRANSACTION OR MATTER.**

## XXI. DETERMINATION OF CLAIMS

### A. Objections to Claims

Notwithstanding the occurrence of the Effective Date, and except as to any Claim that has been Allowed before the Effective Date, the Reorganized Debtor or the Bank Group may object to the allowance of any Claim against the Debtor or seek estimation of any Claim other than the Bank Group Claim on any grounds permitted by the Bankruptcy Code. All objections to Claims filed by the Debtor or Reorganized Debtor must be brought by filing the appropriate pleading in the Bankruptcy Court before the first Business Day that is 180 days after the Effective Date, but the Bankruptcy Court may approve a later date on the Reorganized Debtor's motion filed (but not necessarily heard) before the first Business Day that is 180 days after the Effective Date.

### B. Distributions on Allowance or Disallowance of Disputed Claims

No distributions shall be made to any holder of a Claim unless and until the Claim becomes an Allowed Claim. If a Claim is not an Allowed Claim as of the Effective Date, distributions on account of that Claim shall commence only when the Claim becomes an Allowed Claim after the Effective Date or as otherwise specifically provided in the Plan. If a Disputed Claim becomes an Allowed Claim, the Reorganized Debtors shall make a distribution in accordance with the terms of the Plan applicable to Claims of the Class in which that Claim resides.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

C. **Contingent Claims**

Until a Contingent Claim becomes an Allowed Claim or is Disallowed, the Claim shall be treated as a Disputed Claim for all purposes under the Plan. The holder of a Contingent Claim shall be entitled to a distribution under the Plan only when the Contingent Claim becomes an Allowed Claim. Any Contingent Claim for reimbursement or contribution held by a Person that may be liable with a Debtor on a Claim of a Creditor is Disallowed as of the Effective Date if: (a) that Creditor's Claim is Disallowed; (b) the Claim for reimbursement or contribution is contingent as of the Effective Date; or (c) that Person asserts a right of subrogation to the rights of the Creditor under Section 509 of the Bankruptcy Code.

## XXII. EXECUTORY CONTRACTS

A. **Assumption and Rejection of Executory Contracts and Unexpired Leases**

Except as otherwise provided in the Plan, the Debtor's executory contracts or unexpired leases listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" or not assumed or rejected pursuant to a Bankruptcy Court order prior to the Effective Date shall be deemed rejected pursuant to Sections 365 and 1123 of the Bankruptcy Code, except for those executory contracts or unexpired leases: (1) listed on the schedule of "Assumed Executory Contracts and Unexpired Leases"; (2) that are the subject of a motion to assume or reject pending on the Effective Date (in which case the such assumption or rejection and the effective date thereof shall remain subject to a Bankruptcy Court order); (3) that are subject to a motion to reject with a requested effective date of rejection after the Effective Date; or (4) that are otherwise expressly assumed or rejected pursuant to the Plan. Entry of the Confirmation Order shall constitute a Final Order approving the assumption or rejection of such executory contracts or unexpired leases as set forth in the Plan, all pursuant to Sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of such executory contracts and unexpired leases in the Plan are effective as of the Effective Date. Each such executory contract and unexpired lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party prior to the Effective Date shall revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the Plan Proponent reserves the right to alter, amend, modify, or supplement the schedules of executory contracts or unexpired leases identified at any time through and including fifteen days after the Effective Date. The List of Assumed Executory Contracts and Unexpired Leases and the List of Rejected Executory Contracts and Unexpired Leases are attached as Exhibits 6 and 7.

B. **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

1. **Designation of Cure Amount**. With respect to the Debtor's executory contracts or unexpired leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Plan Proponent shall have designated a proposed Cure Amount, and the assumption of such executory contract or unexpired lease may be conditioned upon the disposition of all issues with respect to Cure in a manner satisfactory to the Plan Proponent or the Reorganized Debtor. Any provision or terms of the Debtor's executory contracts or unexpired leases to be assumed pursuant to the Plan that are or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure.

2. **Disagreement with Cure Amount**. Except with respect to executory contracts and unexpired leases for which the Plan Proponent and the applicable counterparties

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

have stipulated in writing to payment of a Cure Amount, all requests for payment of Cure that differ from the amounts proposed by the Plan Proponent must be filed with the Court and served on the Plan Proponent on or before the Cure Bar Date. Any request for a Cure Payment that is not timely filed shall be disallowed automatically and forever barred from assertion and shall not be enforceable against the Reorganized Debtor, without the need for any objection by the Reorganized Debtor or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtor of the amounts listed on the Plan Proponent's proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided, however, that nothing shall prevent the Reorganized Debtor from paying any Cure Amount despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtor also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

3. **Resolution of Cure Amount**. If the Plan Proponent objects to any requested Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Cure Amount and any related issues. If there is a dispute regarding such Cure Amount, the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" within the meaning of Section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Plan Proponent and the counterparty to the executory contract or unexpired lease. Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption of any executory contract or unexpired lease will be deemed to have consented to such assumption. The Plan Proponent reserves the right either to reject or nullify the assumption of any executory contract or unexpired lease no later than thirty days after a Final Order determining the Cure Amount or any request for adequate assurance of future performance required to assume such executory contract or unexpired lease or any other matter relating to assumption.

4. **Claims Related to Cure**. Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption. Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice, other than notice to the other party to such contract or lease of such disallowance and expungement, or action, order, or approval of the Bankruptcy Court.

C. **Pre-Existing Obligations to the Debtor under Executory Contracts and Unexpired Leases**

Rejection of any executory contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtor under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtor expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtor or the Reorganized Debtor, as applicable, from counterparties to rejected or repudiated executory contracts.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

**D.    Claims Based on Rejection of Executory Contracts and Unexpired Leases**

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Debtor's executory contracts and unexpired leases pursuant to the Plan or otherwise must be filed with the Court and served on the Debtor or Reorganized Debtor, as applicable, no later than thirty days after the later of the Effective Date or the date of any notice of rejection. Any Proofs of Claim arising from the rejection of the Debtor's executory contracts or unexpired leases that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against the Reorganized Debtor without the need for any objection by the Reorganized Debtor or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtor's executory contracts and unexpired leases shall be classified as Rejection Damages Claims and shall be treated in accordance with Article 4.4 of the Plan.

**E.    Modification of Executory Contracts and Unexpired Leases Containing Equity Ownership Restrictions**

All executory contracts and unexpired leases to be assumed under the Plan pursuant to Section 365 and 1123 of the Bankruptcy Code shall be deemed so assumed, without giving effect to any provisions contained in such executory contracts or unexpired leases restricting the change in control or ownership interest composition of any or all of the Debtors, and upon the Effective Date (1) any such restrictions shall be deemed of no further force and effect and (2) any breaches that may arise thereunder as a result of Confirmation or Consummation shall be deemed waived by the applicable non-Debtor counterparty.

**F.    Modifications, Amendments, Supplements, Restatements, or Other Agreements**

Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and all executory contracts and unexpired leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan. Modifications, amendments, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**G.    Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in schedule of Assumed Executory Contracts and Unexpired Leases, the schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Plan Proponent or the Debtor that any such contract or lease is in fact an executory contract or unexpired lease or that the Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired lease at the time of

12015364

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

assumption or rejection, the Plan Proponent shall have thirty days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

### H. Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to Sections 365(d)(4) of the Bankruptcy Code.

## XXIII. MODIFICATION OF PLAN

In addition to its modification rights under Section 1127 of the Bankruptcy Code, the Plan Proponent may amend or modify its Plan at any time prior to Confirmation Date without leave of the Bankruptcy Court. The Plan Proponent may propose amendments and/or modifications of its Plan at any time subsequent to Confirmation Date with leave of the Bankruptcy Court and upon notice to Creditors. After the Confirmation Date, the Plan Proponent may, with approval of the Bankruptcy Court, as long as it does not materially or adversely affect the interests of Creditors, remedy any defect or omission or reconcile any inconsistencies of the Plan, or in the Confirmation Order, if any may be necessary to carry out the purposes and intent of the Plan

## XXIV. CONDITIONS PRECEDENT

### A. Conditions to Confirmation

The following are conditions precedent to confirmation of the Plan that must be satisfied or waived in accordance with Article 12.3 of the Plan:

   1. The Bankruptcy Court shall have approved by Final Order a Disclosure Statement with respect to the Plan in form and substance acceptable to the Debtor in its sole and absolute discretion.

   2. The Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance acceptable to the Debtor.

   3. The New Loan Documents shall be in form and substance acceptable to the Bank Group.

### B. Conditions to the Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with Section 12.3 of the Plan:

   1. The Bankruptcy Court shall have entered one or more orders (which includes the Confirmation Order) authorizing the assumption and rejection of unexpired leases and executory contracts by the Debtor as contemplated by Article VIII of the Plan.

   2. The Confirmation Order shall be a Final Order, the Confirmation Date shall have occurred, and no request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

Snell & Wilmer
—— L.L.P. ——
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

3. Each Exhibit, document or agreement to be executed in connection with the Plan shall be in form and substance reasonably acceptable to the Plan Proponent.

C. **Waiver of Conditions**

The Plan Proponent may waive any condition to confirmation or the Effective Date, in whole or in part, at any time, without any notice to parties-in-interest and without further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan, provided, however, that the conditions to consummation set forth in Article 12.1.1 and 12.1.2, and the condition to the Effective Date set forth in the Plan, may not be waived.

## XXV. POST-EFFECTIVE DATE FEES; FINAL DECREE

The Reorganized Debtor shall be responsible for paying any post-Effective Date fees under 28 U.S.C. § 1930(a)(6) and filing post-confirmation reports until the Bankruptcy Court enters a final decree, which shall be as soon as practicable after distributions under the Plan have commenced. Notice of application for a final decree need be given only to those holders of Claims and Equity Interests and other parties that, after the Effective Date, specifically request such notice.

## XXVI. RETENTION OF JURISDICTION

Pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and the Plan, including, among others, the following matters:

1. to hear and determine motions for (i) the assumption or rejection or (ii) the assumption and assignment of executory contracts or unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid;

2. to adjudicate any and all adversary proceedings, applications and contested matters that may be commenced or maintained pursuant to the Chapter 11 Case or the Plan, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests and all controversies and issues arising from or relating to any of the foregoing;

3. to ensure that distributions to Allowed Claimholders are accomplished as provided herein;

4. to hear and determine any and all objections to the allowance or estimation of Claims and Equity Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and to allow or disallow any Claim or Equity Interest, in whole or in part;

5. to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified and/or vacated;

6. to issue orders in aid of execution, implementation, or consummation of the Plan;

Snell & Wilmer
—— L.L.P. ——
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

53

7.     to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

8.     to hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under the Plan or under Sections 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code;

9.     to determine requests for the payment of Claims entitled to priority under Section 507(a)(l) of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

10.     to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order including disputes arising under agreements, documents or instruments executed in connection with the Plan;

11.     to hear and determine all suits or adversary proceedings to recover assets of the Debtor and property of the Estate, wherever located; to hear and determine matters concerning state, local and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

12.     to hear any other matter not inconsistent with the Bankruptcy Code;

13.     to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

14.     to enter a final decree closing the Chapter 11 Case; and

15.     to enforce all orders previously entered by the Bankruptcy Court.

## XXVII.   RETENTION AND ENFORCEMENT OF CLAIMS

### A.     Retention and Reservation

In accordance with Section 1123(b)(3) for the Bankruptcy Code, all Preserved Litigation Claims are retained and reserved for each of the Reorganized Debtor, which are designated as the Estate's representative under Section 1123(b)(3)(B) for purposes of the Preserved Litigation Claims. A list of the Preserved Litigation Claims is attached as Exhibit 12.

### B.     Prosecution

The Reorganized Debtor, such to the approval of the Bank Group, shall have the authority to prosecute, defend, compromise, settle, and otherwise deal with any Preserved Litigation Claims, and the Reorganized Debtor shall do so in its capacity as a representative of the Estate in accordance with Section 1123(b)(3)(B) of the Bankruptcy Code. The Reorganized Debtor shall pay the fees and costs associated with litigating the Preserved Litigation Claims in the ordinary course of business. In the event that the Reorganized Debtor's recommendation to pursue any action is not approved by the bank Group, then the Bank Group may pursue such action in the name of the Reorganized Debtor at the expense of the Reorganized Debtor, such to the investigation and prosecution of said action is pursued in a reasonable and expeditious manner.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

54

To effectuate this procedure, the Bank Group and the Reorganized Debtor will be the subject of a Common Interest Agreement.

## XXVIII.   MISCELLANEOUS PROVISIONS

### A.   Effecting Documents, Further Transactions, and Timing

The Debtor, the Reorganized Debtor, the Administrative Agent, the Bank Group, and all other parties to the Plan Documents are authorized and directed as of the Effective Date, and without further order of the Bankruptcy Court, to execute, deliver, file, or record all Plan Documents and other contracts, instruments, releases, and other agreements or documents, and to take all actions necessary and/or appropriate to effect and further evidence the terms of the Plan. All transactions required to occur on the Effective Date under the terms of the Plan are deemed to have occurred simultaneously.

### B.   Binding Effect

The Plan is binding on, and inures to the benefit of, the Debtor, the Reorganized Debtor, and the holders of all Claims and Equity Interests, and their respective successors and assigns.

### C.   Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or as provided in any document entered into in connection with the Plan, the rights, duties, and obligations of the Debtor, the Reorganized Debtor, and any other Person arising under the Plan are governed by, construed, and enforced in accordance with the laws of the State of Arizona, without giving effect to Arizona's choice of law principals.

### D.   Modification and Treatment of Claims

The Reorganized Debtor reserves the right to modify the treatment of any Allowed Claim in any manner adverse only to the holder of that Claim at any time after the Effective Date on that holder's prior written consent.

### E.   Setoffs and Recoupment

The Debtor and the Reorganized Debtor may, but are not required to, setoff or recoup against any Claim or Equity Interest and the payments or other distributions to be made under the Plan in respect of such Claim. Claims of any nature that arose before the Petition Date that the Debtor may have against the holder of such Claim or Equity Interest to the extent such Claims may be setoff or recouped under applicable law, but neither the failure to do so nor the fact of any Claim or Equity Interest under the Plan becoming Allowed constitutes a waiver or release by the Debtor or the Reorganized Debtor of any such claim that they may have against such holder.

### F.   Severability

If the Bankruptcy Court finds the Plan or any provision of the Plan to be invalid, illegal, or unenforceable, or if the Bankruptcy Court cannot confirm the Plan under Section 1129 of the Bankruptcy Code, the Bankruptcy Court, at the request of the Plan Proponent, may retain the power to alter and interpret the Plan or any such provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the provision held to be

12015364

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

invalid or unenforceable, and such provision shall then become applicable as altered or interpreted. The Confirmation Order constitutes a judicial determination and provides that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable.

### G. Plan Documents

Notwithstanding anything to the contrary contained in the Plan, including any reference in the Plan to documents in the forms annexed to the Plan as exhibits, the Debtor may revise any Plan Document (a) by filing such revised Plan Document with the Bankruptcy Court more than 10 days before the deadline for voting on the Plan, or (b) with the written consent of all parties in interest that are entitled to vote on the Plan and are materially and adversely affected by such revision.

### H. Inconsistency

If any inconsistency between the Plan and the Disclosure Statement exists, the provisions of the Plan govern. If any inconsistency between the Plan and any Plan Document exists, the provisions of the Plan Document govern.

### I. Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection with the Plan, the Debtor or the Reorganized Debtor, as the case may be, must comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions under the Plan remain subject to any such withholding and reporting requirements. The Debtor and the Reorganized Debtor, as the case may be, may take all actions necessary to comply with such withholding and reporting requirements. Notwithstanding any other provision of the Plan, each holder of an Allowed Claim or Allowed Equity Interest that has received a distribution under the Plan has sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding, and other tax obligation on account of such distribution.

### J. IRS Circular 230 Notice

Any United States federal tax descriptions or advice included in the Plan is not intended or written to be used, and cannot be used, to avoid any United States federal tax penalties, or to promote, market or recommend to another party any transaction or matter.

### K. Method of Payment; Payments, Filings and Notices Only on Business Days

Payments of Cash under the Plan must be made by check drawn on a domestic bank or by wire transfer from a domestic bank. Whenever any payment, distribution, filing, delivery, or notice to be made under the Plan is due on a day other than a Business Day, such payment, distribution, filing, delivery, or notice may instead be made, without interest or penalty, on the immediately following Business Day.

## XXIX.  RISKS

The restructuring of the Debtor involves a degree of risk, and this Disclosure Statement and the Plan and certain of their exhibits contain forward-looking statements that involve risks

Snell & Wilmer
—— L.L.P. ——
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

and uncertainty. The Reorganized Debtor's actual results could differ materially from those anticipated in such forward-looking statements as a result of a variety of factors, including those set forth in the following risk factors and elsewhere in this Disclosure Statement. Holders of Claims should consider carefully the following factors, in addition to the other information contained in this Disclosure Statement, before submitting a vote to accept or reject the Plan.

A.    **Homebuilding Industry**

1.    **Economic Conditions**

The residential homebuilding industry is sensitive to changes in economic conditions and other factors, such as the level of employment, consumer confidence, consumer income, availability of financing, and interest rate levels. While the Bank Group believes that Reorganized Debtor will be successful given the terms of the Plan, adverse changes in any of these conditions generally, or in the markets where the Reorganized Debtor operates, could decrease demand and pricing for new homes in these areas or result in customer cancellations of pending contracts, which could adversely affect the projections that were used to create the Plan and could result in a decrease in revenues and earnings and would adversely affect the financial condition and/or operating results of the Reorganized Debtor.

The homebuilding industry has recently been impacted by lack of consumer confidence, decreased housing affordability, rising unemployment, a significant increase in the number of foreclosed homes, and large supplies of resale and new home inventories which resulted in an industry-wide softening of demand for new homes. As a result of these factors, many homebuilders have experienced significant decreases in revenues and profitability and incurred substantial impairments of land and certain other assets. While it is impossible to predict the duration or the severity of the current market conditions, the Bank Group believes that the Reorganized Debtor will be able to meet its obligations under the Plan.

2.    **Mortgage Industry**

Housing demand is adversely affected by the lack of availability of mortgage financing and increases in interest rates. Increased cancellations could augment the available homes inventory supply, which may in turn reduce prices and reduce the availability of future financing for homebuyers. Most homebuyers finance their home purchases through third-party lenders providing mortgage financing. If mortgage interest rates increase and, consequently, the ability of prospective buyers to finance home purchases is adversely affected, home sales, gross margins, and cash flow may also be adversely affected and the impact may be material.

Homebuilding activities depend, in part, upon the availability and costs of mortgage financing for buyers of homes owned by potential customers, as those customers (move-up buyers) often must sell their residences before they purchase new homes. Mortgage lenders have recently become subject to more intense underwriting standards by the various regulatory authorities that oversee them as a consequence of, among other things, the sub-prime mortgage market failures. More stringent underwriting standards for mortgage lenders could have a material adverse effect on the homebuilding business if certain buyers are unable to obtain mortgage financing. Additionally, the recent lack of liquidity in both the national and global financial markets further intensified the limited availability of financing for mortgage lenders, even for those who are not impacted by the stricter underwriting standards. A prolonged tightening of the financial markets would also negatively impact the homebuilding business.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

3.      **Land Acquisition**

The homebuilding industry historically was competitive for suitable land. The availability of finished and partially finished developed lots and undeveloped land for purchase that meet the assumptions used for the Plan depends on a number of factors outside the control of the Reorganized Debtor, including land availability in general, competition with other homebuilders and land buyers for desirable property, inflation in land prices, zoning, allowable housing density, and other regulatory requirements. Should suitable lots or land become less available, the number of homes the Reorganized Debtor may be able to build and sell could be reduced, and the cost of land could be increased, perhaps substantially, which could adversely impact the Reorganized Debtor's operations.

The Reorganized Debtor's long-term ability to build homes can be affected by its ability to acquire land suitable for residential building at reasonable prices in locations where it wants to build. As competition for suitable land increases, and as available land is developed, the cost of acquiring suitable remaining land could rise, and the availability of suitable land at acceptable prices may decline. Any land shortages or any decrease in the supply of suitable land at reasonable prices (however likely or unlikely) could limit the Reorganized Debtor's ability to develop new communities or result in increased land costs, which could adversely impact the Reorganized Debtor's revenues, earnings, margins, and operating results.

4.      **Labor and Materials**

Even in this difficult economic climate, the homebuilding industry can be competitive for skilled labor and materials. Increased costs or shortages of skilled labor and/or lumber, framing, concrete, steel, and other building materials could cause increases in construction costs and construction delays that cannot be passed on to those customers who have already entered into sale contracts as those sales contracts generally fix the price of the home at the time the contract is signed, which may be well in advance of the construction of the home. Sustained increases in construction costs may, over time, erode margins, and pricing competition for materials and labor that may not be passed on to homebuyers.

The Reorganized Debtor could depend on the continued availability of and satisfactory performance by its subcontractors for the design and construction of its homes. There can be no assurance that there will be sufficient availability of and satisfactory performance by these unaffiliated third-party subcontractors. In addition, inadequate subcontractor resources could have a material adverse affect on the Reorganized Debtor's business.

5.      **Warranty and Liability Claims**

Homebuilders are subject to home warranty and construction defect claims arising in the ordinary course of business. Homebuilders record warranty and other reserves for the homes they sell based on historical experience in the respective markets based on the qualitative risks associated with the types of homes built. The Reorganized Debtor will have, and require the majority of its subcontractors to have, general liability, property, errors and omissions, workers' compensation, and other business insurance. These insurance policies protect against a portion of the risk of loss from claims, subject to deductibles, and other coverage limits. Because of the uncertainties inherent in these matters, however, the Reorganized Debtor cannot provide assurance that such insurance coverage and reserves will be adequate to address all warranty and construction defect claims in the future. Contractual indemnities may be difficult to enforce and some types of claims may not be covered by insurance or may exceed applicable coverage limits.

12015364

Additionally, the coverage offered by and the availability of general liability insurance for construction defects may be limited or costly, and may vary in the future.

## B.     Reorganization Factors

### 1.     Financial Considerations

As with any plan of reorganization or other financial transaction, there are certain risk factors that must be considered. All risk factors cannot be anticipated, some events will develop in ways that were not foreseen, and many or all of the assumptions that have been used in connection with this Disclosure Statement and the Plan will not be realized exactly as assumed. Some or all of such variations may be material. While efforts have been made to be reasonable in this regard, there can be no assurance that subsequent events will bear out the analyses set forth in this Disclosure Statement. Holders of Claims and Equity Interests should be aware of some of the principal risks associated with the contemplated reorganization:

2.     There is a risk that one or more of the required conditions or obligations under the Plan or the Plan Documents will not occur, be satisfied, or waived, as the case may be, resulting in the inability to confirm the Plan.

(a)     The total amount of all Claims filed in the Chapter 11 Cases may materially exceed the estimated amounts of Allowed Claims assumed in the development of the Plan, in the valuation estimates provided above. The actual amount of all Allowed Claims in any Class may differ significantly from the estimates provided in this Disclosure Statement. Accordingly, the amount and timing of the distributions that will ultimately be received by any particular holder of an Allowed Claim in any Class may be materially and adversely affected if the estimates are exceeded as to any Class.

(b)     A number of other uncertainties may adversely affect the Reorganized Debtor's future operations including, without limitation, economic recession, lumber prices, increased competition, adverse regulatory agency actions, acts of God, voluntary departure of particular officers or employees, or similar circumstances. Many of these factors will be substantially beyond the Reorganized Debtor's control, and a change in any factor or combination of factors could have a material adverse effect on the Reorganized Debtor's financial condition, cash flows, and operating results.

(c)     There can be no assurance that the Reorganized Debtor will be able to continue to generate sufficient funds to meet its obligations and necessary capital expenditures. Although the Reorganized Debtor's financial projections assume that the Reorganized Debtor will generate sufficient funds to meet its working capital needs for the foreseeable future on a stand-alone basis, its ability to gain access to additional capital, if needed, cannot be assured, particularly in view of possible competitive factors and industry conditions.

### 3.     Risk of Non-Confirmation of the Plan

Although the Bank Group believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications of the Plan will not be required for confirmation, that such negotiations would not adversely affect the holders of Allowed Claims and Equity Interests, or that such modifications would not necessitate the re-solicitation of votes.

12015364

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

## XXX.  RECOMMENDATION AND CONCLUSION

### A.  Hearing On and Objection to Confirmation

The evidentiary hearing on confirmation of the Plan has been scheduled for_____ _____, 2010 at __:00 _.m. (MST).  The hearing may be adjourned from time to time by announcing the adjournment in open court, all without further notice to parties in interest, and the Plan may be modified by the Debtor under Bankruptcy Code Section 1127 before, during, or as a result of that hearing, without further notice to parties in interest..

The time by which any objections to confirmation of the Plan must be filed with the Bankruptcy Court and received by the parties listed in the Confirmation Hearing Notice has been set for _____, 2010 at __:00 _.m. (MST).

### B.  Recommendation

The Bank Group's Plan is significantly superior to the Debtor's Fourth Amended Plan as it will pay Creditors in full including their attorneys' fees and costs, pays all Creditors other than the Bank Group the entire amount of their Allowed Claim on the Effective Date, pays Creditors within three years instead of six, and allows the Debtor to adjust to appropriate company operations without laying off any employees and retaining current management and will be better positioned to deal with the linger economic downturn while remaining strong and financially positioned to expand in the coming years as the economy improves.  Accordingly, the Bank Group recommends that you vote in favor of the Bank Group's Plan.

**FOR THESE REASONS, THE BANK GROUP URGES YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN.**

Dated:  September 28, 2010

**SNELL & WILMER** L.L.P.

By: /s/  DG #005717 _____
    Donald L. Gaffney
    Lori A. Lewis
    Evans O'Brien
    One Arizona Center
    400 E. Van Buren
    Phoenix, AZ  85004-2202
    Attorneys for Creditor Bank of America, N.A., on its own and as administrative agent for JPMorgan Chase Bank, N.A.; Compass Bank, on its own and as successor-in-interest to Guaranty Bank; and Wells Fargo, as successor-in-interest to Wachovia Bank

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

1

Exhibits to the Creditors' Disclosure Statement Concerning Creditors'
Plan of Reorganization Dated September 28, 2010

2

| | |
|---|---|
| Exhibit 1 | Creditors' Plan of Reorganization Dated September 28, 2010 |
| Exhibit 2 | Amended and Restated Credit Agreement |
| Exhibit 3 | New Note |
| Exhibit 4 | Amended and Restated Organizational Documents |
| Exhibit 5 | Avoidance Actions |
| Exhibit 6 | List of Assumed Executory Contracts and Unexpired Leases |
| Exhibit 7 | List of Rejected Executory Contracts and Unexpired Leases |
| Exhibit 8 | Liquidation Analysis |
| Exhibit 9 | Feasibility Analysis |
| Exhibit 10 | Plan Contribution Agreement |
| Exhibit 11 | Schedule of Compensation of Officers and Directors of Reorganized Debtor |
| Exhibit 12 | Preserved Litigation Claims |

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12015364

Case 2:09-bk-01298-GBN    Doc 526    Filed 09/28/10    Entered 09/28/10 13:03:20    Desc
Main Document    Page 67 of 122

**Exhibit 1**

**CREDITORS'** Plan of Reorganization Dated September 28, 2010

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In Re: | Proceedings Under Chapter 11 |
| FULTON HOMES CORPORATION, | Case No.  2:09-bk-1298-GBN |
| Debtor. | |

**CREDITORS' PLAN OF REORGANIZATION DATED SEPTEMBER 28, 2010**

**SNELL & WILMER L.L.P.**
One Arizona Center
400 E.  Van Buren
Phoenix, AZ  85004-2202
Telephone:      (602) 382-6000
Facsimile:       (602) 382-6070
Attorneys:       Donald L.  Gaffney (#005717) dgaffney@swlaw.com
                       Lori A.  Lewis (#019285) llewis@swlaw.com
                       A. Evans O'Brien (#026251) eobrien@swlaw.com

Attorneys for Creditor Bank of
America, N.A., on its own and as
administrative agent for JPMorgan
Chase Bank, N.A.; Compass Bank,
on its own and as successor-in-
interest to Guaranty Bank; and Wells
Fargo, as successor-in-interest to
Wachovia Bank

Dated: September 28, 2010

Phoenix, Arizona

**THIS PLAN HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY
COURT, AND THE BANK GROUP IS NOT YET SOLICITING VOTES ON
THIS PLAN UNTIL AFTER THE DISCLOSURE STATEMENT IS
APPROVED BY THE BANKRUPTCY COURT**

Snell & Wilmer
————— L.L.P. —————
LAW OFFICES
One Arizona Center, 400 E.  Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12009513.4

# TABLE OF CONTENTS

**Page**

ARTICLE 1      DEFINITION, RULES OF INTERPRETATION, AND
COMPUTATION OF TIME ........................................................... 1

     A.     Scope of Definitions ................................................................ 1

     B.     Definitions ............................................................................ 1

     C.     Rules of Interpretation ......................................................... 12

     D.     Computation of Time ........................................................... 12

     E.     Reference to Monetary Figures ............................................ 12

     F.     Exhibits ............................................................................... 12

ARTICLE 2      TREATMENT OF UNCLASSIFIED CLAIMS ..................... 13

     2.1    Unclassified Claims .............................................................. 13

     2.2    Allowed Administrative Claims ............................................. 13

     2.3    Preserved Ordinary Course Administrative Claims ................ 13

     2.4    Allowed Priority Tax Claims ................................................. 13

     2.5    Allowed Other Priority Claims .............................................. 14

     2.6    Professional Claims .............................................................. 14

ARTICLE 3      CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ................. 14

     3.1    Secured Claims ..................................................................... 15

     3.2    Unsecured Claims ................................................................. 15

     3.3    Equity Interests .................................................................... 15

ARTICLE 4      TREATMENT OF CLAIMS AND INTERESTS ................... 15

     4.1    Class 1 – Secured Vendor Claims ......................................... 15

     4.2    Class 2 – Secured Tax Claims ............................................... 16

     4.3    Class 3 – Bank Group Claims ............................................... 16

     4.4    Class 4 – General Unsecured Claims ..................................... 17

     4.5    Class 5 – Queen Creek Claims .............................................. 18

     4.6    Class 6 - Unsecured Warranty Claims ................................... 18

     4.7    Class 7 - Fulton Unsecured Claim ......................................... 18

     4.8    Class 8 – Equity Interests ...................................................... 18

ARTICLE 5      ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
REJECTION BY ONE OR MORE IMPAIRED CLASSES OF
CLAIMS OR EQUITY INTERESTS ......................................... 19

     5.1    Impaired Classes of Claims Entitled to Vote .......................... 19

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12009513.4

i

# TABLE OF CONTENTS
## (continued)

5.2 Classes Deemed to Accept the Plan ...................................................................... 19

5.3 Acceptance By Impaired Classes ........................................................................ 19

5.4 Classes Deemed to Reject the Plan ...................................................................... 19

5.5 Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code .................... 19

ARTICLE 6 IMPLEMENTATION OF THE PLAN ................................................. 20

6.1 Sources of Consideration for Plan Distributions ................................................. 20

6.2 Continued Corporate Existence ......................................................................... 20

6.3 Cancellation of Securities, Instruments and Agreements .................................... 21

6.4 Effectiveness of New Securities, Instruments, Agreements and Documents ....... 21

6.5 No Corporate Action Required by the Debtor ..................................................... 21

6.6 Officers and Directors ........................................................................................ 21

6.7 Operations Pending Effective Date ..................................................................... 22

6.8 Exemption from Transfer Taxes ......................................................................... 22

6.9 Payment of Trustee Fees .................................................................................... 22

ARTICLE 7 PROVISIONS GOVERNING DISTRIBUTIONS ............................... 22

7.1 Distributions on Account of Claims Allowed as of the Effective Date ................ 22

7.2 Distribution on Account of Claims Allowed after the Effective Date .................. 23

7.3 Delivery of Distributions .................................................................................... 24

7.4 Claims Paid or Payable by Third Parties ............................................................ 25

ARTICLE 8 EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................ 26

8.1 Assumption and Rejection of Executory Contracts and Unexpired Leases .......... 26

8.2 Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ........ 27

8.3 Pre-Existing Obligations to the Debtor under Executory Contracts and Unexpired Leases ............................................................................................... 28

8.4 Claims Based on Rejection of Executory Contracts and Unexpired Leases ......... 28

8.5 Modification of Executory Contracts and Unexpired Leases Containing Equity Ownership Restrictions ........................................................................... 28

8.6 Modifications, Amendments, Supplements, Restatements, or Other Agreements ......................................................................................................... 28

8.7 Reservation of Rights ......................................................................................... 29

8.8 Nonoccurrence of Effective Date ........................................................................ 29

ARTICLE 9 DETERMINATION OF CLAIMS ...................................................... 29

Snell & Wilmer
— L.L.P. —
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12009513.4

ii

9.1    Objections to Claims ..................................................................... 29

9.2    Distributions on Allowance or Disallowance of Disputed Claims ...................... 29

9.3    Contingent Claims .......................................................................... 29

ARTICLE 10      TITLE TO PROPERTY; VESTING OF ASSETS ........................................ 30

10.1   Vesting of Assets .......................................................................... 30

10.2   Preservation of Insurance ................................................................. 30

ARTICLE 11      PRESERVATION OF LITIGATION CLAIMS ............................................ 30

11.1   Retention and Reservation ................................................................. 30

11.2   Prosecution ................................................................................ 30

ARTICLE 12      CONDITIONS PRECEDENT .......................................................... 31

12.1   Conditions to Confirmation ................................................................ 31

12.2   Conditions to the Effective Date .......................................................... 31

12.3   Waiver of Conditions ...................................................................... 31

ARTICLE 13      RETENTION OF JURISDICTION ..................................................... 32

13.1   Retention of Jurisdiction .................................................................. 32

ARTICLE 14      MISCELLANEOUS PROVISIONS ...................................................... 33

14.1   Effecting Documents; Further Transactions; and Timing .................................... 33

14.2   Binding Effect ............................................................................. 33

14.3   Governing Law .............................................................................. 33

14.4   Modification of Treatment of Claims ....................................................... 33

14.5   Setoffs and Recoupment .................................................................... 34

14.6   Notices .................................................................................... 34

14.7   Delivery of Notices ........................................................................ 34

14.8   Severability ............................................................................... 35

14.9   Plan Documents ............................................................................. 35

14.10  Inconsistency .............................................................................. 35

14.11  Withholding and Reporting Requirements .................................................... 35

14.12  Post-Effective Date Fees; Final Decree .................................................... 35

14.13  IRS Circular 230 Notice .................................................................... 36

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12009513.4

## INTRODUCTION

Bank of America, N.A., on its own and as administrative agent for the following banks: JPMorgan Chase Bank, N.A.; Compass Bank, on its own and as successor-in-interest to Guaranty Bank; and Wells Fargo, as successor-in-interest to Wachovia Bank (collectively, the "**Bank Group**"), the largest general unsecured creditor of Fulton Homes Corporation, debtor and debtor-in-possession in the above-captioned Chapter 11 case, hereby proposes its Creditor Plan of Reorganization for the resolution of the outstanding Claims against and Equity Interests in the Debtor. Capitalized terms used herein shall have the meanings ascribed to such terms in Article I.B. of this Plan. The Bank Group is a proponent of this Plan within the meaning of Section 1129 of the Bankruptcy Code.

Under Section 1125(b) of the Bankruptcy Code, a vote to accept or reject this Plan cannot be solicited from a holder of a Claim or Equity Interest until such time as the Disclosure Statement has been approved by the Bankruptcy Court and distributed to holders of Claims and Equity Interests. In this case, the Bankruptcy Court entered an order approving the Disclosure Statement, as amended, and authorizing the Bank Group to commence solicitation of votes to accept or reject this Plan on _____, 2010, and such Disclosure Statement has been distributed simultaneously with this Plan to all parties whose votes are being solicited. The Disclosure Statement contains, among other things, a discussion of the Debtor's history, business, properties, operations, and risk factors associated with this Plan, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS CREDITORS AND EQUITY INTERESTS ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT AND RELATED SOLICITATION MATERIALS IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in Section 14.4 of this Plan, the Bank Group expressly reserves the right to alter, amend, modify, revoke or withdraw this Plan, one or more times, prior to this Plan's substantial consummation.

## ARTICLE 1
## DEFINITION, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

### A.    Scope of Definitions

For purposes of this Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article I.B. of this Plan. Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

### B.    Definitions

**1.1    Administrative Agent**. Bank of America, N.A. as administrative agent for the Bank Group under the Pre-Petition Credit Agreement.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

**1.2    Administrative Claim**.  A Claim for any cost or expense of administration of the Chapter 11 Case Allowed under Sections 503(b), 507(b) or 546(c)(2) of the Bankruptcy Code and entitled to priority under Section 507(a)(2) of the Bankruptcy Code, including: (a) fees payable under 28 U.S.C. § 1930; (b) actual and necessary costs and expenses incurred in the ordinary course of the Debtor's business; (c) actual and necessary costs and expenses of preserving the Estate or administering the Chapter 11 Case; and (d) all Professional Claims to the extent Allowed by Final Order under Sections 330, 331, or 503 of the Bankruptcy Code.

**1.3    Administrative Claim Bar Date**.  The deadline for filing proofs or requests for payment of Administrative Claims, which shall be 30 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.

**1.4    Affiliate**.  With respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such Person and, with respect to any specified natural Person, any other Person having a relationship by blood, marriage, or adoption not more remote than first cousins with such natural Person. For purposes of this definition, "controlling" (including, with correlative meanings, the terms "controlled by" and "under direct or indirect common control with"), as used with regard to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of that Person, whether through the ownership of voting securities, by agreement, or otherwise.

**1.5    Allowed**.  A Claim that has been allowed by a Final Order or with respect to any Claim against, or Equity Interest in, the Debtor: (a) proof of which, request for payment of which, or application for allowance of which, was filed or deemed filed with the Bankruptcy Court on or before the Bar Date, the Administrative Claim Bar Date, the Professional Claim Bar Date, or the Rejection Claim Bar Date, as applicable, for filing proofs of claim or equity interest or requests for payment for Claims of that type against the Debtor, or other applicable date established by order of the Bankruptcy Court, even if that date is after the Bar Date, the Administrative Claim Bar Date, the Professional Claim Bar Date, or the Rejection Claim Bar Date, as applicable; and (b) to which no objection to its allowance or motion to estimate for purposes of allowance has been interposed within the applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or, as to which any such objection or motion has been interposed, to the extent allowed by a Final Order.  The term "Allowed" when used to modify a reference in this Plan to any Claim, Equity Interest, Class of Claims, or Class of Equity Interests, means a Claim or Interest (or any Claim or Interest in any Class) that is so allowed.

**1.6    Amended and Restated Organizational Documents**.  The articles of incorporation and bylaws of the Reorganized Debtor, amended and restated to the extent necessary to comply with the provisions of Section 1123(a)(6) of the Bankruptcy Code, in substantially the form attached to the Disclosure Statement as Exhibit 4.

**1.7    Amended and Restated Credit Agreement**.  The amended and restated credit agreement between the Borrowers and the holders of Allowed Bank Group Claims, in substantially the form attached to the Disclosure Statement as Exhibit 2.

**1.8    Avoidance Actions**.  All statutory causes of action under Sections 510, 542, 543, 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code that the Debtor or the Estate may have against any Person including, but not limited to, those listed in Exhibit 5 to the Disclosure

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Statement. Failure to list an Avoidance Action in Exhibit 5 to the Disclosure Statement does not constitute the waiver or release of that Avoidance Action.

**1.9** **Ballot**. Each of the ballot forms that are distributed with the Disclosure Statement to Claimholders included in Classes that are Impaired under this Plan and entitled to vote under Article V of this Plan to accept or reject this Plan.

**1.10** **Bank Group**. Bank of America, N.A., on its own and as administrative agent for the following banks: JPMorgan Chase Bank, N.A.; Compass Bank, on its own and as successor-in-interest to Guaranty Bank; and Wells Fargo, as successor-in-interest to Wachovia Bank, all of whom comprise the consortium of lenders under the Pre-Petition Credit Agreement.

**1.11** **Bank Group Claims**. All general unsecured Claims of the Bank Group arising under the Pre-Petition Credit Agreement, which will be Allowed[1] in the amount of: (i) $163,488,654.82 in unpaid principal and pre-petition interest; (ii) accrued and unpaid interest from the Petition Date through and including the Effective Date at the Note Rate; (iii) reasonable and actual fees and expenses of the restructuring professionals of the Bank Group in an amount determined by the Bankruptcy Court or otherwise agreed to by the Debtor and the Bank Group; and (iv) reasonable and actual fees payable to the Administrative Agent or otherwise under the Pre-Petition Credit Agreement, to the extent such fees are Allowed by the Bankruptcy Court; provided, however, that in the event of a default by the Reorganized Debtor under this Plan, the general unsecured Claims of the Bank Group shall be Allowed as of the Effective Date in the amount of: (i) $163,488,654.82 in unpaid principal and pre-petition interest; (ii) accrued and unpaid interest from the Petition Date through and including the Effective Date at the Default Note Rate; (iii) reasonable and actual fees and expenses of the restructuring professionals of the Bank Group in an amount determined by the Bankruptcy Court or otherwise agreed to by the Debtor and the Bank Group; and (iv) reasonable and actual fees payable to the Administrative Agent or otherwise under the Pre-Petition Credit Agreement, to the extent such fees are Allowed by the Bankruptcy Court.

**1.12** **Bank Group Collateral**. All of the Borrowers' (i) real property assets, including, without limitation, lots, units, leaseholds and fixtures; (ii) inventory and other goods; (iii) accounts receivable; (iv) Cash and bank accounts; (v) all proceeds of any of the foregoing; and (vi) any and all property and/or property interests of any kind or nature of the Debtor, or of the Debtor's estate.

**1.13** **Bank Group Effective Date Cash Payment**. A payment to be made on the Effective Date by the Borrowers to the Bank Group, which shall equal $50 million.

**1.14** **Bank Group Judgment**. The judgment obtained or to be obtained by the Bank Group in Case No. CV 2009-004101 pending in Superior Court of Arizona, Maricopa County, pursuant to the "Under Advisement Ruling" entered on September 15, 2010 granting the Bank Group's Motion for Summary Judgment.

**1.15** **Bankruptcy Code**. Title 11 of the United States Code, as amended from time to time and applicable to the Chapter 11 Cases.

---

[1] The Bank Group agrees to the Allowed amount of its Claims for purposes of this Creditor Plan only, and not for any other purpose.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

**1.16    Bankruptcy Court**.  The United States Bankruptcy Court for the District of Arizona, or such other court having jurisdiction over the Chapter 11 Case.

**1.17    Bankruptcy Rules**.  The Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

**1.18    Bar Date**.  The deadline set by the Bankruptcy Court for filing Proofs of Claim in the Chapter 11 Case.

**1.19    Borrowers**.  The Reorganized Debtor, and, if elections are made, Fulton Sales and Fulton Warranty.

**1.20    Business Day.**  Any day other than a Saturday, Sunday, or legal holiday (as defined in Bankruptcy Rule 9006).

**1.21    Cash**.   Currency, checks drawn on a bank insured by the Federal Deposit Insurance Corporation, certified checks, money orders, negotiable instruments, and wire transfers of immediately available funds.

**1.22    Chapter 11 Case**.  The Chapter 11 Case of the Debtor pending in the Bankruptcy Court under Case No.  2:09-bk-1298-GBN.

**1.23    Claim**.  A claim against the Debtor or its property as defined in Section 101(5) of the Bankruptcy Code, including: (a) any right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured arising at any time before the Effective Date; or (b) any right to an equitable remedy for breach of performance if the breach gives rise to a right to payment, whether or not the right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**1.24    Claims Register**.  The official register of Claims and Equity Interests maintained by the Debtor.

**1.25    Class**.  A category consisting of holders of Claims or Equity Interests substantially similar in nature, classified as described in Article III of this Plan.

**1.26    Collateral.**  Any property or interest in property of the Estate subject to a Lien to secure the payment or performance of a Claim, the Lien not being subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law.

**1.27    Confirmation Date**.  The date the Bankruptcy Court enters the Confirmation Order.

**1.28    Confirmation Hearing**.  The hearing at which the Confirmation Order is first considered by the Bankruptcy Court.

**1.29    Confirmation Order**.  The order of the Bankruptcy Court confirming this Plan in accordance with the Bankruptcy Code.  The Confirmation Order need not necessarily be a Final Order.

**Snell & Wilmer**
— L.L.P. —
LAW OFFICES
One Arizona Center, 400 E.  Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12009513.4

**1.30 Contingent Claim.** Any Claim for which a Proof of Claim has been filed with the Bankruptcy Court that: (a) was not filed in a fixed amount, or has not accrued and depends on a future event that has not occurred and may never occur; and (b) has not been Allowed on or before the Confirmation Date.

**1.31 Creditor.** Any holder of a Claim, whether or not the Claim is an Allowed Claim, encompassed within the statutory definition set forth in Section 101(10) of the Bankruptcy Code.

**1.32 Cure.** The distribution in the ordinary course of business as soon as reasonably practicable following the Effective Date of a Cure Amount in Cash, or such other property as may be ordered by the Bankruptcy Court or agreed upon by the parties.

**1.33 Cure Amount.** The amount equal to all unpaid monetary obligations under applicable law which are required to be paid under Section 365(b) of the Bankruptcy Code or such lesser amount as may be agreed upon by the parties, under an executory contract or unexpired lease assumed pursuant to Section 365 of the Bankruptcy Code, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

**1.34 Cure Bar Date.** The deadline for filing requests for payment of Cure, which shall be the later of: (a) 30 days after the Effective Date; or (b) 30 days after the date of any notice of assumption of the applicable executory contract or unexpired lease, unless otherwise ordered by the Bankruptcy Court or agreed to by the Debtor and the counterparty to the applicable executory contract or unexpired lease.

**1.35 Debtor.** Fulton Homes Corporation.

**1.36 Disallowed.** In reference to a Claim, a Claim or any portion of a Claim that has been disallowed, overruled, withdrawn, or expunged by Final Order.

**1.37 Disclosure Statement.** The written disclosure statement (including all Exhibits and Schedules thereto) relating to this Plan (including all Exhibits and Schedules thereto) in the form approved by the Bankruptcy Court under Section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017.

**1.38 Disputed.** With respect to Claims or Equity Interests, any Claim or Equity Interest that is not Allowed.

**1.39 Distribution.** Payments in Cash or distributions of other property made pursuant to this Plan.

**1.40 Distribution Agent.** The Person responsible for making or facilitating Distributions to holders of Allowed Claims under this Plan. The Distribution Agent shall be: (a) the Administrative Agent, or the Person chosen by the Administrative Agent, with respect to Distributions to the holders of Allowed Bank Group Claims; and (b) the Reorganized Debtor, or the Person chosen by the Reorganized Debtor, with respect to Distributions to the holders of all other Allowed Claims, except for Allowed Bank Group Claims.

**1.41 Distribution Record Date.** The date for determining the holders of Allowed Claims and Interests who are eligible to receive Distributions pursuant to this Plan, which shall be the Confirmation Date or such other date as designated in this Plan or a Bankruptcy Court order.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

**1.42   Distribution Reserve**.  The Reorganized Debtor shall determine the reserve, if any, to be established and maintained by the Reorganized Debtor for purposes of making Distributions to holders of Disputed Claims if and when such Disputed Claims become Allowed General Unsecured Claims.

**1.43   Effective Date**.  The first Business Day that is 11 days after the Confirmation Date and on which (a) no stay of the Confirmation Order is in effect, and (b) all conditions to effectiveness set forth in Article XII of this Plan have been satisfied or waived in accordance with the terms of this Plan.

**1.44   Equity Interest**.  The legal, equitable, contractual, and other rights of any Person with respect to membership or ownership interests in the Debtor, or any other equity securities of or ownership interests in the Debtor.

**1.45   Estate**.  The bankruptcy estate for the Debtor created by virtue of Section 541 of the Bankruptcy Code upon commencement of the Chapter 11 Case.

**1.46   Exchange Act**.  The Securities Exchange Act of 1934, as amended, and the regulations promulgated under that act.

**1.47   Exhibit**.  An exhibit annexed to either this Plan or as an appendix to the Disclosure Statement.

**1.48   Existing Credit Documents**.  The Pre-Petition Credit Agreement, and all documents and guarantees required under or otherwise executed in connection with the Pre-Petition Credit Agreement.

**1.49   Final Order**.  An order or judgment of the Bankruptcy Court: (a) as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired, or as to which any right to appeal, petition for certiorari, reargue, or rehear has been waived in writing in form and substance satisfactory to the Debtors; and (b) if an appeal, writ of certiorari, reargument, or rehearing has been sought, as to which the highest court to which the order was appealed, or certiorari, reargument, or rehearing was sought, has determined or denied the appeal, writ of certiorari, reargument, or rehearing, and the time to take any further appeal, petition for writ of certiorari, or move for reargument or rehearing has expired; but the filing of a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, with respect to the order does not prevent the order from being a Final Order.

**1.50   Fulton Family Trust**.  The Ira A.  Fulton and Mary Lou Fulton Family Trust, dated December 17, 1982.

**1.51   Fulton Sales**.  Fulton Homes Sales Corporation.  Fulton Sales is not a Debtor in this Chapter 11 Case.

**1.52   Fulton Sales Guaranty**.   The "Second Amended and Restated Continuing Guaranty" dated February 24, 2003 and executed by Fulton Sales guarantying the Debtor's obligations under the Pre-Petition Credit Agreement.

**1.53   Fulton Sales Reimbursement Payment**.  A payment made on the Effective Date by Fulton Sales to the Debtor in an amount equal to any intercompany charges.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E.  Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12009513.4

**1.54** **Fulton Sales Contribution**. If elected, the contribution by Fulton Sales to the Reorganized Debtor. The Fulton Sales Contribution will occur on the Effective Date in the manner set forth in Article VI of this Plan.

**1.55** **Fulton Unsecured Claim**. The unsecured Claim of Ira A. Fulton against the Debtor arising from advances made by Ira A. Fulton to the Debtor as evidenced by those certain notes issued to Ira A. Fulton by the Debtor, as amended and updated from time to time. This Claim is contractually subordinated to the repayment of the Bank Group Claims. According to the Debtor, the current amount of outstanding principal under this Claim is approximately $25,000,000.00.

**1.56** **Fulton Warranty**. Fulton Homes Warranty Corporation. Fulton Warranty is not a Debtor in this Chapter 11 Case.

**1.57** **Fulton Warranty Guaranty**. The "Amended and Restated Continuing Guaranty" dated February 24, 2003 and executed by Fulton Warranty, guarantying the Debtor's obligations under the Pre-Petition Credit Agreement.

**1.58** **General Unsecured Claim**. Any Claim against the Debtor that is unsecured and not subject of any Lien or priority or administrative status under the Bankruptcy Code, provided that a General Unsecured Claim shall not include: (a) a Secured Claim; (b) an Administrative Claim; (c) a Secured Vendor Claim; (d) a Secured Tax Claim; (e) a Priority Claim; (f) the Bank Group Claims; (g) the Queen Creek Claim; (h) the Fulton Unsecured Claim; and (i) an Unsecured Warranty Claim.

**1.59** **Gross Sales Price**. The gross sales price of a Unit or Non-Unit set forth in the purchase contract (expressed in United States Dollars), less any third party improvements financed through such sale for which neither Borrowers, nor any of their respective Affiliates or subsidiaries will receive payment, including, without limitation, costs for landscaping, window covering, pools, or other improvements that are included in the gross sales price for purposes of financing such improvements.

**1.60** **Guaranties**. The Fulton Sales Guaranty and the Fulton Warranty Guaranty, collectively.

**1.61** **Impaired**. Any Claim or Equity Interest that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

**1.62** **Initial Distribution Date**. The first Business Day after the Effective Date or as soon thereafter as is practical on which distributions are made to holders of Allowed Claims under this Plan.

**1.63** **IRS**. The Internal Revenue Service.

**1.64** **Lien**. A lien as defined in Section 101(37) of the Bankruptcy Code, except a lien that has been avoided in accordance with Sections 544, 545, 546, 547, 548, or 549 of the Bankruptcy Code.

**1.65** **List of Reorganized Officers**. A schedule identifying the officers of the Reorganized Debtor as of the Effective Date. The List of Reorganized Officers is contained in

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12009513.4

the Schedule of Compensation of Officers and Directors of Reorganized Debtor, which is attached to the Disclosure Statement as Exhibit 11.

**1.66    Minimum Working Capital Reserve**.  A working capital reserve to fund working capital necessary to implement this Plan in the amount of no less than $6 million, or such other amount that may agreed to by the Bank Group.

**1.67    Net Cash Proceeds**.  The Gross Sales Price of a Unit or Non-Unit (expressed in United States Dollars), less (i) customary tax and assessment prorations; (ii) reasonable and customary real estate brokerage commissions paid to third party brokers unaffiliated with the Borrowers or any Affiliate of the Borrowers; and (iii) reasonable and customary closing costs.

**1.68    New Credit Facility**.  The new, secured credit facility to be entered into between the Borrowers and the Bank Group on the Effective Date, pursuant to which the New Note will be issued to the holders of Allowed Bank Group Claims.

**1.69    New Loan Documents**.  Collectively, the Amended and Restated Credit Agreement, the New Note, and any related documents and agreements in connection therewith.

**1.70    New Note**.  A term note in the face amount of the New Note Face Amount.  The New Note matures on the third anniversary of the Effective Date.  The New Note shall bear interest at (i) Prime + 3.75 % during the first year following the Effective Date, Prime + 4.75 % during the second year following the Effective Date, and Prime + 5.75 % during the third year following the Effective Date, subject to an interest rate floor of 7 %, or (ii) whatever rate the Bankruptcy Court approves as appropriate.  The New Note is attached to the Disclosure Statement as Exhibit 2.

**1.71    New Note Face Amount**.  An amount equal to the sum of: (a) the Allowed Bank Group Claims as of the Effective Date; minus (b) the Bank Group Effective Date Cash Payment.

**1.72    Non-Debtor Affiliates**.  The Affiliates of the Debtor that have not commenced cases under Chapter 11 of the Bankruptcy Code.

**1.73    Non-Unit**.  Any Bank Group Collateral consisting of any Unentitled Land, Entitled Land, Lots Under Development, or Finished Lots, as those terms are defined in the Amended and Restated Credit Agreement.

**1.74    Note Default Rate**.  The rate of interest applicable after an event of default by the Debtor pursuant to the Pre-Petition Credit Agreement.

**1.75    Note Rate**.  The rate of interest applicable prior to an event of default by the Debtor pursuant to the Pre-Petition Credit Agreement.

**1.76    Other Priority Claim**.  Any Claim (or portion of a Claim) entitled to priority under Section 507(a) of the Bankruptcy Code other than Priority Tax Claims and Administrative Claims.

**1.77    Person**.  Any individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, association, joint-stock company, trust, unincorporated association or organization, governmental agency or associated political subdivision.

Snell & Wilmer
— L.L.P. —
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

**1.78    Petition Date**.  The date on which the Debtor filed its voluntary petition for relief in the Bankruptcy Court, which date is January 27, 2009.

**1.79    Plan**.  This Plan, either in its present form or as it may be amended, supplemented, or modified from time to time in accordance with the terms of this Plan, including, except where the context otherwise requires, all its annexed exhibits.

**1.80    Plan Contribution Agreement**.  An agreement between Ira A.  Fulton and the Reorganized Debtor, which if elected to by Ira Fulton, provides that the holders of Allowed Equity Interests in the Debtor and Fulton Sales, in exchange for the Bank Group's Agreement to forbear from collecting the Bank Group Judgment, consent to the provisions of this Plan necessary to implement this Plan, including, without limitation: (a) Fulton Sales becoming a co-Borrower under the Amended and Restated Credit Agreement; (b) Fulton Sales pledging all of its assets to the holders of Allowed Bank Group Claims; (c) the making of the Fulton Sales Contribution; and (d) any other actions required to be taken by holders of Allowed Equity Interests pursuant to Article 4.8 of this Plan.  The Plan Contribution Agreement is attached to the Disclosure Statement as Exhibit 10.

**1.81    Plan Documents**.  Collectively: (a) the Amended and Restated Organizational Documents; (b) the Amended and Restated Credit Agreement; (c) the New Note; and (d) the list of Avoidance Actions; copies of which shall be filed with the Bankruptcy Court as an Exhibit to the Disclosure Statement, and any other contracts, instruments, releases, and other agreements or documents to be executed in order to consummate the transactions contemplated under this Plan or otherwise necessary to effect and further evidence the terms and conditions of this Plan.

**1.82    Plan Proponent**.  The Bank Group.

**1.83    Pre-Petition Credit Agreement**.  That certain Revolving Credit Agreement dated May 5, 2000, as amended from time to time, between the Debtor as borrower, the Administrative Agent, and the Bank Group, and any other lenders from time to time party thereto, and all guaranty agreements, and all other loan documents related thereto.

**1.84    Preserved Litigation Claims**.  All rights, claims, torts, liens, actions, causes of action, avoiding powers, proceedings, debts, contracts, judgments, offsets, damages, and demands in law or in equity, whether known or unknown, contingent or otherwise, that the Debtor or the Estate (through an official committee or otherwise) has brought or may have against any Person, including, without limitation, those listed in Exhibit 12 to the Disclosure Statement.  Failure to list a Preserved Litigation Claim in Exhibit 12 to the Disclosure Statement does not constitute the Debtor's, the Estate's, or the Reorganized Debtor's waiver or release of that Preserved Litigation Claim.

**1.85    Preserved Ordinary Course Administrative Claim**.  Any Administrative Claim based on liabilities incurred by a Debtor in the purchase, lease, or use of goods and services in the ordinary course of its business, including Administrative Claims, on account of services provided after the Petition Date to the Debtor by its employees, and Claims for unpaid rent or contract payments arising under a rejected executory contract or unexpired lease of nonresidential real property after the Petition Date and before the effective date of the rejection of that contract or lease, but excluding Professional Claims.

**1.86    Priority Tax Claim**.  Any Claim of a governmental unit entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

12009513.4

9

**1.87   Professional**.  A Person: (a) employed in the Chapter 11 Case in accordance with an order of the Bankruptcy Court under Sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services under Sections 327, 328, 329, 330, and 331 of the Bankruptcy Code or order of the Bankruptcy Court; or (b) for whom compensation and reimbursement has been Allowed by a Final Order under Section 503(b) of the Bankruptcy Code.

**1.88   Professional Claim**.    An Administrative Claim for compensation and reimbursement of expenses of a Professional rendered or incurred before the Effective Date submitted in accordance with Sections 328, 330, 331, and 503(b) of the Bankruptcy Code.

**1.89   Professional Claim Bar Date**.  The first Business Day that is 30 days after the Effective Date.

**1.90   Pro Rata**.  A proportionate share, such that the ratio of the consideration distributed on account of an Allowed Claim or Equity Interest in a Class to the amount of such Allowed Claim or Equity Interest is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims or Equity Interests in that Class to the amount of all Allowed Claims or Equity Interests in that Class.

**1.91   Proof of Claim**.  A proof of Claim filed against any the Debtor in the Chapter 11 Case.

**1.92   Q-Sub Election**.  An election by the Debtor or Reorganized Debtor, as applicable, to treat Fulton Sales as a qualified subchapter S subsidiary in connection with the Tax Reorganization.  The Q-Sub Election will occur in the manner set forth in Article VI of this Plan.

**1.93   Queen Creek**.  The town of Queen Creek, Arizona.

**1.94   Queen Creek Claim**.  The unsecured claim of Queen Creek arising from the development agreement between the Debtor and Queen Creek in 2007 concerning the Debtor's development of a community commonly referred to as "Ironwood Crossing," and any other documents or claims arising under or associated therewith.

**1.95   Rejection Claims**.  All Claims arising from the Debtor's rejection of an executory contract or unexpired lease of nonresidential real property either during the Chapter 11 Case or in connection with this Plan, including Claims for future rents under Section 502(b)(6) of the Bankruptcy Code or future contract payments and General Unsecured Claims for unpaid rent or contract payments accruing before the Petition Date.  Rejection Claims do not include Claims for unpaid rent or contract payments arising under a rejected executory contract or unexpired lease of nonresidential real property after the Petition Date and before the effective date of the rejection of such contract or lease.

**1.96   Rejection Claim Bar Date**.  The earlier of: (a) 30 Business Days following the entry of the order of the Bankruptcy Court approving such rejection, provided the effectiveness of such order has not been stayed; and (b) 30 Business Days following the Effective Date of this Plan.

**1.97   Reorganized Debtor**.  The Debtor, on and after the Effective Date.

**1.98   Schedules**.  The schedules of assets and liabilities, the list of holders of Equity Interests, and the statements of financial affairs filed by the Debtor under Section 521 of the

12009513.4

Snell & Wilmer
— L.L.P. —
LAW OFFICES
One Arizona Center, 400 E.  Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Bankruptcy Code and Bankruptcy Rule 1007, as the schedules, list, and statements may have been or may be supplemented or amended from time to time.

**1.99  Secured Claim**.  Any Claim (a) listed in the Schedules as a liquidated, noncontingent, and undisputed secured Claim, or (b) reflected in a Proof of Claim as a secured Claim, secured by a Lien on Collateral to the extent of the value of the Collateral, as determined in accordance with Section 506(a) of the Bankruptcy Code, or, if the Claim is subject to setoff under Section 553 of the Bankruptcy Code, net of the setoff.

**1.100  Secured Tax Claim**.  Any Claim of any governmental unit or associated political subdivision, including property taxes and accrued and unpaid interest under applicable law from the Petition Date, which is secured by a Lien on property of an Estate by operation of applicable law including every Claim for unpaid real, personal property, or *ad valorem* taxes.  For the avoidance of doubt, Secured Tax Claims include the claims of Maricopa and Pinal Counties.

**1.101  Secured Vendor Claim**.  Any Claim of a Person arising from the provision of goods and services to the Debtor before the Petition Date, that is: (a) secured by a Lien on property of the Estate, including a mechanic's lien, materialman's lien, or similar lien; (b) entitled to administrative expense priority under Section 503(b)(9) of the Bankruptcy Code; or (c) for which a right of reclamation exists under Section 546 of the Bankruptcy Code or applicable non-bankruptcy law.  For the avoidance of doubt, Secured Vendor Claims include claims for vertical or horizontal construction at the development communities commonly referred to as "Cobblestone", "Coldwater Springs", "Cortina", "Fulton Estates", "Royal Ranch", "Villago", "Freeman Farms", "Fulton Ranch", "Geneva Estates", and "Ironwood Crossing."

**1.102  Subordinated Debt Securities Claim**.  Any Claim of the type described in and subject to subordination pursuant to Section 510(b) of the Bankruptcy Code relating to Equity Interests or Equity Related Claims.

**1.103  Subordination Agreement**.  That certain second amended and restated subordination agreement executed by Ira A. Fulton and dated February 4, 2003, as amended from time to time, which provides that Ira A. Fulton agrees to subordinate repayment of the Fulton Unsecured Claim to the Claims of the Bank Group arising under the Pre-Petition Credit Agreement.

**1.104  Tax Reorganization**.  A tax-free reorganization under Internal Revenue Code Section 368(a)(1)(D) or (G).

**1.105  Unimpaired**.  Any Claim or Equity Interest that is not Impaired within the meaning of Section 1124 of the Bankruptcy Code.

**1.106  Unit.**  Any Bank Group Collateral consisting of single family residential housing units.

**1.107  Unsecured Deficiency Claim**.  Any Claim by a Person holding a Secured Claim to the extent the value of such Creditor's Collateral, as determined in accordance with Section 506(a) of the Bankruptcy Code, is less than the Allowed amount of such Creditor's Claims as of the Petition Date, after taking into account any elections made pursuant to Section 1111(b) of the Bankruptcy Code.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12009513.4

**Snell & Wilmer**
— L.L.P. —
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

**1.108  Unsecured Warranty Claim**.  Any Claim by a Person against the Debtor: (a) arising from the provision of a two-year seller's warranty to the purchaser of homes constructed and sold by the Debtor before the Effective Date; and (b) for which the Debtor is determined to be actually liable to such Person under contract, tort, equity, or other applicable law as determined by a court of competent jurisdiction.

**1.109  Voting Deadline**.  The date established by the Bankruptcy Court by which holders of Allowed Claims and Interests are determined for purposes of such holders' right to submit Ballots.

## C.  Rules of Interpretation

For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, and neuter; (c) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (d) any reference in this Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to this Plan; (e) any reference to an entity as a holder of a Claim or Equity Interest includes that entity's successors and assigns; (f) all references in this Plan to Sections, Articles and Exhibits are references to Sections, Articles, and Exhibits of or to this Plan; (g) the words "herein," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (h) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (i) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; and (j) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply.

## D.  Computation of Time

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.  If a date on which a transaction may occur pursuant to this Plan or the Amended Operating Agreement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## E.  Reference to Monetary Figures

All references in this Plan to monetary figures shall refer to United States of America currency, unless otherwise expressly provided.

## F.  Exhibits

All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein. Copies of Exhibits can be obtained by: (a) written request to Snell & Wilmer L.L.P., One Arizona Center, 400 East Van Buren, Phoenix, Arizona 85004. (Attn: Evans O'Brien,

12009513.4

eobrien@swlaw.com), counsel to the Bank Group; or (b) accessing the website for the United States Bankruptcy Court for the District of Arizona (www.azb.uscourts.gov/). To the extent any Exhibits are inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the non-Exhibit portion of this Plan shall control.

## ARTICLE 2
## TREATMENT OF UNCLASSIFIED CLAIMS

### 2.1   Unclassified Claims

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims and Other Priority Claims are not classified for purposes of voting on, or receiving distributions under, this Plan. Holders of Administrative Claims and Priority Tax Claims are not entitled to vote on this Plan but, rather, are treated separately in accordance with Article II of this Plan and under Section 1129(a)(9)(A) of the Bankruptcy Code.

### 2.2   Allowed Administrative Claims

2.2.1   **Generally**.  Each Allowed Administrative Claim (other than a Preserved Ordinary Course Administrative Claim or Professional Claim) shall be paid in full in Cash (or otherwise satisfied in accordance with its terms) on the latest of: (a) the Effective Date, or as soon after that date as practicable; (b) any date the Bankruptcy Court may fix, or as soon after that date as practicable; (c) 30 days after the Claim is Allowed; or (d) any date on which the holder of the Claim and the Reorganized Debtor agree.

2.2.2   **Requests for Payment**.  All requests for payment of an Administrative Claim (other than a Preserved Ordinary Course Administrative Claim or Professional Claim) must be served on the Reorganized Debtor and filed with the Bankruptcy Court no later than the Administrative Claims Bar Date.  Any holder of an Administrative Claim (other than a Preserved Ordinary Course Administrative Claim or Professional Claim) that fails to file and serve its request by the Administrative Claims Bar Date shall be forever barred from asserting its Administrative Claim against the Debtor or the Reorganized Debtor.

### 2.3   Preserved Ordinary Course Administrative Claims

Each Allowed Preserved Ordinary Course Administrative Claim shall be paid in full in Cash at the Reorganized Debtor's election either: (a) in accordance with the terms and conditions under which the Claim arose; or (b) on such date on which the holder of the Claim and the Reorganized Debtor agree.  Payments shall be made without further action by the holder of the Preserved Ordinary Course Administrative Claim.

### 2.4   Allowed Priority Tax Claims

Any Allowed Priority Tax Claim shall be paid in full in Cash on the later of the Effective Date (or as soon after that date as practicable) and 30 days after the Claim is Allowed, but the Plan Proponent or the Reorganized Debtor may elect to pay any Allowed Priority Tax Claim through regular installment payments in Cash of a total value, as of the Effective Date, equal to the Allowed amount of the Claim, over a period ending not later than five years after the Petition Date, and in a manner not less favorable than the most favored General Unsecured Claim provided for by this Plan.  If the Plan Proponent or the Reorganized Debtor so elects, the installment payments shall be made in equal quarterly installments of principal plus simple

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

interest on the unpaid portion of the Allowed Priority Tax Claim accruing from the Effective Date at the rate of 6% per year. The first payment shall be made on the latest of: (a) the Effective Date, or as soon after that date as practicable; (b) 30 days after the Claim is Allowed, or as soon after than date as practicable; or (c) another date on which the holder of the Claim and the Plan Proponent or the Reorganized Debtor agree. The Reorganized Debtor retains the right to prepay any Allowed Priority Tax Claim, or any remaining balance of such a Claim, in full or in part, at any time on or after the Effective Date without premium or penalty.

### 2.5    Allowed Other Priority Claims

Any Allowed Other Priority Claim shall be paid in full in Cash either: (a) on the later of the Effective Date (or as soon after that date as practicable) and 30 days after the Claim is Allowed; or (c) on such date on which the holder of the Allowed Other Priority Claim and the Reorganized Debtor agree.

### 2.6    Professional Claims

Each Allowed Professional Claim shall be paid in full in Cash: (a) no later than 30 days after the Professional Claim is Allowed; (b) on any other terms the holder of an Allowed Professional Claim and the Plan Proponent or the Reorganized Debtor may agree; or (c) in accordance with the terms of any applicable administrative procedures order entered by the Bankruptcy Court. Each Person seeking an award by the Bankruptcy Court of Professional Fees must file with the Bankruptcy Court and serve on the Reorganized Debtor its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date within 30 days after the Effective Date.

### ARTICLE 3
### CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Pursuant to Section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Equity Interests in the Debtor. All Claims and Equity Interests, except Administrative Claims, Priority Tax Claims, Other Priority Claims and any other unclassified Claims are placed in the Classes as set forth below. In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Other Priority Claims have not been classified, and the respective treatments of such unclassified Claims are set forth in Article II of this Plan.

A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class and is classified in another Class or Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date. The value of any Distributions received by holders of Claims in satisfaction of interest-bearing obligations shall be allocated first to the full satisfaction of the principal of such interest-bearing obligations and second in satisfaction of any accrued and unpaid interest, except as otherwise provided in the Amended and Restated Credit Agreement.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12009513.4

Snell & Wilmer
——— L.L.P. ———
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

### 3.1    Secured Claims

Secured Claims shall be classified in the following Classes:

3.1.1    **Class 1**.  Class 1 shall consist of all Allowed Secured Vendor Claims. Each holder of an Allowed Secured Vendor Claim is considered to be in its own separate subclass within Class 1, and each such subclass is deemed to be a separate Class for purposes of this Plan.

3.1.2    **Class 2**.  Class 2 shall consist of all Allowed Secured Tax Claims.  Each holder of an Allowed Secured Tax Claim is considered to be in its own separate subclass within Class 2, and each such subclass is deemed to be a separate Class for purposes of this Plan.

### 3.2    Unsecured Claims

Unsecured Claims shall be classified in the following Classes:

3.2.1    **Class 3**.  Class 3 shall consist of all Allowed Bank Group Claims.

3.2.2    **Class 4**.  Class 4 shall consist of all Allowed General Unsecured Claims.

3.2.3    **Class 5**.  Class 5 shall consist of all Allowed Queen Creek Claims.

3.2.4    **Class 6**.  Class 6 shall consist of all Allowed Unsecured Warranty Claims.

3.2.5    **Class 7**.  Class 7 shall consist of all Allowed Fulton Unsecured Claims.

### 3.3    Equity Interests

Equity Interests shall be classified in the following Classes:

3.3.1    **Class 8**.  Class 8 shall consist of all Allowed Equity Interests

### ARTICLE 4
### TREATMENT OF CLAIMS AND INTERESTS

The treatment of Claims and Equity Interests as provided in this Article IV represents a compromise and full and final settlement, pursuant to Section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, of the various Claims and Equity Interests of parties in interest in the Chapter 11 Case.

### 4.1    Class 1 – Secured Vendor Claims

4.1.1    **Impairment and Voting**.  Class 1 is Unimpaired by this Plan.  Holders of Allowed Secured Vendor Claims in Class 1 are not entitled to vote and shall not be solicited to vote on this Plan.

4.1.2    **Treatment**.  Each holder of an Allowed Secured Vendor Claim is considered to be in its own separate subclass within Class 1, and each such subclass is deemed to be a separate Class for purposes of this Plan. Each holder of an Allowed Secured Vendor Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, such Claim, a

12009513.4

Cash payment on the Effective Date equal to 100% of the Allowed amount of such Secured Vendor Claim

## 4.2    Class 2 – Secured Tax Claims

4.2.1    **Impairment and Voting**. Class 2 is Impaired by this Plan. Holders of Allowed Secured Tax Claims in Class 2 are entitled to vote and shall be solicited to vote on this Plan

4.2.2    **Treatment**. Each holder of an Allowed Secured Tax Claim is considered to be in its own separate subclass within Class 2, and each such subclass is deemed to be a separate Class for purposes of this Plan. The treatment of Allowed Secured Tax Claims will depend upon the nature of the property subject to the Lien of the holder of the Allowed Secured Tax Claim.

(i)    <u>Finished Lots</u>:  Each holder of an Allowed Secured Tax Claim that are secured by a Lien on finished lots of the Debtor shall receive, in full and final satisfaction, settlement, release, and discharge of, such Claim, the following treatment: a) the Claim holder will retain its Lien on the property until such time as the Claim is paid in full; and b) the Claim will be paid in full and in Cash, with interest at the statutory rate, on the date that the respective developed lot is sold to a third party.

(ii)    <u>Unfinished Lots</u>:  Each holder of an Allowed Secured Tax Claim that are secured by a Lien on unfinished lots of the Debtor shall receive, in full and final satisfaction, settlement, release, and discharge of, such Claim, the following treatment: a) the Claim holder will retain its Lien on the property until such time as the Claim is paid in full; and b) the Claim will be paid in full and in Cash, with interest at the statutory rate, over a 4-year period following the Effective Date. The Reorganized Debtor will make semiannual payments on account of such Allowed Secured Tax Claims.

## 4.3    Class 3 – Bank Group Claims.

4.3.1    **Impairment and Voting**. Class 3 is Impaired by this Plan. All holders of Allowed Bank Group Claims in Class 3 are entitled to vote and shall be solicited to vote on this Plan.

4.3.2    **Treatment**.  In full settlement, release and discharge of all Bank Group Claims, on the Effective Date or as soon thereafter as practicable, Holders of Allowed Bank Group Claims shall receive the following:

(i)    <u>Cash Payment</u>.  On the Effective Date, the Borrowers will pay the Bank Group Effective Date Cash Payment to the holders of Allowed Bank Group Claims.

(ii)    <u>New Note</u>.  On the Effective Date, the Borrowers will issue the New Note to the holders of Allowed Bank Group Claims, and shall execute the Amended and Restated Credit Agreement. The Amended and Restated Credit Agreement provides for:

(1)    A maximum lot ratio;

(2)    Maximum speculative units;

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12009513.4

(3)    No additional indebtedness or contingent liabilities without express written approval of the Administrative Agent;

(4)    Maintenance of all of the Reorganized Debtor's bank accounts at Bank of America, N.A.; and,

(5)    Evidence of Liability, Workman's Comp and Course of Construction insurance on all collateral with acceptable levels of coverage and underwritten by a credit-rated insurance company acceptable to the Bank Group.

(iii)    <u>Collateral</u>.  On the Effective Date, the Borrowers will grant to the holders of Allowed Bank Group Claims senior, perfected and valid Liens on the Bank Group Collateral (subject only to existing Liens securing Allowed Secured Tax Claims), provided, however, that the Liens granted hereunder shall be released by the holders of Allowed Bank Group Claims upon the satisfaction of the conditions set forth in Section ___ of the Amended and Restated Credit Agreement.

(iv)    <u>Interest and Term</u>.  The New Note matures on the third anniversary of the Effective Date.  The New Note shall bear interest at  (i) Prime + 3.75 % during the first year following the Effective Date, Prime + 4.75 % during the second year following the Effective Date, and Prime + 5.75 % during the third year following the Effective Date, subject to an interest rate floor of 7 %, or (ii) whatever rate the Bankruptcy Court approves as appropriate.

(v)    <u>Minimum Amortization</u>.  The Borrowers will make minimum semi-annual principal payments on the New Note in the amount of $10 million, which will be due and payable beginning six months after the first anniversary of the Effective Date, and every six months thereafter.

(vi)    <u>Mandatory Prepayments</u>.  From and after the Effective Date, the Borrowers shall make mandatory prepayments pursuant to the Amended and Restated Credit Agreement as follows: (i) in connection with the sale of Bank Group Collateral consisting of a Unit, the Borrowers shall prepay the obligations arising under the Amended and Restated Credit Agreement in an aggregate amount equal to 25 % of the Gross Sales Price from the sale of such Unit; and (ii) in connection with the sale of Bank Group Collateral consisting of a Non-Unit, the Borrowers shall apply the Net Cash Proceeds from such sale as follows:  (a) first, to fund the Minimum Working Capital Reserve, if necessary, and (b) second, all remaining Net Cash Proceeds shall be used to prepay the obligations arising under the Amended and Restated Credit Agreement.

**4.4    Class 4 – General Unsecured Claims**

4.4.1    **Impairment and Voting**.  Class 4 is Unimpaired by this Plan.[2]  Holders of Allowed General Unsecured Claims in Class 4 are not entitled to vote and shall not be solicited to vote on this Plan.

---

[2] An announcement was made of a settlement between Queen Creek and the Debtor.  If such a settlement has been reached and is approved by the Bankruptcy Court, the Queen Creek Class may not be impaired.

12009513.4

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer
— L.L.P. —
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

4.4.2  **Treatment**.  Holders of Allowed General Unsecured Claims (other than Bank Group Claims, the Queen Creek Claim, and the Fulton Unsecured Claim) will receive, in full and final satisfaction of such claims a Cash payment on the Effective Date equal to 100% of the Allowed amount of such General Unsecured Claim.

**4.5      Class 5 – Queen Creek Claims**

4.5.1  **Impairment and Voting**.  Class 5 is Impaired by this Plan. All Holders of Allowed Queen Creek Claims in Class 5 are entitled to vote and shall be solicited to vote on this Plan.

4.5.2  **Treatment**.  The Queen Creek Claims shall be Allowed in the amount of $250,000.  Holders of Allowed Queen Creek Claims will receive, in full and final satisfaction of such claims, a Cash payment on the Effective Date equal to 100% of the Allowed amount of such Queen Creek Claim.

**4.6      Class 6 - Unsecured Warranty Claims**

4.6.1  **Impairment and Voting**.  Class 6 is Unimpaired by this Plan.  All holders of Allowed Equity Interests in Class 6 are deemed to have accepted this Plan and shall not be entitled to vote on this Plan.

4.6.2  **Treatment**.  Holders of Allowed Unsecured Warranty Claims will have their Claims paid in full in the ordinary course of business of the Debtor or Reorganized Debtor, as applicable, as and when such Claims become Allowed.

**4.7      Class 7 - Fulton Unsecured Claim**

4.7.1  **Impairment and Voting**.  Class 7 is Impaired by this Plan.  All holders of Allowed Fulton Unsecured Claims in Class 7 are entitled to vote and shall be solicited to vote on this Plan.

4.7.2  **Treatment**.  The Fulton Unsecured Claim is subordinate to the Bank Group Claims pursuant to the Subordination Agreement.   There shall be no payments made on account of the Fulton Unsecured Claim so long as any obligations under the New Loan Documents remain outstanding.  After satisfaction of the obligations under the New Loan Documents, the Fulton Unsecured Claim shall be paid as a cash flow obligations in annual installments as the Board of Directors of the Reorganized Debtors determines cash to be available.

Nothing in this Plan or Confirmation Order, including Article 10.4 of this Plan, shall alter or impair the Subordination Agreement.

**4.8      Class 8 – Equity Interests**

4.8.1  **Impairment and Voting**.  Class 8 is Impaired by this Plan.  All holders of Allowed Equity Interests in Class 8 are entitled to vote and shall be solicited to vote on this Plan.

4.8.2  **Treatment**.  The Reorganized Debtor will not make distributions to holders of Allowed Equity Interests, including any distributions to holders of Allowed Equity

Interests for the purpose of permitting such holders to pay personal taxes, until the Borrowers' obligations under the New Loan Documents are first paid and satisfied in full.

Additionally, to facilitate the transactions and treatment of Claims set forth in this Plan, on the Effective Date the holders of Allowed Equity Interests will, as described in Article 6.1 of this Plan: (a) make Fulton Sales become a Borrower under the Amended and Restated Credit Agreement; and (b) make Fulton Sales pledge its assets to the holders of Allowed Bank Group Claims as part of the Bank Group Collateral.

# ARTICLE 5
## ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE IMPAIRED CLASSES OF CLAIMS OR EQUITY INTERESTS

### 5.1    Impaired Classes of Claims Entitled to Vote

Except as otherwise provided in any Final Order(s) of the Bankruptcy Court pertaining to solicitation of votes on this Plan and Sections 5.3 and 5.5 of this Plan, holders of Claims in each Impaired Class are entitled to vote in their respective classes as a class to accept or reject this Plan.

### 5.2    Classes Deemed to Accept the Plan

Classes 1, 4, and 6 are Unimpaired by this Plan.  Pursuant to Section 1126(f) of the Bankruptcy Code, such Class is conclusively presumed to have accepted this Plan, and the votes of holders of Equity Interests in Class 6 therefore shall not be solicited.

### 5.3    Acceptance By Impaired Classes

Classes 2, 3, 5, 7 and 8 are Impaired under this Plan.[3]  Pursuant to Section 1126(c) of the Bankruptcy Code, and except as provided in Section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted this Plan if this Plan is accepted by the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject this Plan.

### 5.4    Classes Deemed to Reject the Plan

Pursuant to Section 1126(g) of the Bankruptcy Code, no Classes of Claims or Equity Interests are conclusively presumed to have rejected this Plan.

### 5.5    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

If any Impaired Class of Claims entitled to vote should not accept this Plan by the requisite statutory majorities provided in Section 1126(c) of the Bankruptcy Code, this Plan Proponent reserves the right to request that the Bankruptcy Court confirm this Plan under Section 1129(b) of the Bankruptcy Code.

---

[3] In the event of an approved settlement, Class 5 may become unimpaired.

12009513.4

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

# ARTICLE 6
## IMPLEMENTATION OF THE PLAN

### 6.1    Sources of Consideration for Plan Distributions

The Reorganized Debtor shall fund Distributions under this Plan with Cash on hand, the sale of existing assets in the ordinary course of business, the New Credit Facility, the agreement of Fulton Sales to become a co-Borrower under the New Credit Facility or the judicial execution or collection of the assets of Fulton Sales, the conversion of the Fulton Unsecured Claim into equity in the Reorganized Debtor, and the creation of new Liens and security interests in assets of the Reorganized Debtor and Fulton Sales to secure the obligations of the Borrowers under the New Credit Facility.

6.1.1    **New Credit Facility**.  On the Effective Date, the Borrowers shall execute the New Loan Documents.  Pursuant to the New Loan Documents, the Borrowers shall issue the New Note to the holders of Allowed Bank Group Claims on the Effective Date.

6.1.2    **Fulton Sales Becomes Borrower Under New Credit Facility or Becomes an Asset Resource for Pay Down of Debt**.  On the Effective Date, in full and final settlement and satisfaction of the treatment of Claims and releases granted under this Plan, either: 1) Fulton Sales agrees to become a co-Borrower under the New Credit Facility, and will, in its capacity as a Borrower, pledge all of its assets, including unrestricted Cash generated post-Effective Date from Sales of Units and Non-Units, as part of the Bank Group Collateral; or 2) if no such agreement occurs, thereafter the execution and/or collection of the assets of Fulton Sales by the Bank Group for application to the Bank Group's New Credit Facility and New Note.

6.1.3    **Bank Group Collateral**.  On the Effective Date, in full and final settlement and satisfaction of the treatment of Claims and releases granted under this Plan, the obligations of the Borrowers under the New Credit Facility shall be secured by senior, perfected, and valid Liens on the Bank Group Collateral (subject only to existing Liens securing Allowed Secured Tax Claims); provided, however, that the Liens granted hereunder shall be released by the holders of Allowed Bank Group Claims upon the satisfaction of the conditions set forth in Section _____ of the Amended and Restated Credit Agreement.

### 6.2    Continued Corporate Existence

6.2.1    **The Debtor**.  From and after the Effective Date, the Debtor will continue to exist, with all the powers of a corporation under applicable law in the jurisdiction in which each the Debtor is incorporated and pursuant to its articles of incorporation and bylaws in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws are amended by this Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

6.2.2    **Amended and Restated Organizational Documents**.  As of the Effective Date and without any further action by the stockholders or directors of the Debtor or the Reorganized Debtor, the Reorganized Debtor's certificate of incorporation will be amended and restated substantially in the form of the Amended and Restated Articles of Organization.  The Amended and Restated Organizational Documents will also prohibit (to the extent required by Sections 1123(a) and (b) of the Bankruptcy Code) the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtor may amend the Amended and Restated Organizational Documents as permitted by applicable law

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer
— L.L.P. —
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

6.2.3  **Non-Debtors**.  There are certain Affiliates of the Debtor that are not Debtors in the Chapter 11 Case to the extent that certain Affiliates of the Debtor make certain elections.  The continued existence, operation and ownership of such Non-Debtor Affiliates would be a material component of the Debtor's business, and, as set forth in Article 10.1 of this Plan, all of the Debtor's equity interests and other property interests in such Non-Debtor Affiliates shall revest in the Reorganized Debtor on the Effective Date.

### 6.3    Cancellation of Securities, Instruments and Agreements

On the Effective Date, except to the extent provided otherwise in this Plan, all securities, and all agreements, instruments, and other documents evidencing or governing any Claims against the Debtor, will be automatically deemed terminated, canceled, and extinguished with respect to the Debtor and the Chapter 11 Case (all without further action by any Person), and all obligations of the Debtor and its Estate under such instruments and agreements will be deemed fully and finally waived, released, canceled, extinguished, and discharged.

### 6.4    Effectiveness of New Securities, Instruments, Agreements and Documents

On the Effective Date, all securities, instruments, agreements, and documents issued, entered into, delivered, or filed under this Plan, including, without limitation, the New Note, the Amended and Restated Credit Agreement, this Plan Documents, and any security, instrument, agreement or document entered into, delivered, or filed in connection with any of the foregoing, will be deemed to become effective, binding, and enforceable in accordance with its respective terms and conditions.

### 6.5    No Corporate Action Required by the Debtor

As of the Effective Date: (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements related to or contemplated by this Plan; and (b) the other matters provided for under, or in furtherance of, this Plan involving corporate action required of the Debtor, will be deemed to have occurred and become effective as provided in this Plan, and will be deemed authorized and approved in all respects without further order of the Bankruptcy Court or any further action by the stockholders or directors of the Debtor.

### 6.6    Officers and Directors

6.6.1  **Board of Directors**.  The board of directors of the Reorganized Debtor as of the Effective Date will consist of Ira and Mary Lou Fulton as continuing members, and an independent director to be named by the Plan Proponent [name of independent director will be inserted prior to solicitation of this Plan].  In the event that Ira and/or Mary Lou Fulton decline to remain on the board of directors of the Reorganized Debtor, they may within 30 days after their resignation each name a substitute director for their positions, or if none is named after 30 days, then the Plan Proponent may name the substitute director.  Each director shall be paid $50,000 annually, plus reimbursement of any reasonable expenses incurred as a director.

6.6.2  **Officers**.  The officers of the Reorganized Debtor as of the Effective Date may remain consisting of Douglas S. Fulton, who may continue as Chief Executive Officer and Executive Vice President, Norman Lee Nicholls, who may continue as President and Chief Operating Officer, and Steve W.  Walters, who may continue as Chief Financial Officer and Treasurer.  The qualifications and compensation of these officers is described in the Disclosure Statement.

6.6.3 **Indemnification and Insurance**. The Reorganized Debtor will assume any pre-Petition Date indemnification obligations that are scheduled and approved by the Bank Group prior to the Effective Date to any current or former directors and officers employed with the Debtor as of the Effective Date.

### 6.7 Operations Pending Effective Date

Until the Effective Date, the Debtor will continue to operate its business, subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules.

### 6.8 Exemption from Transfer Taxes

In accordance with Section 1146 of the Bankruptcy Code: (a) the issuance, distribution, transfer, and exchange of the New Note; (b) the execution and filing of any deed of trust, security agreement, or other document or instrument necessary to create, attach, perfect, or record any Lien, mortgage, deed of trust, or security interest granted under this Plan; (c) the issuance, distribution, transfer, and exchange of assets or property of the Reorganized Debtor, including, without limitation, all real property owned by the Debtor; (d) the execution, assignment, modification, or recording of any lease or sublease; and (e) the execution, delivery, or recording of a deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, the Confirmation Order, or any transaction contemplated above, or any transactions arising out of, contemplated by, or in any way related to, the foregoing are not subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, or real estate transfer tax, or other similar tax or governmental assessment and the appropriate state or local government officials or agents are directed to forego the collection of any such tax or assessment and to accept for filing or recordation any of the foregoing instruments or other documents without the payment of any such tax or assessment.

### 6.9 Payment of Trustee Fees

The Debtor shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) within 10 days of the entry of the order of confirmation for pre-confirmation periods and simultaneously provide to the United States Trustee an appropriate affidavit indicating the case disbursements for the relevant period. The Reorganized Debtor shall further pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) based upon all disbursements of the Reorganized Debtor for post-confirmation periods within the time periods set forth in 28 U.S.C. § 1930(a)(6), until the earlier of the closing of these cases by the issuance of a Final Decree by the Court, or upon the entry of an Order by this Court dismissing this case or converting this case to another chapter under the Bankruptcy Code, and the parties responsible for paying the post-confirmation United States Trustee fees shall provide to the United States Trustee upon the payment of each post-confirmation payment an appropriate affidavit indicating all the cash disbursements for the relevant period.

### ARTICLE 7
### PROVISIONS GOVERNING DISTRIBUTIONS

### 7.1 Distributions on Account of Claims Allowed as of the Effective Date

Except as otherwise provided in this Plan, a Final Order, or as agreed to by the relevant parties, initial Distributions under this Plan on account of Claims Allowed on or before the Effective Date shall be made on the Distribution Record Date; provided, however, that (1)

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Preserved Ordinary Course Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case or assumed by the Debtor prior to the Effective Date will be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims, unless otherwise agreed, shall be paid in accordance with Article II.4 of this Plan.

## 7.2     Distribution on Account of Claims Allowed after the Effective Date

7.2.1   **Payments and Distributions on Disputed Claims**.  Except as otherwise provided in this Plan, a Final Order, or as agreed to by the relevant parties, Distributions under this Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the Distribution Date that is at least 30 days after the Disputed Claim becomes an Allowed Claim; provided, however, that (a) Disputed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case or assumed by the Debtor on or before the Effective Date that become Allowed after the Effective Date will be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business or industry practice, and (b) Disputed Priority Tax Claims become Allowed Priority Tax Claims after the Effective Date, unless otherwise agreed, shall be paid in accordance with Article II.4 of this Plan.

7.2.2   **Special Rules for Distributions to Holders of Disputed Claims**. Notwithstanding any provision otherwise in this Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and all Claims of such holder have been Allowed.  In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtor shall in its sole discretion establish appropriate reserves for potential payment of such Claims.  All Distributions made pursuant to this Plan on account of an Allowed Claim will be made together with any dividends, payments, or other Distributions made on account of, as well as any obligation arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates Distributions were previously made to holders of Allowed Claims included in the applicable Class.

7.2.3   **Reserve of Funds for Payment of Disputed Claims**.  On the Effective Date, after calculating Distributions to Holders of Allowed Claims and potential Distributions to holders of Disputed Claims under this Plan, the Reorganized Debtor shall retain and set aside in a reserve fund an amount in cash sufficient to make all payments and Distributions that may be subsequently required for payment to holders of Disputed Claims.  As Disputed Claims are Allowed, the Reorganized Debtor shall distribute, in accordance with the terms of this Plan, Cash to holders of Allowed Claims, and the reserve fund shall be adjusted.  The Reorganized Debtor may (but is not required to) request estimation for any Disputed Claim that is contingent or unliquidated.

7.2.4   **Limits on Distributions**.  Notwithstanding anything in the applicable holder's Proof of Claim or otherwise to the contrary, the holder of a Claim will not be entitled to receive or recover a Distribution under this Plan on account of a Claim in excess of the amount: (a) stated in the holder's Proof of Claim, if any, as of the Distribution Record Date, plus interest thereon to the extent provided for by this Plan; (b) if the Claim is denominated as contingent or

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

unliquidated as of the Distribution Record Date, the amount that the Debtor elects to reserve on account of such Claim, or such other amount as may be estimated by the Bankruptcy Court prior to the Confirmation Hearing; or (c) if a Claim has been estimated, the amount reserved to satisfy such Claim after such estimation.

### 7.3 Delivery of Distributions

7.3.1 **Record Date for Distributions**. On the Distribution Record Date, the Claims Register will be closed and the Distribution Agent will instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, if a Claim or Equity Interest is transferred 20 or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to transfer by the transferor.

7.3.2 **Distribution Agent**. The Distribution Agent shall make all distributions required under this Plan to the holders of Allowed Claims.

7.3.3 **Delivery of Distributions**. Except as otherwise provided in this Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Distribution Agent: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the signatory set forth on any of the Proofs of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the Debtor has been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim; (d) at the addresses reflected on the Schedules if no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address; or (e) on any counsel that has appeared in the Chapter 11 Case on the holder's behalf. Distributions under this Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of distributions in the manner set forth in this Plan. The Debtor, the Reorganized Debtor, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under this Plan, except for gross negligence or intentional misconduct.

7.3.4 **Compliance Matters**. In connection with this Plan, to the extent applicable, the Reorganized Debtor and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Distributions pursuant to this Plan shall be subject to such tax withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Reorganized Debtor and the Distribution Agent are authorized to take all actions necessary or appropriate to comply with such tax withholding and reporting requirements, including liquidating a portion of the Distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate to comply with such withholding and reporting requirements.

7.3.5 **Fractional, De Minimis, Undeliverable, and Unclaimed Distributions**

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12009513.4

(i) **Fractional Distributions**. Notwithstanding any other provision of this Plan to the contrary, payments of fractions of dollars shall not be made and shall be deemed to be zero, and the Reorganized Debtor and the Distribution Agent shall not be required to make distributions or payments of fractions of dollars. Whenever any payment of Cash of a fraction of a dollar pursuant to this Plan would otherwise be required, the actual payment by the Reorganized Debtor or Distribution Agent shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

(ii) **De Minimis Distributions**. The Reorganized Debtor and Distribution Agent shall not have any obligation to make a Distribution on account of an Allowed Claim if (1) the amount to be distributed to the Holder of an Allowed Claim on the particular periodic Distribution Date does not constitute a final Distribution to such holder and is or has an economic value of less than $50 or (2) the aggregate amount of all Distributions authorized to be made on that periodic Distribution Date have an economic value less than $20,000, unless such Distribution is a final Distribution.

(iii) **Undeliverable Distributions**. If any Distribution to a Holder of an Allowed Claim is returned to the Reorganized Debtor or the Distribution Agent as undeliverable, no further Distributions shall be made to such holder unless and until the Reorganized Debtor or Distribution Agent is notified in writing of such holder's then-current address, at which time all currently due missed Distributions shall be made to such holder on the next periodic Distribution Date. Undeliverable Distributions shall remain in the possession of the Reorganized Debtor until such time as a Distribution becomes deliverable, or such Distribution shall be reallocated to the holders of other Claims in the same Class on a Pro Rata basis, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

(iv) **Reversion**. Any Distribution under this Plan that is an Unclaimed Distribution for a period of six months after the periodic Distribution Date on which such Distribution is initially attempted shall be deemed unclaimed property under Section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall be reallocated to other holders of Claims in the same Class as the Claim on account of which such Unclaimed Distribution was made, Pro Rata. Upon such reallocation, the Claim of any holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.

(v) **Manner of Payment Pursuant to the Plan**. Any payment in Cash to be made pursuant to the Plan will be made at the election of the Reorganized Debtor by check or by wire transfer. Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 90 days after issuance, but may be reissued upon written request of the recipient until the Distribution is reallocated to the Holders of other Claims in the same Class.

### 7.4 Claims Paid or Payable by Third Parties

7.4.1 **Claims Paid by Third Parties**. The Debtor or Reorganized Debtor, as applicable, shall reduce in full a Claim on the Claims Register, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtor or the Reorganized Debtor. Further, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtor or the Reorganized Debtor

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

on account of such Claim, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

      7.4.2 **Claims Payable by Third Parties**. No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtor's insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtor's insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Debtor or Reorganized Debtor without a Claims objection having to be filed and without any further notice, other than notice to the holder of such Claim of such expungement, or action, order, or approval of the Bankruptcy Court.

      7.4.3 **Applicability of Insurance Policies**. Distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE 8
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 8.1     Assumption and Rejection of Executory Contracts and Unexpired Leases

      Except as otherwise provided in this Plan, the Debtor's executory contracts or unexpired leases listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" or not assumed or rejected pursuant to a Bankruptcy Court order prior to the Effective Date shall be deemed rejected pursuant to Sections 365 and 1123 of the Bankruptcy Code, except for those executory contracts or unexpired leases: (1) listed on the schedule of "Assumed Executory Contracts and Unexpired Leases"; (2) that are the subject of a motion to assume or reject pending on the Effective Date (in which case the such assumption or rejection and the effective date thereof shall remain subject to a Bankruptcy Court order); (3) that are subject to a motion to reject with a requested effective date of rejection after the Effective Date; or (4) that are otherwise expressly assumed or rejected pursuant to this Plan. Entry of the Confirmation Order shall constitute a Final Order approving the assumption or rejection of such executory contracts or unexpired leases as set forth in this Plan, all pursuant to Sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of such executory contracts and unexpired leases in this Plan are effective as of the Effective Date. Each such executory contract and unexpired lease assumed pursuant to this Plan or by Bankruptcy Court order but not assigned to a third party prior to the Effective Date shall revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in this Plan, this Plan Proponent reserves the right to alter, amend, modify, or supplement the schedules of executory contracts or unexpired leases identified at any time through and including 15 days after the Effective Date. The List of Assumed Executory Contracts and Unexpired Leases and the List

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

of Assumed Executory Contracts and Unexpired Leases are attached to the Disclosure Statement as Exhibits 6 and 7, respectively.

**8.2    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

8.2.1    **Designation of Cure Amount**.  With respect to the Debtor's executory contracts or unexpired leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," this Plan Proponent shall have designated a proposed Cure Amount, and the assumption of such executory contract or unexpired lease may be conditioned upon the disposition of all issues with respect to Cure in a manner satisfactory to the Plan Proponent or the Reorganized Debtor.  Any provision or terms of the Debtor's executory contracts or unexpired leases to be assumed pursuant to this Plan that are or may be, alleged to be in default, will be satisfied solely by Cure, or by an agreed-upon waiver of Cure.

8.2.2    **Disagreement with Cure Amount**.  Except with respect to executory contracts and unexpired leases for which the Plan Proponent and the applicable counterparties have stipulated in writing to payment of a Cure Amount, all requests for payment of Cure that differ from the amounts proposed by the Plan Proponent must be filed with the Court and served on the Plan Proponent on or before the Cure Bar Date.  Any request for a Cure Payment that is not timely filed shall be disallowed automatically and forever barred from assertion and shall not be enforceable against the Reorganized Debtor, without the need for any objection by the Reorganized Debtor or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtor of the amounts listed on the Plan Proponent's proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided, however, that nothing shall prevent the Reorganized Debtor from paying any Cure Amount despite the failure of the relevant counterparty to File such request for payment of such Cure.  The Reorganized Debtor also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

8.2.3    **Resolution of Cure Amount**.  If the Plan Proponent objects to any requested Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Cure Amount and any related issues.  If there is a dispute regarding such Cure Amount, the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" within the meaning of Section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Plan Proponent and the counterparty to the executory contract or unexpired lease.  Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption of any executory contract or unexpired lease will be deemed to have consented to such assumption.  The Plan Proponent reserves the right either to reject or nullify the assumption of any executory contract or unexpired lease no later than 30 days after a Final Order determining the Cure Amount or any request for adequate assurance of future performance required to assume such executory contract or unexpired lease or any other matter relating to assumption.

8.2.4    **Claims Related to Cure**.  Assumption of any executory contract or unexpired lease pursuant to this Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

effective date of assumption. Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice, other than notice to the other party to such contract or lease of such disallowance and expungement, or action, order, or approval of the Bankruptcy Court.

**8.3     Pre-Existing Obligations to the Debtor under Executory Contracts and Unexpired Leases**

Rejection of any executory contract or unexpired lease pursuant to this Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtor under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtor expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtor or the Reorganized Debtor, as applicable, from counterparties to rejected or repudiated executory contracts.

**8.4     Claims Based on Rejection of Executory Contracts and Unexpired Leases**

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Debtor's executory contracts and unexpired leases pursuant to this Plan or otherwise must be filed with the Court and served on the Debtor or Reorganized Debtor, as applicable, no later than 30 days after the later of the Effective Date or the date of any notice of rejection. Any Proofs of Claim arising from the rejection of the Debtor's executory contracts or unexpired leases that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against the Reorganized Debtor without the need for any objection by the Reorganized Debtor or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtor's executory contracts and unexpired leases shall be classified as Rejection Damages Claims and shall be treated in accordance with Article 4.4 of this Plan.

**8.5     Modification of Executory Contracts and Unexpired Leases Containing Equity Ownership Restrictions**

All executory contracts and unexpired leases to be assumed under this Plan pursuant to Section 365 and 1123 of the Bankruptcy Code shall be deemed so assumed, without giving effect to any provisions contained in such executory contracts or unexpired leases restricting the change in control or ownership interest composition of any or all of the Debtors, and upon the Effective Date (1) any such restrictions shall be deemed of no further force and effect and (2) any breaches that may arise thereunder as a result of Confirmation or consummation shall be deemed waived by the applicable non-Debtor counterparty.

**8.6     Modifications, Amendments, Supplements, Restatements, or Other Agreements**

Unless otherwise provided in this Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and all executory contracts and unexpired leases related thereto, if any, including easements, licenses,

**Snell & Wilmer**
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under this Plan. Modifications, amendments, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the pre-petition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 8.7  Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in schedule of Assumed Executory Contracts and Unexpired Leases, the schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in this Plan, shall constitute an admission by the Plan Proponent or the Debtor that any such contract or lease is in fact an executory contract or unexpired lease or that the Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired lease at the time of assumption or rejection, the Plan Proponent shall have 30 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

### 8.8  Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to Sections 365(d)(4) of the Bankruptcy Code.

## ARTICLE 9
## DETERMINATION OF CLAIMS

### 9.1  Objections to Claims

Notwithstanding the occurrence of the Effective Date, and except as to any Claim that has been Allowed before the Effective Date, a party in interest may object to the allowance of any Claim against the Debtor, other than the Bank Group Claim as stated in the Plan, or seek estimation of any Claim on any grounds permitted by the Bankruptcy Code. All objections to Claims filed by a party in interest must be brought by filing the appropriate pleading in the Bankruptcy Court before the first Business Day that is 180 days after the Effective Date, but the Bankruptcy Court may approve a later date requested by a motion filed (but not necessarily heard) before the first Business Day that is 180 days after the Effective Date.

### 9.2  Distributions on Allowance or Disallowance of Disputed Claims

No distributions shall be made to any holder of a Claim unless and until the Claim becomes an Allowed Claim. If a Claim is not an Allowed Claim as of the Effective Date, distributions on account of that Claim shall commence only when the Claim becomes an Allowed Claim after the Effective Date or as otherwise specifically provided in this Plan. If a Disputed Claim becomes an Allowed Claim, the Reorganized Debtors shall make a distribution in accordance with the terms of this Plan applicable to Claims of the Class in which that Claim resides.

### 9.3  Contingent Claims

Snell & Wilmer
——— L.L.P. ———
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Until a Contingent Claim becomes an Allowed Claim or is Disallowed, the Claim shall be treated as a Disputed Claim for all purposes under this Plan. The holder of a Contingent Claim shall be entitled to a distribution under this Plan only when the Contingent Claim becomes an Allowed Claim. Any Contingent Claim for reimbursement or contribution held by a Person that may be liable with a Debtor on a Claim of a Creditor is Disallowed as of the Effective Date if: (a) that Creditor's Claim is Disallowed; (b) the Claim for reimbursement or contribution is contingent as of the Effective Date; or (c) that Person asserts a right of subrogation to the rights of the Creditor under Section 509 of the Bankruptcy Code.

**ARTICLE 10**
**TITLE TO PROPERTY; VESTING OF ASSETS**

**10.1    Vesting of Assets**

Except as provided in this Plan, the Confirmation Order, or the Plan Documents, all property of the Estate shall vest in the Reorganized Debtor on the Effective Date free and clear of all Liens and Claims of all kinds existing before the Effective Date; provided, however, that all assets of the Reorganized Debtor shall be subject to the senior, perfected Liens granted to the holders of Allowed Bank Group Claims, with such Liens being senior to any and all other Liens, Claims and interests, including any Liens or Claims of creditors asserting mechanics liens or similar operational liens, other than Liens securing Allowed Secured Tax Claims. Real property that vests in the Reorganized Debtor shall remain subject to any easements, rights-of-way, zoning, covenants, conditions, and restrictions and other similar land-use restrictions in existence as of the Effective Date. From and after the Effective Date, the Reorganized Debtor may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, including the employment of, and payment to, Professionals except as otherwise provided in this Plan, or the Confirmation Order.

**10.2    Preservation of Insurance**

The discharge and release from Claims as provided in this Plan, except as necessary to be consistent with this Plan, do not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtor or any other Person.

**ARTICLE 11**
**PRESERVATION OF LITIGATION CLAIMS**

**11.1    Retention and Reservation**

In accordance with Section 1123(b)(3) of the Bankruptcy Code, all Preserved Litigation Claims are retained and reserved for the Reorganized Debtor, which is designated as the Estate's representative under Section 1123(b)(3)(B) of the Bankruptcy Code for purposes of the Preserved Litigation Claims.

**11.2    Prosecution**

The Reorganized Debtor, subject to the approval of the Plan Proponent, shall have the authority to prosecute, defend, compromise, settle, and otherwise deal with any Preserved Litigation Claims, and the Reorganized Debtor shall do so in its capacity as a representative of the Estate in accordance with Section 1123(b)(3)(B) of the Bankruptcy Code. The Reorganized Debtor shall pay the fees and costs associated with litigating the Preserved Litigation Claims in

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

the ordinary course of business. The Reorganized Debtor shall determine which Preserved Litigation Claims to pursue, which to settle, and the terms and conditions of those settlements, subject to consultation with the Plan Proponent. In the event that the Reorganized Debtor determines not to pursue or defend any Preserved Litigation Claims, then the Plan Proponent may pursue, prosecute, defend, or compromise any Preserved Litigation Claim in the name of the Reorganized Debtor with all attendant reasonable fees and costs incurred therein to be advanced by the Reorganized Debtor.

## ARTICLE 12
## CONDITIONS PRECEDENT

### 12.1   Conditions to Confirmation

The following are conditions precedent to confirmation of this Plan that must be satisfied or waived in accordance with Article 12.3 of this Plan:

12.1.1  The Bankruptcy Court shall have approved by Final Order a Disclosure Statement with respect to this Plan in form and substance acceptable to the Debtor in its sole and absolute discretion.

12.1.2  The Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance acceptable to the Debtor.

12.1.3  The New Loan Documents shall be in form and substance acceptable to the Bank Group.

### 12.2   Conditions to the Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with Section 12.3 of this Plan:

12.2.1  The Bankruptcy Court shall have entered one or more orders (which includes the Confirmation Order) authorizing the assumption and rejection of unexpired leases and executory contracts by the Debtor as contemplated by Article VIII of this Plan.

12.2.2  The Confirmation Order shall be a Final Order, the Confirmation Date shall have occurred, and no request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

12.2.3  Each Exhibit, document or agreement to be executed in connection with this Plan shall be in form and substance reasonably acceptable to the Plan Proponent.

### 12.3   Waiver of Conditions

The Plan Proponent may waive any condition to confirmation or the Effective Date, in whole or in part, at any time, without any notice to parties-in-interest and without further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate this Plan; provided, however, that the conditions to consummation set forth in Article 12.1(a) and 12.1(b), and the condition to the Effective Date set forth in Article 12.2(a) of this Plan, may not be waived.

Snell & Wilmer
— L.L.P. —
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

**ARTICLE 13**
**RETENTION OF JURISDICTION**

**13.1    Retention of Jurisdiction**

Pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and this Plan, including, among others, the following matters:

13.1.1   to hear and determine motions for (i) the assumption or rejection or (ii) the assumption and assignment of executory contracts or unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid;

13.1.2   to adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Case or this Plan, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests and all controversies and issues arising from or relating to any of the foregoing;

13.1.3   to ensure that distributions to Allowed Claimholders are accomplished as provided herein;

13.1.4   to hear and determine any and all objections to the allowance or estimation of Claims and Equity Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and to allow or disallow any Claim or Equity Interest, in whole or in part;

13.1.5   to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified and/or vacated;

13.1.6   to issue orders in aid of execution, implementation, or consummation of this Plan;

13.1.7   to consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

13.1.8   to hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under this Plan or under Sections 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code;

13.1.9   to determine requests for the payment of Claims entitled to priority under Section 507(a)(l) of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

13.1.10  to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

12009513.4

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

13.1.11  to hear and determine all suits or adversary proceedings to recover assets of the Debtor and property of the Estate, wherever located;

13.1.12  to hear and determine matters concerning state, local and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

13.1.13  to hear any other matter not inconsistent with the Bankruptcy Code;

13.1.14  to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of this Plan;

13.1.15  to enter a final decree closing the Chapter 11 Case; and

13.1.16  to enforce all orders previously entered by the Bankruptcy Court.

## ARTICLE 14
## MISCELLANEOUS PROVISIONS

### 14.1  Effecting Documents; Further Transactions; and Timing

The Debtor, the Reorganized Debtor, the Administrative Agent, the Bank Group, and all other parties to the Plan Documents are authorized and directed as of the Effective Date, and without further order of the Bankruptcy Court, to execute, deliver, file, or record all Plan Documents and other contracts, instruments, releases, and other agreements or documents, and to take all actions necessary or appropriate to effect and further evidence the terms of this Plan. All transactions required to occur on the Effective Date under the terms of this Plan are deemed to have occurred simultaneously.

### 14.2  Binding Effect

This Plan is binding on, and inures to the benefit of, the Debtor and the holders of all Claims and Interests, including the holders of Equity Related Claims, and their respective successors and assigns.

### 14.3  Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable or as provided in any document entered into in connection with this Plan, the rights, duties and obligations of the Debtor, the Reorganized Debtor, and any other Person arising under this Plan are governed by, and construed and enforced in accordance with, the internal laws of the State of Arizona, without giving effect to Arizona's choice of law provisions.

### 14.4  Modification of Treatment of Claims

The Reorganized Debtor reserves the right to modify the treatment of any Allowed Claim in any manner adverse only to the holder of that Claim at any time after the Effective Date on that holder's prior written consent.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

### 14.5 Setoffs and Recoupment

The Debtor and the Reorganized Debtor may, but are not required to, setoff or recoup against any Claim or Equity Interest and the payments or other distributions to be made under this Plan in respect of such Claim, Claims of any nature that arose before the Petition Date that the Debtor may have against the holder of such Claim or Equity Interest to the extent such Claims may be setoff or recouped under applicable law, but neither the failure to do so nor the fact of any Claim or Equity Interest under this Plan becoming Allowed constitutes a waiver or release by the Debtor or the Reorganized Debtor of any such claim that they may have against such holder.

### 14.6 Notices

Any notice required or permitted to be provided under this Plan must be in writing and served by one of the following: (a) certified mail, return receipt requested, postage prepaid; (b) hand delivery; (c) reputable overnight courier service, freight prepaid; (d) e-mail; or (e) fax; addressed as follows:

| | |
|---|---|
| To the Debtor: | Attn: Craig D. Hansen, Esq. |
| | Sean T. Cork, Esq. |
| | Kelly Singer, Esq. |
| | c/o SQUIRE, SANDERS & DEMPSEY, L.L.P. |
| | 1 East Washington, Suite 2700 |
| | Phoenix, Arizona 85004-2256 |
| | Fax: 602.253.8129 |
| | E-mail: chansen@ssd.com |
| | scork@ssd.com |
| | ksinger@ssd.com |
| | |
| To the Bank Group: | Attn: Donald L. Gaffney, Esq. |
| | Lori A. Lewis, Esq. |
| | SNELL & WILMER, L.P. |
| | One Arizona Center, 400 E. Van Buren |
| | Phoenix, Arizona 85004-2202 |
| | Fax: 602.382.6070 |
| | E-mail: dgaffney@swlaw.com |
| | llewis@swlaw.com |
| | |
| To the United States Trustee: | Attn: Larry Watson, Esq. |
| | OFFICE OF THE UNITED STATES TRUSTEE |
| | 230 North First Avenue, Suite 204 |
| | Phoenix, Arizona 85003-1706 |
| | E-Mail: larry.watson@usdoj.gov |

### 14.7 Delivery of Notices

If personally delivered, notice is deemed delivered on actual receipt; if faxed or e-mailed in accordance with this Plan, notice is deemed delivered noon of the first Business Day following transmission; if sent by overnight courier in accordance with this Plan, notice is deemed delivered at noon of the first Business Day following deposit with such courier; and if sent by United States mail in accordance with this Plan, notice is deemed delivered as of the date of delivery indicated on the receipt issued by the relevant postal service; or, if the addressee fails or refuses to accept

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12009513.4

delivery, as of the date of that failure or refusal. Any party to this Plan may change its address for the purposes of this Plan by giving notice of the change.

### 14.8 Severability

If the Bankruptcy Court finds this Plan or any provision of this Plan to be invalid, illegal or unenforceable, or if the Bankruptcy Court cannot confirm this Plan under Section 1129 of the Bankruptcy Code, the Bankruptcy Court, at the request of the Plan Proponent or the Reorganized Debtor, may retain the power to alter and interpret this Plan or any such provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the provision held to be invalid or unenforceable, and such provision shall then become applicable as altered or interpreted. The Confirmation Order constitutes a judicial determination and provides that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable.

### 14.9 Plan Documents

Notwithstanding anything to the contrary contained in this Plan, including any reference in this Plan to documents in the forms annexed to this Plan and the Disclosure Statement as exhibits, the Bank Group may revise any Plan Document (a) by filing such revised Plan Document with the Bankruptcy Court more than 10 days before the deadline for voting on this Plan, or (b) with the written consent of all parties in interest that are entitled to vote on this Plan and are materially and adversely affected by such revision.

### 14.10 Inconsistency

If any inconsistency between this Plan and the Disclosure Statement exists, the provisions of this Plan govern. If any inconsistency between this Plan and any Plan Document exists, the provisions of the Plan Document govern.

### 14.11 Withholding and Reporting Requirements

In connection with this Plan and all instruments issued in connection with this Plan, the Debtor or the Reorganized Debtor, as the case may be, must comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions under this Plan remain subject to any such withholding and reporting requirements. The Debtor and the Reorganized Debtor, as the case may be, may take all actions necessary to comply with such withholding and reporting requirements. Notwithstanding any other provision of this Plan, each holder of an Allowed Claim or Allowed Equity Interest that has received a distribution under this Plan has sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding, and other tax obligation on account of such distribution.

### 14.12 Post-Effective Date Fees; Final Decree

The Reorganized Debtor shall be responsible for paying any post-Effective Date fees under 28 U.S.C. § 1930(a)(6) and filing post-confirmation reports until the Bankruptcy Court enters a final decree, which shall be as soon as practicable after distributions under this Plan have commenced. Notice of application for a final decree need be given only to those holders of Claims and Interests and other parties that, after the Effective Date, specifically request such notice.

**14.13 IRS Circular 230 Notice**

Any United States federal tax descriptions or advice included in this Plan is not intended or written to be used, and cannot be used, to avoid any United States federal tax penalties, or to promote, market, or recommend to another party any transaction or matter.

Dated: September 28, 2010

BANK OF AMERICA, N.A., on its own and as administrative agent for the Bank Group

By: /s/

Its: Senior Vice President

SNELL & WILMER L.L.P.

By /s/ DG - #005717
    Donald L. Gaffney
    Lori A. Lewis
    A. Evans O'Brien
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2202
Attorneys for Creditor Bank of America, N.A., on its own and as administrative agent for JPMorgan Chase Bank, N.A.; Compass Bank, on its own and as successor-in-interest to Guaranty Bank; and Wells Fargo, as successor-in-interest to Wachovia Bank

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12009513.4

- 36 -

**Exhibits 2-4**

[These Exhibits will be filed prior to the hearing to approve the Disclosure Statement.]

**Exhibit 5**
**List of Avoidance Actions**

[The Debtor submitted the following List of Avoidance Actions as Exhibit D to its Plan Supplement [D.E. 466]. This list is subject to amendment at any time by the Bank Group prior to confirmation of the Plan.]

NONE

**Exhibit 6**
**List of Assumed Executory Contracts and Unexpired Leases**

[The Debtor submitted the following List of Assumed Executory Contracts and Unexpired Leases as Exhibit E to its Plan Supplement [D.E. 466]. This list is subject to amendment at any time by the Bank Group prior to confirmation of the Plan.]

      1.    As Amended by the Plan, the Contract with Town of Queen Creek regarding Ironwood Crossing and Johnson Utilities 208 Plan Amendment for Ironwood Crossing dated 9/5/06

**Exhibit 7**
**List of Rejected Executory Contracts and Unexpired Leases**

[The Debtor submitted the following List of Rejected Executory Contracts and Unexpired Leases as Exhibit F to its Plan Supplement [D.E. 466]. This list is subject to amendment at any time by the Bank Group prior to confirmation of the Plan.]

     1.    Agreement between Fulton Homes Corporation and Trilogy Avalea Construction, LLC dated 4/25/08

     2.    Amended and Restated Real Estate Purchase and Sale Agreement with Suburban Land Reserve, Inc. dated February 17, 2005

     3.    Development Agreement between Fulton Homes Corporation and Pecan Creek Community Association

**Exhibit 8**

**Liquidation Analysis**

[The Debtor submitted the following Liquidation Analysis as Exhibit G to its Plan Supplement [D.E. 466]. The Debtor has represented that its Liquidation Analysis is a true and correct representation of a hypothetical liquidation of the Debtor. Without endorsement of its contents, the Bank Group incorporates the Debtor's Liquidation Analysis for purposes of disclosure.]

# Chapter 7 Liquidation Analysis

## Background

Often called the "best interests" test of creditors, section 1129(a)(7) of the Bankruptcy Code requires that the bankruptcy court find, as a condition to confirmation of a plan of reorganization, that each holder of a Claim or Equity interest in each impaired class either: (i) has voted to accept the Plan; or (ii) will receive or retain under the Plan property of a value that, as of the Effective Date, is **not less** than the amount the such Person would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. To make these findings, a Bankruptcy Court will typically: (1) estimate the cash proceeds (the "Liquidation Proceeds") that a Chapter 7 Trustee would generate if the Debtor's Chapter 11 case was converted to a Chapter 7 case on the Effective date and the assets of the Debtor's Estate were liquidated; (2) determine the distribution (the "Liquidation Distribution") that each non-accepting holder of a Claim or interest would receive from the Liquidation Proceeds under the priority scheme dictated in Chapter 7; and (3) compare each holder's Liquidation Distribution to the distribution under the Plan ("Plan Distribution") that such holder receive if the Plan were confirmed and consummated.

It is assumed that the liquidation would occur under the direction of a Chapter 7 trustee. It is further assumed that the Liquidation Proceeds would be distributed in accordance with section 726 of the Bankruptcy Code. Under any liquidation scenario there can be unanticipated events that may materially impact disbursements. These events can include, but are not limited to, macro economic conditions, changes in the value of the assets that are being liquidated and changes in consumer preferences.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7), the Debtor's management together with its professionals prepared the Liquidation Analysis.

The Liquidation Analysis presents both "High" and "Low" estimates of Liquidation Proceeds representing a range of management's assumptions related to the sale of the assets, the costs incurred during liquidation and the proceeds realized. It is assumed that liquidation would be performed over a twelve month period commencing on September 30, 2010.

In a Chapter 7 liquidation, certain distinctive factors would limit the recovery from the sale of the Debtor's assets. The Debtor's assets consists of cash, models and spec homes, work in progress ("WIP"), finished lots and platted and engineered lots. In a liquidation, the Debtor would likely have to discount prices to sell houses that are completed or currently under construction due to factors such as, but not limited to, market perception regarding the value of the Fulton brand name and the perceived quality and value currently associated with that name, the Debtor's inability to offer home warranties, the sale of homes in partially completed developments, concerns regarding maintenance of common areas, and potentially low sales values for partially-completed homes. As a result, the sale of such assets would most likely generate insufficient proceeds to repay the creditors in full. Current market conditions would seem to indicate that significant price reductions would be required in order to sell the inventory. In addition, it is assumed that in Liquidation, the Chapter 11 Trustee would need to spend some amount

of the Debtor's cash to finish construction of WIP, including payments to contractors and employees of the debtor necessary to convert the WIP into salable product. Estimates of wind-down expenses to be incurred after the assumed Effective Date include expenses related to the sales of homes and land and expenses of the Chapter 7 Trustee and the Trustee's professionals. Any administrative claims included in the wind down expenses are assumed to be paid during the wind down period. It is assumed that the Chapter 7 Trustee would retain professionals to expedite the liquidation and that the Chapter 7 Trustee fees are paid in accordance with the limits established by section 326 of the Bankruptcy Code.

The Debtor controls interest in several non-filing operating subsidiaries. In Chapter 7 liquidation, it is assumed that funding would not be available to meet future operating requirements for such subsidiaries. It is further assumed that since these subsidiaries derive a great deal of their business from the operations of the Debtor, the Chapter 7 liquidation of the Debtor will result in the subsidiaries no longer having viable operations or market value.

The Liquidation Analysis includes the value of cash and other assets of Fulton Homes Sales Corporation ("Fulton Sales"), an affiliate of the Debtor that has guaranteed its debt to the Bank Group, and value estimates as of June 30, 2010. The Liquidation Analysis assumes that a liquidation of the Debtor would require the liquidation of Futon Sales as well, and that such action would: (a) significantly increase the amount of claims against the Debtor arising from the assertion of warranty claims against the Debtor and Fulton Sales due to such liquidation; and/or (b) decrease the amount of assets available from Fulton Sales to satisfy the Claims of creditors of the Debtor. The recovery amounts presented are estimates of the aggregate recoveries that each class would recover based on the estimated allowed claims against the Debtor.

The statements in the Liquidation Analysis, including estimates of Allowed Claims, were prepared solely to assist the Bankruptcy Court in making the findings required under section 1129 (a)(7) of the Bankruptcy Code and may not be used or relied upon fro any other purpose.

THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTOR WAS, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND THE ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE CONTAINED WITHIN THE LIQUIDATION ANALYSIS PRESENTED HERE. THE LIQUIDATION ANALYSIS IS SUBJECT TO ECONOMIC, COMPETITIVE AND OPERATIONAL UNCERTAINTIES THAT MAY BE BEYOND THE CONTROL OF THE DEBTOR OR A CHAPTER 7 TRUSTEE. NEITHER THE LIQUIDATION ANALYSIS NOR THE FINANCIAL PROJECTIONS HAVE BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH THE STANDARDS OF THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.

Liquidation Value Assessment
Fulton Homes
As of June 30, 2010 ($ millions)

## Analysis Output

| | Notes | Liquidation Analysis | | | |
|---|---|---|---|---|---|
| | | Lo | | Hi | |
| Inventory | | | | | |
| Homes | | $ | 63.6 | $ | 73.7 |
| Finished Lots | | | 26.7 | | 29.6 |
| P&E Lots | | | 16.0 | | 18.9 |
| Total Inventory | 1 | | 106.3 | | 122.3 |
| Cash | | | 77.0 | | 77.0 |
| Total Assets | | | 183.3 | | 199.3 |

| Costs of Liquidation | | | % of inventory | | % of inventory |
|---|---|---|---|---|---|
| Wind-Down operating Expenses | | | | | |
| Salary and benefits | | (12.4) | -11.7% | (12.4) | -10.1% |
| Chapter 7 Professional Fees and Expenses | | (2.7) | -2.5% | (3.1) | -2.5% |
| Chapter 7 Trustee Fees | | (2.7) | -2.5% | (3.1) | -2.5% |
| Closing Costs | | (8.5) | -8.0% | (9.8) | -8.0% |
| Total Costs of Liquidation | | (26.2) | -24.7% | (28.3) | -23.1% |
| Net Liquidation Proceeds Available for Distribution | | 157.1 | | 171.0 | |

## Claims Recovery Summary

| | | Lo | | | Hi | | |
|---|---|---|---|---|---|---|---|
| | | Total Claims | Dollars Recovered | Recovery % | Total Claims | Dollars Recovered | Recovery % |
| Secured Claims | | 2.2 | 2.2 | 100.0% | 2.2 | 2.2 | 100.0% |
| Administrative Claims | | 2.5 | 2.5 | 100.0% | 2.5 | 2.5 | 100.0% |
| Unsecured Claims | 2,3,4 | 169.4 | 152.3 | 89.9% | 169.4 | 166.3 | 98.1% |
| Total Claims | | $ 174.2 | $ 157.1 | 90.2% | $ 174.2 | $ 171.0 | 98.2% |

Notes
1 - Net of $12.5mm in costs to complete.
2 - Includes post petition interest calculated at 0.43%.
3 - Includes estimate for seller warranty claims of $3.3mm, but does not include potential latent defect claims which could be substantial in number and amount.
4 - Includes the following: Unsecured claims from Third Amended Disclosure Statement $164.7mm, Warranty Claims Estimate $3.3mm, Accrued Interest on Bank Debt $1.2mm, Town of Queen Creek Liability $250k (see table below).

Unsecured Claims Detail

| Unsecured Bank Claim with Accrued Post Petition Interest | 164.7 |
|---|---|
| Town of Queen Creek Liability | 0.3 |
| General Unsecured Claims plus Accrued Post Petition Interest | 1.2 |
| Home Warranty Reserve | 3.3 |
| Total | 169.4 |

**Notes to Liquidation Analysis**

1) **Cash**

   Reflects the cash balances as of June 30, 2010. It is comprised of approximately $66 million at Fulton Homes Corporation and approximately $11 million at Fulton Homes Sales.

2) **Inventory**

   It is assumed that inventory, regardless of type (model homes, spec homes, contract homes, finished lots and platted and engineered lots) will be marketed and sold within 12 months. The liquidation values of the inventory are based on management's best estimation as to the value of potential recovery based on the following range of discounts:

   | Discount Summary by Inventory Type | High | Low |
   |---|---|---|
   | Homes | 15% | 25% |
   | Finished Lots | 22% | 30% |
   | Platted & Engineered Lots | 35% | 45% |

   Any anticipated recovery could be negatively impacted by any damage to the Fulton brand name in the marketplace, the Debtor's inability to offer home warranties and the sale of homes in partially completed communities.

   The values for the inventory for both the "High" and "Low" recovery scenarios are presented net of approximately $12.5 million in costs to complete.

3) **Costs of Liquidation**

   The wind-down operating expenses include an estimate of approximately $12.4 million for expenses associated with personnel required for winding down the operations under both the "High" and "Low" scenarios.

   It is estimated that the Chapter 7 Trustee professionals' fees are approximately $2.7 million, or 2.5% of the value of the inventory, under the "Low" scenario, and approximately $3.1 million, or 2.5% of the value of the inventory, under the "High" scenario for costs related to legal, accounting, financial and related fees.

   It is estimated that the Chapter 7 Trustee fees are approximately $2.7 million, or 2.5% of the value of the inventory, under the "Low" scenario, and approximately $3.1 million, or 2.5% of the value of the inventory, under the "High" scenario for costs related to legal, accounting, financial and related fees.

Closing costs are estimated to be approximately $8.5 million, or 8% of the value of the inventory, under the "Low" scenario, and approximately $9.8 million, or 8% of the value of the inventory, under the "High" scenario.

4) **Claims Recovery**

**Secured Claims**  - These claims, estimated to be approximately $2.2 million, are assumed to be paid in full on the Effective Date.

**Administrative Claims**  - These claims,  estimated to be approximately $2.5 million, are assumed to be paid in full on the Effective date.

**Unsecured Claims -** These claims are assumed to be entitled to interest calculated at a rate of 0.43% from the Debtor's Petition date until September 30, 2010.

Both "Low" and "High" scenarios include an estimation of approximately $3.3 million for home warranty claims.  The scenarios do not include any estimation of potential latent construction defect claims which could be substantial in number and amount and could negatively and materially affect the amount of recovery for creditors.

Under the "Low" scenario it is estimated that the Liquidation Proceeds will be approximately $152.3 million or approximately 90%. Under the "High" scenario it is estimated that the Liquidation Proceeds will be approximately $166.3 million or approximately 98%.

**Exhibit 9**

**Feasibility Analysis**

[This Exhibit will be filed prior to the hearing to approve the Disclosure Statement.]

**Exhibit 10**

**Plan Contribution Agreement**

[This Exhibit will be filed prior to the hearing to approve the Disclosure Statement.]

# Exhibit 11

## Schedule of Compensation of Officers and Directors of Reorganized Debtor

| Name | Title | Annual Base Salary |
|---|---|---|
| Ira Fulton | Chairman of the Board of Directors | $50,000 |
| Doug Fulton | Chief Executive Officer and Executive Vice President | $350,000 |
| Norm Nicholls | President and Chief Operating Officer | $350,000 |
| Steve Walters | Chief Financial Officer and Treasurer | $215,000 |

# Exhibit 12

## Preserved Litigation Claims

[The Debtor submitted the following list of Preserved Litigation Claims as Exhibit K to its Revisions to Plan Supplement [D.E. 508]. This list is subject to amendment at any time by the Bank Group prior to confirmation of the Plan.]

| Name of Suit | Nature of Proceeding | Disposition |
|---|---|---|
| Revey Farms Estates Homeowners Association v. Fulton Homes Corporation | Suit alleges deficiencies in development of common areas. The Debtor denies the allegations and denies liability to plaintiff. | Pending |
| Pecan Creek Community Association v. Fulton Homes Corporation | Suit alleges deficiencies in development of common areas. The Debtor denies the allegations and denies liability to plaintiff. | Pending |
| Fulton Homes Corporation v. The Ira A. Fulton and Mary Lou Fulton Family Trust | Potential claim against the Ira A. Fulton and Mary Lou Fulton Family Trust for unjust enrichment stemming from certain tax refunds to which Ira A. Fulton or the Fulton Family Trust is or may be entitled relating to prior income taxes paid by Ira A. Fulton or the Fulton Family Trust. | Has not been commenced |