1  Donald L. Gaffney (#005717)
   Lori A. Lewis (#019285)
2  Evans O'Brien (#026521)
   SNELL & WILMER L.L.P.
3  One Arizona Center
   400 E. Van Buren
4  Phoenix, AZ 85004-2202
   Telephone:    (602) 382-6000
5  Facsimile:    (602) 382-6070
   E-mail:dgaffney@swlaw.com
6           llewis@swlaw.com
            eobrien@swlaw.com
7
   Attorneys for Creditor Bank of America, N.A.,
8  on its own and as administrative agent for
   JPMorgan Chase Bank, N.A.; Compass Bank,
9  on its own and as successor-in-interest to
   Guaranty Bank; and Wells Fargo, as successor-
10 in-interest to Wachovia Bank

11

12

13                    IN THE UNITED STATES BANKRUPTCY COURT

14                        FOR THE DISTRICT OF ARIZONA

15  In Re:                              Proceedings Under Chapter 11

16  FULTON HOMES CORPORATION,           Case No. 2:09-bk-01298-GBN

17                 Debtor.              **BANK GROUP'S TRIAL BRIEF ON
                                        DEBTOR'S FOURTH AMENDED PLAN
18                                      OF REORGANIZATION**

19                                      Date:          November 8, 2010
                                        Time:          9:00 a.m.
20                                      Location:      230 N. First Ave.
                                                       7th Floor, Courtroom 702
21                                                     Phoenix, AZ 85003

22                                      Related DE(s):456, 504

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................................. 1

II.  FACTUAL AND PROCEDURAL BACKGROUND ........................................... 3

    A.   The Bank Group Debt ................................................................................... 3

    B.   The Original Plan and Disclosure Statement ............................................... 4

    C.   The Amended Plan of Reorganization .......................................................... 5

    D.   The Second Amended Plan and the Second Amended Disclosure
        Statement ....................................................................................................... 5

    E.   The Fulton Family Trust's Obstruction and Contempt ................................ 10

    F.   The Third Amended Plan of Reorganization ................................................ 14

    G.   The Fourth Amended Plan, Preliminary Injunction, and Purported
        Importance of Fulton Sales .......................................................................... 15

        1.   The Fourth Amended Plan and Disclosure Statement ........................ 15

        2.   The Preliminary Injunction ................................................................ 16

        3.   The Summary Judgment Order Against Fulton Sales ......................... 17

        4.   Debtor's Removal of Fulton Sales from the Fourth Amended Plan ....... 17

        5.   The Reintegration of Fulton Sales into the Reorganization Through
            the Proposed "Transition Services Agreement" ................................. 18

III. LEGAL ANALYSIS ........................................................................................... 19

    A.   The Fourth Amended Plan Violates Section 1129(a)(1) .............................. 20

        1.   The Fourth Amended Plan Violates Section 510(a) ............................ 20

        2.   The Proposed Emergency Transfer Motion is an Admission by the
            Debtor that the Plan does not Contain Adequate Means of
            Implementation .................................................................................. 26

    B.   The Debtor, As Proponent of the Fourth Amended Plan, Has Failed to
        Comply With Section 1129(a)(2) ................................................................. 27

        1.   The Emergency Transfer Motion is an Improper Attempt to
            Modify the Fourth Amended Plan ...................................................... 28

        2.   The Emergency Transfer Motion Fails to Comply with Section
            1125 ................................................................................................... 28

        3.   The Debtor Failed to Disclose Critical Affiliate Executory
            Contracts ............................................................................................ 29

    C.   The Debtor's Actions Do Not Satisfy The Good Faith Requirement ........... 31

        1.   Debtor's Post-Petition Conduct Indicates Bad Faith ......................... 32

        2.   Gerrymandering Plan Classification Indicates Bad Faith .................. 33

        3.   The Debtor's Artificial Impairment to Create Impaired Accepting
            Classes is Bad Faith ........................................................................... 35

    D.   The Fourth Amended Plan Fails The Best Interest of Creditors Test ........... 37

        1.   In re Cardelucci and In re Beguelin Do Not Control ......................... 38

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

2. Under Travelers and Future Media, the Contract Rate is "the Legal Rate" of Pendency Interest on a Claim Based in Contract ..................... 40

3. Other Concerns Underlying In re Cardelucci and In re Beguelin are Not Present in This Case .................................................................. 42

E. The Fourth Amended Plan Is Not Feasible ............................................. 42

1. The Fourth Amended Plan is Contingent Upon the Emergency Transfer Motion .................................................................................... 43

2. New Fulton Sales is Liable to the Bank Group ...................................... 44

3. The Feasibility Analysis Does Not Address Rejection Damages From the Fulton Sales Executory Contracts ............................................ 45

F. The Plan Is Not Fair And Equitable ....................................................... 46

1. Failure to Pay the Bank Group Default Interest Under the Credit Agreement Violates the "Fair and Equitable" Requirement .................... 47

2. Failure to Pay a Market Rate of Post-Effective Date Interest Violates the "Fair and Equitable" Requirement ..................................... 50

3. Failure to Pay the Fulton Unsecured Claim in Full Violates the Absolute Priority Rule ........................................................................... 51

G. The Plan Unfairly Discriminates ............................................................ 51

H. The Debtor's Lack of Notice Has Deprived the Bank Group of its Due Process Rights ......................................................................................... 52

IV. CONCLUSION .............................................................................................. 54

Snell & Wilmer
— L.L.P. —
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12153208.3

# TABLE OF AUTHORITIES

**Page**

<u>FEDERAL CASES</u>

Ad Hoc Committee for the Subordinated Debentures of W.T. Grant Co. v. Pardo
(In re W.T. Grant Co.), 75 B.R. 163 (D. Ct. S.D.N.Y. 1987) ................................ 21

Bank of America National Trust and Savings Association v. 203 North LaSalle
Street Partnership, 526 U.S. 434 (1999) ............................................ 46

Beatrice Foods Co. v. Hart Ski Mfg. Co. (In re Hart Ski Mfg. Co.), 5 B.R. 734
(Bankr. D. Minn. 1980).................................................................. 21

Butner v. United States, 440 U.S. 48 (1979) .............................................. 41

Dep't of Hous. & Urban Dev. v. Westwood Plaza Apartments, Ltd. (In re
Westwood Plaza Apartments, Ltd.), 192 B.R. 693 (E.D. Tex. 1996).................... 50

General Electric Capital Corp. v. Future Media Productions, Inc., 547 F.3d 956
(9th Cir. 2008)............................................................... 38, 41

Hamilton v. State Farm Fire & Cas. Co., 270 F.3rd 778 (9th Cir. 2001) .................... 31

In re Ambanc La Mesa Ltd. P'ship, 115 F.3d 650 (9th Cir.1997) ............ 20, 35, 46, 51

In re American Solar King Corp., 90 B.R 808 (Bankr. W.D. Tex. 1988) .................. 29

In re Arch Wireless, 332 B.R. 241 (Bankr. D. Mass. 2005)............................... 53

In re Arnold and Baker Farms, 177 B.R. 648 (BAP 9th Cir. 1994), aff'd, 85 F.3d
1415 (9th Cir.1996).............................................................. 20

In re Bank of New England Corp., 364 F.3d 355 (1st Cir. 2004)......................... 21, 25

In re Barakat, 99 F.3d 1520 (9th Cir. 1996)........................................... 33, 35

In re Bashas' Inc., No. 2:09-bk-16050, 2010 WL 3832048, at *23 (Bankr. D. Ariz.
Aug. 13, 2010) ......................................................... 31, 33

In re Beguelin, 220 B.R. 94 (BAP 9th Cir. 1998)................................ 38, 39, 42

In re Cardelucci, 285 F.3d 1231 (9th Cir. 2002)........................... 38, 39, 42

In re Cardsystems Solutions, Inc., 2007 WL 4166184, at *10-11 (Bankr. D. Ariz.
Nov.19, 2007) .................................................................... 33

In re Concrete Designers, Inc., 173 B.R. 354 (Bankr. S.D. Ohio 1994)..................... 29

In re Consol. Operating Partners L.P., 91 B.R. 113 (Bankr. D. Colo. 1988) .............. 47

In re Dow Corning Corp., 237 B.R. 380 (Bankr. E.D. Mich. 1999)...................... 48

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

In re Dow Corning Corp., 244 B.R. 678 (Bankr. E.D. Mich. 1999) ............................................ 48

In re Dow Corning Corp., 456 F.3d 668 (6th Cir. 2006) ........................................ 41, 46, 47, 49

In re Fobian, 951 F.2d 1149 (9th Cir. 1991) ............................................................................. 40

In re Frontier Airlines, Inc., 93 B.R. 1014 (Bankr. D. Colo. 1988) ................................... 29, 30

In re Gen. Homes Corp., 134 B.R. 853 (Bankr. S.D. Tex. 1991) ............................................... 21

In re Hotel Associates of Tucson, 165 B.R. 470 (BAP 9th Cir. 1994) ...................................... 36

In re Jorgensen, 66 B.R. 104 (9th Cir. BAP 1986) .................................................................... 32

In re Kemp, 134 B.R. 413 (Bankr. E.D. Cal. 1991) ................................................................... 32

In re L & J Anaheim Associates, 995 F.2d 940 (9th Cir. 1993) ................................................ 36

In re Leasing Consultants, Inc., 2 B.R. 165 (Bankr. E.D.N.Y. 1980) ....................................... 21

In re M. Long Arabians, 103 B.R. 211 ...................................................................................... 37

In re Meadow Glenn, Ltd., 87 B.R. 421 (Bankr. W.D. Tex. 1988) ........................................... 36

In re Pizza of Hawaii, Inc., 761 F.2d 1374 (9th Cir. 1985) ...................................................... 42

In re S.E.T. Income Properties, III, 83 B.R. 791 (Bankr. N.D. Okla. 1988) ............................ 50

In re Southland Corp., 160 F.3d 1054 (5th Cir. 1998) .............................................................. 47

In re Sylmar Plaza, L. P., 314 F.3d 1070 (9th Cir. 2002) ......................................................... 31

In re Trans Max Tech., Inc., 349 B.R. 80 (Bankr. D. Nev. 2006) ............................................ 43

In re Trans World Airlines, Inc., 185 B.R. 302 (Bankr. E.D. Mo. 1995) ................................. 27

In re Tucson Self-Storage, Inc., 166 B.R. 892 (BAP 9th Cir. 1994) ........................................ 33

In re Welco Indus., Inc., 60 B.R. 880 (BAP 9th Cir. 1986) ...................................................... 50

In re Wiersma, 324 B.R. 92 (9th Cir. BAP 2005) ..................................................................... 43

Miller v. MIF Realty L.P. (In re Perrysburg Marketplace Co.), 208 B.R. 148
(Bankr. N.D. Ohio 1997) ..................................................................................................... 21

Mullane v. Central Hanover Trust Co., 339 U.S. 306 (1950) ................................................... 53

Northwest Bank Worthington v. Ahlers, 485 U.S. 197 (1988) .................................................. 51

Reliable Elec. Co. v. Olson Const. Co., 726 F.2d 620 (10th Cir. 1984) ................................... 53

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Ruskin v. Griffiths, 269 F.2d 827 (2d Cir. 1959) ........................................................................ 47

Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 549 U.S. 443 (2007) .......... 38, 40, 41

STATE CASES

Burkons v. Ticor Title Ins. Co. of Ca., 813 P.2d 710 (1991)........................................................ 21

Warne Investments, Ltd. v Higgins, 219 Ariz. 186, 195 P.3d 645 (Ct.App. 2008)............... 44, 45

FEDERAL STATUTES

11 U.S.C. § 105(a) ....................................................................................................................... 16

11 U.S.C. § 510 (2010) ........................................................................................................... 20, 34

11 U.S.C. § 726(a)(5) ............................................................................................................... 38, 41

11 U.S.C. § 1122(a) ...................................................................................................................... 33

11 U.S.C § 1123(a)(5) ................................................................................................................... 27

11 U.S.C. § 1127(a) ...................................................................................................................... 28

11 U.S.C. § 1127(c) ...................................................................................................................... 29

11 U.S.C. § 1128(a) ...................................................................................................................... 52

11 U.S.C. § 1129(a) ................................................................................................................. 35, 46

11 U.S.C. § 1129(a)(1) .................................................................................................................. 20

11 U.S.C. § 1129(a)(2) .................................................................................................................. 27

11 U.S.C. § 1129(a)(3)............................................................................................................. 31, 36

11 U.S.C. § 1129(a)(7) .................................................................................................................. 37

11 U.S.C. § 1129(a)(8) .................................................................................................................. 46

11 U.S.C. § 1129(b) ...................................................................................................................... 46

11 U.S.C. §1129(a)(3) ................................................................................................................... 35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Bank of America, N.A., on its own behalf and as administrative agent for JPMorgan Chase Bank, N.A.; Compass Bank, on its own and as successor-in-interest to Guaranty Bank; and Wells Fargo, as successor-in-interest to Wachovia Bank (collectively, the "Bank Group") hereby submits its Trial Brief in opposition to confirmation of Fulton Homes Corporation's ("Debtor") "Fourth Amended Plan of Reorganization" ("Fourth Amended Plan").

**I.**

## INTRODUCTION

The Fourth Amended Plan[1] is the latest enumeration of the Debtor's dual Chapter 11 strategies to: (i) pay the Bank Group as little as possible over as long of period as possible; and (ii) protect and benefit equity at the expense of the creditors. A simple review of the Debtor's Chapter 11 plans reveals the Debtor's calculated use of the bankruptcy process. The Original Plan provided a mere 52% return to the Bank Group, while providing for the Debtor to retain through excess cash and remaining real properties value in excess of $86,000,000. Ironically, under the Original Plan, the projected value of the Debtor's Share of Excess Cash, when combined with the value of raw land, exceeded the cash being paid to unsecured claims, including the Bank Group. The Debtor did not seriously pursue confirmation of the First Amended Plan; instead, the Debtor replaced it with the Second Amended Plan. This Court sustained the Bank Group's legal objections to the Second Amended Plan and denied confirmation of the Second Amended Plan.

The Debtor only dropped its feigned position of insolvency as the Bank Group began investigating potential claims against equity. More than two months after this Court denied confirmation of the Second Amended Plan, and in a transparent effort to support equity's opposition to such discovery, the Debtor filed its Third Amended Plan. The Debtor then claimed to be paying all creditors in full under the Third Amended Plan. Equity utilized the conveniently filed Third Amended Plan as a new argument to avoid turnover of documents previously ordered disclosed by this Court. Realizing that the Third Amended Plan was also not confirmable, the Debtor then abandoned the Third Amended Plan for the present Fourth Amended Plan.

---

[1] The defined terms capitalized in the Introduction are subsequently defined in the Trial Brief.

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Now that the Debtor has burned through its maximum twenty-month exclusivity period and is faced with a competing plan from the Bank Group, the Debtor has accelerated its efforts in an obvious effort to "race to a finish." However, the Debtor is not content with seeking to preserve the value of the Debtor for equity, it is also trying to effectuate a retrieval of necessary business operations of a non-debtor affiliate, Fulton Sales. The Fourth Amended Plan initially sought to "fold" Fulton Sales into the Debtor's bankruptcy and provide bankruptcy relief and protection from the Bank Group to its non-debtor affiliate, Fulton Sales. The grant of summary judgment by the Maricopa County Superior Court in favor of the Bank Group and against Fulton Sales complicated the Debtor's efforts to quietly wash Fulton Sales through the Fourth Amended Plan. Shortly after the entry of summary judgment, the Debtor hastily removed all references to and reliance upon Fulton Sales from the Fourth Amended Plan through a slapped-together "modification." Recognizing that the removal of Fulton Sales in turn had created feasibility problems for the Fourth Amended Plan, the Debtor, Fulton Sales, and their respective officers contrived to escape the Bank Group's pending judgment against Fulton Sales by creating and then proposing to transfer nearly all of the Fulton Sales' tangible assets and all of its intangible assets to New Fulton Sales. To further the conspiracy, the Debtor filed the Emergency Transfer Motion and declared it an essential element of the Fourth Amended Plan, apparently hopeful that the Bankruptcy Court will discharge the actions against a non-debtor entity.

The Debtor's conduct outlined above demonstrates the Debtor's complete lack of good faith in these proceedings, generally, and the Fourth Amended Plan specifically with the respect to the Bank Group. A now admittedly solvent Debtor seeks to avoid paying what it owes to the Bank Group under the contract terms of the Credit Agreement. The Debtor's attempt to allow equity to profit and to enhance equity at the expense of the Bank Group is not an appropriate use of bankruptcy.

For the reasons set forth in detail below, the Fourth Amended Plan is not confirmable because, among other things, it fails to satisfy sections 1129(a)(1), (2), (3), (7), (11) and (b) of the Bankruptcy Code.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.    The Bank Group Debt**

1.      On or about February 24, 2003, the Bank Group extended unsecured credit (the "Loan") under a Credit Agreement (the "Pre-Petition Credit Agreement") to Fulton Homes Corporation, an Arizona corporation ("Fulton" or Debtor"), in a maximum aggregate principal amount not to exceed $250,000,000.

2.      The Loan is guaranteed by Fulton Homes Warranty Corporation ("Fulton Warranty") and by Fulton Home Sales Corporation ("Fulton Sales," and collectively with Fulton Warranty, "Guarantors"), who each, among other things, unconditionally guaranteed and promised to pay the Debtor's obligations under the Pre-Petition Credit Agreement to the Bank Group.

3.      The Debtor has been in default of its obligations under the Pre-Petition Credit Agreement since at least August 19, 2008, when it failed to make a required remargining payment.

4.      The Bank Group agreed to four forbearance agreements with the Debtor. As a result of the default and consistent with the terms of the forbearance agreements, the Debtor is contractually obligated under the Pre-Petition Credit Agreement to execute and record deeds of trust granting the Bank Group a secured position in all of its real property.  After the Debtor ignored the Bank Group's repeated demands that it execute such deeds of trust, the Bank Group notified the Debtor that it would use the power of attorney granted to it by the Debtor to execute the deeds of trust on January 27, 2009.  Before the Bank Group could exercise its contractual rights, on January 27, 2009 ("Petition Date"), the Debtor filed a voluntary petition for relief under the Bankruptcy Code.

5.      As of January 27, 2009, the Bank Group asserts that the total amount due and owing under the Loan was no less than $163,488,654.82 in principal; $1,454,791.73 in interest ($23,842.09 per diem); $223,816 in loan fees and costs; and accrued attorneys' fees and costs.

12153208.3

3

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

6.     The Debtor originally admitted in its Schedules of Assets and Liabilities ("Schedules") that it owes the Bank Group no less than $163,488,655.  On October 9, 2009, the Debtor amended its Schedules and now lists the Bank Group's claim as "Disputed."  To this point, the Debtor has not disclosed or otherwise explained the basis upon which it allegedly disputes the Bank Group's claim.

7.     On October 14, 2009, the Bank Group filed a proof of claim in the amount of $163,488,654.82 (the "Bank Group Proof of Claim").  No objection to the Bank Group Proof of Claim has been filed.

**B.     The Original Plan and Disclosure Statement**

8.     On May 27, 2009, the Debtor filed "Debtor's Disclosure Statement Dated May 27, 2009" ("Original Disclosure Statement") [DE #136] and "Debtor's Plan of Reorganization Dated May 27, 2009" ("Original Plan") [DE #137].

9.     The Original Plan provided that the claim of the Bank Group would be classified as a Class 3 Unsecured Claim, and paid, along with other Class 3 claimants, a total of $85,350,000, over approximately five years.  Total Class 3 Unsecured Claims, per the Debtor, are $164,697,251.85.

10.    Under the Original Plan, the Reorganized Debtor retained (the "Debtor's Share of Excess Cash") $76,118,506, and the Debtor would acquire and retain an additional $10,000,000 in raw land, despite the Class 3 claimants only receiving the gross amount of $85,350,000, or approximately 52% of their claims.

11.    The Original Plan was patently unconfirmable for several reasons.  The Fulton Family Trust is the sole shareholder of the Debtor.  The Original Plan provided that the Fulton Family Trust would retain its equity position in the Debtor in exchange for the infusion of new value in the form of cash totaling $1,000,000 (the "Original New Value").  The Original New Value was not to be paid to creditors, but was to be held by the Reorganized Debtor as "an additional capital cushion for Fulton as the market moves toward recovery."  The Original New Value amount was approximately 0.6% of the total Class 3 Claims, 1.2% of the proposed

distribution to Class 3 Claims, and 1.2% of the Debtor's Share of Excess Cash and the raw land (a total of $86,118,506) that the Reorganized Debtor proposed to retain post-confirmation.

12.     On June 3, 2009, the Bank Group filed a motion to terminate the exclusivity period ("Motion to Terminate") based, among other things, on the fact that the Plan violated the absolute priority rule and did not provide a market test for the shareholder's retention of its equity interest in the Debtor (and $86,118,506 in income and property) in exchange for the $1,000,000 Original New Value. The Court denied the Motion to Terminate. The Debtor's exclusivity period would expire on July 27, 2009.

**C.     The Amended Plan of Reorganization**

13.     The day before the Court was to hold a hearing on the Original Disclosure Statement, and less than two weeks prior to the expiration of exclusivity, the Debtor filed an Amended Plan of Reorganization on July 15, 2009 (the "Amended Plan"). The Amended Plan provided that the Bank Group would be paid $120,000,000 over approximately five years, and that the Fulton Family Trust would retain its equity interest in exchange for a $1,000,000 New Value payment. The Debtor never filed a disclosure statement regarding the Amended Plan.

**D.     The Second Amended Plan and the Second Amended Disclosure Statement**

14.     The Debtor filed a Motion to Extend Exclusivity Period on July 21, 2009 (the "Exclusivity Motion"). A hearing on the Exclusivity Motion was set for August 24, 2009. On August 21, 2009, the Debtor apparently recognized that the weaknesses of the Amended Plan (and the lack of an accompanying disclosure statement) might adversely affect the prospects of prevailing on the Exclusivity Motion, and filed a Second Amended Plan [DE #234] and the Amended Disclosure Statement. On August 24, 2009, the Court extended the exclusivity period to October 9, 2009. (Subsequently, the Bank Group stipulated to the entry of an order extending the exclusivity period to December 8, 2009, and then again to February 25, 2010, and finally to April 16, 2010).

15.     On October 13, 2009, following a hearing to approve the Amended Disclosure Statement, the Debtor filed a "Second Amended Disclosure Statement Relating to Second Amended Plan of Reorganization Dated August 21, 2009" ("Second Amended

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Disclosure Statement"). The Court entered an order approving the Second Amended Disclosure Statement on October 14, 2009.

16. The Second Amended Plan still classified the Bank Group's claim as a Class 3 Unsecured Claim. Under the Second Amended Plan, the Bank Group was to be paid, along with other Class 3 claimants, a total of $125,000,000 over approximately five years.

17. The Second Amended Plan provided that the Class 3 claims shall be paid 95% of the Excess Cash on a quarterly basis. The Second Amended Plan defined Excess Cash as:

> [t]he cash remaining from Fulton's actual revenues after (a) a working capital reserve in the amount of $10,000,000; (b) a finished lot purchase allowance in a total amount not to exceed $15,000,000, to be deducted from Excess Cash as payments are made to finish lots, and (c) Fulton's payment of its actual direct and indirect costs, including but not limited to lot acquisition expenses, land acquisition expenses, lot development expenses (including a reserve for such lot development expenses equal to the next quarter's anticipated lot development expenses), property taxes, interest on debt expenses, home construction expenses (e.g., 100% of the costs to complete construction of a home at the time that a building permit in such home has been obtained), home closing costs, sales taxes, employee salaries, advertising costs, model maintenance costs, HOA costs, and other general and administrative costs and expenses.

Thus, under this Plan scheme the Reorganized Debtor had enormous discretion in determining what would constitute "Excess Cash" under the Second Amended Plan and, consequently, over how quickly or slowly the Bank Group would be paid under the Second Amended Plan.

18. The Second Amended Plan provided that the Debtor's Share of Excess Cash would consist of the remaining 5% of the Excess Cash, to be held by the Reorganized Debtor in cash reserves. The Debtor's Share of Excess Cash therefore inured directly to the benefit of the shareholder of the Reorganized Debtor, as the proceeds of any future growth were not to be shared by creditors whose distributions under the Second Amended Plan were capped at $125,000,000.[2] According to the business plan provided by the Debtor to the Bank Group at

---

[2] It is important to note that the proposed distribution to Class 3 Claims was capped at $125,000,000, but there was no such guaranteed floor or minimum distribution. Since the Reorganized Debtor was obligated only to distribute 95% of excess cash on a quarterly basis, there was no way of knowing exactly how much money would actually be distributed over a given time period.

that time, the Debtor projected that the Debtor's Share of Excess Cash would total $53.3 million over approximately ten years, above and beyond the $125 million to be paid to Class 3 Claimants.

19.     The Second Amended Plan provided that the Fulton Family Trust would retain its equity position in the Debtor and reap the benefit of the projected $53.3 million Debtor's Share of Excess Cash, in exchange for (i) the infusion of new value in the form of a cash payment totaling $5,000,000 (the "Second Amended Plan New Value"), (ii) waiver of Ira Fulton's alleged $25,000,000 unsecured claim against the Debtor, and (ii) Fulton's "name and experience."  The Second Amended Plan New Value was approximately 3% of the total Class 3 Claims, 4% of the proposed distribution to Class 3 Claims, and only 9% of the Debtor's Share of Excess Cash, consisting of a $53.3 million cash flow to be retained by the Reorganized Debtor for the benefit of the shareholder.

20.     In addition to the proposed contribution of the Second Amended Plan New Value, the Second Amended Plan set forth certain bidding procedures ("Bidding Procedures") to sell the equity of the Reorganized Debtor, which the Debtor asserted was only necessary if the Court determined that the proposed infusion of the Second Amended Plan New Value by the Fulton Family Trust was insufficient to overcome the Plan's violation of the absolute priority rule.

21.     Pursuant to the Debtor's proposed Bidding Procedures, only a current creditor or interest holder of the Debtor was a potential Qualified Bidder who would be permitted to bid on the interests of the Reorganized Debtor.

22.     On December 1, 2009, the Bank Group filed the "Bank Group's Objection to the Second Amended Plan of Reorganization Dated August 21, 2009" ("Plan Objection") [DE #298].  The Bank Group objected to confirmation of the Second Amended Plan because it violated, among other things, the following provisions of Title 11, United States Code ("Bankruptcy Code"):

    a. **Section 1129(a)(1).** The Second Amended Plan violated section 1129(a)(1) of the Bankruptcy Code by, among other things, (1) impermissibly seeking non-debtor third-party

releases, (2) proposing an impermissible classification scheme, and (3) failing to satisfy the Bankruptcy Code's "cramdown" requirements.

b. **Section 1129(a)(3).**  The Second Amended Plan was proposed in bad faith as evidenced by, among other things, the blatant gerrymandering of the Plan's classification scheme solely to create an impaired accepting class.

c. **Section 1129(a)(5).**  The Second Amended Plan contemplated retaining the entire management team to run the Reorganized Debtor but failed to disclose the compensation to be paid to these insiders.

d. **Section 1129(a)(7).**  The Second Amended Plan proposed to pay Class 3 claimants less than they would receive in a Chapter 7 liquidation and thus violated the best interest of creditors test.  This violation of section 1129(a)(7) is evidenced by (1) the Plan's requirement that any recovery from the retained causes of action become an asset of the Debtor, as opposed to being distributed among the creditors, and (2) its proposal to pay Class 3 claimants less than the Debtor's liquidation value.

e. **Section 1129(a)(8).**  The Plan violated section 1129(a)(8)'s requirement that each class of claims either be unimpaired or vote to accept the treatment proposed by the Plan.

f. **Section 1129(a)(10).**  The Second Amended Plan improperly gerrymandered the voting classes for the sole purpose of obtaining an impaired accepting class.

g. **Section 1129(a)(11).**  By the Debtor's own admission, it cannot function without the release of Fulton Sales from its guaranty liability.  However, third party releases are specifically not allowed by Ninth Circuit law.  Therefore, the Second Amended Plan was not feasible.

h. **Section 1129(b).**  The Second Amended Plan unfairly discriminated against Class 3 claimants and violated the absolute priority rule by proposing that the Fulton Family Trust retain 100% of the equity in the Reorganized Debtor while the Class 3 claimants receive tens of millions of dollars less than the amount of their debt.  Although the Second Amended Plan attempted to invoke the new value exception to the absolute priority rule, the proposed New Value was legally insufficient to satisfy the exception. Moreover, the proposed Bidding Procedures were unduly onerous and are intended to chill, not encourage, bidding. As a result, the Second Amended Plan failed the express requirements of the Ninth Circuit's new value exception to the absolute priority rule, as well as the "market test" added by the Supreme Court.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer

L.L.P.

LAW OFFICES

One Arizona Center, 400 E. Van Buren

Phoenix, Arizona 85004-2202

(602) 382-6000

23.     In pleadings filed in connection with the Second Amended Plan, the Debtor blamed the economic climate at the time that it proposed its Original Plan of Reorganization for the fact that the proposed distribution to the Bank Group was so small in the Original Plan, and credited the improved economy and its better than projected post-petition performance for its ability to propose a much larger payout in its Second Amended Plan. However, the Debtor's projections of its future earnings did not change significantly between the filing of the Original Plan and the Second Amended Plan.[3]  The only thing that changed was the Debtor's willingness to share a larger, but still insufficient, portion of those earnings with its creditors.  Without adjusting its business plan projections significantly, the Debtor was able to agree to pay the Bank Group a much larger percentage of the Excess Cash in the Second Amended Plan (95% up to $125,000,000, plus interest), than in the Original Plan (80% up to $85,350,000).

24.     On December 8, 2009, the Court held an initial hearing on plan confirmation.  At the hearing, the Court ordered additional briefing on the Bank Group's legal objections to the Second Amended Plan.

25.     The Court heard oral arguments on the Bank Group's legal objections to the Second Amended Plan on February 25, 2010.  On March 17, 2010, the Court ordered that the Second Amended Plan could not be confirmed (the "Order Denying Confirmation").  Among other things, the Court made findings in the Order Denying Confirmation that (a) the Second Amended Plan did not comply with section 1129(a)(1) as the Debtor's requirements regarding the assumption of non-Debtor Fulton Sales warranty obligations and the release of Fulton Sales violated section 524(e);  (b) if the Bank Group were to establish artificial impairment of the Class 2 mechanics' lien claims at an evidentiary hearing, the Second Amended Plan could not be confirmed; (c) the Second Amended Plan did not meet the requirements of section 1129(a)(5);

---

[3]  An examination of the Debtor's business plans attached to the Disclosure Statements accompanying each proposed plan indicates that the Debtor's projections of the amount of Excess Cash that it would have generated at the end of 2014 (the end of the five-year projected payment period) did not vary substantially between the business plan attached to the "Debtor's Disclosure Statement Relating to Second Amended Plan dated August 21, 2009."  In its Original Disclosure Statement, the Debtor projected that it would have generated $123,888,954 in Excess Cash by the end of 2014.  In its Second Amended Disclosure Statement, the Debtor projected that it would have generated $129,226,251 by the end of 2014.

(d) that the waiver of Ira Fulton's note and the contribution of Fulton's "name and experience" did not constitute new value; (e) that the Second Amended Plan New Value failed the "dividend paid on unsecured claims as a result of the contribution" test; (f) that it was not clear that the Debtor had met its burden of establishing that the Second Amended Plan New Value is substantial; (g) that it was not clear that the Debtor's proposed class of bidders met the *LaSalle* standards; (h) that the Bank Group should not be required to demonstrate that it is authorized to do business in Arizona and that it has the ability to obtain all necessary permits or licenses to build homes, or that it qualifies as the shareholder of a subchapter S corporation; (i) that a successful bidder should not be required to assume Fulton Sales' warranty obligations or its guaranty obligations; and (j) that the provision that a successful bidder other than the current shareholder shall not be permitted to use the Debtor's name renders the Second Amended Plan unconfirmable.

**E.** **The Fulton Family Trust's Obstruction and Contempt**

26.     The Bank Group believes that the Debtor and bankruptcy estate possess a potential cause of action against the Fulton Family Trust for unjust enrichment relating to several millions of dollars of tax refunds which the Bank Group believes that the Fulton Family Trust has received ("Unjust Enrichment Claim").

27.     The Debtor refused (both verbally and in writing) to investigate or prosecute the potential Unjust Enrichment Claim.  As a result, on December 23, 2009, the Bank Group served a subpoena ("Subpoena") on Ira A. Fulton, as Trustee of, and with respect to any beneficial interest in, the Ira A. Fulton and Mary Lou Fulton Family Trust Dated December 17, 1982.

28.     The Subpoena commanded Mr. Fulton to produce for inspection and copying the following documents:

> a.  Any and all documents relating to the creation, modification, and/or amendment of the Ira A. Fulton and Mary Lou Fulton Family Trust Dated December 17, 1982, including, but not limited to, the executed trust agreement in its original form, and any amendments thereto.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

b. Any and all state and federal tax returns filed by, or on behalf of, the Ira A. Fulton and Mary Lou Fulton Family Trust Dated December 17, 1982 for the tax years 2004 through the present.

c. Any and all state and federal tax returns filed by, or on behalf of, any party with a beneficial interest in the Ira A. Fulton and Mary Lou Fulton Family Trust Dated December 17, 1982 for the tax years 2004 through the present.

d. Any and all documents relied upon in preparing the tax returns referred to in Paragraphs 2 and 3 above.

e. All correspondence, memoranda, notes of conversations and other documents, including, without limitation, any letters, notes, electronically transmitted messages, recorded messages, or any other form of communication, between you and Debtors or Debtors' agents, accountants, or attorneys relating to this bankruptcy case.

29. By letter dated January 7, 2010, the Trust objected to the Subpoena. Specifically, the Trust refused to produce the documents requested in the Subpoena on the grounds that the requests 1) were overly broad and unduly burdensome, 2) sought the production of confidential and personal documents, and 3) sought the production of irrelevant information. In addition, the Trust suggested that it was not in possession of any documents "relevant to the bankruptcy that cannot be demanded from the debtor in possession."

30. The Bank Group responded to the Trust's objection by letter dated January 22, 2010, wherein the Bank Group agreed, for the time being, to narrow the scope of the documents requested to:

a. The most recent version of the Trust Agreement;

b. Any amendments to the Trust Agreement made since January 1, 2008;

c. (1) To the extent the Trust is a recognized entity for the purposes of filing Federal income tax returns, copies of any and all tax returns filed by, or on behalf of the Trust, for the tax years 2006 through the present; or

(2) In the event the Trust is not a recognized entity for the purposes of filing Federal income tax returns, copies of any and all tax returns filed by, or on behalf of the grantor(s), as that term is used for the purposes of Federal income taxes, of the Trust for the tax years 2006 through the present; and

d. Proof that the Trust has sufficient liquid assets to fund the proposed New Value, as that term is defined by Debtor's "Second Amended Plan of Reorganization Dated August 21, 2009."

(collectively, the "Required Documents").

31. The Fulton Family Trust refused to comply with the Subpoena, even though the Bank Group substantially narrowed the scope of the Subpoena in response to the Trust's stated concerns about relevancy.

32. The Bank Group engaged in lengthy discussions with the Fulton Family Trust in order to obtain the production of documents pursuant to the Subpoena, but failed to reach an agreement.

33. Finally, on March 16, 2010, the Bank Group filed its "Motion to Compel Production of Documents" ("Motion to Compel") [DE #336], seeking entry of an order compelling the Trust to produce the Required Documents.

34. After argument on the Motion to Compel was held on April 9, 2010, the Court found that the discovery sought by the Bank Group was relevant to the administration of the underlying bankruptcy estate and granted the Bank Group's Motion to Compel.

35. On May 6, 2010, the Court entered the "Order Granting Motion to Compel Production of Documents" ("Order"), which directed the Fulton Family Trust to produce documents requested by the Bank Group to permit it to investigate the Unjust Enrichment Claim. The Court ordered the parties to negotiate and file a protective order and ordered the Fulton Family Trust to produce the Required Documents within one week of entry of the protective order.

36. On May 18, 2010, the Court entered the "Stipulated Protective Order Re Production of Documents by the Ira A. Fulton and Mary Lou Fulton Family Trust" ("Protective Order").

37. The Order Compelling Production required the Fulton Family Trust to produce the Required Documents to the Bank Group within seven days of entry of the Protective Order, making May 25, 2010 the Trust's original deadline to produce the documents.

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

38.     On May 20, 2010, just two days after entry of the Protective Order, the Fulton Family Trust filed its "Notice of Appeal" [DE #375], "Motion for Stay Pending Appeal" ("Stay Motion") [DE #378], and "Motion for Leave to Appeal" ("Leave Motion") [DE #377].

39.     In paragraph 3 of the Stay Motion, the Trust acknowledged that disobedience of the Order Compelling Production would likely result in a contempt sanction. Stay Motion at ¶ 3.

40.     The Trust also acknowledged in the Leave Motion that failure to comply with the Order Compelling Production would likely result in a contempt sanction.  Leave Motion at p. 4, ll. 15-19.

41.     The Bank Group voluntarily agreed to an extension of the deadline for the Trust to produce the Required Documents until May 27, 2010, the date on which a hearing was held to consider the Stay Motion.

42.     The Court denied the Stay Motion but granted the Trust a seven-day administrative stay to give the appellate court time to rule on the Trust's request for a stay pending the appeal.

43.     The Trust filed its "Motion for Stay Pending Appeal" ("BAP Stay Motion") with the BAP on May 28, 2010.

44.     The Trust acknowledged in the BAP Stay Motion that its failure to comply with the Order Compelling Production would risk a contempt sanction.  BAP Stay Motion at p. 4, ll. 4-6.

45.     The following Tuesday, on June 1, 2010, the BAP denied the Trust's request for stay pending its appeal, concluding, "[i]n particular, appellant has not established a sufficient likelihood of success on the merits to warrant a stay."

46.     On June 4, 2010, having failed to obtain a stay pending appeal from this Court and the BAP, the Fulton Family Trust filed its "Motion for Reconsideration by the Ira A. Fulton and Mary Lou Fulton Family Trust of Order Granting Bank of America's Motion to Compel Production of Documents" ("Motion for Reconsideration") [DE #401].

47. Shortly after filing its Motion for Reconsideration, the Trust also filed its "Motion to Dismiss Appeal" with the BAP on June 4, 2010.

48. Because it was unable to obtain a stay pending appeal from either this Court or the BAP, the Trust was required to produce the Required Documents to the Bank Group by 5:00 p.m. on June 7, 2010.

49. The Trust did not produce any of the documents the Court ordered it to produce to the Bank Group prior to the June 7, 2010 deadline, and the Bank Group filed its "Motion to Find the Ira A. Fulton and Mary Lou Fulton Family Trust in Civil Contempt for Willful Refusal to Comply with Court Order" (the "Contempt Motion"). After a hearing held on June 21, 2010, the Court denied the Trust's Motion for Reconsideration and granted the Contempt Motion, assessing sanctions against the Trust.

50. Finally, and only after being held in contempt by the Court, the Trust produced the Required Documents. The Trust did not pay the sanctions assessed by the Court for more than four months after the order of contempt was entered, and only after repeated requests by the Bank Group that the sanctions be paid.

## F.    The Third Amended Plan of Reorganization

51. More than two months after the Order Denying Confirmation was entered, the Debtor filed a Third Amended Chapter 11 Plan of Reorganization on May 25, 2010 (the "Third Amended Plan"), the same date that the Trust was required to produce the Required Documents pursuant to the Order Compelling Production, and just two days prior to a hearing on the Debtor's Motion to Further Extend Exclusivity Period.[4] Under the Third Amended Plan, the Debtor proposed to pay general unsecured creditors, including the Bank Group, what the Debtor claimed was "in full" on or before December 31, 2015. The Debtor argued that its Third Amended Plan was a "full payment" plan that (a) excused its shareholder, the Fulton Family Trust, from producing the Required Documents, (b) justified extending the exclusivity period, and (c) solved the absolute priority rule and new value problems of the Second Amended Plan.

[4] When the Debtor's exclusivity period expired on April 16, 2010, the Bank Group objected to any further extension of exclusivity. Nonetheless, on June 1, 2010, the Court entered an order extending the exclusivity period to August 29, 2010, based largely on the Debtor's last-minute filing of the Third Amended Plan.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1  However, the Debtor overlooked or ignored the fact that the Third Amended Plan did not provide

2  for the payment of pendency interest on unsecured claims by the now solvent Debtor, and thus

3  was not a full payment plan at all.

4          52.     At a hearing on the Third Amended Disclosure Statement set for July 6,

5  2010, the Court agreed with the Bank Group that the Third Amended Disclosure Statement was

6  deficient in that it did not contain a liquidation analysis.  The Court ordered the Debtor to file a

7  revised disclosure statement in connection with the Third Amended Plan by July 16, 2010, and

8  set an additional hearing on approval of the disclosure statement on July 29, 2010.

9          53.     The Debtor did not revise the Third Amended Disclosure Statement and,

10  instead, hired substitute bankruptcy counsel and restructuring financial advisors on or about

11  July 17, 2010.  The Bank Group stipulated with the Debtor that the liquidation analysis for the

12  revised Third Amended Disclosure Statement could be provided by the Debtor on or before

13  August 9, 2010, and that the Bank Group would not seek to file a competing plan of

14  reorganization before September 27, 2010.  The Debtor's new restructuring counsel, recognizing

15  that the Third Amended Plan was unconfirmable in that it did not provide for pendency interest

16  on unsecured claims, indicated that the Debtor would abandon the Third Amended Plan and

17  would instead formulate and file a new plan of reorganization.

18  **G.     The Fourth Amended Plan, Preliminary Injunction, and Purported Importance of**
    **Fourth Sales**

19

20          **1.     The Fourth Amended Plan and Disclosure Statement**

21          54.     On September 15, 2010, Debtor filed the "Debtor's Fourth Amended Plan

22  of Reorganization" ("Fourth Amended Plan") and the "Amended and Supplemented Disclosure

23  Statement Concerning the Debtor's Fourth Amended Plan of Reorganization" ("Disclosure

24  Statement").

25          55.     In Article X of the Disclosure Statement, entitled "Means for Executing

26  the Plan," the Debtor represented that the Fourth Amended Plan would be funded by, among

27  other things, (1) the agreement of Fulton Sales to become a co-Borrower under the New Credit

28  Facility, (2) the creation of new Liens and security interests in assets of the Reorganized Debtor

12153208.3

15

and Fulton Sales to secure the obligations of the Borrowers under the New Credit Facility, and (3) the contribution of the Fulton Sales stock to the Reorganized Debtor.

56. On September 17, 2010, the Court entered the Disclosure Statement Order. The Debtor completed the mailing of its solicitation packages by September 21, 2010.

**2. The Preliminary Injunction**

57. On February 10, 2009, Bank of America filed a lawsuit in the Superior Court of Arizona in and for the County of Maricopa, Case No. CV2009-004101 (the "State Court Action"), against Fulton Sales and Fulton Warranty for their respective breaches of the "Second Amended and Restated Continuing Guaranty" and the "Amended and Restated Continuing Guaranty" dated February 24, 2003.

58. On April 10, 2009, the Debtor commenced an adversary proceeding (the "Adversary Proceeding") seeking to enjoin the Bank Group from prosecuting a guarantee lawsuit against Fulton Sales and Fulton Warranty in the State Court Action.

59. In the Introduction to its "Motion for Preliminary Injunction Pursuant to 11 U.S.C. § 105(a)" ("Preliminary Injunction Motion") filed in the Adversary Proceeding, the Debtor argued that:

> [t]he business of Fulton Homes and Fulton Sales are inextricably intertwined and dependent upon each other. In fact, Fulton Homes' ability to generate revenue, operate, and propose, confirm and consummate a Chapter 11 plan of reorganization is highly dependent upon Fulton Sales' continued existence and viability outside of bankruptcy.

In addition, ¶ 38 of the Preliminary Injunction Motion and the supporting Affidavit of Steven W. Walters state in no uncertain terms that "[i]f Fulton Homes is unable to sell homes (through Fulton Sales, as discussed above), Fulton Homes will not be able to reorganize and will have to liquidate its assets to the detriment of its bankruptcy estate and its creditors.

60. On July 2, 2009, this Court entered its "Order Granting Preliminary Injunction Pursuant to 11 U.S.C. § 105(a)" ("Preliminary Injunction"), which enjoined the Bank Group from enforcing any judgment it may obtain in the State Court Action against Fulton Sales and Fulton Guaranty until after the confirmation of a plan of reorganization in this case.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

12153208.3

61.     The Preliminary Injunction also prohibits Fulton Sales from selling, disposing of, or encumbering any of its assets outside the ordinary course of its business.

**3.      The Summary Judgment Order Against Fulton Sales**

62.     On September 28, 2009, the Bank Group filed a motion for summary judgment in the State Court Action.

63.     Following briefing that concluded on May 3, 2010, and oral argument held on August 12, 2010, the Bank Group was awarded summary judgment against Fulton Sales in the State Court Action by minute entry dated September 20, 2010 (the "Summary Judgment Order").

64.     Pursuant to the Summary Judgment Order, Fulton Sales is liable for all amounts owed by Fulton Homes under the Pre-Petition Credit Agreement, including default interest and attorneys' fees and costs.  The amount of the judgment that will be entered in favor of the Bank Group against Fulton Sales in the State Court Action is approximately $191,000,000.

65.     On October 1, 2010, the Bank Group filed its "Motion to Dissolve Preliminary Injunction" ("Motion to Dissolve").

**4.      Debtor's Removal of Fulton Sales from the Fourth Amended Plan**

66.     On October 7, 2010, the Debtor filed the "Emergency Motion to Supplement Disclosure Statement to Reflect Modifications to Fourth Amended Plan of Reorganization" ("Motion to Supplement") [DE #543].  The changes reflected in the Motion to Supplement include the complete removal of Fulton Sales from the Fourth Amended Plan.

67.     In the Motion to Supplement, the Debtor asserted, without support, that the removal of Fulton Sales from the Fourth Amended Plan "[did] not affect the Plan's implementation or feasibility[.]"

68.     In its Response to the Motion to Supplement, the Bank Group stated that the removal of Fulton Sales from the Fourth Amended Plan raised serious questions regarding the proposed plan, specifically noting "that removing Fulton Sales from the Plan creates significant uncertainties and likely legal and factual issues with the feasibility of the Debtor's Plan."  Although the Bank Group did not press the Court to deny approval of the Motion to

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Supplement on the basis of this major change, the Bank Group did reserve the right to raise and argue those issues during the confirmation proceedings.

69. The Debtor then proceeded forward without re-balloting or re-soliciting acceptances of the Fourth Amended Plan.

70. On October 11, 2010, the Debtor filed the "Debtor's Response to Bank Group's Motion to Dissolve Preliminary Injunction," in which it did not oppose the Motion to Dissolve because, according to the Debtor, dissolution of the Preliminary Injunction "is no longer inconsistent with the Debtor's efforts to reorganize."

71. On October 19, 2010, the Court entered the "Order Allowing Debtor to Supplement Disclosure Statement to Reflect Modifications to Fourth Amended Plan of Reorganization" ("Supplemental Disclosure Statement Order"), and the Debtor mailed out the "Supplemental Disclosure to the *Disclosure Statement Concerning the Debtor's Fourth Amended Plan of Reorganization* dated September 15, 2010" (the "Supplemental Disclosure").

72. According to the Debtor, through its modifications of the Fourth Amended Plan "the Debtor has eliminated Fulton Sales as a participant in the Debtor's Plan in any way," and "the Debtor's Plan is completely independent of Fulton Sales and does not rely upon Fulton Sales for any funding or any post-confirmation support." These statements were made in the Debtor's Response in non-opposition to dissolution of the Preliminary Injunction.

73. Later, in the Supplemental Disclosure, the Debtor reiterated its position that it "believes that the result of these amendments do not affect the feasibility of the Debtor's Plan."

**5. The Reintegration of Fulton Sales into the Reorganization Through the Proposed "Transition Services Agreement"**

74. On October 22, 2010, three days <u>after</u> mailing the Supplemental Disclosure, the Debtor filed the "Emergency Motion for an Order Under Sections 105(a) and 363 of the Bankruptcy Code Authorizing Debtor to Enter into Transition Services Agreement with Fulton Sales in Aid of Confirmation and Consummation of Debtor's Reorganization Plan" ("Emergency Transfer Motion").

75. In the Emergency Transfer Motion ― and contrary to its earlier statement that the Fourth Amended Plan was completely independent of Fulton Sales and does not rely upon Fulton Sales for any post-confirmation support ― the Debtor now takes the position that "[the Fulton Sales] employees, assets, and use of the building are necessary to the Reorganization Plan, because Fulton Sales has been eliminated from participating in the Reorganization Plan, and a new entity will undertake the operations of Fulton Sales ("**New Fulton Sales**")."

76. The Debtor did not mince words in the Emergency Transfer Motion, bluntly admitting the Transition Services Agreement ("<u>Transfer Agreement</u>") with Fulton Sales "is necessary to facilitate confirmation and consummation of the Debtor's own Reorganization Plan."

77. On or about November 1, 2010, the Bank Group filed that certain "Objection to Emergency Motion for an Order Under Sections 105(a) and 363 of the Bankruptcy Code Authorizing Debtor to Enter into Transition Services Agreement with Fulton Sales in Aid of Confirmation and Consummation of Debtor's Reorganization Plan" ("<u>Objection to Transfer Motion</u>").  The Objection to Transfer Motion is incorporated herein by this reference.

### III.

### LEGAL ANALYSIS

Prior to addressing the fatal defects preventing confirmation of the Debtor's Fourth Amended Plan, the Bank Group draws the Court's attention to two important and overarching issues: (i) the unnecessarily accelerated confirmation timetable on the Debtor's Fourth Amended Plan; and (ii) the burden of proof.

While the Court is aware of the Bank Group's prior objection to the expedited nature of the Debtor's near frantic confirmation schedule with the respect to the Fourth Amended Plan, the Bank Group reiterates and renews its prior objections.  The Debtor, having frivolously wasted twenty months of exclusivity on a variety of patently unconfirmable plans, now seeks to race forward to expedited confirmation on the ever evolving Fourth Amended Plan.  The Debtor's new found zeal for confirmation is solely a litigation tactic designed to try to avoid the Bank

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer
LLP
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    Group's competing plan. As the Court is well aware, the Bank Group, through its own claim and

2    subordinated Fulton Unsecured Claims, controls over 95% of the claims in this bankruptcy

3    proceeding.

4    The Debtor failed to offer a good faith basis to support such an accelerated plan

5    confirmation timetable. There is no evidence of an emergency. There is no evidence of

6    compelling business need. The Debtor cannot articulate a rational basis for its sudden sense of

7    urgency. The Debtor's litigation tactic is a thinly veiled attempt to deny the Bank Group its due

8    process rights and to afford the Bank Group a reasonable opportunity to present its objections to

9    the Fourth Amended Plan and an attempt to "run out the clock" on the Bank Group Plan.

10   The Debtor bears the burden of proof by a preponderance of the evidence to establish that

11   the Fourth Amended Plan satisfies all requirements for confirmation required by sections 1129(a)

12   and (b) of the Code. *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 653 (9th Cir.1997); *In re*

13   *Arnold and Baker Farms*, 177 B.R. 648, 654 (BAP 9th Cir. 1994), *aff'd*, 85 F.3d 1415 (9th

14   Cir.1996). As set forth below, the Debtor cannot satisfy its burden because the Fourth Amended

15   Plan is unconfirmable.

16   **A.    The Fourth Amended Plan Violates Section 1129(a)(1)**

17   A court can only confirm a plan if it "complies with the applicable provisions of [the

18   Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). The Fourth Amended Plan fails this requirement

19   for at least two reasons. First, it violates the Subordination Agreement and, therefore, section

20   510(a) of the Bankruptcy Code. Second, as evidenced by the Emergency Transfer Motion, the

21   Fourth Amended Plan does not contain an adequate means of implementation, as required by

22   section 1123(a)(5).

23   **1.    The Fourth Amended Plan Violates Section 510(a)**

24   "A subordination agreement is enforceable in a case under this title to the same extent

25   that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510

26   (2010). Congress clearly declared that with respect to section 510(a), "subsection (a) **requires**

27   the court to enforce subordination agreements." H.R. REP. No. 95-595, 95th Cong., 1st Sess.

28   359 (1977); S. REP. No. 95989, 95th Cong., 2d Sess. 74 (1978) (emphasis added). Based upon

12153208.3

section 510(a)'s mandate, courts routinely enforce subordination agreements between creditors in the bankruptcy context. *See e.g., In re Leasing Consultants, Inc.,* 2 B.R. 165, 168 (Bankr. E.D.N.Y. 1980); *Beatrice Foods Co. v. Hart Ski Mfg. Co. (In re Hart Ski Mfg. Co.)*, 5 B.R. 734, 735 (Bankr. D. Minn. 1980); *Ad Hoc Committee for the Subordinated Debentures of W.T. Grant Co. v. Pardo (In re W.T. Grant Co.),* 75 B.R. 163, 164 (D. Ct. S.D.N.Y. 1987) (citing *In re Credit Indus. Corp.,* 366 F.2d 402, 408 (2d Cir. 1966)); *In re Gen. Homes Corp.,* 134 B.R. 853, 864 (Bankr. S.D. Tex. 1991); *Miller v. MIF Realty L.P. (In re Perrysburg Marketplace Co.),* 208 B.R. 148, 160 (Bankr. N.D. Ohio 1997).

The Subordination Agreement between Ira Fulton and the Bank Group is a contractual subordination agreement that is enforceable under section 510(a) to the extent it is enforceable under non-bankruptcy law. In this bankruptcy case, Arizona contract law is the applicable non-bankruptcy law. *See In re Bank of New England Corp.,* 364 F.3d 355, 363 (1st Cir. 2004). Since subordination agreements are enforceable under Arizona law, the Subordination Agreement is enforceable in this bankruptcy case. *See Burkons v. Ticor Title Ins. Co. of Ca.,* 813 P.2d 710 (1991) (discussing enforceability of subordination agreements under Arizona law). No one has alleged otherwise. The Debtor's Fourth Amended Plan, however, fails to properly account for the Subordination Agreement and is, therefore, fundamentally flawed and unconfirmable.

The Fourth Amended Plan proposes two alternative treatments of the Fulton Unsecured Claim. First, the Fourth Amended Plan requires Ira Fulton to "convert the $25 million Fulton Unsecured Claim into additional equity in the Reorganized Debtor[.]" Second, the Fourth Amended Plan alternatively proposes that, in the event the Court determines that the conversion of the Fulton Unsecured Claim into equity constitutes a payment of principal and interest on the Fulton Unsecured Claim, the claim will not be converted to equity. Instead, under this alternative treatment, no payments will be made on the claim until all obligations under the Amended and Restated Credit Agreement, which are less than the full amount of the debt under the Pre-Petition Credit Agreement, are satisfied. Both of these proposed treatments violate the Subordination Agreement and would result in a windfall for Ira Fulton, who would be allowed to receive payments on account of the Fulton Unsecured Claim before the Bank Group is paid in

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

full under the Pre-Petition Credit Agreement. This is a blatant violation of the Bank Group's bargained-for rights under the Subordination Agreement.

     (a) <u>Conversion of the Fulton Unsecured Claim to equity violates the Subordination Agreement.</u>

In the most basic sense, the conversion of the Fulton Unsecured Claim to equity violates the Subordination Agreement because it pays Ira Fulton with stock in the Reorganized Debtor in full satisfaction of the Fulton Unsecured Claim. In addition, it allows Ira Fulton to receive cash distributions of the converted equity before the Bank Group is paid in full. A clearer violation of the Subordination Agreement is difficult to imagine.

The operative provisions of the Subordination Agreement are:

1.     Any and all claims of Creditor against Borrower, now or hereafter existing, are, and shall be at all times, subject and subordinate to any and all claims, now or hereafter existing which Agent or any Lending Bank may have against Borrower **(including any claim by Agent or Lending Banks for interest accruing after any assignment for the benefit of creditors by Borrower or the institution by or against Borrower of any proceedings under the Bankruptcy Act, or any claim by Agent or Lending Banks for any such interest which would have accrued in the absence of such assignment or the institution of such proceedings).**

2.     **Creditor agrees not to sue upon, or to collect, or to receive payment of the principal or interest of any claim or claims now or hereafter existing which Creditor may hold against Borrower, and not to sell, assign, transfer, pledge, hypothecate, or encumber such claim or claims** except subject expressly to this Agreement, and not to enforce or apply any security now or hereafter existing therefor, nor to file or join in any petition to commence any proceeding under the Bankruptcy Act, nor to take any lien or security on any of Borrower's property, real or personal, **so long as** the Agent and/or Lending Banks have any obligation to make loans or otherwise extend credit pursuant to the Credit Agreement, any Letters of Credit (as defined in the Credit Agreement) are outstanding, **any Obligations (as defined in the Credit Agreement) may be outstanding** or any other claim of Agent or any Lending Bank against Borrower shall exist. Notwithstanding the foregoing, with respect to the indebtedness of Borrower to Creditor listed on Exhibit A hereto (the "Approved Indebtedness"), Borrower may make and Creditor may receive payments of principal and interest in accordance with the terms of such Approved Indebtedness, provided

that (a) at the time of such payment, no Unmatured Event of Default (as defined in the Credit Agreement) or Event of Default (as defined in the Credit Agreement) shall have occurred and be continuing, (b) both before and after giving effect to such payments the Borrower will remain in compliance with the covenants set forth in Sections 7.1, 7.2, 7.3, 7.4, 7.5, 7.6, and 7.7 of the Credit Agreement, and (c) after giving effect to such payments no Event of Default or Unmatured Event of Default shall have occurred and be continuing.

3. **In case of any assignment for the benefit of creditors by Borrower or in case any proceedings under the Bankruptcy Act are instituted by or against Borrower,** or in case of the appointment of any receiver for Borrower's business or assets, or in case of any dissolution or winding up of the affairs of Borrower: (a) **Borrower and any assignee, trustee in bankruptcy, receiver, debtor in possession or other person or persons in charge are hereby directed to pay to Agent and each Lending Bank the full amount of Agent's and Lending Banks' claims against Borrower (including interest to the date of payment) before making any payment of principal or interest to Creditor,** and insofar as may be necessary for that purpose, Creditor hereby assigns and transfers to Agent and Lending Banks, all security or the proceeds thereof, and all rights to any payments, dividend or other distributions, and (b) Creditor hereby irrevocably constitutes and appoints Agent its true and lawful attorney to act in its name and stead: (i) to file the appropriate claim or claims on behalf of Creditor if Creditor does not do so prior to 30 days before the expiration of the time to file claims in such proceeding and if Agent elects at its sole discretion to file such claim or claims and (ii) to accept or reject any plan of reorganization or arrangement on behalf of Creditor, and to otherwise vote Creditor's claim in respect of any indebtedness now or hereafter owing from Borrower to Creditor in any manner Agent deems appropriate for its own benefit and protection and the benefit and protection of Lending Banks.

(emphasis added). Thus, in Paragraph 1, Ira Fulton unambiguously agrees that any and all claims he has, or will have, against the Debtor are subordinate to any and all claims the Bank Group has, or will have, against the Debtor, including any claim for interest accruing after the Petition Date. In Paragraph 2, Ira Fulton agrees not to receive payment of principal or interest of any claim he holds against the Debtor and agrees "not to sell, assign, transfer, pledge,

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

hypothecate, or encumber such claim" so long as any Obligations[5] under the Credit Agreement remain outstanding. Paragraph 3 of the Subordination Agreement directs the Debtor to pay the full amount of the Bank Group's claims against it before making any payment of principal or interest to Ira Fulton. Paragraph 3 also appoints the Bank Group as the attorney to act in Ira Fulton's name and stead for purposes of accepting or rejecting any plan of reorganization and authorizes the Bank Group to vote the Fulton Unsecured Claim. In short, the Bank Group controls the Fulton Unsecured Claim until it is paid in full under the Pre-Petition Credit Agreement.

Ira Fulton cannot receive any payments on account of the Fulton Unsecured Claim or otherwise dispose of or transfer the claim, including converting the claim to equity in the Reorganized Debtor, before the Bank Group is paid in full. Therefore, the Fourth Amended Plan's proposal to convert the Fulton Unsecured Claim into equity violates the Subordination Agreement in at least three ways.

First and foremost, the Fourth Amended Plan satisfies the outstanding principal and interest on the Fulton Unsecured Claim by paying Ira Fulton with stock in the Reorganized Debtor.

Second, the Fourth Amended Plan permits Ira Fulton to receive cash distributions from this newly-acquired equity for the purpose of paying income taxes. These distributions are permitted under the Plan without regard to whether the Allowed Bank Group Claims have first been paid in full under the proposed Amended and Restated Credit Agreement. At least part of these distributions would be received by Ira Fulton as a result of the conversion of the Fulton

---

[5] The Credit Agreement defines Obligations as:

> all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    Unsecured Claim into equity in the Reorganized Debtor.  Therefore, this provision of the Fourth

2    Amended Plan plainly violates the Subordination Agreement.

3        Third, the Fourth Amended Plan violates the Subordination Agreement even without the

4    shareholder tax distributions because it provides that Ira Fulton may receive distributions on the

5    converted debt while Obligations remain outstanding under the Pre-Petition Credit Agreement.

6    The Fourth Amended Plan's treatment of the Bank Group Claims is premised on the notion that

7    the Bank Group is entitled to "pendency interest"[6] calculated at the federal judgment rate from

8    the Debtor, as opposed to the contract rate of interest provided for in the Pre-Petition Credit

9    Agreement.  Although the Bank Group disputes that the rate of pendency interest proposed in the

10   Fourth Amended Plan is appropriate,[7] that issue need not be reached here because the

11   Subordination Agreement entitles the Bank Group to collect its contract interest through its

12   private agreement with Ira Fulton through the Fulton Unsecured Claim.  *See In re Bank of New*

13   *England Corp.,* 364 F.3d 355 (1st Cir. 2004).

14       Ira Fulton agreed that the Fulton Unsecured Claim is subordinate to "any and all claims"

15   of the Bank Group, "including any claim by [the Bank Group] for interest accruing after … the

16   institution by or against [the Debtor] of any proceedings under the Bankruptcy Act, or any claim

17   by [the Bank Group] for any such interest which would have accrued in the absence of … the

18   institution of such proceedings."  He also agreed not to receive payment of principal or interest

19   of any claim he holds against the Debtor or "sell, assign, transfer, pledge, hypothecate, or

20   encumber such claim" so long as any Obligations, which include interest and fees accruing post-

21   petition, regardless of whether such interest and fees are allowed claims in the instant bankruptcy

22   case.  Likewise, the Debtor agreed to pay the Bank Group the full amount of its claims against

23   the Debtor, including interest to the date of payment, before making any payment of principal or

24   interest to Ira Fulton on the Fulton Unsecured Claim.

25       As required by section 510(a), the Court must interpret and enforce the Subordination

26   Agreement pursuant to contract principles.  Here, the Subordination Agreement is clear and

27   ───────────────
     [6] "Pendency interest" is interest that accrues from the petition date through the confirmation of a
28   plan of reorganization.
     [7] *See* Part III.D., *infra.*

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1  unambiguous. The Debtor cannot make, and Ira Fulton cannot receive, any payments on account

2  of the Fulton Unsecured Claim until all of the Debtor's obligations to the Bank Group, including

3  pendency interest as calculated under the Pre-Petition Credit Agreement, are paid in full. By

4  permitting Ira Fulton to convert the Fulton Unsecured Claim to equity and then allowing him to

5  receive cash distributions before the Debtor satisfies all of the Obligations under the Credit

6  Agreement, the Fourth Amended Plan violates the Subordination Agreement. Accordingly, the

7  Fourth Amended Plan cannot be confirmed because it violates section 510(a) of the Bankruptcy

8  Code.

9           (b)  <u>Allowing Ira Fulton to receive payments on account of the Fulton
            Unsecured Claim once the obligations under the Amended and Restated
10          Credit Agreement are satisfied also violates the Subordination Agreement.</u>

11         Apparently cognizant of the fact that paying the Fulton Unsecured Claim by converting it

12  to equity in the Reorganized Debtor will run afoul of the Subordination Agreement, the Debtor

13  included alternative plan treatment in the Fourth Amended Plan that does not require immediate

14  conversion of the claim. Instead, as an alternative, the Fourth Amended Plan provides that the

15  Fulton Unsecured Claim will not be converted, and no payments will be made on the claim until

16  the Reorganized Debtor's obligations under the Amended and Restated Credit Agreement are

17  satisfied. As set forth above, the Fourth Amended Plan attempts to cap pendency interest on the

18  Bank Group Claims at the federal judgment rate, as opposed to the contract rate provided for in

19  the Pre-Petition Credit Agreement. Therefore, even under this alternative treatment, the Fourth

20  Amended Plan violates the Subordination Agreement because it provides for Ira Fulton to

21  receive payments on account of the Fulton Unsecured Claim before all of the Obligations under

22  the Credit Agreement are satisfied. Accordingly, for the reasons set forth above, the alternative

23  treatment of the Fulton Unsecured Claim also violates the Subordination Agreement.

24     **2.      The Proposed Emergency Transfer Motion is an Admission by the Debtor
               that the Plan does not Contain Adequate Means of Implementation**
25

26         The Fourth Amended Plan also fails to comply with the requirements of section 1123,

27  and thus the Fourth Amended Plan cannot satisfy section 1129(a)(1)'s mandates that a plan must

28  comply with "the applicable provisions of this title." Section 1123 requires that a plan, among

12153208.3

other things, "**shall** provide adequate means of implementation." 11 U.S.C § 1123(a)(5) (emphasis added).

Perhaps recognizing that the Fourth Amended Plan fails to satisfy section 1123, the Debtor filed the Emergency Transfer Motion. In the Emergency Transfer Motion, the Debtor unequivocally admits that the "[t]he TSA is necessary to facilitate confirmation and consummation of the Debtor's own [Fourth Amended Plan]." The Debtor further admits that "[t]he transactions contemplated under the TSA are an essential element of the Debtor's [Fourth Amended Plan]." Emergency Transfer Motion at ¶¶ 21 and 23. Clearly, if the Fourth Amended Plan provided the adequate means for its own implementation as required by section 1123(a)(5), the Emergency Transfer Motion would not have been filed. Accordingly, based upon the Debtor's *de facto* admission created by the filing of the Emergency Transfer Motion, the Court must deny confirmation of the Fourth Amended Plan for its failure to comply with section 1129(a)(1) on this basis alone.

**B.** **The Debtor, As Proponent of the Fourth Amended Plan, Has Failed to Comply With Section 1129(a)(2)**

Under section 1129(a), a plan proponent must comply with the "the applicable provisions of this title." 11 U.S.C. § 1129(a)(2); *see* 7 COLLIER ON BANKRUPTCY ¶ 1129.02[2], at 1229-19 (16th ed. 2010) ("Where section 1129(a)(1) focuses on the form and content of the actual plan, section 1129(a)(2) focuses on the activities of the plan proponent."). The principal purpose of section 1129(a)(2) is to "assure that the plan proponents have complied with the disclosure requirements of § 1125 of the Bankruptcy Code in connection with solicitation of acceptances of the plan." *In re Trans World Airlines, Inc.,* 185 B.R. 302, 313 (Bankr. E.D. Mo. 1995). The Debtor's Emergency Transfer Motion alone prevents the Debtor from satisfying its burden under section 1129(a)(2) for at least two reasons: (i) the Emergency Transfer Motion is an attempt to modify the Fourth Amended Plan without complying with section 1127(a); and (ii) the Emergency Transfer Motion, as a plan modification, fails to comply with the disclosure requirements mandated by section 1125.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1. **The Emergency Transfer Motion is an Improper Attempt to Modify the Fourth Amended Plan**

The Bankruptcy Code contemplates that, for a variety of reasons, Chapter 11 plans might evolve and require modification at various stages in the bankruptcy proceedings. Specifically, section 1127(a) authorizes a plan proponent to "modify such plan at anytime before confirmation." 11 U.S.C. § 1127(a). Upon the filing of the modification with the court, the "plan as modified becomes the plan." *Id.*

The Emergency Transfer Motion is undeniably a Plan modification. On October 7, 2010, the Debtor filed its Motion to Supplement, wherein the Debtor removed all references to Fulton Sales from the Fourth Amended Plan. More importantly, the Debtor contended in the Motion to Supplement that removal of Fulton Sales did "not affect the Plan's implementation or feasibility." Apparently recognizing the Plan defects created by the Motion to Supplement, the Debtor reversed course and filed the Emergency Transfer Motion. While the Debtor inexplicably fails to identify the Emergency Transfer Motion as a plan modification, a brief review of the Emergency Transfer Motion easily reveals its true nature as a plan modification.

In the Emergency Transfer Motion, the Debtor unequivocally admits that the "[t]he TSA is necessary to facilitate confirmation and consummation of the Debtor's own [Fourth Amended Plan]." The Debtor further admits that "[t]he transactions contemplated under the TSA are an essential element of the Debtor's [Fourth Amended Plan]." Emergency Transfer Motion at ¶¶ 21 and 23 (emphasis added). As noted above, section 1123(a)(5) requires that a plan "shall provide adequate means of implementation." Therefore, any "essential elements" that are "necessary to facilitate confirmation and consummation of the Fourth Amended Plan," such as the ones set forth by the Debtor in the Emergency Transfer Motion, render the Emergency Transfer Motion a plan modification.

2. **The Emergency Transfer Motion Fails to Comply with Section 1125**

Not only has the Debtor failed to comply with the plan modification provisions of section 1127(a), the Debtor has failed to comply with its disclosure obligations related to the modification to the Fourth Amended Plan. The disclosure requirements of section 1125 are not

only triggered when a plan is initially filed but also when a party files a modification of a plan through section 1127. *See* 11 U.S.C. § 1127(c) ("The proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified."). While a plan modification does not require a supplement to a disclosure statement and re-solicitation of a plan in every circumstance, additional disclosure and re-solicitation is required "when the modification materially and adversely impacts parties who previously voted for the plan." *See In re Concrete Designers, Inc.,* 173 B.R. 354, 357 (Bankr. S.D. Ohio 1994) (citing *In re American Solar King Corp.,* 90 B.R 808, 823 (Bankr. W.D. Tex. 1988). If questions exist regarding the adequacy of information previously furnished, the plan proponent should obtain a court order concerning adequate information. *Id.* at 356. "If the Court determines that acceptance of the modification was obtained with information that was less than adequate, it may not confirm the plan due to a violation of § 1129(a)(2)." *Id.* (stating that materiality of change from disclosure statement to the second amended plan, among other things, compelled court to conclude that modification of the disclosure statement was necessary for compliance with section 1129(a)(2)); *In re Frontier Airlines, Inc.,* 93 B.R. 1014, 1024 (Bankr. D. Colo. 1988) (concluding that confirmation of modified plan must be denied for failure to meet section 1129(a)(2) because plan proponents did not comply with section 1125 and Fed. R. Bankr. P. 3019).

The Debtor has not amended its disclosure statement to address the issues raised by the Emergency Transfer Motion. Since the statements made in the Emergency Transfer Motion contradict the Motion to Supplement, at a minimum the Debtor must amend its Disclosure Statement to explain its evolving position with respect to Fulton Sales.

**3.    The Debtor Failed to Disclose Critical Affiliate Executory Contracts**

Pursuant to section 521(a)(1)(B)(i), a Chapter 11 debtor is obligated to file a schedule of assets and liabilities signed under penalty of perjury. As part of its obligations under section 521(a)(1)(B)(i), a Debtor must disclose both (2) all executory contracts to which the debtor is a party, and (2) assets in the form of monetary claims against third parties. The Debtor materially failed to do so.

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

The Debtor failed to disclose material executory contracts with Fulton Sales (the "Fulton Sales Executory Contracts"). While the Bank Group would prefer to highlight the significance of the Fulton Sales Executory Contracts in more detail, the Fulton Sales Executory Contracts were first produced to the Bank Group on November 1, 2010, and were produced to the Bank Group only after it agreed to a "confidentiality agreement."[8] The Fulton Sales Executory Contracts are notably absent from the Debtor's Schedule G filed in this bankruptcy case. Compounding the Debtor's failure to disclose the Fulton Sales Executory Contracts is the impact upon the estate by the Fourth Amended Plan's treatment of the Fulton Sales Executory Contracts.

Pursuant to section 8.1 of the Fourth Amended Plan, all executory contracts, which are not specifically assumed, are rejected. To date, the Debtor has not proposed to specifically assume the Fulton Sales Executory Contracts. Accordingly, if the Fourth Amended Plan is confirmed, the Fulton Sales Executory Contracts will be rejected. Based upon an initial review of the Fulton Sales Executory Contracts, it appears that the rejection of the Fulton Sales Executory Contracts will result in the assertion of a significant rejection damages claim against the Debtor. Preliminary analysis, based on the company's accounting and tax returns, indicates the rejection damages claim could possibly range in the millions of dollars. As set forth in the feasibility section below, the Fourth Amended Plan does not address how the Debtor can pay a significant rejection damages claim to Fulton Sales.

In the last six days, the Debtor, through both deposition and declaration testimony of Mr. Lyon, has made a startlingly new disclosure. According to Mr. Lyon, since October 2008, the Debtor has not received all sums supposedly due from Fulton Sales under the Fulton Sales Executory Contracts. (*See e.g.* Dep. G. Lyon. October 29, 2010 pp188-192; "Declaration of G. Grant Lyon Regarding Valuation of Assets to be Transferred Pursuant to the Debtor's Proposed Transition Services Agreement" filed on November 1, 2010). Mr. Lyon testified that his preliminary analysis indicates that the amount due from Fulton Sales is "approximately $20 million." *Id.* Amazingly, this alleged $20 million claim is not listed as an asset on the Debtor's

---

[8] A point to be addressed in a different context is why executory agreements of a Chapter 11 are to be considered "confidential."

Schedules and is not contained within <u>any</u> disclosure statement or supplement approved by this Court. Not only is the Debtor's failure to disclose a clear violation of its obligations under section 521, the failure to do so, combined with the failure to disclose the claim in the disclosure statement, may result in a waiver of any alleged claim. *See e.g. Hamilton v. State Farm Fire & Cas. Co.,* 270 F.3rd 778 (9th Cir. 2001).

More troubling than the failure to disclose the existence of a potentially $20 million claim against Fulton Sales are the good faith and fiduciary duty ramifications resulting from Mr. Lyon's revelations. According to Mr. Lyon's testimony, the "undercharging" began approximately 24 months ago in October 2008. Since the Debtor filed its bankruptcy petition on January 27, 2009, it appears that 83.3% (20 of the 24 months) of the Debtor's "undercharging" occurred post-petition. Stated another way, if Mr. Lyon's testimony is to be believed, then post-petition the Debtor has dissipated approximately $16.6 million of estate assets in favor an affiliate non-debtor, Fulton Sales. One can only wonder whether this is a newly-fabricated attempt to prevent the Bank Group from being paid on its state court suit against Fulton Sales or whether this is a set of revelations of camouflaged activity of the Debtor with its non-Debtor entity over the course of this Chapter 11 case.

**C.**    <u>**The Debtor's Actions Do Not Satisfy The Good Faith Requirement**</u>

Under section 1129(a)(3), a plan must be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). While the Bankruptcy Code does not define the term "good faith," "in its most basic sense, 'good faith' means honesty in purpose, faithfulness to one's duty or obligation, observance of concepts of fair dealing, and the absence of intent to defraud or to seek unconscionable advantage." *In re Bashas' Inc.,* No. 2:09-bk-16050, 2010 WL 3832048, at *23 (Bankr. D. Ariz. Aug. 13, 2010) (citing BLACK'S LAW DICTIONARY (9th ed.2009)). To determine good faith, a court must inquire into: (i) the totality of circumstances surrounding the plan, (ii) the application of the principle of fundamental fairness in dealing with creditors, and (iii) whether the plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code. *In re Bashas' Inc.,* 2010 WL 3832048, at * 23; *In re Sylmar Plaza, L. P.,* 314 F.3d 1070, 1074 (9th Cir. 2002); *In re Jorgensen,* 66 B.R. 104, 109 (9th Cir.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

BAP 1986); *In re Kemp,* 134 B.R. 413, 414-15 (Bankr. E.D. Cal. 1991). A court also must inquire into the proponent's conduct as a whole. *See In re Kemp,* 134 B.R. at 415 (finding that plan was not proposed in good faith because it did not provide for speedy payment to creditors and an expeditious resolution of disputes); *see generally In re Jorgensen,* 66 B.R. at 109 (stating that the record supported bankruptcy court's finding that unauthorized payments to some creditors violated the spirit of the Bankruptcy Code and constituted material modification of debtors' proposed plan).

### 1. Debtor's Post-Petition Conduct Indicates Bad Faith

The Debtor's post-petition conduct overwhelmingly demonstrates that the Debtor cannot satisfy its burden of proof to establish the Fourth Amended Plan was filed in good faith. When the Debtor's post-petition conduct is applied to the good faith three-part test of: (i) the totality of circumstances surrounding the plan, (ii) the application of the principle of fundamental fairness in dealing with creditors, and (iii) whether the plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code, the Debtor cannot meet its burden for confirmation under section 1129(a)(3). The Bank Group notes the following, non-exclusive and non-exhaustive list of the Debtor's post-petition conduct that requires a finding that the Debtor has not acted in good faith:

● After obtaining an injunction against the Bank Group related to Fulton Homes Sales Corporation, the Debtor violated the injunction by, among other things, making shareholder distributions to Ira Fulton and dissipating Fulton Homes Sales' assets. The Debtor has further violated the injunction by entering into the Transfer Agreement with Fulton Sales and filing the Emergency Transfer Motion.

● Despite filing multiple cramdown Chapter 11 plans, the Debtor failed and refused to investigate potential claims against insiders, including Ira Fulton. The Debtor disregarded its fiduciary obligations and sought to protect insiders at the expense of the creditors and the bankruptcy estate.

● The Debtor formed a new subsidiary without seeking authorization of the Court or disclosing the actions at the time it filed its Plan and Disclosure Statement modifications on October 7, 2010.

● The Debtor could pay all of the unsecured creditors other than the Bank Group in full on the Effective Date, but has once again proposed a plan that unnecessarily and artificially impairs general unsecured creditors and pays them out over three years.

## 2. Gerrymandering Plan Classification Indicates Bad Faith

Gerrymandering of claims is a telltale sign of a plan that has been proposed in bad faith. *In re Bashas' Inc.,* 2010 WL 3832048, at * 24; *In re Cardsystems Solutions, Inc.,* 2007 WL 4166184, at *10-11 (Bankr. D. Ariz. Nov.19, 2007) (finding that debtor's plan violated section 1129(a)(3) where plan misclassified creditor so debtor would get its much-needed impaired accepting class). While section 1122(a) permits a plan to "place a claim or an interest in a particular class only if such claim or interest is substantially similar to other claims or interest of such class," 11 U.S.C. § 1122(a), "[s]eparate classifications for unsecured creditors are only justified 'where the legal character of their claims is such as to accord them a status different from the other unsecured creditors,'" *In re Tucson Self-Storage, Inc.,* 166 B.R. 892, 897 (BAP 9th Cir. 1994) (citations omitted). "Gerrymandering" occurs when a plan proponent classifies similar claims differently to create an impaired, accepting class to vote for its plan. *In re Barakat,* 99 F.3d 1520, 1524-25 (9th Cir. 1996). Such actions are prohibited and constitute bad faith. *Id.* at 1525 (stating that one clear law emerges from muddled case law on section 1122 claims classification: "thou shall not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan" (citations omitted)).

This case began, and remains, essentially a two-party dispute that was filed to protect the Fulton Family Trust's equity interest in the Debtor and its affiliates. The Fourth Amended Plan continues in the Debtor's efforts to achieve this goal, by separately classifying the Fulton Unsecured Claim from all other General Unsecured Claims in order to avoid the requirements of

the Subordination Agreement.[9] By separately classifying the Fulton Unsecured Claim from the General Unsecured Claims, the Debtor provides disparate treatment for similar claims in an effort avoid paying the Bank Group the amounts to which the Bank Group, by virtue of the Subordination Agreement, would otherwise be entitled under the Fourth Amended Plan.

Under the Fourth Amended Plan, Class 4 General Unsecured Claims are to receive 60% of their allowed claims on the Effective Date, and the balance of the claims is to be paid over the next three years with interest. If the Fulton Unsecured Claim were properly classified as a General Unsecured Claim, Ira Fulton would be entitled to 60% of his $25 million claim ($15 million) on the Effective Date, with the remaining $10 million paid over three years at a market rate of interest. Under the terms of the Subordination Agreement, the Bank Group, rather than Ira Fulton, should be paid these amounts. As a result, the Bank Group Claim would be both: (i) paid the difference between the pendency rate under the Fourth Amended Plan and the rate under the Credit Agreement; and (ii) paid more quickly than the Debtor has proposed.

By separately classifying the Fulton Unsecured Claim, the Debtor seeks to avoid the additional payment obligation to the Bank Group. The Fourth Amended Plan provides that the Fulton Unsecured Claim shall be converted into additional equity of the Reorganized Debtor. Alternatively, if the Court determines that the conversion constitutes a payment of principal and interest on the Fulton Unsecured Claim, then the Fulton Unsecured Claim will not be converted, and no payments will be made on the claim until the Reorganized Debtor's obligations to the Bank Group under the Amended and Restated Credit Agreement are satisfied. Not only does this treatment of the Fulton Unsecured Claim violate 11 U.S.C. § 510 as discussed above, it also indicates the Debtor's bad faith in proposing treatment of the Fulton Unsecured Claim that will result in significantly less money flowing to the Bank Group on the Effective Date than there would be if the Fulton Unsecured Claim were treated as a General Unsecured Claim.

---

[9] As discussed above, in the Subordination Agreement, the holder of the Fulton Unsecured Claim, Ira Fulton, assigns to the Bank Group "all rights to any payments, dividend or other distributions." *See* Subordination Agreement at ¶ 3. Therefore, any payments that are required to be made to Ira Fulton under the Fourth Amended Plan would be paid to the Bank Group until the Bank Group Claim is paid in full.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

In *In re Barakat,* the Ninth Circuit affirmed denial of confirmation of a plan that separately classified (1) the deficiency claim of an undersecured creditor from the class of general unsecured creditors, and (2) the unsecured pre-bankruptcy claims of trade creditors from the class of general unsecured creditors. *In re Barakat*, 99 F.3d 1520, 1521 (9th Cir. 1996). The same principle governed the court's reasoning for each improper classification: whether there was a legitimate business or economic reason for the separate classes. *Id.* at 1526. Here, the legal character of the Fulton Unsecured Claim and the General Unsecured Claims is exactly the same, and the Debtor has failed to articulate any legitimate business or economic reason for their separate classifications. Therefore, classification into separate classes is unjustified and improper.

### 3. The Debtor's Artificial Impairment to Create Impaired Accepting Classes is Bad Faith

The Debtor's failure to propose to pay certain classes of claims in full on the Effective Date, despite having enough cash to do so several times over, is an indication of bad faith and justifies denial of confirmation of the Fourth Amended Plan. A plan proponent must establish that the elements of section 1129(a) have been met by a preponderance of the evidence. *In re Ambanc La Mesa Limited P'ship*, 115 F.3d 650, 653 (9th Cir. 1997). Accordingly, the Debtor must therefore establish that it has met the good faith requirement of section 1129(a)(3) by a preponderance of the evidence.

By failing to pay the Class 1 Allowed Secured Vendor Claims, Class 4 Allowed General Unsecured Claims, and Class 5 Allowed Queen Creek Claims in full (the "Gerrymandered Classes"), the Debtor has created several impaired accepting classes of claims. The Debtor was not motivated by any genuine business reason to create these separate classes and propose extended payment periods for each class, as it has enough cash on hand to easily pay all of these claims in full on the Effective Date, but did so in order to gerrymander impaired accepting classes. The Debtor will have 15 times the amount of cash necessary to pay all of the Allowed Claims in the Gerrymandered Classes in full on the Effective Date, after payment of all other

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Effective Date claims, including all administrative expenses and a $35 million paydown of the Class 3 Bank Group Claim.

An absolute requirement for any plan of reorganization is that it must be "proposed in good faith." 11 U.S.C. § 1129(a)(3). Where a plan proponent has gerrymandered a plan's classification scheme "solely to create an impaired class to vote in favor of the Plan and thus 'cram down' the other impaired classes," courts should deny confirmation on the grounds that the plan was not proposed in good faith. *In re L & J Anaheim Associates*, 995 F.2d 940, 943 n.2 (9th Cir. 1993) (classification and impairment abuses on the part of a plan proponent should be addressed by the court in determining whether a plan was proposed in good faith); *In re Hotel Associates of Tucson*, 165 B.R. 470, 475 (BAP 9th Cir. 1994) ("[T]he act of impairment in an attempt to gerrymander a voting class of creditors is indicative of bad faith."). Specifically, the necessity for the delay in payment of an impaired class should be considered in determining whether a plan was proposed in good faith. *In re Hotel Associates of Tucson*, 165 B.R. at 475 (remanding for findings on whether plan was proposed in good faith where unsecured creditors were to be paid in full plus interest over thirty-day period). Where there is no need to impair any of the separately classified creditors, the plan is unconfirmable. *In re Meadow Glenn, Ltd.*, 87 B.R. 421, 427 (Bankr. W.D. Tex. 1988) (finding that the act of unnecessarily impairing a class to obtain an impaired accepting class is an abuse of the classification system).

The claims in the Gerrymandered Classes total approximately $ 3.7 million, according to the Liquidation Analysis attached as Exhibit G to the Fourth Amended Disclosure Statement. According to the Feasibility Analysis attached as Exhibit C to the Declaration of G. Grant Lyon, the Debtor will have $55,173,487 in cash on the Effective Date after payment of all other Effective Date claims, including all administrative expenses and a $35 million paydown of the Class 3 Bank Group Claim. *See* page 3 of Feasibility Analysis. The Debtor could easily pay the Allowed Claims in the Gerrymandered Classes in full on the Effective Date and still have more than $50 million in cash on the Effective Date to fund its Fourth Amended Plan. In fact, the Creditors' Plan does provide for the payment of all of these claims in full on the Effective Date.

The Fourth Amended Plan artificially proposes to pay the Allowed Claims in the Gerrymandered Classes over a two to four-year period. The following chart illustrates the amount of the remaining Allowed Claims in the Gerrymandered Classes and the amount of cash that the Reorganized Debtor will have on hand during that period :

| Year Ending | Cash Balance | Remaining Claims |
|---|---|---|
| 2011 | $ 60,786,138 | $ 2,145,668 |
| 2012 | $ 40,581,972 | $ 1,408,561 |
| 2013 | $ 19,451,715 | $  696,565 |
| 2014 | $ 26,376,955 | $  267,073 |

Given the amount of cash held by the Debtor during the payment period of the Fourth Amended Plan, and the relatively small amount of claims in the Gerrymandered Classes, there is no apparent business reason for the delayed and protracted payment of these claims.[10] The clear purpose of this artificial impairment of the Gerrymandered Classes is to overcome the anticipated rejection of the Fourth Amended Plan by the largest unsecured creditor, the Bank Group. Because there is no legitimate business need for the delay in paying the claims in the Gerrymandered Classes, their artificial impairment indicates that the Fourth Amended Plan was proposed in bad faith and is, therefore, unconfirmable.

**D.    The Fourth Amended Plan Fails The Best Interest of Creditors Test**

The best interest of creditors test requires that the holder of an impaired claim who does not accept the plan "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount such holder would so receive or retain if the debtor liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7). The plan proponent carries the burden of establishing that this test is satisfied. *In re M. Long Arabians,* 103 B.R. 211, 215 (BAP 9th Cir. 989) (holding that debtor failed to

---

[10] In its Plan Objection regarding the Debtor's Second Amended Plan, the Bank Group argued that the impairment of the secured vendor claims was trivial. The Debtor has responded in its Fourth Amended Plan by extending the payment period for the Gerrymandered Classes, thus rendering the impairment non-trivial, but still unjustified by the facts of this case.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

establish that plan met best interest of creditors test because debtor did not file a proper statement of assets and liabilities).  As the Debtor acknowledges, in the case of a solvent debtor application of the best interest of creditors test means that unsecured creditors are entitled to receive pendency interest on their claims through application of 11 U.S.C. § 726(a)(5).  However, the rate of pendency interest provided for in the Fourth Amended Plan is incorrect.

The Debtor has referenced *In re Cardelucci,* 285 F.3d 1231, 1234 (9th Cir. 2002) and *In re Beguelin,* 220 B.R. 94 (BAP 9th Cir. 1998), for the proposition that pendency interest in a solvent debtor case is capped at the federal judgment rate.  However, *In re Cardelucci* and *In re Beguelin* are not controlling since they do not involve the issue presently before the Court, namely whether the contract, as opposed to federal judgment, rate of interest is the proper measure of pendency interest.  In addition, to the extent *In re Cardelucci* and *In re Beguelin* can be read to measure pendency interest at the federal judgment rate where the creditor's claim is based in contract, they are no longer good law in light of the Supreme Court's decision in *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.,* 549 U.S. 443 (2007) ("*Travelers*") and the Ninth Circuit's decision in *General Electric Capital Corp. v. Future Media Productions, Inc.,* 547 F.3d 956 (9th Cir. 2008) ("*Future Media*").  Accordingly, the Fourth Amended Plan fails the best interest of creditors test because it calculates pendency interest at the federal judgment, as opposed to contract, rate.

### 1.  *In re Cardelucci* and *In re Beguelin* Do Not Control

The Debtor asserts that *In re Cardelucci* and *In re Beguelin* are "binding" authority that requires pendency interest to be measured at the federal judgment rate.  However, the two cases are not controlling here because they answer a question not presently before this Court.  The creditors in *In re Cardelucci* and *In re Beguelin* were judgment creditors.  Therefore, each court was asked to resolve whether to measure pendency interest at the federal, or state, judgment rate.  Here, however, the Bank Group's claim is based in contract.  Therefore, the issue before the Court is whether the proper rate of pendency interest is the contract rate or the federal judgment rate where the creditor's claim is based in contract.  This question was not before the courts in *In re Cardelucci* and *In re Beguelin*.  Therefore, any suggestion in those cases that the federal

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

judgment rate is the proper measure of pendency interest was, at best, *dicta*. Consequently, despite the Debtor's repeated assertions to the contrary, *In re Cardelucci* and *In re Beguelin* do not control the issue presently before the Court.

The Chapter 11 debtor in *In re Cardelucci* had a judgment in excess of $5,000,000 against him. *In re Cardelucci,* 285 F.3d at 1233. Based on the debtor's apparent solvency, the parties agreed that the judgment creditor was entitled to pendency interest. *Id.* However, the judgment creditor objected to the debtor's plan because it proposed to pay post-petition interest at the federal (3.5%), as opposed to the state (10%), judgment rate. *Id.* After first recognizing that, in a solvent debtor case, an unsecured creditor is entitled to pendency interest, the court affirmed the district court's ruling that the federal judgment rate, as opposed to the state judgment rate, is the proper measure of pendency interest on a judgment debtor's unsecured claim in a solvent debtor case. *Id.* at 1233-34. Similarly, *In re Beguelin,* on which *In re Cardelucci* is largely based, involved a judgment creditor's objection to a Chapter 13 plan that proposed to pay post-petition interest at the federal judgment rate (5%) as opposed to the state law rate (10.5%). 220 B.R. at 96. In analyzing the judgment creditor's objection, the Bankruptcy Appellate Panel held that in a Chapter 13 case the federal judgment rate is the proper measure of post-petition interest. *Id.* at 101.

Unlike both creditors in *In re Cardelucci* and *In re Beguelin*, the Bank Group is a contract creditor, not a judgment creditor. Nevertheless, the Debtor extends the holdings of *In re Cardelucci* and *In re Beguelin* to the facts of this case and concludes that the federal judgment rate is the proper measure of pendency interest on the Bank Group's contract claim. However, in each case the court was only asked to decide whether the federal, as opposed to state, judgment rate is the correct rate of pendency interest for a judgment creditor in a solvent debtor case. Therefore, where, as here, the creditor's claim is based in contract, *In re Cardelucci* and *In re Beguelin* do not control. Moreover, it is clear that under *Travelers* and *Future Media,* the reasoning of *In re Cardelucci* and *In re Beguelin* is no longer persuasive.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

**2.** **Under *Travelers* and *Future Media,* the Contract Rate is "the Legal Rate" of Pendency Interest on a Claim Based in Contract**

The fact that the Bank Group's claim is based in contract is significant. Since *In re Cardelucci* and *In re Beguelin* were decided, the Supreme Court decided *Travelers,* and the Ninth Circuit, applying *Travelers,* decided *Future Media.* The holdings of these two cases make it clear that the terms of the parties' contract control unless governing substantive law or the Bankruptcy Code provides otherwise. Accordingly, to the extent that *In re Cardelucci* and *In re Beguelin* can be read as deciding that the proper measure of pendency interest on a contract-based claim is the federal judgment rate, *Travelers* and *Future Media* have overruled them.

As a general unsecured creditor, Travelers filed an amended proof of claim pursuant to a court-approved stipulation for attorneys' fees incurred post-petition. *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.,* 549 U.S. at 447. PG&E objected to the amended proof of claim, arguing that Travelers could not recover attorneys' fees incurred while litigating bankruptcy issues. *Id.* On that basis, the bankruptcy court rejected Travelers' claim, and the district court and Ninth Circuit affirmed. *Id.* Starting from the general principle that "'[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code,'" the Supreme Court held that the Ninth Circuit's *Fobian* rule,[11] which held that claims of creditors for attorneys' fees for litigating bankruptcy issues must be disallowed, had no support in section 502 of the Bankruptcy Code "or elsewhere." *Id.* at 451-53. Accordingly, the Court vacated the Ninth Circuit's judgment, which failed to enforce the contractual attorneys' fees provision.

The rule announced in *Travelers* is a reaffirmation of the long-recognized "basic federal rule in bankruptcy" set forth in *Butner v. United States. Id.* at 451. "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to

---

[11] *See In re Fobian*, 951 F.2d 1149 (9th Cir. 1991).

12153208.3

prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.'" *Butner v. United States,* 440 U.S. 48, 55 (1979).

In 2008, the Ninth Circuit applied *Travelers* to resolve the issue of whether an oversecured creditor is entitled to a presumption in favor of the loan agreement's default rate of interest, as opposed to the pre-default rate. *General Electric Capital Corp. v. Future Media Productions, Inc.,* 547 F.3d at 960. After interpreting *Travelers* "to mean the default rate should be enforced, subject only to substantive law governing the loan agreement, unless a provision of the Bankruptcy Code provides otherwise," the Ninth Circuit held "that the parties' arms length bargain … controls." *Id.* at 960-61.

The mandate of *Travelers* and *Future Media* is clear. Unless governing substantive law or the Bankruptcy Code requires otherwise, bankruptcy courts are to enforce the terms of the parties' contracts. Section 502(b)(2) would, of course, prevent the Bank Group from, however, receiving pendency interest if the Debtor were insolvent. When the Debtor is solvent, however, the Bankruptcy Code provides only that pendency interest must be paid "at the legal rate." *See* 11 U.S.C. § 726(a)(5). Prior to the mandate of *Travelers* and *Future Media,* the courts in *In re Cardelucci* and *In re Beguelin* interpreted "the legal rate" to mean the federal judgment rate. However, there is no compelling federal interest that compels this result. Therefore, if *Travelers* and *Future Media* have any meaning, the proper measure of pendency interest where the creditor's claim is based in contract must be the contract rate since no "qualifying or contrary provisions of the Bankruptcy Code" require otherwise. *Travelers,* 549 U.S. at 450; *see also In re Dow Corning Corp.,* 456 F.3d 668, 679 (6th Cir. 2006) ("When a debtor is solvent, then, the presumption is that a bankruptcy court's role is merely to enforce the contractual rights of the parties … ."). Accordingly, at least where the creditor seeking pendency interest is a contract creditor, *Travelers* and *Future Media* have overruled *In re Cardelucci* and *In re Beguelin.* In such a case, the proper measure of pendency interest is the rate provided for in the underlying contract.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

3. **Other Concerns Underlying *In re Cardelucci* and *In re Beguelin* are Not Present in This Case**

Finally, the courts in *In re Cardelucci* and *In re Beguelin* were expressly searching for a rule that would promote the concept of equality of treatment among creditors and efficiency. *See In re Cardelucci,* 285 F.3d at 1235-36 and *In re Beguelin,* 220 B.R. at 100-101. These two concerns are not present here. First, the <u>only</u> party that will be impacted by application of the contract rate of interest during the pendency period is the Fulton Family Trust, the Debtor's sole shareholder. The other creditors will not be impacted. Thus, the interest rate dispute here is between the Bank Group and equity, not between the Bank Group and competing creditors. As a result, the same concerns over fairness among creditors that animated the courts in *In re Cardelucci* and *In re Beguelin* are not present in this case. Likewise, those courts were concerned that applying different interest rates to different creditors could overwhelm what would otherwise be a simple process. Again, this concern is not present here where there is only one unsecured creditor seeking pendency interest at the contract rate and there are sufficient assets to pay all claims of interest. Consequently, the facts and rationales that motivated the courts in *In re Cardelucci* and *In re Beguelin* have either been overruled by *Travelers* and *Future Media,* or simply are not present here.

E. **The Fourth Amended Plan Is Not Feasible**

As a condition of confirmation, section 1129(a)(11) requires that the court find that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.'" 7 COLLIER ON BANKRUPTCY ¶ 1129.03[11], 1129-74 (15th ed. 2009). The purpose of this provision is to "prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *In re Pizza of Hawaii, Inc.,* 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 COLLIER ON BANKRUPTCY ¶ 1129.02[11], at 1129-34 (15th ed. 1984)).

In considering whether a particular plan is feasible, courts have considered the following factors:

> (1) the adequacy of the debtor's capital structure;
>
> (2) the earning power of its business;
>
> (3) economic conditions;
>
> (4) the ability of the debtor's management;
>
> (5) the probability of the continuation of the same management; and
>
> (6) any related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*In re Trans Max Tech., Inc.,* 349 B.R. 80, 92 (Bankr. D. Nev. 2006); *In re Wiersma,* 324 B.R. 92, 113 (9th Cir. BAP 2005), *aff'd in part and rev'd in part on other grounds,* 483 F.3d 933 (9th Cir. 2007). Like all requirements of section 1129(a), the plan proponent must demonstrate that its plan is "feasible" by a preponderance of the evidence. *In re Trans Max Tech., Inc.,* 349 B.R. at 92. This requires the plan proponent to proffer concrete evidence of sufficient cash flow both to fund the plan and maintain the debtor's operations and obligations under the plan. *Id.* (finding that plan proponent failed to present sufficient evidence to establish that plan was feasible). The Fourth Amended Plan is not feasible for at least the following two reasons: (i) the Fourth Amended Plan appears dependent upon the Court granting the Emergency Transfer Motion; and (ii) New Fulton Sales as a mere successor in interest to Old Fulton Sales is liable to the Bank Group based upon successor liability.

> **1.    The Fourth Amended Plan is Contingent Upon the Emergency Transfer Motion**

Since the Debtor has repeatedly argued to this Court that its operations are inextricably intertwined with those of Fulton Sales, and that the continued operations and assets of Fulton Sales are essential to the Debtor's business, the Bank Group was perplexed by the Motion to Supplement, wherein the Debtor removed all references to and dependence on Fulton Sales in the Fourth Amended Plan. In light of the Debtor's substantial record of declaring the necessity

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

of Fulton Sales to the Debtor's operations and reorganization efforts, the Fourth Amended Plan is not feasible and therefore not confirmable.

Recognizing the glaring deficiencies created by the Motion to Supplement, the Debtor reversed course once again and filed the Emergency Transfer Motion. Assuming *arguendo* that the Emergency Transfer Motion is not a plan modification, then the Debtor's judicial admissions within the Emergency Transfer Motion doom the feasibility of the Fourth Amended Plan as written and unmodified by the Emergency Transfer Motion. In the Emergency Transfer Motion, the Debtor explicitly admits that the "[t]he TSA is necessary to facilitate confirmation and consummation of the Debtor's own [Fourth Amended Plan]." The Debtor further avows that "[t]he transactions contemplated under the TSA are an essential element of the Debtor's [Fourth Amended Plan]." Emergency Transfer Motion at ¶¶ 21 and 23 (emphasis added). Based upon the Debtor's own admissions, the Fourth Amended Plan is not feasible without the Emergency Transfer Motion.

### 2. New Fulton Sales is Liable to the Bank Group

Even if this Court could approve the Emergency Transfer Motion and authorize the fraudulent conveyance between two non-debtor entities, Fulton Sales Assets to New Fulton Sales, Arizona law does not allow Fulton Sales to escape its liability to the Bank Group by merely shutting down Fulton Sales and reopening its business as New Fulton Sales. Arizona, along with the majority of other states, recognizes and enforces successor liability.

The Arizona Court of Appeals recently addressed successor liability under Arizona law in *Warne Investments, Ltd. v Higgins,* 219 Ariz. 186, 195 P.3d 645 (Ct.App. 2008). In *Higgins,* the judgment debtor sought to avoid liability on the judgment by closing down the judgment debtor, selling its physical assets to Newco, and essentially reopening the judgment debtor's prior business operations under Newco. The judgment creditor brought action to hold Newco liable on the judgment based upon successor liability. The Court of Appeals noted that as a general rule under Arizona law, a purchaser of a business' principal assets is not liable for its predecessor's (seller's) debts and liabilities. *Higgins,* 219 Ariz at 191, 195 P.3d 650. However, the Court of Appeals further noted that Arizona recognizes four exceptions to the general rule:

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

(1) the successor corporation expressly or impliedly agreed to assume the liabilities of the predecessor corporation; (2) the alleged transactions between the two companies amounted to a consolidation or merger of the corporations; (3) the successor corporation is a mere continuation or reincarnation of the predecessor corporation; or (4) clear and convincing evidence shows that the transfer of assets from the predecessor corporation to the successor corporation was for the fraudulent purpose of escaping debt liability.

*Id.* (citations omitted).

Based upon the facts, the Court of Appeals affirmed the trial court's determination that Newco had successor liability to the judgment creditor on the judgment because Newco was a "mere continuation" of the judgment debtor. *Id.* at194, 195 P.3d at 653.

The present facts are even more egregious than the facts presented to the Court of Appeals in *Higgins*. Based upon discovery to date, (i) New Fulton Sales is a mere continuation or reincarnation of Fulton Sales; and (ii) the stated purpose of the Transfer Agreement is to escape Fulton Sales' liability to the Bank Group. Accordingly, the Bank Group intends to immediately commence litigation in the Arizona Superior Court in and for Maricopa County to, among other things, determine that New Fulton Sales is liable to the Bank Group for successor liability (the "Successor Liability Action"). In light of the Debtor's assertions regarding the necessity of New Fulton Sales and the Transfer Agreement to the success of the Fourth Amended Plan, the Successor Liability Action, and any related potential provisional remedies, the Fourth Amended Plan is not feasible.

3.      **The Feasibility Analysis Does Not Address Rejection Damages From the Fulton Sales Executory Contracts**

Section 8.1 of the Fourth Amended Plan generally provides that the Fulton Sales Executory Contracts will be rejected as of the Effective Date. Since it is not excepted, this "sweep" clause would effectively reject the Fulton Sales Executory Contracts. The Feasibility Analysis prepared by the Debtor does not make any provision for the payment of rejection damages for the rejection of these contracts, and the Fourth Amended Disclosure Statement does not disclose the amount of damages that will arise upon the rejection of the Fulton Sales

12153208.3

45

Executory Contracts. As discussed above, the rejection damages could be quite significant. Dep. G. Lyon. October 29, 2010 pp. 188-192. The elimination of potential claims against the estate from the Feasibility Analysis makes it impossible to determine whether the Fourth Amended Plan is, in fact, feasible, and the Debtor has therefore failed to meet its burden of demonstrating feasibility. Moreover, because these potential claims may total millions of dollars, it is likely that the Fourth Amended Plan is not feasible.[12]

## F.  The Plan Is Not Fair And Equitable

Before a bankruptcy court can confirm a plan of reorganization, the plan proponent must prove "by a preponderance of the evidence either (1) that the Plan satisfies all thirteen requirements of 11 U.S.C. § 1129(a), or (2) if the only condition not satisfied is the eighth requirement, 11 U.S.C. § 1129(a)(8), the Plan satisfies the 'cramdown' alternative to this condition found in 11 U.S.C. § 1129(b) … ." *In re Ambanc La Mesa Limited P'ship,* 115 F.3d 650, 653 (9th Cir. 1997). A plan of reorganization can only satisfy the "cramdown" alternative if it "'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the Plan." *Id.* "As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). The latter condition is the core of what is known as the 'absolute priority rule.'" *Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership,* 526 U.S. 434, 441-42 (1999) ("*LaSalle*"). "[A] plan is deemed fair and equitable as to a dissenting class of unsecured creditors only if it does not violate the absolute priority rule[.]" *In re Dow Corning Corp.,* 456 F.3d 668, 678 (6th Cir. 2006) ("*Dow III*").

The Fourth Amended Plan violates the absolute priority rule in at least three ways. First, the plan only proposes to pay pendency interest on the Bank Group Claims at the federal

---

[12] The Debtor also asserts that it is owed a significant debt by Fulton Sales under the Fulton Sales Executory Contracts. Dep. G. Lyon. October 29, 2010 pp. 188-192. Even under this view of the contracts, the Debtor has failed to account for this debt in the Liquidation Analysis included in the Plan Supplement.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

judgment rate, while allowing the Fulton Family Trust to maintain 100% of the equity in the Reorganized Debtor. Second, the Fourth Amended Plan proposes to pay the Bank Group less than a market rate of interest post-confirmation. Third, the plan allows the Fulton Family Trust to retain its equity in the Reorganized Debtor without satisfying the Fulton Unsecured Claim in full or providing any new value. Each of these shortcomings violates the absolute priority rule and renders the Fourth Amended Plan unconfirmable.

### 1. Failure to Pay the Bank Group Default Interest Under the Credit Agreement Violates the "Fair and Equitable" Requirement

"[W]here an estate is solvent, in order for a plan to be fair and equitable, unsecured and undersecured creditors' claims must be paid in full, including postpetition interest, before equity holders may participate in any recovery." *Id.* (quoting 140 Cong. Rec. H10, 752-01, H10, 768 (1994)). "When a debtor is solvent, then, the presumption is that a bankruptcy court's role is merely to enforce the contractual rights of the parties, and the role that equitable principles play in the allocation of competing interest is significantly reduced." *Id.* at 679. As a result, "[c]ourts in solvent debtor cases have overwhelmingly concluded that there is a presumption that the default interest rate should be allowed." *Id.* (citing *In re Southland Corp.,* 160 F.3d 1054, 1059-60 (5th Cir. 1998); *In re Consol. Operating Partners L.P.,* 91 B.R. 113, 116 (Bankr. D. Colo. 1988); and *Ruskin v. Griffiths,* 269 F.2d 827, 832 (2d Cir. 1959)).

### (a) The *Dow* cases

Dow Corning Corporation ("Dow") filed for Chapter 11 relief as a result of the numerous breast-implant-related lawsuits pending against it in the mid-1990s. At the time it filed its petition, Dow was fully solvent and remained so throughout its bankruptcy proceedings. Therefore, because it was solvent, Dow was not in default under most of its contracts. In 1999, Dow filed a plan of reorganization that included a provision for the payment of pendency interest on contract claims at the federal judgment rate of 6.28%. The Class 4 creditors objected to the plan on the grounds that paying pendency interest at the federal judgment rate (as opposed to the contract or an otherwise applicable statutory rate) violated the best interest of creditors test. Ultimately, the bankruptcy court held that section 726(a)(5) requires pendency interest to be

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    calculated at the federal judgment rate. *See generally In re Dow Corning Corp.,* 237 B.R. 380

2    (Bankr. E.D. Mich. 1999) ("*Dow I*").

3        Following the bankruptcy court's ruling in *Dow I,* the Class 4 creditors objected to the

4    plan on the grounds that paying pendency interest at the federal judgment rate was not "fair and

5    equitable" under section 1129(b).   This time, the bankruptcy court sustained the Class 4

6    creditor's objection.  As a result, the bankruptcy court ruled that pendency interest would be paid

7    "in accordance with the terms of the parties' contracts." *In re Dow Corning Corp.,* 244 B.R.

8    678, 696 (Bankr. E.D. Mich. 1999) ("*Dow II*").  Before reaching this conclusion, the bankruptcy

9    court clarified its ruling in *Dow I,* explaining that "the upshot of the best-interests test is that the

10   creditor of a solvent chapter 11 estate must receive postpetition interest at a rate which is at least

11   equal to the federal statutory rate.  We are unwilling to infer from this that Congress intended to

12   preclude creditors from being paid a higher rate." *Id.* at 686.

13       After clarifying its decision in *Dow I,* the bankruptcy court explained the history of the

14   "fair and equitable" standard.  This discussion culminated with the court finding that pendency

15   interest is not governed by section 1129(b)(2)(B)(i) because it is not part of a creditor's "allowed

16   claim."  "It is instead something which must be paid in addition to the allowed claim.  Thus,

17   there is no contradiction between the assertion that allowed claims of the dissenting class must

18   be paid (as per section 1129(b)(2)(B)(i)), on the one hand, and the assertion that as a matter of

19   fairness, the holders of such claims are also entitled to pendency interest at the contract rate."

20   *Id.* at 693.  Reasoning that "[a] debtor with the financial wherewithal to honor its contractual

21   commitments should be required to do so," the court found that the debtor failed to satisfy its

22   burden of proof with respect to the "fair and equitable" requirement. *Id.* at 695.

23       Following *Dow II,* the debtor objected to the Class 4 creditors' claims for money due

24   under default rates of interest where the contracts were not in default on the petition date.  The

25   bankruptcy court held that it could not award default interest without evidence that it would be

26   fair and equitable to award additional default interest and because Dow Corning had not been in

27   default under the contracts on the date of the bankruptcy filing.  On appeal, the Sixth Circuit

28   found that the bankruptcy court abused its discretion by denying interest at the default rate,

absent compelling equitable considerations. *Dow III,* 456 F.3d at 676-680. Specifically, the court held that "there is a presumption that default interest should be paid to unsecured claim holders in a solvent debtor case." *Id.* at 680. The presumption can be rebutted by equitable considerations, but "when a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights." *Id.* at 679.

(b)    <u>Application of the Dow cases to the Fourth Amended Plan</u>

The Debtor was in default under the Credit Agreement before the Petition Date. Therefore, under both *Dow II* and *Dow III,* for the Debtor's treatment of the Bank Group's claim under the Fourth Amended Plan to be "fair and equitable," the Bank Group is entitled to a presumption that pendency interest should be calculated at the rate provided for in the Credit Agreement. This presumption can only be rebutted on a showing of "compelling equitable considerations." *Id.* at 679-80.

No "compelling equitable considerations" exist to rebut the presumption that the Bank Group is entitled to pendency interest at the default rate. This case is over twenty-one months old. The Debtor has proposed multiple plans of reorganization that all have at least one common thread: the retention of 100% equity in the Reorganized Debtor by the Fulton Family Trust while the Bank Group receives less than payment in full. As a consequence, the Debtor's inability to confirm a plan is the result of its own choices, not any actions taken by the Bank Group. Moreover, the default rate of interest under the Pre-Petition Credit Agreement is 8.5%, an extremely reasonable rate. Therefore, the difference in dollar amounts between application of the federal judgment rate (0.43%) and the default under the Pre-Petition Credit Agreement (8.5%) is simply a function of the Debtor's own inability to confirm a plan within a reasonable time. To allow this solvent Debtor to escape liability on the default rate of interest under the Credit Agreement would result in a windfall for equity. Accordingly, the Fourth Amended Plan's failure to pay pendency interest to the Bank Group at the default rate under the Credit Agreement fails the "fair and equitable" test. Thus, the Fourth Amended Plan cannot be confirmed.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

2.      **Failure to Pay a Market Rate of Post-Effective Date Interest Violates the "Fair and Equitable" Requirement**

The Fourth Amended Plan cannot be confirmed because it is not "fair and equitable" as it proposes to pay the Bank Group post-Effective Date interest at less than a "market rate" and, accordingly, violates sections 1129(b)(2)(B)(i) and 1129(b)(1) of the Bankruptcy Code.  "The holder of an unsecured claim should receive 'property of a value, as of the effective date of the plan, equal to the allowed amount of such claim' under the cramdown provision of 11 U.S.C. § 1129(b)(2)(B)(i)."  *Dep't of Hous. & Urban Dev. v. Westwood Plaza Apartments, Ltd.* (*In re Westwood Plaza Apartments, Ltd.*), 192 B.R. 693, 697 (E.D. Tex. 1996).  "This language is identical to that contained in [Section] 1129(b)(2)(A)(i)(II), which has been interpreted to require that the total deferred payments have a present value equal to the amount of the secured claim."  *Id.* (citation omitted).

"Present value…simply compensates the creditor for not receiving its money today by charging an additional sum based on a rate of interest called the 'discount rate.'"  *In re S.E.T. Income Properties, III*, 83 B.R. 791, 793 (Bankr. N.D. Okla. 1988).  The discount rate used by a debtor in connection with Section 1129(b)(2)(B)(i) must be equivalent to the prevailing "market rate" for such loans.  As the Ninth Circuit has stated, "[t]he appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the Court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration to the quality of the security and the risk of subsequent default."  *In re Welco Indus., Inc.*, 60 B.R. 880, 882 (BAP 9th Cir. 1986) (emphasis added).

Evidence established at trial will show that the Debtor's proposed interest rate under the Fourth Amended Plan is not a prevailing "market rate" as is required under section 1129(b)(2)(B)(i) and applicable case law.  Accordingly, the Fourth Amended Plan cannot be confirmed because it is not "fair and equitable" and violates section 1129(b)(1).

### 3. Failure to Pay the Fulton Unsecured Claim in Full Violates the Absolute Priority Rule

"[T]he absolute priority rule provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan." *Northwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (alteration in original). As it is entitled to do under the Subordination Agreement, the Bank Group cast a Class 7 ballot to vote the Fulton Unsecured Claim rejecting the Fourth Amended Plan. Thus, Class 7 has rejected the Fourth Amended Plan. As a result, the absolute priority rule bars the Fulton Family Trust from retaining its equity in the Reorganized Debtor since the Fourth Amended Plan does not pay the Fulton Unsecured Claim in full. Therefore, the Fourth Amended Plan cannot be confirmed because it violates the absolute priority rule by allowing the Fulton Family Trust to retain its equity in the Reorganized Debtor without providing for payment of the Fulton Unsecured Claim in full.

### G. The Plan Unfairly Discriminates

To the extent the Debtor is permitted to classify the Fulton Unsecured Claim separately, the Fourth Amended Plan is not confirmable because the Debtor unfairly discriminates against the Fulton Unsecured Claim and in favor of the other general unsecured claims in Class 4 in violation of section 1129(b)(1). In order for a debtor's discrimination between classes to be proper under section 1129(b), four criteria must be satisfied: "(1) the discrimination must be supported by a reasonable basis; (2) the debtor could not confirm or consummate the plan without the discrimination; (3) the discrimination is proposed in good faith; and (4) the degree of the discrimination is directly related to the basis or rationale for the discrimination." *Liberty Nat'l Enter. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa P'ship)*, 115 F.3d 650, 656 (9th Cir. 1997) (citing *In re Wolff*, 22 B.R. 510, 511-12 (BAP 9th Cir. 1982)).

The Debtor cannot satisfy the criteria for justifying its discriminatory treatment of the Fulton Unsecured Claim. First, the discrimination is not supported by a reasonable basis. Neither of the Debtor's alternative proposals for the treatment of the Fulton Unsecured Claim (conversion or non-payment until the Amended and Restated Credit Agreement is paid in full)

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

are supported by a reasonable basis. The conversion of the Fulton Unsecured Claim into additional equity of the Reorganized Debtor violates the Subordination Agreement and the absolute priority rule because Ira Fulton will be able to retain his equity ownership and receive distributions from the Reorganized Debtor despite the fact that the Bank Group is not being repaid in full. The non-payment alternative is also not supported by a reasonable basis because it violates the absolute priority rule. As a general unsecured claim, there is no valid basis for withholding distributions under the plan when other general unsecured claims are receiving payment. It is clear that the Debtor's sole motivation for not paying on the Fulton Unsecured Claim is to avoid having to remit payments on the Fulton Unsecured Claim to the Bank Group as required by the Subordination Agreement.

Second, the Bank Group's competing plan clearly demonstrates that the Debtor could confirm and/or consummate a plan without discriminating against the Fulton Unsecured Claim. Third, the proposed discrimination was not done in good faith, but rather in an attempt to gerrymander an accepting impaired class and to prevent the Bank Group from recovering the full amount of its debt from Ira Fulton under the Subordination Agreement. Fourth, there is no evidence that the degree of the discrimination is directly related to the basis or rationale for the discrimination against the Fulton Unsecured Claim. The Debtor proposes either to convert the debt or not pay it until the Amended and Restated Credit Agreement is paid in full, despite the fact that Bank Group is unwilling to permit such conversion and is legally entitled to recover amounts due to Ira Fulton under the Fulton Unsecured Claim pursuant to the Subordination Agreement. It appears that the Debtor's sole reason for this discrimination is to thwart the Bank Group's recovery. Such a basis or rationale clearly does not satisfy the requirements of section 1129(b) and, accordingly, the Fourth Amended Plan unfairly discriminates against the Fulton Unsecured Claim and cannot be confirmed.

## H. The Debtor's Lack of Notice Has Deprived the Bank Group of its Due Process Rights

Section 1128(a) provides that "[a]fter notice, the court shall hold a hearing on confirmation of a plan." 11 U.S.C. § 1128(a). The Supreme Court has held that for notice to

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    satisfy the fundamental right to due process under the Fifth Amendment of the Constitution it

2    must be "reasonably calculated, under all of the circumstances, to apprise interested parties of the

3    pendency of the action and afford them an opportunity to present their objections." *Mullane v.*

4    *Central Hanover Trust Co.,* 339 U.S. 306, 314 (1950); *see also Reliable Elec. Co. v. Olson*

5    *Const. Co.,* 726 F.2d 620, 622 (10th Cir. 1984) (applying *Mullane* in the context of bankruptcy

6    reorganization proceedings).  In the context of a plan of reorganization, creditors are required to

7    be given at least 28 days advance notice of the deadline to file objections and of the hearing at

8    which the Court will consider confirmation of a chapter 11 plan.  *See* Bank. R. Fed. P. 2002(b).

9    "Because the notice requirements under the Bankruptcy Rules are designed to provide

10   procedurally adequate notice, . . . debtors disregard them at their peril." *In re Arch Wireless,* 332

11   B.R. 241, 252 (Bankr. D. Mass. 2005).

12         Here, Debtor's effort to push the Fourth Amended Plan through is a blatant violation of

13   the Bank Group's due process rights.  Debtor's proposed Plan is constantly changing and

14   remains in flux.  Between September 21, 2010 and October 22, 2010, Debtor modified its

15   proposed Plan two separate times without re-balloting or re-soliciting acceptances of the

16   proposed Plan.  First, on October 7, 2010, Debtor filed its Motion to Supplement proposing to,

17   among other things, remove Fulton Sales from the Fourth Amended Plan.  Then, on October 22,

18   2010, Debtor filed the Emergency Transfer Motion through which Debtor seeks authority to

19   enter into the Transfer Agreement with Fulton Sales to facilitate confirmation and consummation

20   of the Fourth Amended Plan.  In the Emergency Transfer Motion, Debtor even admits that "[t]he

21   transactions contemplated under the TSA are an essential element of the Debtor's Reorganization

22   Plan."  Emergency Transfer Motion at ¶ 21.  Despite the fact that the Motion to Supplement and

23   Emergency Transfer Motion substantially change the Fourth Amended Plan, Debtor has insisted

24   on pressing forward with the Plan confirmation hearing on November 8, 2010, a mere 16 days

25   after Debtor's latest substantive amendment of the Fourth Amended Plan.  Debtor has provided

26   no justification for depriving the Bank Group or the other creditors and parties in interest in this

27   case of the minimum required 28 days notice under Rule 2002.  Further, at the time of the

28   scheduling of these confirmation hearings, the Bank Group explained that it was not possible to

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1  produce its expert report within that schedule, and certain important witnesses have been

2  unavailable prior to the confirmation start date of November 8, 2010.  Debtor's actions in

3  feigning an emergency need for a setting (without a supporting affidavit or declaration) have

4  effectively deprived the Bank Group and other parties in interest of their due process rights by

5  failing to afford them an adequate space and time to prepare a case relating to the Fourth

6  Amended Plan.

7                                                    **IV.**

8                                            <u>**CONCLUSION**</u>

9          The Fourth Amended Plan is fatally flawed and cannot be confirmed.  The Fourth

10  Amended Plan continues the Debtor's efforts to deny the Bank Group the benefit of its bargain

11  solely for the advantage of Equity.  As a now admittedly solvent entity, the Bank Group is

12  entitled to all the sums due under the Credit Agreement and all rights under the Credit

13  Agreement.  The Fourth Amended Plan's attempt to end run the Subordination Agreement and

14  the Debtor's active participation in the Fulton Sales to New Fulton Sales shell game alone are

15  sufficient to deny confirmation.  Additionally, confirmation of the Fourth Amended Plan must be

16  denied because the Fourth Amended Plan does not comply with, and the Debtor has not

17  complied with, the Bankruptcy Code as required by sections 1129(a)(1) and (2).  The Fourth

18  Amended Plan is also not confirmable because it is not feasible, not proposed in good faith, and

19  fails the best interests of creditors test.  Lastly, the Fourth Amended Plan is not "fair and

20  equitable" and is "unfairly discriminatory," thus barring confirmation under section 1129(b).

21          RESPECTFULLY SUBMITTED, this 3rd day of November, 2010.

22                                            SNELL & WILMER L.L.P.

23                                            By /s/  DG - #005717
24                                               Donald L. Gaffney
                                                 Lori A. Lewis
                                                 Evans O'Brien
25                                               One Arizona Center,400 E. Van Buren
                                                 Phoenix, AZ  85004-2202
26                                               Attorneys for Creditor Bank of America, N.A., on its
                                                 own and as administrative agent for JPMorgan Chase
27                                               Bank, N.A.; Compass Bank, on its own and as
                                                 successor-in-interest to Guaranty Bank; and Wells
28                                               Fargo, as successor-in-interest to Wachovia Bank

Copy of the foregoing served by
U.S. Mail or Electronic Notification
this 3rd day of November, 2010, to:

CRAIG D. HANSEN/SEAN T. CORK
KELLY SINGER
SQUIRE SANDERS & DEMPSEY L.L.P.
1 EAST WASHINGTON, SUITE 2700
PHOENIX, AZ 85004
CHANSON@SSD.COM
SCORK@SSD.COM
KSINGER@SSD.COM
ATTORNEYS FOR DEBTOR

LARRY LEE WATSON
OFFICE OF THE U.S. TRUSTEE
230 N. FIRST AVE., STE. 240
PHOENIX, AZ  85003-1706
LARRY.WATSON@USDOJ.GOV

MARICOPA COUNTY TREASURER
C/O MADELEINE C. WANSLEE
GUST ROSENFELD, P.L.C.
201 E. WASHINGTON, SUITE 800
PHOENIX, AZ 85004-2327
MWANSLEE@GUSTLAW.COM

MARICOPA COUNTY TREASURER
C/O MADELEINE C. WANSLEE
GUST ROSENFELD
ONE EAST WASHINGTON ST., SUITE 1600
PHOENIX, ARIZONA 85004-2553
MWANSLEE@GUSTLAW.COM

MICHAEL W. CARMEL
MICHAEL W. CARMEL, LTD.
80 EAST COLUMBUS AVENUE
PHOENIX, ARIZONA 85012-2334
MICHAEL@MCARMELLAW.COM


/s/ Janice L. Rogalla

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000