Craig D. Hansen, Esq. (AZ Bar No. 007405) craig.hansen@ssd.com
Sean T. Cork, Esq. (AZ Bar No. 022149) sean.cork@ssd.com
Kelly Singer, Esq. (AZ Bar No. 022024) kelly.singer@ssd.com
**SQUIRE, SANDERS & DEMPSEY (US) LLP**
1 East Washington, Suite 2700
Phoenix, Arizona 85004-4498
(602) 528-4000
Counsel to Debtor-In-Possession

Donald L. Gaffney, Esq. (AZ Bar No. 005717) dgaffney@swlaw.com
Don Bivens, Esq. (AZ Bar No. 005134) dbivens@swlaw.com
Donald F. Ennis, Esq. (AZ Bar No. 025986) dfennis@swlaw.com
Evans O'Brien, Esq. (AZ Bar No. 026521) eobrien@swlaw.com
**SNELL & WILMER** L.L.P.
One Arizona Center
Phoenix, Arizona 85004-2202
(602) 382-6000
Counsel to Bank of America, N.A.

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA**

| | |
|---|---|
| In re<br><br>FULTON HOMES CORPORATION,<br><br>                     Debtor. | Case No. 2:09-bk-1298-GBN<br><br>Chapter 11<br><br>**NOTICE OF FILING TERM SHEET REGARDING PENDING DEBTOR AND CREDITOR PLANS**<br><br>**Date of Hearing:  March 29, 2011**<br>**Time of Hearing: 10:00 AM (AZ TIME)** |

**PLEASE  NOTE  THAT** on March 22, 2011, FULTON HOMES CORPORATION, debtor-in-possession in the above-captioned chapter 11 case (the "**Debtor**"), and BANK OF AMERICA, N.A., filed the Term Sheet, which is attached to this Notice.  Schedule 2 of the Term Sheet is filed under seal.  A status hearing on the Debtor's Chapter 11 reorganization plan and other matters, to which the Term Sheet relates, will take place on March 29, 2011, at 10:00 am (Arizona Time).

Dated this 22nd day of March, 2011.

**SQUIRE, SANDERS & DEMPSEY (US) LLP**

By: */s/ Craig D. Hansen*
      Craig D. Hansen, Esq.
      Sean T. Cork, Esq.
      Kelly Singer, Esq.
1 East Washington, Suite 2700
Phoenix, Arizona 85004-4498
Counsel to Debtor-in-Possession

**SNELL & WILMER** L.L.P.

By: */s/Donald L. Gaffney*
      Donald L. Gaffney, Esq.
      Don Bivens, Esq.
      Donald F. Ennis, Esq.
      Evans O'Brien, Esq.
One Arizona Center
Phoenix, Arizona 85004-2202
Counsel to Bank of America, N.A.

# **TERM SHEET**

<u>**Term Sheet**</u>
**March 21, 2011**

*This term sheet outline does not purport to summarize all of the conditions, covenants, agreements, representations and warranties that may be contained in the definitive documents if and when a transaction is entered into. This is for discussion purposes only and does not constitute a commitment or binding contract by any person.*

*(For Settlement Purposes Only; Subject to Rule 408, F.R.E.)*

| | |
|---|---|
| **Borrowers:** | Fulton Homes Corporation, an Arizona corporation ("Fulton Homes"), Fulton Homes Sales Corporation, an Arizona corporation ("Fulton Sales"), and the Ironwood Subsidiary (defined below). On the Effective Date (defined below), Fulton Sales will become a wholly-owned subsidiary of Fulton Homes. Fulton Homes Warranty Corporation ("Fulton Warranty") will be dissolved on the Effective Date. |
| **Administrative Agent:** | Bank of America, N.A. |
| **Lenders:** | Current Lenders (the "Lenders") under the existing Bank of America agented credit facility ("Existing Credit Facility") with Fulton Homes. |
| **Loan Amount:** | On July 1, 2011 (the "Effective Date"), the existing indebtedness will be replaced with a loan (the "Loan") in an amount equal to the sum of the Allowed Claim.<br><br>"Allowed Claim" means an amount equal to the sum of (i) the principal amount outstanding under the Existing Credit Facility, plus (ii) the Agreed Interest, plus (iii) accrued and unpaid loan fees, plus (iv) reasonable and actual fees and expenses of the restructuring professionals of the Administrative Agent and Lenders in an amount agreed upon by the parties or determined by the Bankruptcy Court, which Allowed Claim will be reduced by the Effective Date Cash Payment as provided below.<br><br>"Agreed Interest" means an agreed interest settlement amount determined as the sum of (a) the Borrower Interest, plus (b) one-half of the difference between the Lender Interest, minus the Borrower Interest.<br><br>"Lender Interest" means accrued, unpaid interest on the principal amount outstanding under the Existing Credit Facility at the Prime Rate + 0.45% per annum to the Effective Date.<br><br>"Borrower Interest" means the sum of (a) accrued, unpaid interest on the principal amount outstanding under the Existing Credit Facility at 5.25% per annum to January 27, 2009 (the "Petition Date"), plus (b) accrued, unpaid interest on the principal amount outstanding under the Existing Credit Facility at LIBOR + 2.70% per annum from the Petition Date to the Effective Date. |

1

| | |
|---|---|
| | "Effective Date Cash Payment" means the sum of $55,000,000, comprised of $50,000,000 from the Borrowers and $5,000,000 from the Land Acquisition (defined below), which will be applied to the Allowed Claim as follows: (i) first, to reasonable and actual fees and expenses of the restructuring professionals of the Lenders in an amount agreed upon by the parties or determined by the Bankruptcy Court, (ii) second, to accrued and unpaid loan fees, (iii) third, to the Agreed Interest; and (iv) fourth, to the principal amount outstanding under the Existing Credit Facility. |
| | The Order confirming the Plan (the "Confirmation Order") will authorize and direct Fulton Homes to pay to the Administrative Agent, within 3 business days following the entry of the Confirmation Order, for the benefit of the Lenders, $30,000,000 of the Effective Date Cash Payment (the "Partial Effective Date Cash Payment"). The Partial Effective Date Cash Payment will be irrevocable and will be applied to the Allowed Claim in the manner provided above. The parties will use commercially reasonable efforts to ensure that the Confirmation Order is entered by March 15, 2011. |
| **Interest Rate:** | The interest rate on the Loan will be equal to the Interest Rate Spread plus the greater of (a) the Prime Rate (reset daily) and (b) the Prime Rate Floor. Interest will be payable on the Loan monthly in arrears and on an actual/360-day basis. |
| **Prime Rate Floor:** | 4.00% per annum. |
| **Non-Default Interest Rate Spread:** | The Non-Default Interest Rate Spread will be determined on a quarterly basis based upon the Lot Ratio (defined below) for the most recent quarter as follows:<br><br>• 2.75% if the Lot Ratio is less than 6.0<br><br>• 3.75% if the Lot Ratio is equal to or greater than 6.0 to 1 |
| **Term:** | The maturity date will be the fourth anniversary of the Effective Date. |
| **Minimum Amortization:** | On or before December 31, 2011, Borrowers will make a minimum principal curtailment in the amount of $9 million. Thereafter, semi-annually on each June 30 and December 31, Borrowers shall make principal curtailments in the amount of $9 million each. All Release Prices (defined below) will be credited against the minimum principal curtailments payable in the calendar year in which the applicable Release Price was paid. |
| **Collateral/Security:** | Senior, perfected and valid liens on all Borrowers' assets now or hereafter acquired, excluding any assets acquired with Permitted Debt (defined below), except that the Lenders will have a second lien on assets secured by Permitted Debt, but only to the extent permitted by |

2

| | the holder of such Permitted Debt. |
|---|---|
| **Release Prices:** | Unit Release Price of 22% of the units' Gross Sales Price to a third party retail purchaser. Bulk Lot Release Price of 70% of the Gross Sales Price to a third party purchaser. With respect to Units, "Gross Sales Price" will be defined in the Credit Agreement to include all revenues of Fulton Homes or Fulton Sales (or any other affiliate engaged in the sale of the Units), from each Unit sale, including, without limitation, revenues from options and upgrades. With respect to the bulk sale of Lots, "Gross Sales Price" will be defined in the Credit Agreement as the full sale price set forth in the purchase contract for such Lots. The Unit Release Price and Bulk Lot Release Price are collectively referred to as the "Release Prices." All Release Prices will be applied as provided above under "Minimum Amortization" |
| **Loan Fee:** | Commencing on the first anniversary of the Effective Date, and on the second and third anniversary thereof (each a "Calculation Date"), the Borrowers will pay a loan fee (the "Loan Fee") in an amount equal to 0.25% of the outstanding principal amount of the Loan on the applicable Calculation Date. Each Loan Fee shall be paid in four equal installments with each installment due on the first day of each quarter following the applicable Calculation Date. If the Loan is prepaid prior to the scheduled maturity date, the remaining Loan Fee, if any, for the year in which the pre-payment occurs will be prepaid as part of such pre-payment. |
| **Covenants:** | To include covenants with respect to: <br><br> • Maximum Lot Ratio: As tested quarterly, Borrowers will not permit the Lot Ratio to be greater than 7.0 to 1. "Lot Ratio" means, at any time, (a) the total number of lots owned by Borrowers, divided by (b) the Borrowers' Unit Closings for the 12 month period ending on the date for which the ratio is being calculated. "Unit Closings" means the conveyance of a housing unit by Borrowers to a member of the home buying public who is not an affiliate of Borrowers. For purposes of determining "Lot Ratio", if a parcel of real property owned by Borrowers is not subject to a final or approved preliminary plat, that parcel will be deemed to include 5 Lots per acre. Borrowers will not be in default unless they fail to meet the Maximum Lot Ratio covenant for 2 consecutive quarters. <br><br> • Maximum Spec Units: Beginning June 30, 2011, as tested quarterly, Borrowers will not permit the number of Spec Units, for each Subdivision, to exceed five times (a) the number of Unit Closings in such Subdivision over the prior 12 months, (b) divided by 12. For purposes of determining the number of Spec Units in a Subdivision, (y) the documents will provide that to the extent new product lines do not have actual Unit Closings during the applicable period, the Maximum Spec covenant will be calculated based on the reasonable and |

3

good faith sales projections for the remaining portion of the applicable period, and (z) the Subdivision known as Geneva Estates, and the product lines Ironwood Parcel 5 and Ironwood Parcel 10 will not be included until September 30, 2011. "Subdivision" will be defined as a contiguous group of Lots within the same community that has substantially similar typical lot dimensions. For reference, the current Subdivisions are listed on Schedule III. Borrowers will not be in default for failing to meet the Maximum Spec Unit covenant in any Subdivision unless Borrowers fail to cure a violation within a specific Subdivision within ninety (90) days following receipt of written notice from the Administrative Agent identifying the violation in such Subdivision; provided, however, that Ira A. Fulton may, in his sole and absolute discretion, cure any default of this covenant by paying, or causing to be paid (within the 90-day cure period), to the Administrative Agent 22% of the greater of (a) the most recent appraised value, or (b) the asking sales price (such greater amount the "Spec Unit Price") for each of the Spec Units in any Subdivision as may be necessary to cure such default. Upon payment of the Spec Unit Price, Lenders shall release the lien on such Spec Unit (each a "Released Spec Unit"), such Released Spec Unit shall no longer be included for purposes of this covenant and Ira A. Fulton may record a first priority lien against the Released Spec Unit as security for the repayment of the Spec Unit Price for such Released Spec Unit. Upon the sale of the Released Spec Unit to a third party, 22% of the gross sales price, excluding any options financed through the sale of the Released Spec Unit for which neither Borrowers nor any affiliate of Borrowers receive payment, will be disbursed to Ira A. Fulton and the remainder thereof will be retained by the Borrowers.

- Minimum cash balance: On the last day of each calendar month, Borrowers will have a cash balance, as reflected on the statements received from the Administrative Agent at which Borrowers' accounts are held, of no less than $6 million.

- Additional Indebtedness: Other than Permitted Debt, Borrowers will not incur any additional debt (excluding accounts payable and similar ordinary course debt incurred in connection with Borrowers' operations). "Permitted Debt" means additional debt incurred by Borrowers for the acquisition of land and/or the construction of improvements in an aggregate outstanding principal amount not to exceed $10 million.

| | |
|---|---|
| **Distributions to Equity:** | No distributions to holders of the Borrowers' equity interests, other than distributions on account of any actual tax liability incurred, will be allowed until the Loan has been paid in full, provided if there is a default under the Loan, then no distributions will be permitted. |

12602054.9

| | |
|---|---|
| **Right to Cure:** | The Credit Agreement (defined below) to include customary defaults. 10-day cure period after receiving notice of default for monetary defaults. 30-day cure period after receiving notice of default for non-monetary defaults (except no cure period will be applicable for certain negative covenants and no cure period in addition to those stated above in "Covenants" will be permitted for violation of the Maximum Lot Ratio or the Maximum Spec Unit covenants). |
| **Prepayment Penalty:** | None. |
| **Cash Management:** | Borrowers will maintain all bank accounts with the Administrative Agent. Subject to the minimum balance required above, so long as no default has occurred, Borrowers can use their cash in the ordinary course of business. |
| **Financial Statements and Reporting:** | Current reporting, including quarterly and annual financial statements of the Borrowers (consolidated and consolidating), plus additional information required in connection with covenant testing and the other reports required pursuant to the Existing Credit Facility. |
| **Covenants:** | The Credit Agreement (defined below) to contain customary affirmative covenants, including, without limitation, compliance with laws, maintenance of insurance, keeping of books, conduct of business, maintenance of properties, and payment of taxes. The Credit Agreement also to contain customary restrictive covenants, including, without limitation, restrictions on dividends, indebtedness, mergers, investments, loans, advances, and liens and encumbrances. The Credit Agreement will also include customary conditions precedent including execution, delivery and (if applicable) recording of all loan documents (including deeds of trust, security agreements, assignments, and other documents), proof of insurance, receipt of title insurance, and delivery of certificates, resolutions and opinions. |
| **Option Agreements** | On the Effective Date, Fulton Homes will waive and release all claims it has against Fulton Sales in connection with any deferred purchase price resulting from Fulton Sales' acquisition of lots or homes under the Option Agreements. On the Effective Date, the Option Agreements will be assumed by Fulton Homes, as amended and restated, to reflect the current business practices and policies between Fulton Homes and Fulton Sales. |
| **Fulton Unsecured Claim:** | On the Effective Date, as part of the Plan, Ira A. Fulton will waive and release the Fulton Unsecured Claim. |
| **Land Acquisition:** | On the Effective Date, Ira A. Fulton (or an entity formed by him) will purchase 893 lots in the Ironwood Crossings development (the "Ironwood Lots") for a purchase price (the "Purchase Price") equal to the bulk wholesale value for such lots (the "Land Acquisition"); provided, however, that in no event will the purchase price be less than $5,000,000; and provided further that the Land Acquisition may be effectuated through Fulton Homes' contribution of the Ironwood Lots |

5

| | to a wholly owned subsidiary of Fulton Homes (the "Ironwood Subsidiary"), which will enter into a loan agreement with Ira Fulton in the amount of the Purchase Price for the Ironwood Lots (the "Land Loan"). The Land Loan will be fully funded and all proceeds of the Land Loan will be distributed to Fulton Homes and applied as hereinafter provided. The Land Loan will be secured by the Ironwood Lots and will provide for no interest or principal payments prior to the indefeasible payment in full of the Loan. The Ironwood Subsidiary will be a Borrower (or at Administrative Agent's option a guarantor) under the Loan, but the Ironwood Lots will not be subject to the terms and conditions of the Loan, will not be included in determining compliance with the covenants in the Loan, and the Lender will have no recourse to the Ironwood Lots for satisfaction of the Loan. The Credit Agreement and other documents will include covenants and restrictions to ensure that the establishment and operations of the Ironwood Subsidiary and the structure of the transfer of the Ironwood Lots to the Ironwood Subsidiary will not create additional risk for the Lenders, including restrictions that the Ironwood Subsidiary will not hold other assets, conduct other business, or incur other debts and obligations. Whether the purchase of the Ironwood Lots is accomplished through the Land Loan or by direct purchase, not less than $5,000,000 will be immediately paid to the Lenders for inclusion in the Effective Date Cash Payment. As of the date of this Term Sheet, Administrative Agent has ordered an appraisal of the bulk wholesale value of the Ironwood Lots, but has not received the final written appraisal. If based on the final appraisal, the Purchase Price is greater than $5,000,000 the excess will also be paid to Lenders and applied to the next principal curtailment. |
|---|---|
| | The Ironwood Lots are generally described and depicted on Schedule I. In addition, prior to the Effective Date (and as a further condition to Lenders' obligations), Fulton Homes will provide a metes and bounds legal description and ALTA Survey of the Ironwood Lots, which shall reflect that the Ironwood Lots are located within the area shown on Schedule I and do not exceed 273 acres in gross area (including common areas, easement areas and roadways). Prior to transfer, the Ironwood Lots shall be included in and subject to all CC&R's, cross easements and other development requirements and restrictions applicable to the Ironwood Crossing Community. |
| **Mutual Releases:** | In consideration of the Administrative Agent's and the Lenders' willingness to enter into the transactions contemplated in this Term Sheet, each of the Borrowers, Fulton Warranty, their respective shareholders, officers, directors, and the spouses of such officers and directors, effective as of the Effective Date, shall forever release, waive and discharge all Lender Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the |

Effective Date in any way relating to (i) the Existing Credit Facility, (ii) Fulton Homes' Chapter 11 case or the conduct thereof, and (iii) the Plan.

In consideration of the obligations of the Borrowers under the Loan and the willingness of the Borrowers to enter into the transactions contemplated in this Term Sheet, the Administrative Agent and the Lenders, effective as of the Effective Date shall forever release, waive and discharge all Borrower Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to (i) the Existing Credit Facility, (ii) Fulton Homes' Chapter 11 case or the conduct thereof, and (iii) the Plan, provided, however, that such releases shall not in any way be deemed to (a) release any of the Borrowers from any of their obligations under the Plan, Confirmation Order, Loan, Credit Agreement (defined below) and related loan documents, (b) release any liens, encumbrances or security interest in connection with the Loan, (c) release Fulton Homes, Fulton Sales or Fulton Warranty from any indemnification obligations owed to the Lenders or Administrative Agent under the Existing Credit Facility for third party claims, or (d) release any claims or defenses that the Administrative Agent or the Lenders may have against any third party insurer under a policy of insurance, or release or waive any claims, counterclaims or defenses, including coverage defenses, of any third party insurer under a policy of insurance with respect to such claims.

"Lender Released Parties" means the Administrative Agent, the Lenders, and each of their respective current and former officers, directors, employees, representatives, members, affiliates, agents, counsel, financial advisors and professionals.

"Borrower Released Parties" means Fulton Homes, Fulton Sales, Fulton Warranty, and each of their respective current and former officers, directors, employees, representatives, members, shareholders, affiliates, agents, counsel, financial advisors and professionals, and the spouses of each of their respective officers and directors.

The parties shall take such actions as are reasonable or necessary to (i) dismiss with prejudice the pending state court litigation between Fulton Homes Sales, LLC *et. al.* and the Lenders, Case No. CV2010-031793, and (ii) effectuate a satisfaction or release of judgment, in such form as Borrowers and Lenders shall mutually agree, in the pending state court litigation between Fulton Home Sales Corporation *et. al.* and the Lenders, Case No. CV2009-004101.

| | |
|---|---|
| **Additional Conditions:** | Executive compensation: See Schedule II attached hereto and incorporated herein for reference. |
| | On or promptly following the Effective Date, Ira A. Fulton will purchase, or cause to be purchased, from Bravo, Bravo, LLC the helicopter at a purchase price equal to the current appraised value |

7

| | |
|---|---|
| | thereof. Borrowers will not fund any operating, maintenance, capital or other expenses relating to the helicopter. The net proceeds from the sale of the helicopter will be retained by Borrowers as working capital, subject to the liens of the Lenders and Administrative Agent pursuant to the terms of the Credit Agreement. |
| **Other Provisions:** | The Administrative Agent will be entitled to obtain appraisals of the Borrowers real property assets, at Borrowers' expense, in connection with the closing of the Loan and thereafter as reasonably requested by Administrative Agent and as required under applicable law, rules and regulations. |
| | The amended and restated credit agreement (the "Credit Agreement") will be in form and substance acceptable to the Borrowers and the Lenders and will be attached as an exhibit to the Confirmation Order. The Credit Agreement will contain customary provisions for a loan of this type and will expressly permit the Borrowers to sell their existing office building to Ira A. Fulton for cash based upon an independent, third party appraisal report with the net cash proceeds from such sale being applied as a principal prepayment of the Loan, which prepayment shall be credited against the next succeeding minimum principal curtailment. |

12602054.9

## SCHEDULE I

## LAND ACQUISITION
## LOTS TO BE ACQUIRED

893 lots located in Parcels 1, 2, 3, 18, 19, 20 and 21 as identified in the Ironwood Crossings Master Plan attached hereto as Exhibit A.

9

## EXHIBIT A

**Ironwood Crossing Master Plan**

(SEE ATTACHED)

10

12602054.9

# Ironwood Crossing Land Acquisition Map

| Ironwood Parcel # | Lot Size | Number of Lots |
|---|---|---|
| Parcel 1 | 60 x 120 | 118 |
| Parcel 2 | 48 x 115 | 144 |
| Parcel 3 | 70 x 125 | 101 |
| Parcel 18 | 48 x 115 | 97 |
| Parcel 19 | 60 x 120 | 145 |
| Parcel 20 | 48 x 115 | 156 |
| Parcel 21 | 60 x 120 | 132 |
| Total | | 893 |



FTI CONSULTING



CRITICAL THINKING AT THE CRITICAL TIME™

## SCHEDULE II


**[FILED UNDER SEAL]**

## SCHEDULE III

### Current Subdivisions

Cobblestone Parcel 1 (60x125)
Cobblestone Parcel 8 (45x120)
Cortina II (02/01) Parcel 12 & 13 (45x120)
Freeman Farms (1/05) Parcels 1 & 3 (70x120)
Freeman Farms (1/05) Parcel 2 & 4 (60x115)
Fulton Ranch (1/05) Parcels 2, 3 & 5 (87x140)
Fulton Ranch (1/05) Parcels 1, 4 & 7 (65x134)
Geneva Estates (5/05) (73x128)
Ironwood Crossing (10/03) Parcel 4 & 6 (60x120)
Ironwood Crossing (10/03) Parcel 7 & 8 (70x125)
Ironwood Crossing (10/03) Parcel 5, 10 & 15 (48x115)

12602054.9