Craig D. Hansen, Esq. (AZ Bar No. 007405) craig.hansen@ssd.com
Sean T. Cork, Esq. (AZ Bar No. 022149) sean.cork@ssd.com
Kelly Singer, Esq. (AZ Bar No. 022024) kelly.singer@ssd.com
**SQUIRE, SANDERS & DEMPSEY (US) LLP**
1 East Washington, Suite 2700
Phoenix, Arizona 85004-4498
(602) 528-4000

Counsel to Debtor-In-Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Case No. 2:09-bk-1298-GBN |
| FULTON HOMES CORPORATION | Chapter 11 |
| Debtor. | **DEBTOR'S (1) STATUS REPORT AND RESPONSE TO BANK GROUP'S NOTICE OF INABILITY TO RESOLVE DISPUTE OVER COMPETING PLANS OF REORGANIZATION; AND (2) EXPEDITED MOTION TO SET PROCEDURES TO RESOLVE ANY CONFIRMATION DISPUTES CONSISTENT WITH THE AGREED-UPON TERM SHEET** |
| | Hearing Date: April 25, 2011
Hearing Time: 11:00 a.m. |

FULTON HOMES CORPORATION (the "**Debtor**"), debtor-in-possession in the above-captioned chapter 11 case, files this *Debtor's (1) Status Report and Response to Bank Group's Notice of Inability to Resolve Dispute Over Competing Plans of Reorganization; and (2) Expedited Motion to Set Procedures to Resolve Any Confirmation Disputes Consistent with the Agreed-Upon Term Sheet* (the "**Status Report**"). The Status Report is provided to update the Court on the status of plan negotiations, and also responds to the *Notice of Parties' Inability to Resolve Dispute Over Competing Plans of Reorganization and Decision to Proceed with Court-Ordered Mediation* (the "**Notice**") [DE # 826], filed by Bank of America, N.A., administrative

agent for the Debtor's pre-petition unsecured lenders (the "**Bank Group**") on April 18, 2011. The Notice filed by the Bank Group represents that negotiations have broken down on material issues concerning the treatment of the Bank Group's claim. The reality, however, is that the only material dispute between the Debtor and the Bank Group is the Debtor's refusal to agree to the Bank Group's demands that it pay, without the normal transparency associated with a bankruptcy court approval process, approximately $1.2 million in fees incurred by the Bank Group in connection with its retention of Houlihan Lokey ("**Houlihan**"), as an expert witness in the contested confirmation hearings. The Debtor has agreed to pay, as part of the Bank Group's allowed claim, more than $4.3 million in professional fees incurred by the Bank Group, even though the Bank Group's total professional fees incurred far exceed those of the Debtor. The Debtor's only objection to any component of the professional fees demanded by the Bank Group is the additional $1.2 million incurred by Houlihan, the bulk of which was incurred over a six week period. The Debtor proposed a process that is employed in virtually ever significant Chapter 11 reorganization for resolving disputed fees that are asserted as part of a claim. Specifically, the Debtor submitted that it would pay, on the confirmation date, to Bank of America, as administrative agent for the Bank Group ("**BofA**"), the approximate $1.2 million in claimed fees associated with the BofA's retention of Houlihan,, and that this cash deposit would be held by BofA, as agent for the Bank Group, pending post-confirmation proceedings before this Court concerning the reasonableness and allowance of the $1.2 million Houlihan fee. If the Court determined, after notice and appropriate proceedings, that some or all of the $1.2 million in requested Houlihan fees should be allowed, BofA would be authorized to apply the appropriate amount of Houlihan fees to the Bank Group's claim from the cash Rather than agree to this customary procedure, BofA unilaterally declared that it would not proceed to consummate

the settlement unless the Debtor relinquished its legitimate right to challenge, on a limited basis, the $1.2 million in Houlihan fees demanded by the Bank Group. There are no other material disputes concerning either the confirmation order or the documentation necessary to implement the settlement along the time line the parties agreed to at the hearing conducted on March 29, 2011. In support of this Status Report, the Debtor respectfully states as follows.

**Background**

1. On March 21, 2011, the Debtor filed with the Court its *Notice of Filing Term Sheet Regarding Pending Debtor and Creditor Plans* [DE # 818]. Attached as an exhibit to this notice is the *Term Sheet Dated March 21, 2011* (the "**Term Sheet**"). The Term Sheet sets forth the terms of a settlement between the Debtor and the Bank Group for the resolution of the Bank Group's objection to confirmation of the *Debtor's Fourth Amended Plan of Reorganization* (the "**Plan**").

2. Among other things, the Term Sheet provides for agreed-upon treatment of the Bank Group's allowed, unsecured claim as follows: (i) the Bank Group would receive a $55 million up-front payment on account of its claim (the "**Effective Date Cash Payment**"), $30 million of which is to be paid within 3 days of the entry of an order confirming the Plan, and the remaining balance of $25 million to be paid on an agreed-upon effective date of July 1, 2011; and (ii) the Debtor and Bank Group would enter into a new term loan agreement for payment of the balance of the Bank Group's claim with interest, maturing in 4 years, and secured by senior, perfected liens on all of the Debtor's assets.

3. More importantly, the Term Sheet also addresses the calculation of the Bank Group's allowed claim. In addition to unpaid principal, loan fees and pre-petition interest, the Term Sheet also includes an agreed-upon component for post-petition interest. Finally, the Term

Sheet expressly provides that the Bank Group's allowed claim will include "***reasonable and actual fees and expenses of the restructuring professionals of the Administrative Agent and Lenders in an amount agreed upon by the parties or determined by the Bankruptcy Court***, which Allowed Claim will be reduced by the Effective Date Cash Payment as provided below." Term Sheet, pg. 1 (emphasis added). In short, the Term Sheet between the Debtor and the Bank Group memorializes the customary procedure employed in virtually all complex Chapter 11 cases with respect to claimed professional fees—specifically, the parties either agree to the claimed professional fees or the Bankruptcy Court, as part of the normal fee approval process, determines the reasonableness of the claimed fees and awards payments accordingly.

4. At a status hearing held before this Court on March 29, 2011, the Court scheduled a continued hearing to consider confirmation of the Plan, as amended to conform to the settlement set forth in the Term Sheet, on April 25, 2011. Counsel to both parties committed to the Court that they would exchange information and initial drafts of documents necessary to implement the terms of the settlement embodied in the Term Sheet later that week.

5. Since the March 29 hearing the parties have exchanged drafts and comments on a number of key documents needed to implement the settlement embodied in the Term Sheet, including a revised Plan, proposed findings of fact and conclusions of law, a proposed confirmation order, a settlement agreement and motion to approve such agreement, and a new term loan agreement detailing the terms of the repayment of the allowed claim of the Bank Group.

6. The most recent round of comments on these key documents were exchanged with counsel on Friday, April 15. The Debtor believes that all comments made to these key documents to date do not pertain to significant deal points, but focus on terms that are not

material to the transaction as a whole. Moreover, the draft documents that have been exchanged reflect and implement the settlement set forth in the Term Sheet. Yet now, just a week away from the continued confirmation hearing, the Bank Group files its Notice that implies that the parties are unable to reach an agreement. This implication is misleading, as the only basis for this "dispute" between the parties is the Bank Group's unwillingness to abide by a specific provision of the Term Sheet and insist that the Debtor pay more than $1.2 million in disputed professional fees without the transparency associated with the normal bankruptcy court approval process. The Debtor has informed the Office of the United States Trustee of the Bank Group's demand and its deviation from normal bankruptcy procedures.

**The Alleged Dispute**

7. The genesis of the dispute referenced in the Bank Group's Notice stems from the professional fee component of the Bank Group's allowed claim. Specifically, the Debtor has advised counsel for the Bank Group that it wishes to review, and only object to, any component of the Bank Group's claim relating to the approximate $1.2 million in fees incurred by Houlihan, the Bank Group's expert witness in this Chapter 11 case. Among the Debtor's many concerns regarding the claimed Houlihan fee, is that the claimed amount is more than three times the total fees incurred by the Debtor in connection with the retention of its expert witness, Odyssey Capital, LLC (who was retained by the Debtor well before the Bank Group's retention of Houlihan).

8. The Debtor and Bank Group exchanged their initial drafts of key documents on Friday, April 1. On the following Monday, April 4, the Debtor requested from Bank Group counsel a total of the Bank Group's claimed professional fees. The Bank Group did not respond to this request until Thursday evening on April 14. On that date, the Bank Group provided

Debtor's counsel with an estimate of the Bank Group's fees and costs. A copy of that estimate is attached hereto as Exhibit "A".

9. As shown on Exhibit "A", the total amount of professional fees for the Bank Group exceeds $5.5 million, which is substantially greater than the professional fees incurred by Debtor in connection with its entire restructuring. These fees have been incurred as follows:

| **Professional** | **Date Service Commenced** | **Total Estimated Fees** |
| --- | --- | --- |
| Snell & Wilmer (restructuring counsel) | January 15, 2009 | $2,250,716.03 |
| FTI Consulting (financial advisor) | March 31, 2009 | $2,154,774.34 |
| Houlihan Lokey (expert witness) | October 21, 2010 to March 24, 2011 | $1,176,756.27 |
| **Total:** | | **$5,582,246.64** |

10. The Debtor has advised counsel for the Bank Group that it does not intend to object to the fees and expenses of either Snell & Wilmer or FTI. The Debtor has advised Bank Group's counsel, however, that it has serious concerns regarding the size of Houlihan's fees and expenses, of approximately $1.2 million incurred in the short time it has spent on this case. The Debtor has further advised the Bank Group that it intends to review and object to some portion of Houlihan's fees and expenses, as provided in the Term Sheet.

11. A hallmark of the Bankruptcy Code is complete transparency regarding professional fees, whether of estate-retained professionals or creditors. The Debtor's Plan honors that hallmark by providing that estate-retained professionals, i.e., the Debtor's counsel and financial advisor, must file final fee applications within 60 days of the Effective Date, subject to review by the Court and parties-in-interest and possible objection. In keeping with this

time-honored tradition, the Debtor has proposed that Houlihan's fees would be subject to this same transparent process of review.  Despite the fact that this proposal conforms to the Term Sheet and is consistent with bedrock principles of bankruptcy law, the Bank Group's response is that the fees of its own professionals must be cloaked in shadow, secrecy and be beyond review; and unless the Debtor agrees to the $1.2 million payment, the Bank Group will dishonor the Term Sheet and scuttle a full pay reorganization that took more than two years to accomplish. .

12. On Friday, April 15, 24 hours after the Bank Group finally provided its estimate of professional fees and costs to the Debtor, the Debtor proposed the following procedures to address its concerns over Houlihan's fees:

> <u>Professional Claims</u>.  Any portion of the Allowed Bank Group Claim relating to the fees and expenses of Houlihan Lokey, which served as financial advisor and provided expert testimony for the Bank Group, will be treated as a Professional Claim subject to the same procedures and standards as other Professional Claims (the "**Houlihan Lokey Professional Claim**").  Houlihan Lokey shall file a final application for allowance of the Houlihan Lokey Professional Claim, including compensation for services rendered and reimbursement of expenses incurred through the Effective Date, in accordance with section 330 of the Bankruptcy Code.  Such application shall be filed within sixty (60) days of the Effective Date.  The Reorganized Debtor shall have the right to review and file an objection to the allowance of Houlihan Lokey's Professional Claim within the normal time periods fixed for filing objections to final fee applications.  To the extent that the Bankruptcy Court disallows any or all of the Houlihan Lokey Professional Claim, the amount of the Allowed Bank Group Claim and the Borrowers' obligations under the New Loan Documents shall be reduced in an equal amount.  No portion of the Houlihan Lokey Professional Claim may be paid until an order of this Court is entered allowing the Houlihan Lokey Professional Claim.

> <u>Allocation of Partial Effective Date Cash Payment</u>.  The Administrative Agent shall, upon receipt of the Partial Effective Date Cash Payment from the Debtor, set aside an amount equal to the total requested amount of the Houlihan Lokey Professional Claim (the "**Professional Reserve**").  The Administrative Agent shall not remit, transfer, pay or apply any portion of the Professional Reserve to the holders of Allowed Bank Group Claims until the Bankruptcy Court enters an order allowing the Houlihan Lokey Professional Claim.  In the event that the Bankruptcy Court allows the Houlihan Lokey Professional Claim in an amount lesser than what is requested, excess funds in the Professional Reserve remaining after payment of the Houlihan Lokey Professional Claim shall be applied to Allowed Bank Group Claims in accordance with the allocation established by the Plan.

13. The Debtor proposed a reasoned and measured process to address the allowance of Houlihan's fees that is not only consistent with the spirit of the bankruptcy laws and the process that estate-retained professionals must follow, but also conforms to the settlement described in the Term Sheet.

14. The Bank Group's response was to declare that any objection to Houlihan's fees is a "deal-breaker," despite the fact that there are no other material terms of the confirmation order or implementing documents in dispute. Attached hereto as Exhibit "B" is an email exchange between Messrs. Hansen, Cork and Gaffney on Monday, April 18.

15. As set forth on Exhibit "B", the Bank Group's response to the Debtor's proposal was as follows:

> Mr. Gaffney: Gentlemen: As I indicated last Monday, ***the Bank group will not proceed to confirmation without their professional fees being resolved***. Consequently, I was more than a little surprised that the documents received on Friday did not reflect my communications earlier in the week. In case I had any misperception of my clients' position, I have just spoken with the bankers again this morning and have confirmed their position; I left a voicemail with Sean to that effect. Lenders' fees are, of course, reimburseable in a fully insolvent estate. Moreover, the settlement covers resolution of non-debtor entities. Avenues exist to get this problem dealt with quickly, but we do not have much time to do so. The full bank group authorization has gone out, and some key bankers are out on vacation starting tomorrow. Please let me know how you wish to proceed.

Exhibit B (emphasis added).

16. This statement from Mr. Gaffney was followed by the following exchange between counsel:

> Mr. Cork: Don, we will forward your email to our client. That said, we don't see that this should come as a surprise based on our prior email exchanges and documents. If we cannot get this resolved we expect plan to address this specific issue with Judge Nielsen next Monday, and you will have an opportunity to raise this argument to the court at that time.

> Mr. Gaffney: ***Perhaps I am not being clear, although I said this in my emails last Monday. This is a deal point. We will not go forward with settlement. There will not be an "argument raised with the Court" on this subject, or if you want to do so, I would***

> *like to be informed in what context since it will not be in the contexyt (sic) of a consensual plan*.
>
> <u>Mr. Hansen</u>: And we just want Judge Nielsen to have a very clear understanding of the position of the Lenders here, as you so clearly articulated in the e-mail below. And unless Fulton begs off being able to review and potentially challenge the Houlihan fee, we going to tee this up before [Judge] Nielsen very quickly. Fulton will live with what [Judge] Nielsen has to say about the Lenders position as, I suspect, the Lenders will.
>
> <u>Mr. Cork</u>: As a follow-on to Craig's email, the term sheet expressly provides that the Bank Group's allowed claim will include professional fees "in an amount agreed upon by the parties or determined by the Bankruptcy Court." If there is no agreement on that portion of the professional fees relating solely to Houlihan, then the Court will have to determine it, as the term sheet provides.

Exhibit B (emphasis added).

17. The final, and somewhat remarkable, response of the Bank Group's counsel to the Debtor's proposal to treat the Houlihan fees like those of other professionals was to simply declare that "*We will not be working further on documents or pleadings at this point and will so inform the Court*." Exhibit B, email from Don Gaffney (emphasis added). Shortly thereafter, the Bank Group filed its Notice with the Court.

18. As of the filing of this Status Report, the Bank Group has not told the Debtor or its counsel of any other open or unresolved issues that are "deal points" or "deal breakers," either in the proposed term loan agreement, revised Plan, or related documents. In fact, as described above, the Debtor and the Bank Group have exchanged drafts of comments and revisions to these key documents, and while there remain points to be negotiated the Debtor believes that these points are not material to the overall transaction and can be resolved in a manner acceptable to both parties.

19. The only "deal point" that the Debtor is aware of that the Bank Group will not agree to is the Debtor's simple proposal to address Houlihan's fees like any other professional.

It could be implied from the Bank Group's Notice that the number of open "deal points" are numerous. Yet this is the only issue that the Bank Group mentioned when it announced it will "not work further on documents or pleadings at this point."

20. More importantly, the Debtor submits that the Bank Group's characterization of the Houlihan issue as an open "deal point" is inconsistent with the express provisions of the Term Sheet and with the settlement embodied therein. Mr. Gaffney's emails of April 18 state that "***the Bank group will not proceed to confirmation without their professional fees being resolved***." Exhibit B (emphasis added). As described above, however, the Bank Group's position contradicts the express provisions of the Term Sheet. To reiterate, the first page of the Term Sheet states that the Bank Group's allowed claim will include "***reasonable and actual fees and expenses of the restructuring professionals of the Administrative Agent and Lenders in an amount agreed upon by the parties or determined by the Bankruptcy Court***, which Allowed Claim will be reduced by the Effective Date Cash Payment as provided below." Term Sheet, pg. 1 (emphasis added).

21. The Term Sheet, by its own terms, contemplates the exact process for treating the professional fee component of the Bank Group's allowed claim as proposed by the Debtor. By providing that the Bank Group's professional fees will be in an amount either agreed to by the parties or as determined by the Court, the Bank Group committed itself to a transparent process for handling any fee dispute - which is the filing of fee applications subject to review by the Debtor, the US Trustee, other parties in interest and ultimate review and approval by the Court. This is the same process that all of the Debtor's professionals must comply with, and the Debtor has not attempted to condition the implementation of the Term Sheet by forcing the Bank Group to agree to approval of its fees or waive any objections thereto. Such a demand by the Debtor

would simply be inappropriate and potentially sanctionable. Frankly, the Debtor is unable to reconcile the Bank Group's statement that the professional fee component of its claim must be resolved before confirmation with the express provisions of the Term Sheet or long standing, and widely accepted, practices in any large Chapter 11 case. In short, the Bank Group's recently stated position contradicts the explicit and unambiguous provisions agreed to in the Term Sheet for dealing with professional fee claims.

22. This conclusion is highlighted by what the Term Sheet does not say. The Term Sheet does not provide that a final determination as to the Bank Group's professional fees is a condition to confirmation of the Plan, or that a condition to confirmation is the payment of professional fees to the Bank Group in an amount certain. Instead, the Term Sheet provides that the Bank Group's professional fees will either be subject to agreement or determined by the Court.

**Conclusion**

23. In conclusion, the Debtor believes that the "dispute" alluded to in the Bank Group Notice relates to only one issue - the process for determining the extent to which Houlihan's fees and expenses may be allowed as part of the Bank Group's claim. Contrary to the statements set forth in the Notice, the Debtor submits that this issue is addressed in the Term Sheet, and that the Bank Group's unwillingness to agree to the Debtor's proposal to address this issue contradicts the provisions of the Term Sheet.

24. Finally, the Debtor submits that by agreeing to the provisions of the Term Sheet and filing it with the Court as representing the form of a global settlement, that the parties have submitted themselves to the jurisdiction of this Court to enter an order confirming a plan consistent with the provisions of the Term Sheet. Given the short statement in the Notice, it is

clear that the hearing scheduled for April 25 will not address Plan confirmation as scheduled. The Debtor respectfully requests, however, that the Court treat that hearing as a status hearing to discuss the confirmation process and to enter an order requiring the parties to comply with the following procedures, subject to the Court's calendar, to resolve any remaining issues and reach confirmation:

      A.    If the parties cannot reach a consensual agreement concerning the necessary documents by April 25, 2011, the Court will set a deadline by which both parties will submit to the Court all documents and agreements necessary to implement the Term Sheet, including proposed drafts of a revised Plan, confirmation order, findings of fact and conclusions of law, term loan agreement, settlement agreement, and any related and necessary documents;

      B.    If the parties have any remaining disputes following the filing of such documents, the Court will hold a hearing to resolve such disputes in accordance with the provisions of the Term Sheet. Following such hearing, the Court may enter an order confirming the Plan consistent with its resolution of any remaining disputes;

      C.    Upon entry of an order confirming the Plan, the Debtor will deposit the full claimed amount of the Houlihan fee with BofA. That fee will be held by BofA and not applied to the Bank Group claim until Houlihan files a final fee application, subject to notice and a hearing concerning the allowance of such claim; and

      D.    Upon entry of an order by this Court allowing the Houlihan claim in full or in part, BofA will be permitted to apply the allowed amount of such claim to the Bank Group's allowed claim.

Dated this 19th day of April, 2011.

                              **Squire, Sanders & Dempsey (US) LLP**

                              By: */s/ Craig D. Hansen*
                              Craig D. Hansen, Esq.
                              Sean T. Cork, Esq.
                              Kelly Singer, Esq.
                              1 East Washington St., Suite 2700
                              Phoenix, Arizona  85004-4498

                              Counsel to Debtor-In-Possession

A copy of the foregoing Emailed this 19th day of April, 2011 to the parties listed below:

| Name | Contact | E-mail |
|---|---|---|
| Blue Cross Blue Shield Of Arizona, Inc. | Nancy J. March | nmarch@dmyl.com |
| | Cody J. Jess | ecfdocket@swazlaw.com |
| Gabriel Silva | Dale C. Schian | |
| Ira A. Fulton & Mary Lou Fulton Family Trust | Joel E. Sannes | jsannes@lakeandcobb.com |
| Maricopa County Treasurer | Madeleine Wanslee | mwanslee@gustlaw.com |
| New Home Interiors | Karen A. Paleck | karen@paleceklaw.com |
| Pinal County Treasurer | Richard V. Husk | rick.husk@pinalcountyaz.gov |
| SEC Pacific Regional Office | Sandra W Lavigna | lavignas@sec.gov |
| U. S. Trustee's Office | Larry L. Watson | Larry.Watson@Usdoj.Gov |
| | Arturo A. Thompson | Athompson@Polsinelli.Com |
| | John J. Hebert | Jhebert@Polsinelli.Com |
| | Mark W. Roth | Mroth@Polsinelli.Com |
| Polsinelli Shughart P.C. | Philip R. Rudd | Prudd@Polsinelli.Com |
| Burch & Cracchiolo P.A. | M. Brennan Ray | Bray@Bcattorneys.Com |
| | Christopher H. Bayley | cbayley@swlaw.com |
| | Lori A. Lewis | llewis@swlaw.com |
| | Steven D. Jerome | sjerome@swlaw.com |
| | Evans O'brian | eobrian@swlaw.com |
| | Donald L. Gaffney | dgaffney@swlaw.com |
| SNELL & WILMER L.L.P. | Don Bivens | dbivens@swlaw.com |
| CURTIS, GOODWIN, SULLIVAN, UDALL & SCHWAB, P.L.C. | Larry K. Udall | ludall@cgsuslaw.com |
| Fulton Homes Sales Corporation | Michael W. Carmel | michael@mcarmellaw.com |
| Fulton Homes Corporation | Steven Walters | SWalters@fultonhomes.com |

# EXHIBIT A

## BANK GROUP ESTIMATED PROFESSIONAL EXPENSES

Fulton Homes Corporation
Estimate of fees, cost and expenses to March 31, 2011

### Lender's Fees

| | | |
|---|---:|---:|
| Facility Fee | | |
| period of 01/01/2009 to 10/01/2010 | $ | 738,082.46 |
| Collaterization Fee | $ | 225,000.00 |
| **Lender's Fees:** | **$** | **963,082.46** |

### Cost and Expenses:

| | |
|---|---:|
| Legal Fees | 2,250,716.03 |
| Appraisal Fees: | 147,380.00 |
| Financial Advisory & Consulting Services (FTI) | 2,154,774.34 |
| Financial Advisors (Houlihan Lokey) | 1,176,756.27 |
| Inspection | $23,250.00 |
| Other: (Title, Escrow) | 3,336.00 |
| Estimate of Title Closing Cost: | 171,379.98 |
| **Cost and Expenses** | **5,927,592.62** |
| **Total Fees:** | **$ 6,890,675.08** |

**Persuant to certain Letter dated May 5, 20000**

| | | |
|---|---:|---:|
| Agency Fee due to BANA as Agent Bank | $ | 295,233.02 |
| **Total Estimate of Fees** | | **$ 7,185,908.10** |

# Exhibit B

## Emails Between Don Gaffney, Craig Hansen and Sean Cork dated April 18, 2011

## Cork, Sean T.

**From:** Hansen, Craig D.
**Sent:** Monday, April 18, 2011 12:17 PM
**To:** Gaffney, Don; Cork, Sean T.; Steltenpohl, Justin D.; Singer, Kelly E.
**Cc:** Sprentall, Dave; Ennis, Donald; Michael Carmel
**Subject:** RE: Fulton

Again, we will give you the opportunity to argue that point as well before Judge Nielsen. Thanks.

---

**From:** Gaffney, Don [mailto:dgaffney@swlaw.com]
**Sent:** Monday, April 18, 2011 12:15 PM
**To:** Hansen, Craig D.; Cork, Sean T.; Steltenpohl, Justin D.; Singer, Kelly E.
**Cc:** Sprentall, Dave; Ennis, Donald; Michael Carmel
**Subject:** RE: Fulton

Attaching settlement discussion emails are not allowable. I will let you know who our suggested mediators are.

---

**From:** Hansen, Craig D. [mailto:Craig.Hansen@ssd.com]
**Sent:** Monday, April 18, 2011 12:12 PM
**To:** Gaffney, Don; Cork, Sean T.; Steltenpohl, Justin D.; Singer, Kelly E.
**Cc:** Sprentall, Dave; Ennis, Donald; Michael Carmel
**Subject:** RE: Fulton

That's ok. We will file a short pleading and attach the e-mails below so that the Court fully and "clearly" understands the Lenders position. Thanks.

---

**From:** Gaffney, Don [mailto:dgaffney@swlaw.com]
**Sent:** Monday, April 18, 2011 12:09 PM
**To:** Cork, Sean T.; Hansen, Craig D.; Steltenpohl, Justin D.; Singer, Kelly E.
**Cc:** Sprentall, Dave; Ennis, Donald; Michael Carmel
**Subject:** RE: Fulton

We will not be working further on documents or pleadings at this point and will so inform the Court.

---

**From:** Cork, Sean T. [mailto:Sean.Cork@ssd.com]
**Sent:** Monday, April 18, 2011 12:06 PM
**To:** Hansen, Craig D.; Gaffney, Don; Steltenpohl, Justin D.; Singer, Kelly E.
**Cc:** Sprentall, Dave; Ennis, Donald; Michael Carmel
**Subject:** RE: Fulton

As a follow-on to Craig's email, the term sheet expressly provides that the Bank Group's allowed claim will include professional fees "in an amount agreed upon by the parties or determined by the Bankruptcy Court." If there is no agreement on that portion of the professional fees relating solely to Houlihan, then the Court will have to determine it, as the term sheet provides.

---

**From:** Hansen, Craig D.
**Sent:** Monday, April 18, 2011 12:04 PM

**To:** Gaffney, Don; Cork, Sean T.; Steltenpohl, Justin D.; Singer, Kelly E.
**Cc:** Sprentall, Dave; Ennis, Donald; Michael Carmel
**Subject:** RE: Fulton

And we just want Judge Nielsen to have a very clear understanding of the position of the Lenders here, as you so clearly articulated in the e-mail below. And unless Fulton begs off being able to review and potentially challenge the Houlihan fee, we going to tee this up before Nielsen very quickly. Fulton will live with what Nielsen has to say about the Lenders position as, as suspect, the Lenders will.

---

**From:** Gaffney, Don [mailto:dgaffney@swlaw.com]
**Sent:** Monday, April 18, 2011 11:49 AM
**To:** Cork, Sean T.; Hansen, Craig D.; Steltenpohl, Justin D.; Singer, Kelly E.
**Cc:** Sprentall, Dave; Ennis, Donald
**Subject:** RE: Fulton

Perhaps I am not being clear, although I said this in my emails last Monday. This is a deal point. We will not go forward with settlement. There will not be an "argument raised with the Court" on this subject, or if you want to do so, I would like to be informed in what context since it will not be in the contexyt of a consensual plan.

---

**From:** Cork, Sean T. [mailto:Sean.Cork@ssd.com]
**Sent:** Monday, April 18, 2011 11:43 AM
**To:** Gaffney, Don; Hansen, Craig D.; Steltenpohl, Justin D.; Singer, Kelly E.
**Cc:** Sprentall, Dave; Ennis, Donald
**Subject:** RE: Fulton

Don, we will forward your email to our client. That said, we don't see that this should come as a surprise based on our prior email exchanges and documents. If we cannot get this resolved we expect plan to address this specific issue with Judge Nielsen next Monday, and you will have an opportunity to raise this argument to the court at that time.

---

**From:** Gaffney, Don [mailto:dgaffney@swlaw.com]
**Sent:** Monday, April 18, 2011 10:35 AM
**To:** Hansen, Craig D.; Cork, Sean T.; Steltenpohl, Justin D.; Singer, Kelly E.
**Cc:** Sprentall, Dave; Ennis, Donald
**Subject:** Fulton

Gentlemen: As I indicated last Monday, the Bank group will not proceed to confirmation without their professional fees being resolved. Consequently, I was more than a little surprised that the documents received on Friday did not reflect my communications earlier in the week. In case I had any misperception of my clients' position, I have just spoken with the bankers again this morning and have confirmed their position; I left a voicemail wih Sean to that effect. Lenders' fees are, of course, reimburseable in a fully insolvent estate. Moreover, the settlement covers resolution of non-debtor entities. Avenues exist to get this problem dealt with quickly, but we do not have much time to do so. The full bank group authorization has gone out, and some key bankers are out on vacation starting tomorrow. Please let me know how you wish to proceed.

Donald L. Gaffney
Snell & Wilmer L.L.P.
One Arizona Center
400 East Van Buren
Phoenix, AZ 85004-2202
Telephone: (602) 382-6254
Facsimile: (602) 382-6070
Internet: dgaffney@swlaw.com

4/19/2011


The information contained in this electronic mail message is confidential information intended only for the use of the individual or entity named above, and may be privileged. If the reader of this message is not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone (602-382-6000), and delete the original message. Thank you.

CIRCULAR 230 DISCLAIMER: To ensure compliance with Treasury Regulations governing written tax advice, please be advised that any tax advice included in this communication, including any attachments, is not intended, and cannot be used, for the purpose of (i) avoiding any federal tax penalty or (ii) promoting, marketing, or recommending any transaction or matter to another person.

------------------------------------------------------------------------

This message is confidential and may be legally privileged or otherwise protected from disclosure. If you are not the intended recipient, please telephone or email the sender and delete this message and any attachment from your system; you must not copy or disclose the contents of this message or any attachment to any other person.

Squire, Sanders & Dempsey (US) LLP is part of the international legal practice Squire, Sanders & Dempsey, which operates worldwide through a number of separate legal entities. Please visit www.ssd.com for more information.

#SSDUS
------------------------------------------------------------------------